## **<u>EXHIBIT D</u>**
Debtor's 10-K

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 10-K**

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2019**
**or**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the transition period from_____to_____**

**Commission File Number: 001-37857**

# Medley LLC
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **27-2437343** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |

**280 Park Avenue, 6th Floor East**
**New York, New York 10017**
**(Address of principal executive offices)(Zip Code)**

**(212) 759-0777**
**(Registrant's telephone number, including area code)**

**Securities registered pursuant to Section 12 (b) of the Act:**

| **(Title of each class)** | **(Name of each exchange on which registered)** |
|---|---|
| **6.875% Notes due 2026** | **New York Stock Exchange** |
| **7.25% Notes due 2024** | **New York Stock Exchange** |

**Securities registered pursuant to Section 12(g) of the Act:**

**None**

Indicate by check mark if the registrant is a well-known seasoned issuer as defined in Rule 405 of the Securities Act.    Yes  ☐    No  ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.    Yes  ☐    No  ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes  ☒    No  ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).  Yes  ☒    No  ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer", "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes  ☐    No  ☒

As of March 20, 2020, 30,221,518 units of membership interests in Medley LLC were outstanding. There is no trading market for Medley LLC's units of membership interests.

DOCUMENTS INCORPORATED BY REFERENCE

Items 10, 11, 12, 13 and 14 of Part III of this Annual Report on Form 10-K incorporate information by reference from Medley Management Inc.'s definitive proxy statement relating to Medley Management Inc.'s 2020 annual meeting of stockholders to be filed with the Securities and Exchange Commission within 120 days after the close of the registrant's fiscal year.

**TABLE OF CONTENTS**

|  |  | **Page** |
|---|---|---|
| **Part I.** |  |  |
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 14 |
| Item 1B. | Unresolved Staff Comments | 39 |
| Item 2. | Properties | 39 |
| Item 3. | Legal Proceedings | 39 |
| Item 3A. | Executive Officers of the Registrant | 43 |
| Item 4. | Mine safety Disclosures | 44 |
| **Part II.** |  |  |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 44 |
| Item 6. | Selected Financial Data | 44 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 47 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 72 |
| Item 8. | Financial Statements and Supplementary Data | 75 |
| Item 9. | Changes and Disagreements with Accountants on Accounting and Financial Disclosure | 84 |
| Item 9A. | Controls and Procedures | 84 |
| **Part III** |  |  |
| Item 10. | Directors, Executive Officers and Corporate Governance | 85 |
| Item 11. | Executive Compensation | 85 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 85 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 85 |
| Item 14. | Principal Accounting Fees and Services | 85 |
| **Part IV.** |  |  |
| Item 15. | Exhibits, Financial Statement Schedules | 85 |
| Item 16 | Form 10-K Summary | 89 |
| Signatures |  | 89 |

**FORWARD-LOOKING STATEMENTS**

This Annual Report on Form 10-K ("Form 10-K") contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended (the "Securities Act"), and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), that reflect our current views with respect to, among other things, our operations and financial performance. Forward-looking statements include all statements that are not historical facts. In some cases, you can identify these forward-looking statements by the use of words such as "outlook," "believes," "expects," "potential," "may," "should," "could," "seeks," "approximately," "predicts," "intends," "plans," "estimates," "anticipates" or the negative version of these words or other comparable words. Such forward-looking statements are subject to various risks and uncertainties. Accordingly, there are or will be important factors that could cause actual outcomes or results to differ materially from those indicated in these statements. We believe these factors include, but are not limited to, those described under Part I, Item 1A. "Risk Factors," which include, but are not limited to, the following:

- difficult market and political conditions may adversely affect our business in many ways, including by reducing the value or hampering the performance of the investments made by our funds, each of which could materially and adversely affect our business, results of operations and financial condition;

- our business may be adversely affected by the recent coronavirus outbreak;

- we derive a substantial portion of our revenues from funds managed pursuant to advisory agreements that may be terminated or fund partnership agreements that permit fund investors to remove us as the general partner;

- we may not be able to maintain our current fee structure as a result of industry pressure from fund investors to reduce fees, which could have an adverse effect on our profit margins and results of operations;

- a change of control of us could result in termination of our investment advisory agreements;

- the historical returns attributable to our funds should not be considered as indicative of the future results of our funds;

- if we are unable to consummate or successfully integrate development opportunities, acquisitions or joint ventures, we may not be able to implement our growth strategy successfully;

- we depend on third-party distribution sources to market our investment strategies;

- an investment strategy focused primarily on privately held companies presents certain challenges, including the lack of available information about these companies;

- our funds' investments in investee companies may be risky, and our funds could lose all or part of their investments;

- prepayments of debt investments by our investee companies could adversely impact our results of operations;

- our funds' investee companies may incur debt that ranks equally with, or senior to, our funds' investments in such companies;

- subordinated liens on collateral securing loans that our funds make to their investee companies may be subject to control by senior creditors with first priority liens and, if there is a default, the value of the collateral may not be sufficient to repay in full both the first priority creditors and our funds;

- there may be circumstances where our funds' debt investments could be subordinated to claims of other creditors or our funds could be subject to lender liability claims;

- our funds may not have the resources or ability to make additional investments in our investee companies;

- economic recessions or downturns could impair our investee companies and harm our operating results;

- a covenant breach by our investee companies may harm our operating results;

- the investment management business is competitive;

- our funds operate in a competitive market for lending that has recently intensified, and competition may limit our funds' ability to originate or acquire desirable loans and investments and could also affect the yields of these assets and have a material adverse effect on our business, results of operations and financial condition;

- dependence on leverage by certain of our funds and by our funds' investee companies subjects us to volatility and contractions in the debt financing markets and could adversely affect our ability to achieve attractive rates of return on those investments;

i

- some of our funds may invest in companies that are highly leveraged, which may increase the risk of loss associated with those investments;

- we generally do not control the business operations of our investee companies and, due to the illiquid nature of our investments, may not be able to dispose of such investments;

- a substantial portion of our investments may be recorded at fair value as determined in good faith by or under the direction of our respective funds' boards of directors or similar bodies and, as a result, there may be uncertainty regarding the value of our funds' investments;

- we may need to pay "clawback" obligations if and when they are triggered under the governing agreements with respect to certain of our funds and SMAs;

- our funds may face risks relating to undiversified investments;

- third-party investors in our private funds may not satisfy their contractual obligation to fund capital calls when requested, which could adversely affect a fund's operations and performance;

- our funds may be forced to dispose of investments at a disadvantageous time;

- hedging strategies may adversely affect the returns on our funds' investments;

- our business depends in large part on our ability to raise capital from investors. If we were unable to raise such capital, we would be unable to collect management fees or deploy such capital into investments, which would materially and adversely affect our business, results of operations and financial condition;

- we depend on our senior management team, senior investment professionals and other key personnel, and our ability to retain them and attract additional qualified personnel is critical to our success and our growth prospects;

- our failure to appropriately address conflicts of interest could damage our reputation and adversely affect our business;

- rapid growth of our business may be difficult to sustain and may place significant demands on our administrative, operational and financial resources;

- we may enter into new lines of business and expand into new investment strategies, geographic markets and business, each of which may result in additional risks and uncertainties in our business;

- extensive regulation affects our activities, increases the cost of doing business and creates the potential for significant liabilities and penalties that could adversely affect our business and results of operations;

- failure to comply with "pay to play" regulations implemented by the SEC and certain states, and changes to the "pay to play" regulatory regimes, could adversely affect our business;

- new or changed laws or regulations governing our funds' operations and changes in the interpretation thereof could adversely affect our business;

- present and future business development companies for which we serve as investment adviser are subject to regulatory complexities that limit the way in which they do business and may subject them to a higher level of regulatory scrutiny;

- we are subject to risks in using custodians, counterparties, administrators and other agents;

- a portion of our revenue and cash flow is variable, which may impact our ability to achieve steady earnings growth on a quarterly basis;

- we may be subject to litigation risks and may face liabilities and damage to our professional reputation as a result;

- employee misconduct could harm us by impairing our ability to attract and retain investors and subjecting us to significant legal liability, regulatory scrutiny and reputational harm, and fraud and other deceptive practices or other misconduct at our investee companies could similarly subject us to liability and reputational damage and also harm our business;

- our substantial indebtedness could adversely affect our financial condition, our ability to pay our debts or raise additional capital to fund our operations, our ability to operate our business and our ability to react to changes in the economy or our industry and could divert our cash flow from operations for debt payments;

- servicing our indebtedness will require a significant amount of cash. Our ability to generate sufficient cash depends on many factors, some of which are not within our control;

- despite our current level of indebtedness, we may be able to incur substantially more debt and enter into other transactions, which could further exacerbate the risks to our financial condition;

- operational risks may disrupt our business, result in losses or limit our growth; and

- our ability to realize anticipated cost savings and efficiencies from consolidating our business activities to our New York office.

This Form 10-K also includes "forward-looking" statements, including statements regarding the proposed transactions contemplated by the Amended MDLY Merger Agreement (as defined herein) and the Amended MCC Merger Agreement (as defined herein). Because forward-looking statements, such as the possibility that MDLY may receive competing proposals and the date that the parties expect the proposed transactions to be completed, include risks and uncertainties, actual results may differ materially from those expressed or implied and include, but are not limited to, those discussed in each of Sierra's, MCC's and the MDLY's filings with the SEC, and (i) the satisfaction or waiver of closing conditions relating to the proposed transactions described herein, including, but not limited to, the requisite approvals of the stockholders of each of MDLY, Sierra and MCC; Sierra successfully taking all actions reasonably required with respect to certain outstanding indebtedness of MDLY, the Company and MCC to prevent any material adverse effect relating thereto; certain required approvals of the SEC (including necessary exemptive relief to consummate the merger transactions), the necessary consents of certain third-party advisory clients of the Company; and any applicable waiting period (and any extension thereof) applicable to the transactions under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, shall have expired or been terminated; (ii) the parties' ability to successfully consummate the proposed transactions, and the timing thereof; and (iii) the possibility that competing offers or acquisition proposals related to the proposed transactions will be made and, if made, could be successful. Additional risks and uncertainties specific to the Company include, but are not limited to, (i) the costs and expenses that the Company has, and may incur, in connection with the proposed transactions (whether or not they are consummated); (ii) the impact that any litigation relating to the proposed transactions may have on the Company; (iii) that projections with respect to distributions may prove to be incorrect; (iv) Sierra's ability to invest its portfolio of cash in a timely manner following the closing of the proposed transactions; (v) the market performance of the combined portfolio; (vi) the ability of portfolio companies to pay interest and principal in the future; (vii) the ability of the Company to grow its fee earning assets under management; (viii) whether Sierra, as the surviving company, will trade with more volume and perform better than MDLY prior to the proposed transactions; and (ix) negative effects of entering into the proposed transactions on the trading volume and market price of MDLY's common stock. There can be no assurance of the level of any distributions to be paid, if any, following consummation of the proposed transactions.

These factors should not be construed as exhaustive and should be read in conjunction with the other cautionary statements that are included in this Form 10-K and other reports we file with the Securities and Exchange Commission. Forward-looking statements speak as of the date on which they are made, and we undertake no obligation to publicly update or review any forward-looking statement, whether as a result of new information, future developments or otherwise, except as required by law.

Medley LLC was formed on October 27, 2010 and is the operating company of Medley Management Inc., a public company traded under the symbol "MDLY." Medley Management Inc. is the sole managing member of Medley LLC. Medley Management Inc. was incorporated on June 13, 2014 and commenced operations on September 29, 2014 upon completion of its initial public offering ("IPO") of its Class A common stock. Medley Management Inc.'s sole operating asset is its investment in Medley LLC. Medley Management Inc. is controlled by the pre-IPO owners of Medley LLC.

Unless the context suggests otherwise, references herein to the "Company," "Medley," "we," "us" and "our" refer to Medley LLC and its consolidated subsidiaries.

The "pre-IPO owners" refers to the senior professionals who were the owners of Medley LLC immediately prior to the Offering Transactions. The "Offering Transactions" refer to Medley Management Inc.'s purchase upon the consummation of its IPO of 6,000,000 newly issued limited liability company units (the "LLC Units") from Medley LLC, which correspondingly diluted the ownership interests of the pre-IPO owners in Medley LLC and resulted in Medley Management Inc.'s holding a number of LLC Units in Medley LLC equal to the number of shares of Class A common stock it issued in its IPO.

Unless the context suggests otherwise, references herein to:

- "Aspect" refers to Aspect-Medley Investment Platform A LP;

- "Aspect B" refers to Aspect-Medley Investment Platform B LP;

- "AUM" refers to the assets of our funds, which represents the sum of the NAV of such funds, the drawn and undrawn debt (at the fund level, including amounts subject to restrictions) and uncalled committed capital (including commitments to funds that have yet to commence their investment periods);

iii

- "base management fees" refers to fees we earn for advisory services provided to our funds, which are generally based on a defined percentage of fee earning AUM or, in certain cases, a percentage of originated assets in the case of certain of our SMAs;

- "BDC" refers to business development company;

- "Consolidated Funds" refers to, with respect to periods after December 31, 2013 and before January 1, 2015, MOF II, with respect to periods prior to January 1, 2014, MOF I LP, MOF II and MOF III, subsequent to its formation; and, with respect to periods after May 31, 2017, Sierra Total Return Fund, subsequent to its formation.

- "fee earning AUM" refers to the assets under management on which we directly earn base management fees;

- "hurdle rates" refers to the rates above which we earn performance fees, as defined in the long-dated private funds' and SMAs' applicable investment management or partnership agreements;

- "investee company" refers to a company to which one of our funds lends money or in which one of our funds otherwise makes an investment;

- "long-dated private funds" refers to MOF II, MOF III, MOF III Offshore, MCOF, Aspect, Aspect B and any other private funds we may manage in the future;

- "management fees" refers to base management fees, other management fees and Part I incentive fees;

- "MCOF" refers to Medley Credit Opportunity Fund LP;

- "MDLY" refers to Medley Management Inc.;

- "Medley LLC" refers to Medley LLC and its consolidated subsidiaries;

- "MOF II" refers to Medley Opportunity Fund II LP;

- "MOF III" refers to Medley Opportunity Fund III LP;

- "MOF III Offshore" refers to Medley Opportunity Fund Offshore III LP;

- "our funds" refers to the funds, alternative asset companies and other entities and accounts that are managed or co-managed by us and our affiliates;

- "our investors" refers to the investors in our permanent capital vehicles, our private funds and our SMAs;

- "Part I incentive fees" refers to fees that we receive from our permanent capital vehicles, and since 2017, MCOF and Aspect, which are paid in cash quarterly and are driven primarily by net interest income on senior secured loans subject to hurdle rates. As it relates to Medley Capital Corporation (NYSE: MCC) (TASE:MCC) ("MCC"), these fees are subject to netting against realized and unrealized losses;

- "Part II incentive fees" refers to fees related to realized capital gains in our permanent capital vehicles;

- "performance fees" refers to incentive allocations in our long-dated private funds and incentive fees from our SMAs, which are typically 15% to 20% of the total return after a hurdle rate, accrued quarterly, but paid after the return of all invested capital and in an amount sufficient to achieve the hurdle rate;

- "permanent capital" refers to capital of funds that do not have redemption provisions or a requirement to return capital to investors upon exiting the investments made with such capital, except as required by applicable law, which funds currently consist of MCC, Sierra Total Return Fund ("STRF") and Sierra Income Corporation ("SIC" or "Sierra"). Such funds may be required, or elect, to return all or a portion of capital gains and investment income. In certain circumstances, the investment adviser of such a fund may be removed;

- "SMA" refers to a separately managed account; and

- "standalone" refers to our financial results without the consolidation of any fund(s).

**PART I.**

**Item 1.    Business**

**Overview**

We are an alternative asset management firm offering yield solutions to retail and institutional investors. We focus on credit-related investment strategies, primarily originating senior secured loans to private middle market companies in the United States that have revenues between $50 million and $1 billion. We generally hold these loans to maturity. Our national direct origination franchise provides capital to the middle market in the U.S. For over 18 years, we have provided capital to over 400 companies across 35 industries in North America.

We manage three permanent capital vehicles, two of which are Business Development Companies "BDCs", and a credit interval fund, as well as long-dated private funds and Separately Managed Accounts ("SMAs"), with a primary focus on senior secured credit. As of December 31, 2019, we had $4.1 billion of AUM in two business development companies, MCC and SIC, as well as private investment vehicles. Our compounded annual AUM growth rate from December 31, 2010 through December 31, 2019 was 17%, and our compounded annual Fee Earning AUM growth rate was 10%, which have both been driven in large part by the growth in our permanent capital vehicles. Typically the investment periods of our institutional commitments range from 18 to 24 months and we expect our Fee Earning AUM to increase as capital commitments included in AUM are invested.

In general, our institutional investors do not have the right to withdraw capital commitments and to date we have not experienced any withdrawals of capital commitments. For a description of the risk factor associated with capital commitments, see *"Risk Factors — Third-party investors in our private funds may not satisfy their contractual obligation to fund capital calls when requested, which could adversely affect a fund's operations and performance."*

The diagram below presents the historical correlation between growth in our AUM, fee earning AUM and management fees.



[1] Presented on a standalone basis

Direct origination, credit structuring and active monitoring of the loan portfolios we manage are important success factors in our business, which can be adversely affected by difficult market and political conditions, such as the turmoil in the global capital markets from 2007 to 2009 and the ongoing after-effects including market turbulence and volatility. Since our inception in 2006, we have adhered to a disciplined investment process that employs these principles with the goal of delivering strong risk-adjusted investment returns while protecting investor capital. Our focus on protecting investor capital is reflected in our investment strategy; at December 31, 2019, approximately 67% of the combined portfolios investments were in first lien positions. We believe that our ability to directly originate, structure and lead deals enables us to consistently lend at higher yields with better terms. In addition, the loans we manage generally have a contractual maturity between three and seven years and are typically floating rate

(at December 31, 2019, approximately 83% of the loans we manage, based on aggregate principal amount, bore interest at floating rates), which we believe positions our business well for rising interest rates.

Our senior management team has on average over 20 years of experience in credit, including originating, underwriting, principal investing and loan structuring. As of December 31, 2019, we had 65 employees, including 29 investment, origination and credit management professionals, and 36 operations, accounting, legal, compliance and marketing professionals, each with extensive experience in their respective disciplines.

**Our Funds**

We provide our credit-focused investment strategies through various funds and products that meet the needs of a wide range of retail and institutional investors.

Except as otherwise described herein with respect to our BDCs, our investment funds themselves do not register as investment companies under the Investment Company Act of 1940, as amended (the "Investment Company Act"), in reliance on Section 3(c)(1), Section 3(c)(7) or Section 7(d) thereof. Section 3(c)(7) of the Investment Company Act exempts from the Investment Company Act's registration requirements investment funds privately placed in the United States whose securities are owned exclusively by persons who, at the time of acquisition of such securities, are "qualified purchasers" as defined under the Investment Company Act. Section 3(c)(1) of the Investment Company Act exempts from the Investment Company Act's registration requirements privately placed investment funds whose securities are beneficially owned by not more than 100 persons. In addition, under certain current interpretations of the SEC, Section 7(d) of the Investment Company Act exempts from registration any non-U.S. investment fund all of whose outstanding securities are beneficially owned either by non-U.S. residents or by U.S. residents that are qualified purchasers and purchase their interests in a private placement. Certain subsidiaries of Medley LLC typically serve as an investment adviser for our funds and are registered under the Advisors Act. Our funds' investment advisers or one of their affiliates are entitled to management fees, performance fees and/or incentive fees from each investment fund to which they serve as investment advisers. For a discussion of the fees to which our funds' investment advisers are entitled across our various types of funds, please see *"Business — Fee Structure."*

*Medley Capital Corporation*

We launched MCC (NYSE:MCC) (TASE:MCC), our first permanent capital vehicle, in 2011 as a BDC. MCC has grown to become a BDC with approximately $0.4 billion in AUM as of December 31, 2019. MCC has demonstrated an 8% compounded annual growth rate of AUM from inception through December 31, 2019.

*Sierra Income Corporation*

We launched SIC, our first public non-traded permanent capital vehicle, in 2012 as a BDC. As of December 31, 2019, AUM has grown to $1.1 billion, and has demonstrated an 86% compounded annual growth rate of AUM from inception through December 31, 2019.

*Sierra Total Return Fund*

We launched STRF (NASDAQ:SRNTX), our first interval fund, in January 2017. STRF is a continuously offered, non-diversified, closed-end investment management company that is operated as an interval fund. The fund commenced investment operations in June 2017.

*Long-Dated Private Funds*

We launched MOF I, our first long-dated private fund, in 2006, MOF II, our second long-dated private fund, in 2010, MOF III, our third long-dated private fund, in 2014, MCOF and Aspect, our fourth and fifth long-dated private funds, respectively, in 2016, and MOF III Offshore, our sixth long-dated private fund, in 2017. In 2018, we launched Aspect B. Our long-dated private funds are managed through partnership structures, in which limited partnerships organized by us accept commitments or funds for investment from institutional investors and high net worth individuals, and a general partner makes all policy and investment decisions, including selection of investment advisers. Affiliates of Medley LLC serve as the general partners and investment advisers to our long-dated private funds. The limited partners of our long-dated private funds take no part in the conduct or control of the business of such funds, have no right or authority to act for or bind such funds and have no influence on the voting or disposition of the securities or assets held by such funds, although limited partners often have the right to remove the general partner or cause an early liquidation by super-majority vote. As our long-dated private funds are closed-ended, once an investor makes an investment, the investor is generally not able to withdraw or redeem its interest, except in very limited circumstances.

*Separately Managed Accounts (SMAs)*

We launched our first SMA in 2010 and currently manage twelve SMAs. In the case of our SMAs, the investor, rather than us, dictates the risk tolerances and target returns of the account. We act as an investment adviser registered under the Advisers Act for these accounts. The accounts offer customized solutions for liability driven investors such as insurance companies and typically offer attractive returns on risk based capital.

## Fee Structure

We earn management fees at an annual rate of 0.75% to 2.00% and may earn performance fees, which may be in the form of an incentive fee or carried interest, in the event that specified investment returns are achieved by the fund or SMA. Management fees are generally based on a defined percentage of (1) average or total gross assets, including assets acquired with leverage, (2) total commitments, (3) net invested capital (4) NAV, or (5) lower of cost or market value of a fund's portfolio investments. Management fees are calculated quarterly and are paid in cash in advance or in arrears depending on each specific fund or SMA. We earn incentive fees on our permanent capital vehicles and earn incentive fees on certain of our long-dated private funds. In addition, we may earn additional carried interest performance fees on our long-dated private funds and SMAs that are typically 15% to 20% of the total return over a 6% to 8% annualized preferred return.

*Medley Capital Corporation*

Pursuant to the investment management agreement between MCC and our affiliate, MCC Advisors LLC, MCC Advisors LLC receives a base management fee and a two-part incentive fee. Effective January 1, 2016, pursuant to a fee waiver executed by MCC Advisors LLC on February 8, 2016, the base management fee is calculated at an annual rate of 1.75% of MCC's gross assets up to $1.0 billion and 1.50% on MCC's gross assets over $1.0 billion, and is payable quarterly in arrears (the "Reduced Base Management Fee"). The Reduced Base Management Fee is calculated based on the average value of MCC's gross assets at the end of the two most recently completed calendar quarters and will be appropriately pro-rated for any partial quarter. Prior to January 1, 2016, the MCC base management fee was calculated at an annual rate of 1.75% of MCC's gross assets. The base management fee was calculated based on the average value of MCC's gross assets at the end of the two most recently completed calendar quarters.

The two components of the MCC incentive fee are described below.

- The first component of the MCC incentive fee is the Part I incentive fee. Effective January 1, 2016, the incentive fee based on net investment income is reduced from 20.0% on pre-incentive fee net investment income over a fixed hurdle rate of 2.0% per quarter, to 17.5% on pre-incentive fee net investment income over a fixed hurdle rate of 1.5% per quarter. Moreover, the incentive fee based on net investment income is determined and paid quarterly in arrears at the end of each calendar quarter by reference to our aggregate net investment income, as adjusted, as described below (the "Reduced Incentive Fee on Net Investment Income"), from the calendar quarter then ending and the eleven preceding calendar quarters (or if shorter, the number of quarters that have occurred since January 1, 2016). We refer to such period as the "Trailing Twelve Quarters." The hurdle amount for the Reduced Incentive Fee on Net Investment Income is determined on a quarterly basis, and is equal to 1.5% multiplied by MCC's net assets at the beginning of each applicable calendar quarter comprising the relevant Trailing Twelve Quarters. The hurdle amount is calculated after making appropriate adjustments to MCC's net assets, as determined as of the beginning of each applicable calendar quarter, in order to account for any capital raising or other capital actions as a result of any issuances by MCC of its common stock (including issuances pursuant to MCC's dividend reinvestment plan), any repurchase by MCC of its own common stock, and any dividends paid by MCC, each as may have occurred during the relevant quarter. Any Reduced Incentive Fee on Net Investment Income is paid to MCC Advisors LLC on a quarterly basis, and is based on the amount by which (A) aggregate net investment income ("Ordinary Income") in respect of the relevant Trailing Twelve Quarters exceeds (B) the hurdle amount for such Trailing Twelve Quarters. The amount of the excess of (A) over (B) described in this paragraph for such Trailing Twelve Quarters is referred to as the "Excess Income Amount." For the avoidance of doubt, Ordinary Income is net of all fees and expenses, including the Reduced Base Management Fee but excluding any incentive fee on pre-incentive fee net investment income or on MCC's capital gains.

The Reduced Incentive Fee on Net Investment Income for each quarter is determined as follows:

- No incentive fee based on net investment income is payable to MCC Advisors LLC for any calendar quarter for which there is no Excess Income Amount;

- 100% of the Ordinary Income, if any, that exceeds the hurdle amount, but is less than or equal to an amount, which we refer to as the "Catch-up Amount," determined as the sum of 1.8182% multiplied by MCC's net assets at the beginning of each applicable calendar quarter, as adjusted as noted above, comprising the relevant Trailing Twelve Quarters is included in the calculation of the Reduced Incentive Fee on Net Investment Income; and

3

- 17.5% of the Ordinary Income that exceeds the Catch-up Amount is included in the calculation of the Reduced Incentive Fee on Net Investment Income.

The amount of the Reduced Incentive Fee on Net Investment Income that is paid to MCC Advisors LLC for a particular quarter equals the excess of the incentive fee so calculated minus the aggregate incentive fees based on income that were paid in respect of the first eleven calendar quarters (or the portion thereof) included in the relevant Trailing Twelve Quarters but not in excess of the Incentive Fee Cap (as described below).

The Reduced Incentive Fee on Net Investment Income that is paid to MCC Advisors LLC for a particular quarter is subject to a cap (the "Incentive Fee Cap"). The Incentive Fee Cap for any quarter is an amount equal to (a) 17.5% of the Cumulative Net Return (as defined below) during the relevant Trailing Twelve Quarters minus (b) the aggregate incentive fees based on net investment income that was paid in respect of the first eleven calendar quarters (or a portion thereof) included in the relevant Trailing Twelve Quarters.

"Cumulative Net Return" means (X) the Ordinary Income in respect of the relevant Trailing Twelve Quarters minus (Y) any Net Capital Loss (as defined below), if any, in respect of the relevant Trailing Twelve Quarters. If, in any quarter, the Incentive Fee Cap is zero or a negative value, MCC pays no incentive fee based on net investment income to MCC Advisors for such quarter. If, in any quarter, the Incentive Fee Cap for such quarter is a positive value but is less than the Reduced Incentive Fee based on Net Investment Income that is payable to MCC Advisors for such quarter (before giving effect to the Incentive Fee Cap) calculated as described above, MCC pays a Reduced Incentive Fee on Net Investment Income to MCC Advisors equal to the Incentive Fee Cap for such quarter. If, in any quarter, the Incentive Fee Cap for such quarter is equal to or greater than the Reduced Incentive Fee on Net Investment Income that is payable to MCC Advisors for such quarter (before giving effect to the Incentive Fee Cap) calculated as described above, MCC pays a Reduced Incentive Fee on Net Investment Income to MCC Advisors, calculated as described above, for such quarter without regard to the Incentive Fee Cap.

"Net Capital Loss" in respect of a particular period means the difference, if positive, between (i) aggregate capital losses, whether realized or unrealized, and dilution to MCC's net assets due to capital raising or capital actions, in such period and (ii) aggregate capital gains, whether realized or unrealized and accretion to MCC's net assets due to capital raising or capital action, in such period.

Dilution to MCC's net assets due to capital raising is calculated, in the case of issuances of common stock, as the amount by which the net asset value per share was adjusted over the transaction price per share, multiplied by the number of shares issued. Accretion to MCC's net assets due to capital raising is calculated, in the case of issuances of common stock (including issuances pursuant to our dividend reinvestment plan), as the excess of the transaction price per share over the amount by which the net asset value per share was adjusted, multiplied by the number of shares issued. Accretion to MCC's net assets due to other capital action is calculated, in the case of repurchases by MCC of its own common stock, as the excess of the amount by which the net asset value per share was adjusted over the transaction price per share multiplied by the number of shares repurchased by MCC.

The purpose of changing the fee structure was to permanently reduce aggregate fees payable to MCC Advisors by MCC. Beginning January 1, 2016, in order to ensure that MCC pays MCC Advisors aggregate fees on a cumulative basis under the new fee structure that are less than the aggregate fees otherwise due under the management agreement, at the end of each quarter, MCC Advisors calculates aggregate base management fees and incentive fees on net investment income under both the new fee structure and the fee structure under the management agreement, and if, at any time after January 1, 2016, the aggregate fees on a cumulative basis under the new fee structure would be greater than the aggregate fees on a cumulative basis under the fee structure under the management agreement, MCC Advisors is only entitled to the lesser of those two amounts. Since the hurdle rate is fixed, if and as interest rates rise, it would be more likely that we would surpass the hurdle rate and receive an incentive fee based on net investment income.

Prior to January 1, 2016, the Part I incentive fee was payable quarterly in arrears and was 20.0% of MCC's pre-incentive fee net investment income for the immediately preceding calendar quarter subject to a 2.0% (which was 8.0% annualized) hurdle rate and a "catch-up" provision measured as of the end of each calendar quarter. Under the hurdle rate and catch-up provisions, in any calendar quarter, we received no incentive fee until MCC's net investment income equaled the hurdle rate of 2.0%, but then received, as a "catch-up," 100% of MCC's pre-incentive fee net investment income with respect to that portion of such pre-incentive fee net investment income, if any, that exceeded the hurdle rate but was less than 2.5%. The effect of this provision was that, if pre-incentive fee net investment income exceeded 2.5% in any calendar quarter, MCC Advisors LLC would receive 20.0% of MCC's pre-incentive fee net investment income as if the hurdle rate did not apply. For this purpose, pre-incentive fee net investment income meant interest income, dividend income and any other income including any other fees (other than fees for providing managerial assistance), such as commitment, origination, structuring, due diligence and consulting fees or other fees that MCC received from portfolio companies accrued during the calendar quarter, minus MCC's operating expenses for the quarter including the base management fee, expenses payable to MCC Advisors LLC, and any interest expense and any dividends paid on any issued

and outstanding preferred stock, but excluding the incentive fee. Pre-incentive fee net investment income included, in the case of investments with a deferred interest feature (such as original issue discount, debt instruments with payment-in-kind interest and zero coupon securities), accrued income that we had not yet received in cash.

- The second component of the MCC incentive fee, the Part II incentive fee, is determined and payable in arrears as of the end of each calendar year (or upon termination of the investment management agreement as of the termination date), and equals 20.0% of MCC's cumulative aggregate realized capital gains less cumulative realized capital losses, unrealized capital depreciation (unrealized depreciation on a gross investment-by-investment basis at the end of each calendar year) and all capital gains upon which prior performance-based capital gains incentive fee payments were previously made to MCC Advisors LLC.

Entities controlled by former employees held limited liability company interests in MCC Advisors LLC that entitled them to approximately 4.86% of the net incentive fee income through October 29, 2015 and an additional 5.75% of the net incentive fee income through August 20, 2016 from MCC Advisors LLC. Since August 20, 2016 and going forward, we are entitled to all of the management fees paid to MCC Advisors LLC. We may have similar arrangements with respect to the ownership of the entities that advise our BDCs in the future.

*Sierra Income Corporation*

Pursuant to the investment management agreement between SIC and our affiliate, SIC Advisors LLC, SIC Advisors LLC receives a base management fee and a two-part incentive fee. The SIC base management fee is calculated at an annual rate of 1.75% of SIC's gross assets at the end of each completed calendar quarter and is payable quarterly in arrears.

The two components of the SIC incentive fee are as follows:

- The first, the Part I incentive fee (which is also referred to as a subordinated incentive fee), payable quarterly in arrears, is 20.0% of SIC's pre-incentive fee net investment income for the immediately preceding calendar quarter subject to a 1.75% (which is 7.0% annualized) hurdle rate and a "catch-up" provision measured as of the end of each calendar quarter. Under the hurdle rate and catch-up provisions, in any calendar quarter, SIC Advisors LLC receives no incentive fee until SIC's pre-incentive fee net investment income equals the hurdle rate of 1.75%, but then receives, as a "catch-up," 100% of SIC's pre-incentive fee net investment income with respect to that portion of such pre-incentive fee net investment income, if any, that exceeds the hurdle rate but is less than 2.1875%. The effect of this provision is that, if pre-incentive fee net investment income exceeds 2.1875% in any calendar quarter, SIC Advisors LLC will receive 20.0% of SIC's pre-incentive fee net investment income as if the hurdle rate did not apply. For this purpose, pre-incentive fee net investment income means interest income, dividend income and any other income including any other fees (other than fees for providing managerial assistance), such as commitment, origination, structuring, due diligence and consulting fees or other fees that SIC receives from portfolio companies accrued during the calendar quarter, minus SIC's operating expenses for the quarter including the base management fee, expenses payable to SIC Advisors LLC or to us, and any interest expense and any dividends paid on any issued and outstanding preferred stock, but excluding the incentive fee. Pre-incentive fee net investment income includes, in the case of investments with a deferred interest feature (such as original issue discount, debt instruments with payment-in-kind interest and zero coupon securities), accrued income that SIC has not yet received in cash. Since the hurdle rate is fixed, if interest rates rise, it will be easier for us to surpass the hurdle rate and receive an incentive fee based on pre-incentive fee net investment income.

- The second, the Part II incentive fee, is determined and payable in arrears as of the end of each calendar year (or upon termination of the investment management agreement as of the termination date), and equals 20.0% of SIC's cumulative aggregate realized capital gains less cumulative realized capital losses, unrealized capital depreciation (unrealized depreciation on a gross investment-by-investment basis at the end of each calendar year) and all capital gains upon which prior performance-based capital gains incentive fee payments were previously made to SIC Advisors LLC.

Strategic Capital Advisory Services, LLC owned 20% of SIC Advisors LLC through July 31, 2018 and was entitled to receive distributions of up to 20% of the gross cash proceeds received by SIC Advisors LLC from the management and incentive fees paid by SIC to SIC Advisors LLC, net of certain expenses, as well as 20% of the returns of the investments held at SIC Advisors LLC. We may have similar arrangements with respect to the ownership of the entities that advise our BDCs in the future.

*Sierra Total Return Fund*

Pursuant to the investment management agreement between STRF and our affiliate, STRF Advisors LLC, STRF Advisors LLC is entitled to a base management fee and may earn an incentive fee. The STRF base management fee is calculated and payable monthly in arrears at an annual rate of 1.50% of STRF's average daily total assets during such period.

The incentive fee is calculated and payable quarterly in arrears in an amount equal to 15.0% of the Fund's pre-incentive fee net investment income for the immediately preceding quarter, and is subject to a hurdle rate, expressed as a rate of return on the Fund's adjusted capital, equal to 1.50% per quarter, subject to a "catch-up" feature, which will allow STRF Advisors LLC to recover foregone incentive fees that were previously limited by the hurdle rate. Under the hurdle rate and catch-up provisions, in any calendar quarter, STRF Advisors LLC will not receive any incentive fee until STRF's pre-incentive fee net investment income equals the hurdle rate of 1.50%, but then will receive, as a "catch-up," 100% of STRF's pre-incentive fee net investment income with respect to that portion of such pre-incentive fee net investment income, if any, that exceeds the hurdle rate but is less than or equal to 1.76%. The effect of this provision is that, if pre-incentive fee net investment income exceeds 1.76% in any calendar quarter, STRF Advisors LLC will receive 15.0% of SIC's pre-incentive fee net investment income as if the hurdle rate did not apply. For this purpose, pre-incentive fee net investment income means interest income, dividend income and any other income accrued during the calendar quarter, minus STRF's operating expenses for the quarter (including the management fee, expenses reimbursed to STRF Advisors LLC and any interest expenses and distributions paid on any issued and outstanding preferred shares, but excluding the inventive fee). For this purpose, adjusted capital means the cumulative gross proceeds received by STRF from the sale of shares (including pursuant to STRF's distribution reinvestment plan), reduced by amounts paid in connection with purchases of shares pursuant to STRF's mandatory repurchases and discretionary repurchases. There is no accumulation of amounts on the hurdle rate from quarter to quarter, and accordingly there is no clawback of amounts previously paid to STRF Advisors LLC if subsequent quarters are below the quarterly hurdle rate, and there is no delay of payment to STRF Advisors LLC if prior quarters are below the quarterly hurdle rate.

*Long-Dated Private Funds and SMAs*

Pursuant to the respective underlying agreements of our long-dated private funds and SMAs, we receive an annual management fee and may earn incentive or performance fees. In general, management fees are calculated at an annual rate of 0.75% to 2.00% calculated on the value of the capital accounts or the value of the investments held by each limited partner, fund or account. We may also receive transaction and advisory fees from a funds' underlying portfolio investment. In certain circumstances, we are required to offset our management fees earned by 50% to 100% of transaction and advisory fees earned. In addition, we receive performance fees or carried interest in an amount equal to 15.0% to 20.0% of the realized cash derived from an investment, subject to a cumulative annualized preferred return to the investor of 6.0% to 8.0%, which is in turn subject to a 50% to 100% catch-up allocation to us.

For certain long-dated private funds, we may also earn a two-part incentive fee. The first, the Part I incentive fee, is calculated and payable quarterly in an amount equal to 15.0% to 20.0% of the net investment income, subject to a hurdle rate equal to 1.5% to 2.0% per quarter, which is in turn subject to a 50% to 100% catch-up provision measured as of the end of each calendar quarter. The second, the Part II incentive fee, is calculated and payable annually in an amount equal to 15.0% to 20.0% of cumulative realized capital gains.

In order to align the interests of our senior professionals and the other individuals who manage our long-dated private funds with our own interests and with those of the investors in such funds, such individuals may be allocated directly a portion of the performance fees in such funds. These interests entitle the holders to share the performance fees earned from MOF II. We may make similar arrangements with respect to allocation of performance or incentive fees with respect to MOF III, MCOF, Aspect or other long-dated private funds that we may advise in the future.

As noted above, in connection with raising new funds or securing additional investments in existing funds, we negotiate terms for such funds and investments with existing and potential investors. The outcome of such negotiations could result in our agreement to terms that are materially less favorable to us than for prior funds we have advised or funds advised by our competitors. See *"Risk Factors — Risks Related to Our Business and Industry — We may not be able to maintain our current fee structure as a result of industry pressure from fund investors to reduce fees, which could have an adverse effect on our profit margins and results of operations."*

**Investor Relations**

Our fundraising efforts historically have been spread across distribution channels and have not been dependent on the success of any single channel. We distribute our investment products through two primary channels: (1) permanent capital vehicles and (2) long-dated private funds and SMAs. We believe that each of these channels offers unique advantages to investors and allows us to continue to raise and deploy capital opportunistically in varying market environments.

*Permanent Capital Vehicles*

We distribute our permanent capital vehicles through three sub-channels:

- MCC is our publicly traded vehicle. It offers retail and institutional investors liquid access to an otherwise illiquid asset class (middle market credit). In addition to equity capital, MCC also raises debt capital in the private and public markets which is an alternative source of capital in challenging operating environments.

- SIC is our non-traded public vehicle. It offers retail and institutional investors access to an otherwise illiquid asset class (middle market credit) without exposure to public market trading volatility. It allows us to continue to raise capital continually during more challenging operating environments when publicly listed vehicles may be trading below net asset value ("NAV"), which we believe is valuable during times of market volatility. We believe this is a competitive advantage allowing us to make opportunistic investments, while peers may be more limited during times of market volatility.

- STRF is our non-traded interval vehicle. It offers retail and institutional investors investments in the debt and equity of fixed-income and fixed-income related securities. STRF is a continuously offered, non-diversified, closed-end investment management company that is operated as an interval fund.

*Long-Dated Private Funds and SMAs*

We distribute our long-dated private funds and SMAs through two sub-channels:

- *Long-dated private funds:* Our long-dated private funds offer institutional investors attractive risk-adjusted returns. We believe this channel is an important element of our capital raising efforts given institutional investors are more likely to remain engaged in higher yielding private credit assets during periods of market turbulence.

- *Separately managed accounts:* Our SMAs provide investors with customized investment solutions. This is particularly attractive for liability driven investors such as insurance companies that invest over long time horizons.

We believe that our deep and long-standing investor relationships, founded on our strong performance, disciplined management of our investors' capital and diverse product offering, have facilitated the growth of our existing business and will assist us with the development of additional strategies and products, thereby increasing our fee earning AUM in the future. We have dedicated in-house capital markets, investor relations and marketing specialists. We have frequent discussions with our investors and are committed to providing them with the highest quality service. We believe our service levels, as well as our emphasis on transparency, inspire loyalty and support our efforts to continue to attract investors across our investment platform.

**Investment Process**

**Direct Origination.** We focus on lending directly to companies that are underserved by the traditional banking system and generally seek to avoid broadly marketed investment opportunities. We source investment opportunities primarily through financial sponsors, as well as through direct relationships with companies, financial intermediaries such as national, regional and local bankers, accountants, lawyers and consultants. Historically, as much as half of our annual origination volume has been derived from either repeat or referred borrowers or repeat sponsors. The other half of our annual origination volume has been sourced through a variety of channels including direct relationships with companies, financial intermediaries such as national, regional and local bankers, accountants, lawyers and consultants, as well as through other financial sponsors. Medley investments are well diversified across 27 of the 35 industries. As of December 31, 2019, our industry exposures in excess of 10% were 11.2% in business services, 10.7% in healthcare and pharmaceuticals and 10.6% in High Tech Industries. Medley has a highly selective, three step underwriting process that is governed by an investment committee. This comprehensive process narrows down the investment opportunities from generally over 1,000 a year to approximately 1% to 3% originated borrowers in a year. For the year ended December 31, 2019, we sourced 451 investment opportunities across 51 borrowers and approximately $200.0 million of invested capital. As of December 31, 2019, our funds had 266 investments across 169 borrowers.

**Disciplined Underwriting.** We perform thorough due diligence and focus on several key criteria in our underwriting process, including strong underlying business fundamentals, a meaningful equity cushion, experienced management, conservative valuation and the ability to deleverage through cash flows. We are often the agent for the loans we originate and accordingly influence the loan documentation and negotiation of covenants, which allows us to maintain consistent underwriting standards. We invest across a broad range of industries and our disciplined underwriting process often involves engagement of industry experts and third-party consultants. This disciplined underwriting process is essential as our funds have historically invested primarily in privately held companies, for which public financial information may be unavailable. Since our inception, we have experienced annualized realized losses for 0.7% of that capital through December 31, 2019. We believe our disciplined underwriting culture is a key factor to our success and our ability to expand our product offerings.

Prior to making an investment, the investment team subjects each potential borrower to an extensive credit review process, which typically begins with an analysis of the market opportunity, business fundamentals, company operating metrics and historical and projected financial analysis. We also analyze liquidity, operating margin trends, leverage, free cash flow and fixed charge coverage ratios for potential investments. Areas of additional underwriting focus include management or sponsor (typically a private equity firm) experience, management compensation, competitive landscape, regulatory environment, pricing power, defensibility of market share and tangible asset values. Background checks may be conducted and tax compliance information may be requested on management teams and key employees. In addition, the investment team may contact customers, suppliers and competitors and/or perform on-site visits as part of a routine business due diligence process.

The investment team routinely uses third-party consultants and market studies to corroborate valuation and industry specific due diligence, as well as provide quality of earnings analysis. Experienced legal counsel is engaged to evaluate and mitigate regulatory, insurance, tax or other company-specific risks.

After the investment team completes its final due diligence, each proposed investment is presented to our investment committee and subjected to extensive discussion and follow-up analysis, if necessary. A formal memorandum for each investment opportunity typically includes the results of business due diligence, multi-scenario financial analysis, risk-management assessment, results of third-party consulting work, background checks (where applicable) and structuring proposals. Our investment committee requires a majority vote to approve any investment.

***Active Credit Management.*** We employ active credit management. Our process includes frequent interaction with management, monthly or quarterly reviews of financial information and, typically, attendance at board of directors' meetings as observers. Investment professionals with deep restructuring and workout experience support our credit management effort. The investment team also evaluates financial reporting packages provided by portfolio companies that detail operational and financial performance. Data is entered in Mariana Systems, an investment management software program. Mariana Systems creates a centralized, dynamic electronic repository for all of our portfolio company data and generates comprehensive, standardized reports and dashboards, which aggregate operational updates, portfolio company financial performance, asset valuations, macro trends, management call notes and account history.

## Investment Operations and Information Technology

In addition to our investment team, we have a finance, accounting and operations team that supports our public and private vehicles team by providing infrastructure and administrative support in the areas of accounting/finance, valuation, capital markets and treasury functions, operations/information technology, strategy and business development, legal/compliance and human resources.

## Regulatory and Compliance Matters

Our business, as well as the financial services industry generally, is subject to extensive regulation in the United States and elsewhere. The SEC and other regulators around the world have in recent years significantly increased their regulatory activities with respect to alternative asset management firms. Our business is subject to compliance with laws and regulations of United States federal and state governments, their respective agencies and/or various self-regulatory organizations or exchanges, and any failure to comply with these regulations could expose us to liability and/or reputational damage. Our business has been operated for a number of years within a legal framework that requires our being able to monitor and comply with a broad range of legal and regulatory developments that affect our activities. However, additional legislation, changes in rules promulgated by regulators or changes in the interpretation or enforcement of existing laws and rules, either in the United States or elsewhere, may directly affect our mode of operation and profitability.

Certain of our subsidiaries are registered as investment advisers with the SEC. Registered investment advisers are subject to the requirements and regulations of the Investment Advisers Act of 1940, as amended (the "Investment Advisers Act"). Such requirements relate to, among other things, fiduciary duties to advisory clients, maintaining an effective compliance program, solicitation agreements, conflicts of interest, recordkeeping and reporting requirements, disclosure requirements, limitations on agency cross and principal transactions between an advisor and advisory clients and general anti-fraud prohibitions. The SEC requires investment advisers registered or required to register with the SEC under the Investment Advisers Act that advise one or more private funds and have at least $150.0 million in private fund assets under management to periodically file reports on Form PF. We have filed, and will continue to file, quarterly reports on Form PF, which has resulted in increased administrative costs and requires a significant amount of attention and time to be spent by our personnel. In addition, our investment advisers are subject to routine periodic examinations by the staff of the SEC. Our investment advisers also have not been subject to any regulatory or disciplinary actions by the SEC.

MCC and SIC are BDCs. A BDC is a special category of investment company under the Investment Company Act that was added by Congress to facilitate the flow of capital to private companies and small public companies based in the United States

that do not have efficient or cost-effective access to public capital markets or other conventional forms of corporate financing. BDCs make investments in private or thinly traded public companies in the form of long-term debt and/or equity capital, with the goal of generating current income or capital growth.

BDCs are closed-end funds that elect to be regulated as BDCs under the Investment Company Act. As such, BDCs are subject to only certain provisions of the Investment Company Act, as well as the Securities Act and the Exchange Act. BDCs are provided greater flexibility under the Investment Company Act than are other investment companies that are registered under the Investment Company Act in dealing with their portfolio companies, issuing securities, and compensating their managers. BDCs can be internally or externally managed and may qualify to elect to be taxed as a regulated investment company ("RIC") under Subchapter M of the Internal Revenue Code of 1986, as amended (the "Code"), and the regulations thereunder, for federal tax purposes. The Investment Company Act contains prohibitions and restrictions relating to transactions between BDCs and their affiliates, principal underwriters, and affiliates of those affiliates or underwriters. The Investment Company Act requires that a majority of a BDC's directors be persons other than "interested persons," as that term is defined in the Investment Company Act. In addition, the Investment Company Act provides that a BDC may not change the nature of its business so as to cease to be, or withdraw its election to be regulated as a BDC unless approved by a majority of its outstanding voting securities. The Investment Company Act defines "a majority of the outstanding voting securities" as the lesser of: (1) 67% or more of the voting securities present at a meeting if the holders of more than 50% of its outstanding voting securities are present or represented by proxy or (2) more than 50% of its voting securities.

Generally, BDCs are prohibited under the Investment Company Act from knowingly participating in certain transactions with their affiliates without the prior approval of their board of directors who are not interested persons and, in some cases, prior approval by the SEC. The SEC has interpreted the prohibition on transactions with affiliates broadly to prohibit "joint transactions" among entities that share a common investment adviser.

On November 25, 2013, we received an amended order from the SEC that expanded our ability to negotiate the terms of co-investment transactions among our BDCs and other funds managed by us (the "Exemptive Order"), subject to the conditions included therein. In situations where co-investment with other funds managed by us is not permitted or appropriate, such as when there is an opportunity to invest in different securities of the same issuer or where the different investments could be expected to result in a conflict between our interests and those of our other clients, we will need to decide which client will proceed with the investment. We will make these determinations based on our policies and procedures, which generally require that such opportunities be offered to eligible accounts on an alternating basis that will be fair and equitable over time. Moreover, except in certain circumstances, our BDCs will be unable to invest in any issuer in which another of our funds holds an existing investment. Similar restrictions limit our BDCs' ability to transact business with our officers or directors or their affiliates.

Under the terms of the Exemptive Order, a "required majority" (as defined in Section 57(o) of the Investment Company Act) of the independent directors of our BDCs must make certain conclusions in connection with a co-investment transaction, including that (1) the terms of the proposed transaction are reasonable and fair to the applicable BDC and such BDC's stockholders and do not involve overreaching of such BDC or its stockholders on the part of any person concerned and (2) the transaction is consistent with the interests of the BDC's stockholders and is consistent with its investment strategies and policies.

Our BDCs have elected to be treated as RICs under Subchapter M of the Code. As RICs, the BDCs generally do not have to pay corporate-level federal income taxes on any income that is distributed to its stockholders from its tax earnings and profits. To maintain qualification as a RIC, our BDCs must, among other things, meet certain source-of-income and asset diversification requirements (as described below). In addition, in order to obtain and maintain RIC tax treatment, the BDCs must distribute to their stockholders, for each taxable year, at least 90% of their "investment company taxable income," which is generally its net ordinary income plus the excess, if any, of realized net short-term capital gains over realized net long-term capital losses.

In July 2010, President Obama signed into law the Dodd-Frank Act. The Dodd-Frank Act, among other things, imposes significant regulations on nearly every aspect of the U.S. financial services industry, including oversight and regulation of systemic market risk (including the power to liquidate certain institutions); authorizing the Federal Reserve to regulate nonbank institutions that are deemed systemically important; generally prohibiting insured banks or thrifts, any bank holding company or savings and loan holding company, any non-U.S. bank with a U.S. branch, agency or commercial lending company and any subsidiaries and affiliates of any of these types of entities, regardless of geographic location, from conducting proprietary trading or investing in or sponsoring a "covered fund," which includes private equity funds and hedge funds (i.e., the Volcker Rule); and imposing new registration, recordkeeping and reporting requirements on private fund investment advisers. Importantly, while several key aspects of the Dodd-Frank Act have been defined through final rules, some aspects still remain to be implemented by various regulatory bodies.

The Dodd-Frank Act requires the CFTC, the SEC and other regulatory authorities to promulgate certain rules relating to the regulation of the derivatives market. Such rules require or will require the registration of certain market participants, the clearing

9

of certain derivatives contracts through central counterparties, the execution of certain derivatives contracts on electronic platforms, as well as reporting and recordkeeping of derivatives transactions. Certain of our funds may from time to time, directly or indirectly, invest in instruments that meet the definition of a "swap" under the Commodity Exchange Act and the CFTC's rules promulgated thereunder. As a result, such funds may qualify as commodity pools, and the operators of such funds may need to register as commodity pool operators ("CPOs") unless an exemption applies. Additionally, pursuant to a rule finalized by the CFTC in December 2012, certain classes of interest rate swaps and certain classes of index credit default swaps have also been subject to mandatory clearing, unless an exemption applies. Since February 2014, many of these interest rate swaps and index credit default swaps have also been subject to mandatory trading on designated contract markets or swap execution facilities. The Dodd-Frank Act also provides expanded enforcement authority to the CFTC and SEC. While certain rules have been promulgated and are already in effect, the rulemaking and implementation process is still ongoing. In particular, the CFTC has finalized most of its rules under the Dodd-Frank Act, and the SEC has proposed several rules regarding security-based swaps but has only finalized a small number of these rules.

## Competition

The investment management industry is intensely competitive, and we expect it to remain so. We face competition both in the pursuit of outside investors for our funds and in acquiring investments in attractive investee companies and making other investments. We compete for outside investors based on a variety of factors, including:

- investment performance;

- investor perception of investment managers' drive, focus and alignment of interest;

- quality of service provided to and duration of relationship with investors;

- business reputation; and

- the level of fees and expenses charged for services.

We face competition in our lending and other investment activities primarily from other credit-focused funds, specialized funds, BDCs, real estate funds, hedge fund sponsors, other financial institutions and other parties. Many of these competitors in some of our business are substantially larger and have considerably greater financial, technical and marketing resources than are available to us. Many of these competitors have similar investment objectives to us, which may create additional competition for investment opportunities. Some of these competitors may also have a lower cost of capital and access to funding sources that are not available to us, which may create competitive disadvantages for us with respect to investment opportunities. In addition, some of these competitors may have higher risk tolerances, different risk assessments or lower return thresholds, which could allow them to consider a wider variety of investments and to bid more aggressively than us for investments that we want to make. Lastly, institutional and individual investors are allocating increasing amounts of capital to alternative investment strategies. Several large institutional investors have announced a desire to consolidate their investments in a more limited number of managers. We expect that this will cause competition in our industry to intensify and could lead to a reduction in the size and duration of pricing inefficiencies.

Competition is also intense for the attraction and retention of qualified employees. Our ability to continue to compete effectively in our business will depend upon our ability to attract new employees and retain and motivate our existing employees.

For additional information concerning the competitive risks that we face, see *"Risk Factors — Risks Related to Our Business and Industry — The investment management business is competitive."*

## Employees

As of December 31, 2019, we employed 65 individuals, including 29 investment, origination and credit management professionals, located in our New York office.

## Agreements and Plans of Merger

On August 9, 2018, MDLY entered into the Agreement and Plan of Merger (the "MDLY Merger Agreement"), dated as of August 9, 2018, by and among MDLY, Sierra and Sierra Management, Inc., a wholly owned subsidiary of Sierra ("Merger Sub"), pursuant to which MDLY and the Company would, on the terms and subject to the conditions set forth in the MDLY Merger Agreement, merge with and into Merger Sub, with Merger Sub as the surviving company in the merger (the "MDLY Merger"). In the MDLY Merger, each share of MDLY Class A common stock, issued and outstanding immediately prior to the MDLY Merger effective time (other than Dissenting Shares (as defined in the MDLY Merger Agreement) and shares of MDLY Class A common stock held by MDLY, the Company, Sierra or their respective wholly owned subsidiaries) would be converted into the right to receive (i) 0.3836 shares of Sierra's common stock; plus (ii) cash in an amount equal to $3.44 per share. In addition, MDLY stockholders would have the right to receive certain dividends and/or other payments. Simultaneously, pursuant to the Agreement

and Plan of Merger, dated as of August 9, 2018, by and between Medley Capital Corporation ("MCC") and Sierra (the "MCC Merger Agreement"), MCC would, on the terms and subject to the conditions set forth in the MCC Merger Agreement, merge with and into Sierra, with Sierra as the surviving company in the merger (the "MCC Merger" together with the MDLY Merger, the "Mergers"). In the MCC Merger, each share of MCC's common stock issued and outstanding immediately prior to the MCC Merger effective time (other than shares of MCC's common stock held by MCC, Sierra or their respective wholly owned subsidiaries) would be converted into the right to receive 0.8050 shares of Sierra's common stock.

On July 29, 2019, MDLY entered into the Amended and Restated Agreement and Plan of Merger, dated as of July 29, 2019 (the "Amended MDLY Merger Agreement"), by and among MDLY, Sierra, and Merger Sub, pursuant to which MDLY and the Company will, on the terms and subject to the conditions set forth in the Amended MDLY Merger Agreement, merge with and into Merger Sub, with Merger Sub as the surviving company in the MDLY Merger. In the MDLY Merger, each share of MDLY Class A common stock, issued and outstanding immediately prior to the MDLY Merger effective time (other than shares of our Class A common stock held by MDLY, the Company, Sierra or their respective wholly owned subsidiaries (the "Excluded MDLY Shares") and the Dissenting Shares (as defined in the Amended MDLY Merger Agreement), held, immediately prior to the MDLY Merger effective time, by any person other than a holder of LLC Units), will be exchanged for (i) 0.2668 shares of Sierra's common stock; plus (ii) cash in an amount equal to $2.96 per share. In addition, in the MDLY Merger, each share of MDLY Class A common stock issued and outstanding immediately prior to the MDLY Merger effective time, other than the Excluded MDLY Shares and the Dissenting Shares, held, immediately prior to the MDLY Merger effective time, by holders of LLC Units will be exchanged for (i) 0.2072 shares of Sierra's common stock; plus (ii) cash in an amount equal to $2.66 per share. Under the Amended MDLY Merger Agreement, the MDLY exchange ratios and the cash consideration amount was fixed on July 29, 2019, the date of the signing of the Amended MDLY Merger Agreement. The MDLY exchange ratios and the cash consideration amount are not subject to adjustment based on changes in the NAV of Sierra or the market price of MDLY Class A common stock before the MDLY Merger effective time, provided that the MDLY Merger is consummated by March 31, 2020, or, if consummated after March 31, 2020, only if the parties subsequently agree to extend the closing date on the same terms and conditions.

In addition, on July 29, 2019, MCC and Sierra announced the execution of the Amended and Restated Agreement and Plan of Merger, dated as of July 29, 2019 (the "Amended MCC Merger Agreement"), by and between MCC and Sierra, pursuant to which MCC will, on the terms and subject to the conditions set forth in the Amended MCC Merger Agreement, merge with and into Sierra, with Sierra as the surviving company in the MCC Merger. In the MCC Merger, each share of MCC's common stock (other than shares of MCC's common stock held by MCC, Sierra or their respective wholly owned subsidiaries), will be exchanged for the right to receive (i) 0.68 shares of Sierra's common stock if the attorneys' fees of plaintiffs' counsel and litigation expenses paid or incurred by plaintiffs' counsel or advanced by plaintiffs in connection with the Delaware Action, as described below (such fees and expenses, the "Plaintiff Attorney Fees") are less than or equal to $10,000,000; (ii) 0.66 shares of Sierra's common stock if the Plaintiff Attorney Fees are equal to or greater than $15,000,000; (iii) between 0.68 and 0.66 per share of Sierra's common stock if the Plaintiff Attorney Fees are greater than $10,000,000 but less than $15,000,000, calculated on a descending basis, based on straight line interpolation between $10,000,000 and $15,000,000; or (iv) 0.66 shares of Sierra's common stock in the event that the Plaintiff Attorney Fees are not fully and finally determined prior to the closing of the MCC Merger (such ratio, the "MCC Merger Exchange Ratio"). Based upon the Plaintiff Attorney Fees approved by the Court of Chancery of the State of Delaware (the "Delaware Court of Chancery") as set forth in the Order and Final Judgment entered into on December 20, 2019, as described below (the "Delaware Order"), the MCC Merger Exchange Ratio will be 0.66 shares of Sierra's common stock. MCC and Sierra are appealing the Delaware Order with respect to the Delaware Court of Chancery's ruling on the Plaintiff Attorney Fees. Under the Amended MCC Merger Agreement, the MCC Merger exchange ratio is not subject to adjustment based on changes in the NAV of Sierra or the market price of MCC's common stock before the MCC Merger effective time. In addition, under the Settlement (as described below), the defendant parties to the Settlement (other than the Company) shall, among other things, deposit or cause to be deposited the Settlement shares, the number of shares of which is to be calculated using the pro forma NAV of $6.37 per share as of June 30, 2019, and is not subject to subsequent adjustment based on changes in the NAV of Sierra or the market price of MCC's common stock before the MCC Merger effective time, provided that the MCC Merger is consummated by March 31, 2020, or, if consummated after March 31, 2020, only if the parties subsequently agree to extend the closing date on the same terms and conditions.

Pursuant to terms of the Amended MCC Merger Agreement, the consummation of the MCC Merger is conditioned upon the satisfaction or waiver of each of the conditions to closing under the Amended MDLY Merger Agreement and the consummation of the MDLY Merger. However, pursuant to the terms of the Amended MDLY Merger Agreement, the consummation of the MDLY Merger is not contingent upon the consummation of the MCC Merger. If both Mergers are successfully consummated, Sierra's common stock would be listed on the NYSE, with such listing expected to be effective as of the closing date of the Mergers, and Sierra's common stock will be listed on the Tel Aviv Stock Exchange, with such listing expected to be effective as of the closing date of the MCC Merger. If, however, only the MDLY Merger is consummated, Sierra's common stock would be listed on the

11

NYSE. If both Mergers are successfully consummated, the investment portfolios of MCC and Sierra would be combined, Merger Sub, as a successor to MDLY, would be a wholly owned subsidiary of Sierra (the "Combined Company"), and the Combined Company would be internally managed by MCC Advisors LLC, its wholly controlled adviser subsidiary. If only the MDLY Merger is consummated, while the investment portfolios of MCC and Sierra would not be combined, the investment management function relating to the operation of Sierra, as the surviving company, would still be internalized (the "Sierra/MDLY Company") and the Sierra/MDLY Company would be managed by MCC Advisors LLC.

The Mergers are subject to approval by the stockholders of MDLY, Sierra, and MCC, regulators, including the SEC, court approval of the Settlement (as described below), other customary closing conditions and third-party consents. There is no assurance that any of the foregoing conditions will be satisfied. MDLY and Sierra have the right to terminate the Amended MDLY Merger Agreement under certain circumstances, including (subject to certain limitations set forth in the Amended MDLY Merger Agreement), among others: (i) by mutual written agreement of each party; (ii) any governmental entity whose consent or approval is a condition to closing set forth in Section 8.1 of the Amended MDLY Merger Agreement has denied the granting of any such consent or approval and such denial has become final and nonappealable, or any governmental entity of competent jurisdiction shall have issued a final and nonappealable order, injunction or decree permanently enjoining or otherwise prohibiting or making illegal the consummation of the transactions contemplated by the Amended MDLY Merger Agreement; (iii) the MDLY Merger has not closed on or prior to March 31, 2020; or (iv) either party has failed to obtain stockholder approval or the Amended MCC Merger Agreement has been terminated.

Set forth below is a description of the Decision (as defined below), which should be read in the context of the impact of the Delaware Order and corresponding Settlement.

On February 11, 2019, a purported stockholder class action related to the MCC Merger was commenced in the Delaware Court of Chancery by FrontFour Capital Group LLC and FrontFour Master Fund, Ltd. (together, "FrontFour"), captioned FrontFour Capital Group LLC, et al. v. Brook Taube et al., Case No. 2019-0100 (the "Delaware Action") against defendants Brook Taube, Seth Taube, Jeff Tonkel, Mark Lerdal, Karin Hirtler-Garvey, John E. Mack, Arthur S. Ainsberg, MDLY, Sierra, MCC, MCC Advisors LLC, Medley Group LLC, and Medley LLC. The complaint, as amended on February 12, 2019, alleged that the individuals named as defendants breached their fiduciary duties to MCC's stockholders in connection with the MCC Merger, and that MDLY, Sierra, MCC Advisors LLC, Medley Group LLC, and Medley LLC aided and abetted those alleged breaches of fiduciary duties. The complaint sought to enjoin the vote of MCC's stockholders on the MCC Merger and enjoin enforcement of certain provisions of the MCC Merger Agreement.

The Delaware Court of Chancery held a trial on the plaintiffs' motion for a preliminary injunction and issued a Memorandum Opinion (the "Decision") on March 11, 2019. The Delaware Court of Chancery denied the plaintiffs' requests to (i) permanently enjoin the MCC Merger and (ii) require MCC to conduct a "shopping process" for MCC on terms proposed by FrontFour in its complaint. The Delaware Court of Chancery held that MCC's directors breached their fiduciary duties in entering into the MCC Merger, but rejected FrontFour's claim that Sierra aided and abetted those breaches of fiduciary duties. The Delaware Court of Chancery ordered the defendants to issue corrective disclosures consistent with the Decision, and enjoined a vote of MCC's stockholders on the MCC Merger until such disclosures had been made and stockholders had the opportunity to assimilate that information.

On December 20, 2019, the Delaware Court of Chancery entered into the Delaware Order approving the settlement of the Delaware Action (the "Settlement"). Pursuant to the Settlement, MCC agreed to certain amendments to (i) the MCC Merger Agreement and (ii) the MDLY Merger Agreement, which amendments are reflected in the Amended MCC Merger Agreement and the Amended MDLY Merger agreement. The Settlement also provides for, if the MCC Merger is consummated, the creation of a settlement fund, consisting of $17 million in cash and $30 million of Sierra's common stock, with the number of shares of Sierra's common stock to be calculated using the pro forma net asset value of $6.37 per share as of June 30, 2019, which will be distributed to eligible members of the Settlement Class (as defined in the Settlement). In addition, in connection with the Settlement, on July 29, 2019, MCC entered into a Governance Agreement with FrontFour Capital Group LLC, FrontFour Master Fund, Ltd., FrontFour Capital Corp., FrontFour Opportunity Fund, David A. Lorber, Stephen E. Loukas and Zachary R. George, pursuant to which, among other matters, FrontFour is subject to customary standstill restrictions and required to vote in favor of the revised MCC Merger at a meeting of stockholders to approve the revised MCC Merger Agreement. The Settlement also provides for mutual releases between and among FrontFour and the Settlement Class, on the one hand, and the Medley Parties, on the other hand, of all claims that were or could have been asserted in the Delaware Action through September 26, 2019.

The Delaware Court of Chancery also awarded attorney's fees as follows: (i) an award of $3,000,000 to lead plaintiffs' counsel and $75,000 to counsel to plaintiff Stephen Altman (the "Therapeutics Fee Award") and $420,334.97 of plaintiff counsel

expenses payable to the lead plaintiff's counsel, which were paid by MCC on December 23, 2019, and (ii) an award that is contingent upon the closing of the proposed merger transactions (the "Contingent Fee Award"), consisting of:

a.   $100,000 for the agreement by Sierra's board of directors to appoint one independent director of MCC who will be selected by the independent directors of Sierra on the board of directors of the post-merger company upon the closing of the Mergers; and

b.   the amount calculated by solving for A in the following formula:

*Award[A]=(Monetary Fund[M]+Award[A]-Look Through[L])\*Percentage[P]*

Whereas

A    shall be the amount of the Additional Fee (excluding the $100,000 award for the agreement by Sierra's board of directors to appoint one independent director of MCC who will be selected by the independent directors of Sierra on the board of directors of the post-merger company upon the closing of the Mergers);

M    shall be the sum of (i) the $17 million cash component of the Settlement Fund and (ii) the value of the post-merger company stock component of the Settlement Fund, which shall be calculated as the product of the VPS (as defined below) and 4,709,576.14 (the number of shares of post-merger company's stock comprising the stock component of the net settlement amount);

L    shall be the amount representing the estimated value of the decrease in shares to be received by eligible class members arising by operation of the change in the "Exchange Ratio" under the Amended MCC Merger Agreement, calculated as follows:

*L = ((ES \* 68%) - (ES \* 66%)) \* VPS*

Where:

ES    shall be the number of eligible shares;

VPS    shall be the pro forma net asset value per share of the post-merger company's common stock as of the closing as reported in the public disclosure filed nearest in time and after the closing (the "Closing NAV Disclosure"); and

P    shall equal 0.26

The Contingent Fee Award is contingent upon the closing of the MCC Merger. Payment of the Contingent Fee Award will be made in two stages. First, within five (5) business days of the establishment of the Settlement Fund, MCC or its successor shall (i) pay the plaintiffs' counsel an estimate of the Contingent Fee Award (the "Additional Fee Estimate"), less twenty (20) percent (the "Additional Fee Estimate Payment"), and (ii) deposit the remaining twenty (20) percent of the Additional Fee Estimate into escrow (the "Escrowed Fee"). For purposes of calculating such estimate, MCC or its successor shall use the formula set above, except that VPS shall equal the pro forma net asset value of the post-merger company's common stock as reported in the public disclosure filed nearest in time and prior to the closing (the "Closing NAV Estimate").

Second, within five (5) business days of the Closing NAV Disclosure (as defined in the Order and Final Judgment), (i) if the Additional Fee is greater than the Additional Fee Estimate Payment, an amount of the Escrowed Fee shall be released to plaintiffs' counsel such that the total payments made to plaintiffs' counsel equal the Additional Fee and the remainder of the Escrowed Fee, if any, shall be released to MCC or its successor, (ii) if the Additional Fee is less than the Additional Fee Estimate Payment, plaintiffs' counsel shall return to MCC or its successor the difference between the Additional Fee Estimate and the Additional Fee and the Escrowed Fee shall be released to MCC or its successor, or (iii) if the Additional Fee is equal to the Additional Fee Estimate Payment, the Escrowed Fee shall be released to MCC or its successor.

On January 17, 2020, MCC and Sierra filed a notice of appeal with the Delaware Supreme Court from those provisions of the Order and Final Judgment with respect to the Contingent Fee Award.

Transaction expenses related to the MDLY Merger are included in the Company's general, administrative and other expenses and primarily consist of professional fees. Such expenses amounted to $4.6 million and $3.8 million for the years ending December 31, 2019 and 2018, respectively. There were no transaction expenses related to the MDLY Merger during the year ended December 31, 2017.

For additional information, see *"Management's Discussion and Analysis of Financial Condition and Results of Operations- Overview- Agreement and Plan of Merger."*

## Corporate Information

Medley LLC was formed on October 27, 2010 and is the operating company of Medley Management Inc., a public company traded under the symbol "MDLY." Medley Management Inc. is the sole managing member of Medley LLC. Medley Management Inc. was incorporated on June 13, 2014, and commenced operations on September 29, 2014, upon completion of its IPO of its Class A common stock. Medley Management Inc.'s sole operating asset is its investment in Medley LLC. Medley Management Inc. is controlled by the pre-IPO owners. Our principal executive office is located at 280 Park Avenue, 6th Floor East, New York 10017. Our telephone number is (212) 759-0777.

## Where You Can Find More Information

We file annual, quarterly and current reports, proxy statements and other information with the Securities and Exchange Commission ("SEC"). Our SEC filings are available to the public over the internet at the SEC's website at http://www.sec.gov. Our SEC filings are also available on our website at http://www.mdly.com as soon as reasonably practicable after they are filed with or furnished to the SEC. You may also read and copy any filed document at the SEC's public reference room in Washington, D.C. at 100 F Street, N.E., Washington, D.C. 20549. Please call the SEC at 1-800-SEC-0330 for further information about public reference rooms.

## Item 1A.  Risk Factors

You should carefully read the risks and uncertainties described below, together with the other information included in this Form 10-K. Any of the following risks could materially affect our business, financial condition or results of operations. The risks described below are not the only risks we face. Additional risks and uncertainties we are not presently aware of or that we currently believe are immaterial could also materially and adversely affect our business, financial condition or results of operations.

## Risks Related to Our Business and Industry

***Difficult market and political conditions may adversely affect our business in many ways, including by reducing the value or hampering the performance of the investments made by our funds, each of which could materially and adversely affect our business, results of operations and financial condition.***

Our business is materially affected by conditions in the global financial markets and economic and political conditions throughout the world, such as interest rates, availability and cost of credit, inflation rates, economic uncertainty, changes in laws (including laws relating to our taxation, taxation of our investors, the possibility of changes to tax laws in either the United States or any non-U.S. jurisdiction and regulations on asset managers), trade barriers including tariffs, commodity prices, currency exchange rates and controls and national and international political circumstances (including wars, terrorist acts and security operations). These factors are outside of our control and may affect the level and volatility of asset prices and the liquidity and value of investments, and we may not be able to or may choose not to manage our exposure to these conditions. Ongoing developments in the U.S. and global financial markets following the unprecedented turmoil in the global capital markets and the financial services industry in late 2008 and early 2009, and ongoing after-effects including market turbulence and volatility, continue to illustrate that the current environment is still one of uncertainty and instability for investment management business. More recently, global financial markets have experienced heightened volatility, including the June 2016 "Brexit" referendum in the United Kingdom in favor of exiting the EU and subsequent uncertainty regarding the timing and terms of the exit, the results of the 2016 U.S. presidential and 2016 and 2018 congressional elections and resulting uncertainty regarding actual and potential shifts in U.S. and foreign trade, economic and other policies, and, more recently, concerns over increasing interest rates (particularly short-term rates), uncertainty regarding the short- and long-term effects of tax reform in the United States and uncertainty regarding trade policies and tariffs implemented by the Trump administration. For example, in February 2018, global equity markets experienced a widespread sell-off, and bonds have also declined in value. Any of the foregoing (or related events or effects thereof or similar unpredictable events or uncertainties in global market or political conditions) could have a significant impact on the markets in which we operate and a material adverse impact on our business prospects and financial condition.

A number of factors have had and may continue to have an adverse impact on credit markets in particular. In addition following a sustained period of historically low interest rate levels in the United States, short-term interest rates have risen by 150 to 200 basis points since the U.S. presidential election in November 2016. Changes in and uncertainty surrounding interest rates may have a material effect on our business, particularly with respect to the cost and availability of financing for significant acquisition and disposition transactions. Furthermore, some of the provisions under the Tax Cuts and Jobs Act of 2017 in the United States, Public Law No. 115-97 (the "Tax Cuts and Jobs Act") could have a negative impact on the cost of financing and dampen the attractiveness of credit. There has been a corresponding meaningful increase in the uncertainty surrounding interest rates, foreign

14

exchange rates, trade volume, and fiscal and economic policies, which has heightened volatility in the U.S. and global markets and could persist for an extended period.

These and other conditions in the global financial markets and the global economy may result in adverse consequences for our funds and their respective investee companies, which could restrict such funds' investment activities and impede such funds' ability to effectively achieve their investment objectives. In addition, because the fees we earn under our investment management agreements are based in part on the market value of our AUM and in part on investment performance, if any of these factors cause a decline in our AUM or result in non-performance of loans by investee companies, it would result in lower fees earned, which could in turn materially and adversely affect our business and results of operations.

### *Our business may be adversely affected by the recent coronavirus outbreak.*

As of the date of this Form 10-K, there is an outbreak of a novel and highly contagious form of coronavirus (COVID-19), which the World Health Organization has declared to constitute a Public Health Emergency of International Concern. The outbreak of COVID-19 has resulted in numerous deaths adversely impacted global commercial activity and contributed to significant volatility in certain equity and debt markets. The global impact of the outbreak is rapidly evolving, and many countries have reacted by instituting quarantines, prohibitions on travel and the closure of offices, businesses, schools, retail stores and other public venues. Businesses are also implementing similar precautionary measures. Such measures, as well as the general uncertainty surrounding the dangers and impact of COVID-19, are creating significant disruption in supply chains and economic activity and are having a particularly adverse impact on transportation, hospitality, tourism, entertainment and other industries. As COVID-19 continues to spread, the potential impacts, including a global, regional or other economic recession, are increasingly uncertain and difficult to assess.

Any public health emergency, including any outbreak of COVID-19, SARS, H1N1/09 flu, avian flu, other coronavirus, Ebola or other existing or new epidemic diseases, or the threat thereof, could have a significant adverse impact on the Company and could adversely affect the Company's ability to fulfill its investment objectives.

The extent of the impact of any public health emergency on the Company's operational and financial performance will depend on many factors, including the duration and scope of such public health emergency, the extent of any related travel advisories and restrictions implemented, the impact of such public health emergencies on overall supply and demand, goods and services, investor liquidity, consumer confidence and levels of economic activity and the extend of its disruption to important global, regional and local supply chains and economic markets, all of which are highly uncertain and cannot be predicted. The effects of a public health emergency may materially and adversely impact the value and performance of the Company's investments, the Company's ability to source, manage and divest investments and the Company's ability to achieve its investment objectives, all of which could result in significant losses to the Company. In addition, the operations of the Company may be significantly impacted, or even temporarily or permanently halted, as a result of government quarantine measures, voluntary and precautionary restrictions on travel or meetings and other factors related to a public health emergency, including its potential adverse impact on the health of the Company's personnel.

### *Recently enacted laws, such as Tax Cuts and Jobs Act, or regulations and future changes in the U.S. taxation of businesses may impact our effective tax rate or may adversely affect our business, financial condition and operating results.*

On December 22, 2017, the President signed into law the Tax Cuts and Jobs Act, which significantly changed the Code, including a reduction in the federal statutory corporate income tax rate to 21%, a new limitation on the deductibility of business interest expense, restrictions on the use of net operating loss carryforwards arising in taxable years beginning after December 31, 2017 and dramatic changes to the taxation of income earned from foreign sources and foreign subsidiaries. The Tax Cuts and Jobs Act also authorizes the Treasury Department to issue regulations with respect to the new provisions. We cannot predict how the changes in the Tax Cuts and Jobs Act, regulations, or other guidance issued under it (including additional technical corrections or other forthcoming guidance yet to be issued) or conforming or non-conforming state tax rules might affect us or our business. In addition, there can be no assurance that U.S. tax laws, including the corporate income tax rate, would not undergo significant changes in the near future.

### *We derive a substantial portion of our revenues from funds managed pursuant to advisory agreements that may be terminated or fund partnership agreements that permit fund investors to remove us as the general partner.*

With respect to our permanent capital vehicles, each fund's investment management agreement must be approved annually by such fund's board of directors or by the vote of a majority of the stockholders and the majority of the independent members of such fund's board of directors and, in certain cases, by its stockholders, as required by law. In addition, as required by the Investment Company Act, both MCC and SIC have the right to terminate their respective management agreements without penalty upon 60 days' written notice to their respective advisers. Termination of these agreements would reduce the fees we earn from the relevant funds, which could have a material adverse effect on our results of operations. For the years ended December 31, 2019, 2018 and

15

2017, our investment advisory relationships with MCC and SIC represented approximately 68.9%, 69.0% and 74.4%, respectively, of our total management fees. These investment advisory relationships also represented, in the aggregate, 37.5% of our AUM at December 31, 2019. There can be no assurance that our investment management agreements with respect to MCC and SIC will remain in place.

With respect to our long-dated private funds, insofar as we control the general partner of such funds, the risk of termination of the investment management agreement for such funds is limited, subject to our fiduciary or contractual duties as general partner. However, the applicable fund partnership agreements may permit the limited partners of each respective fund to remove us as general partner by a majority or, in certain circumstances, a super majority vote. In addition, the partnership agreements provide for dissolution of the partnership upon certain changes of control.

Our SMAs are governed by investment management agreements that may be terminated by investors at any time for cause under the applicable agreement and "cause" may include the departure of specified members of our senior management team. Absent cause, the investment management agreements that govern our SMAs are generally not terminable during the specified investment period or following the specified investment period, prior to the scheduled maturities or disposition of the subject AUM.

Termination of these agreements would negatively affect the fees we earn from the relevant funds, which could have a material adverse effect on our results of operations.

***We may not be able to maintain our current fee structure as a result of industry pressure from fund investors to reduce fees, which could have a material adverse effect on our profit margins and results of operations.***

We may not be able to maintain our current fee structure as a result of industry pressure from fund investors to reduce fees. Although our investment management fees vary among and within asset classes, historically we have competed primarily on the basis of our performance and not on the level of our investment management fees relative to those of our competitors. In recent years, however, there has been a general trend toward lower fees in the investment management industry. In September 2009, the Institutional Limited Partners Association published a set of Private Equity Principles (the "Principles"), which were revised in January 2011. The Principles were developed to encourage discussion between limited partners and general partners regarding private equity fund partnership terms. Certain of the Principles call for enhanced "alignment of interests" between general partners and limited partners through modifications of some of the terms of fund arrangements, including proposed guidelines for fees and performance income structures.[1] Although we have no obligation to modify any of our fees with respect to our existing funds, we may experience pressure to do so in our funds. More recently institutional investors have been allocating increasing amounts of capital to alternative investment strategies as well as attempting to reduce management and investment fees to external managers, whether through direct reductions, deferrals or rebates. We cannot assure you that we will succeed in providing investment returns and service that will allow us to maintain our current fee structure. For example, on December 3, 2015, we agreed to reduce our fees from MCC and beginning January 1, 2016, the base management fee from MCC was reduced to 1.50% on gross assets above $1 billion. In addition, we reduced our incentive fee from MCC from 20% on pre-incentive fee net investment income over an 8% hurdle, to 17.5% on pre-incentive fee net investment income over a 6% hurdle and introduced a netting mechanism and incentive fee income will be subject to a rolling three-year look back. Under no circumstances will our recently implemented fee structure result in higher fees from MCC than fees under the current investment management agreement. Fee reductions on existing or future new business could have a material adverse effect on our profit margins and results of operations. For more information about our fees, see "*Business - Fee Structure*."

***A change of control of us or Medley Management Inc. could result in termination of our investment advisory agreements.***

Pursuant to the Investment Company Act, each of the investment advisory agreements for the BDCs that we advise automatically terminates upon its deemed "assignment" and a BDC's board and shareholders must approve a new agreement in order for us to continue to act as its investment adviser. In addition, pursuant to the Investment Advisers Act, each of our investment advisory agreements for the separate accounts we manage may not be "assigned" without the consent of the client. A sale of a controlling block of our or Medley Management Inc.'s voting securities and certain other transactions would be deemed an "assignment" pursuant to both the Investment Company Act and the Investment Advisers Act. Such an assignment may be deemed to occur in the event that our pre-IPO owners dispose of enough of their interests in us such that they no longer own a controlling interest in us. If such a deemed assignment occurs, there can be no assurance that we will be able to obtain the necessary consents from clients whose funds are managed pursuant to separate accounts or the necessary approvals from the boards and shareholders of the SEC-registered BDCs that we advise. An assignment, actual or constructive, would trigger these termination and consent provisions and, unless the necessary approvals and consents are obtained, could materially and adversely affect our ability to continue managing client accounts, resulting in the loss of assets under management and a corresponding loss of revenue.

16

***The historical returns attributable to our funds should not be considered as indicative of the future results of our funds or of our future results.***

The historical performance of our funds is relevant to us primarily insofar as it is indicative of fees we have earned in the past and may earn in the future and our reputation and ability to raise new funds. Poor performance of the funds we advise could cause a decline in our revenues and could therefore have a negative effect on our operating results. Also, there is no assurance that projections in respect of our funds or unrealized valuations will be realized.

Moreover, the historical returns of our funds should not be considered indicative of the future returns of these funds or from any future funds we may raise, in part because:

- market conditions during previous periods may have been significantly more favorable for generating positive performance than the market conditions we may experience in the future;

- our funds' rates of returns, which are calculated on the basis of NAV of the funds' investments, including unrealized gains, which may never be realized;

- our funds' returns have previously benefited from investment opportunities and general market conditions that may not recur, and our funds may not be able to achieve the same returns or profitable investment opportunities or deploy capital as quickly;

- the historical returns that we present in this Form 10-K derive largely from the performance of our earlier funds, whereas future fund returns will depend increasingly on the performance of our newer funds or funds not yet formed, which may have little or no realized investment track record;

- in recent years, there has been increased competition for investment opportunities resulting from the increased amount of capital invested in alternative funds and high liquidity in debt markets, and the increased competition for investments may reduce our returns in the future; and

- our newly established funds may generate lower returns during the period that they take to deploy their capital.

The future internal rate of return for any current or future fund may vary considerably from the historical internal rate of return generated by any particular fund, or for our funds as a whole. Future returns will also be affected by the risks described in this Form 10-K, including risks of the industries and business in which a particular fund invests.

***If we are unable to consummate or successfully integrate development opportunities, acquisitions or joint ventures, we may not be able to implement our growth strategy successfully.***

Our growth strategy may include the selective development or acquisition of other asset management businesses, advisory businesses or other businesses or financial products complementary to our business where we think we can add substantial value or generate substantial returns. The success of this strategy will depend on, among other things: (a) the availability of suitable opportunities, (b) the level of competition from other companies that may have greater financial resources, (c) our ability to value potential development or acquisition opportunities accurately and negotiate acceptable terms for those opportunities, (d) our ability to obtain requisite approvals and licenses from the relevant governmental authorities and to comply with applicable laws and regulations without incurring undue costs and delays, (e) our ability to identify and enter into mutually beneficial relationships with venture partners and (f) our ability to properly manage conflicts of interest. Moreover, even if we are able to identify and successfully complete an acquisition, we may encounter unexpected difficulties or incur unexpected costs associated with integrating and overseeing the operations of the new business or activities. If we are not successful in implementing our growth strategy, our business and results of operations.

***We depend on third-party distribution sources to market our investment strategies.***

Our ability to grow our AUM, particularly with respect to our BDCs, is dependent on access to third-party intermediaries, including investment banks, broker dealers and RIAs. We cannot assure you that these intermediaries will continue to be accessible to us on commercially reasonable terms, or at all. In addition, pension fund consultants may review and evaluate our institutional products and our firm from time to time. Poor reviews or evaluations of either a particular product, or of us, may result in institutional client withdrawals or may impair our ability to attract new assets through these consultants.

***An investment strategy focused primarily on privately held companies presents certain challenges, including the lack of available information about these companies.***

Our funds have historically invested primarily in privately held companies. Investments in private companies pose certain incremental risks as compared to investments in public companies including that private companies:

- have reduced access to the capital markets, resulting in diminished capital resources and ability to withstand financial distress;

17

- may have limited financial resources and may be unable to meet their obligations under debt that we hold, which may be accompanied by a deterioration in the value of any collateral and a reduction in the likelihood of us realizing any guarantees we may have obtained in connection with our investment;

- may have shorter operating histories, narrower product lines and smaller market shares than larger business, which tend to render them more vulnerable to competitors' actions and changing market conditions, as well as general economic downturns;

- are more likely to depend on the management talents and efforts of a small group of persons; therefore, the death, disability, resignation or termination of one or more of these persons could have a material adverse impact on our investee company and, in turn, on us; and

- generally have less predictable operating results, may from time to time be parties to litigation, may be engaged in rapidly changing business with products subject to a substantial risk of obsolescence, and may require substantial additional capital to support their operations, finance expansion or maintain their competitive position. In addition, our executive officers, directors or employees may, in the ordinary course of business, be named as defendants in litigation arising from our funds' investments in investee companies.

Finally, limited public information generally exists about private companies and these companies may not have third-party debt ratings or audited financial statements. We must therefore rely on the ability of our funds' advisors to obtain adequate information through due diligence to evaluate the creditworthiness and potential returns from investing in these companies. Additionally, these companies and their financial information will not generally be subject to the Sarbanes-Oxley Act and other rules that govern public companies. If we are unable to uncover all material information about these companies, our funds may lose money on such investments.

***Our funds' investments in investee companies may be risky, and our funds could lose all or part of their investments.***

Our funds pursue strategies focused on investing primarily in the debt of privately owned U.S. companies.

*Senior Secured Debt and Second Lien Secured Debt.* When our funds invest in senior secured term debt and second lien secured debt, our funds will generally take a security interest in the available assets of these investee companies, including the equity interests of their subsidiaries. There is a risk that the collateral securing such investments may decrease in value over time or lose its entire value, may be difficult to sell in a timely manner, may be difficult to appraise and may fluctuate in value based upon the success of the business and market conditions, including as a result of the inability of the investee company to raise additional capital. Also, in some circumstances, our security interest could be subordinated to claims of other creditors. In addition, deterioration in an investee company's financial condition and prospects, including its inability to raise additional capital, may be accompanied by deterioration in the value of the collateral for the debt. Consequently, the fact that debt is secured does not guarantee that we will receive principal and interest payments according to the investment terms, or at all, or that we will be able to collect on the investment should we be forced to enforce our remedies.

*Senior Unsecured Debt.* Our funds may also make unsecured debt investments in investee companies, meaning that such investments will not benefit from any interest in collateral of such companies.

*Subordinated Debt.* Our subordinated debt investments will generally be subordinated to senior debt and will generally be unsecured. This may result in a heightened level of risk and volatility or a loss of principal, which could lead to the loss of the entire investment. These investments may involve additional risks that could adversely affect our investment returns. To the extent interest payments associated with such debt are deferred, such debt may be subject to greater fluctuations in valuations, and such debt could subject our funds to non-cash income. Since the applicable fund would not receive any principal repayments prior to the maturity of some of our subordinated debt investments, such investments will be of greater risk than amortizing loans.

*Equity Investments.* Certain of our funds make selected equity investments. In addition, when our funds invest in senior and subordinated debt, they may acquire warrants or options to purchase equity securities or benefit from other types of equity participation. Our goal is ultimately to dispose of these equity interests and realize gains upon our disposition of such interests. However, the equity interests our funds receive may not appreciate in value and, in fact, may decline in value. Accordingly, our funds may not be able to realize gains from such equity interests, and any gains that our funds do realize on the disposition of any equity interests may not be sufficient to offset any other losses our funds experience.

Most loans in which our funds invest will not be rated by any rating agency and, if they were rated, they would be rated as below investment grade quality. Loans rated below investment grade quality are generally regarded as having predominantly speculative characteristics and may carry a greater risk with respect to a borrower's capacity to pay interest and repay principal. From time to time, our funds, in the past, and may in the future, lose some or all of their investment in an investee company.

18

*Prepayments of debt investments by our investee companies could adversely impact our results of operations.*

We are subject to the risk that the investments our funds make in investee companies may be repaid prior to maturity. When this occurs, our BDCs will generally use such proceeds to reduce their existing borrowings and our private funds will generally return such capital to their investors, which capital may be recalled at a later date pursuant to such funds' governing documents. With respect to our SMAs, if such event occurs after the investment period, such capital will be returned to investors. Any future investment in a new investee company may also be at lower yields than the debt that was repaid. As a result, the results of operations of the affected fund could be materially adversely affected if one or more investee companies elect to prepay amounts owed to such fund, which could in turn have a material adverse effect on our results of operations.

*Our funds' investee companies may incur debt that ranks equally with, or senior to, our funds' investments in such companies.*

Our funds pursue a strategy focused on investing primarily in the debt of privately owned U.S. companies. Our funds' investee companies may have, or may be permitted to incur, other debt that ranks equally with, or senior to, the debt in which our funds invest. By their terms, such debt instruments may entitle the holders to receive payment of interest or principal on or before the dates on which we are entitled to receive payments with respect to the debt instruments in which our funds invest. Also, in the event of insolvency, liquidation, dissolution, reorganization or bankruptcy of an investee company, holders of debt instruments ranking senior to our funds' investment in that investee company would typically be entitled to receive payment in full before we receive any distribution. After repaying such senior creditors, such investee company may not have any remaining assets to use for repaying its obligation to our funds. In the case of debt ranking equally with debt instruments in which our funds invest, our funds would have to share on an equal basis any distributions with other creditors holding such debt in the event of an insolvency, liquidation, dissolution, reorganization or bankruptcy of the relevant investee company.

*Subordinated liens on collateral securing loans that our funds make to their investee companies may be subject to control by senior creditors with first priority liens. If there is a default, the value of the collateral may not be sufficient to repay in full both the first priority creditors and our funds.*

Certain debt investments that our funds make in investee companies are secured on a second priority basis by the same collateral securing senior secured debt of such companies. The first priority liens on the collateral will secure the investee company's obligations under any outstanding senior debt and may secure certain other future debt that may be permitted to be incurred by the company under the agreements governing the debt. The holders of obligations secured by the first priority liens on the collateral will generally control the liquidation of and be entitled to receive proceeds from any realization of the collateral to repay their obligations in full before our funds. In addition, the value of the collateral in the event of liquidation will depend on market and economic conditions, the availability of buyers and other factors. There can be no assurance that the proceeds, if any, from the sale or sales of all of the collateral would be sufficient to satisfy the debt obligations secured by the second priority liens after payment in full of all obligations secured by the first priority liens on the collateral. If such proceeds are not sufficient to repay amounts outstanding under the debt obligations secured by the second priority liens, then our funds, to the extent not repaid from the proceeds of the sale of the collateral, will only have an unsecured claim against the investee company's remaining assets, if any.

Our funds may also make unsecured debt investments in investee companies, meaning that such investments will not benefit from any interest in collateral of such companies. Liens on such investee companies' collateral, if any, will secure the investee company's obligations under its outstanding secured debt and may secure certain future debt that is permitted to be incurred by the investee company under its secured debt agreements. The holders of obligations secured by such liens will generally control the liquidation of, and be entitled to receive proceeds from, any realization of such collateral to repay their obligations in full before us. In addition, the value of such collateral in the event of liquidation will depend on market and economic conditions, the availability of buyers and other factors. There can be no assurance that the proceeds, if any, from sales of such collateral would be sufficient to satisfy our unsecured debt investments after payment in full of all secured debt obligations. If such proceeds were not sufficient to repay the outstanding secured debt obligations, then our unsecured claims would rank equally with the unpaid portion of such secured creditors' claims against the investee company's remaining assets, if any.

The rights our funds may have with respect to the collateral securing the debt investments our funds make in their investee companies with senior debt outstanding may also be limited pursuant to the terms of one or more intercreditor agreements that our funds enter into with the holders of senior secured debt. Under such an intercreditor agreement, at any time that obligations that have the benefit of the first priority liens are outstanding, any of the following actions that may be taken in respect of the collateral will be at the discretion of the holders of the obligations secured by the first priority liens: the ability to cause the commencement of enforcement proceedings against the collateral; the ability to control the conduct of such proceedings; the approval of amendments to collateral documents; releases of liens on the collateral; and waivers of past defaults under collateral documents. Our funds may not have the ability to control or direct such actions, even if their rights are adversely affected.

19

***There may be circumstances where our funds' debt investments could be subordinated to claims of other creditors or our funds could be subject to lender liability claims.***

If one of our investee companies were to go bankrupt, depending on the facts and circumstances, including the extent to which our funds actually provided managerial assistance to that investee company or a representative of us sat on the board of directors of such investee company, a bankruptcy court might recharacterize our funds' debt investment and subordinate all or a portion of our funds' claim to that of other creditors. In situations where a bankruptcy carries a high degree of political significance, our funds' legal rights may be subordinated to other creditors.

In addition, lenders in certain cases can be subject to lender liability claims for actions taken by them when they become too involved in the borrower's business or exercise control over a borrower. It is possible that we or our funds could become subject to a lender's liability claim, including as a result of actions taken if we or our funds render significant managerial assistance to, or exercise control or influence over the board of directors of, the borrower.

***Our funds may not have the resources or ability to make additional investments in our investee companies.***

After an initial investment in an investee company, our funds may be called upon from time to time to provide additional funds to such company or have the opportunity to increase their investment through the exercise of a warrant or other right to purchase common stock. There is no assurance that the applicable fund will make, or will have sufficient resources to make, follow-on investments. Even if such fund has sufficient capital to make a desired follow-on investment, we may elect not to make a follow-on investment because we may not want to increase our level of risk, we prefer other opportunities or we are limited in our ability to do so by compliance with BDC requirements or maintaining RIC status, if applicable. Any decisions not to make a follow-on investment or any inability on our part to make such an investment may have a negative impact on an investee company in need of such an investment, may result in a missed opportunity for us to increase our participation in a successful operation or may reduce the expected return on the investment.

***Economic recessions or downturns could impair our investee companies and harm our operating results.***

Many of our investee companies are susceptible to economic slowdowns or recessions and may be unable to repay our funds' debt investments during these periods. Therefore, our funds' non-performing assets are likely to increase, and the value of our funds' portfolios are likely to decrease during these periods. Adverse economic conditions may also decrease the value of any collateral securing our senior secured or second lien secured debt. A severe recession may further decrease the value of such collateral and result in losses of value in such portfolios. Unfavorable economic conditions also could increase our funding costs, limit our access to the capital markets or result in a decision by lenders not to extend credit to us on terms we deem acceptable. Occurrence of any of these events could materially and adversely affect our business and results of operations.

***A covenant breach by our investee companies may harm our operating results.***

An investee company's failure to satisfy financial or operating covenants imposed by us or other lenders could lead to defaults and, potentially, termination of its debt and foreclosure on its secured assets, which could trigger cross-defaults under other agreements and jeopardize an investee company's ability to meet its obligations under the debt or equity instruments that our funds hold. Our funds may incur expenses to the extent necessary to seek recovery upon default or to negotiate new terms, which may include the waiver of certain financial covenants, with a defaulting investee company. To the extent our funds incur additional costs and/or do not recover their investments in investee companies, we may earn reduced management and incentive fees, which may materially and adversely affect our results of operations.

***The investment management business is competitive.***

The investment management business is competitive, with competition based on a variety of factors, including investment performance, business relationships, quality of service provided to investors, investor liquidity and willingness to invest, fund terms (including fees), brand recognition and business reputation. We compete for investors with a number of other investment managers, public and private funds, BDCs, small business investment companies and others. Numerous factors increase our competitive risks, including:

- a number of our competitors have greater financial, technical, marketing and other resources and more personnel than we do;

- some of our funds may not perform as well as competitors' funds or other available investment products;

- several of our competitors have raised significant amounts of capital, and many of them have similar investment objectives to ours, which may create additional competition for investment opportunities and may reduce the size and duration of pricing inefficiencies that otherwise could be exploited;

- some of our competitors may have a lower cost of capital and access to funding sources that are not available to us, which may create competitive disadvantages for us with respect to our funds;

- some of our competitors may be subject to less regulation and, accordingly, may have more flexibility to undertake and execute certain business or investments than we do and/or bear less compliance expense than we do;

- some of our competitors may have more flexibility than we have in raising certain types of funds under the investment management contracts they have negotiated with their investors;

- some of our competitors may have better expertise or be regarded by investors as having better expertise in a specific asset class or geographic region than we do; and

- other industry participants may, from time to time, seek to recruit our investment professionals and other employees away from us.

In addition, the attractiveness of our funds relative to investments in other investment products could decrease depending on economic conditions. This competitive pressure could adversely affect our ability to make successful investments and limit our ability to raise future funds, either of which would adversely impact our business, results of operations and financial condition.

***Our funds operate in a competitive market for lending that has recently intensified, and competition may limit our funds' ability to originate or acquire desirable loans and investments and could also affect the yields of these assets and have a material adverse effect on our business, results of operations and financial condition.***

Our funds operate in a competitive market for lending that has recently intensified. Our profitability depends, in large part, on our funds' ability to originate or acquire credit investments on attractive terms. In originating or acquiring our target credit investments, we compete with a variety of institutional lenders and investors, including specialty finance companies, public and private funds, commercial and investment banks, BDCs, small business investment companies, REITs, commercial finance and insurance companies and others. Some competitors may have a lower cost of funds and access to funding sources that are not available to us, such as the U.S. government. Many of our competitors or their funds are not subject to the operating constraints associated with qualifying as a RIC under subchapter M of the Code or compliance with the Investment Company Act. In addition, some of our competitors may have higher risk tolerances or different risk assessments, which could allow them to consider a wider variety of investments, offer more attractive pricing, transaction structures, covenants or other terms and establish more relationships than us. Furthermore, competition for originations of and investments in our target assets may lead to the yields of such assets decreasing, which may further limit our ability to generate satisfactory returns. Also, as a result of this competition, desirable loans and investments may be limited in the future and our funds may not be able to take advantage of attractive lending and investment opportunities from time to time, thereby limiting their ability to identify and originate loans or make investments that are consistent with their investment objectives. We cannot assure you that the competitive pressures our funds face will not have a material adverse effect on our business, results of operations and financial condition.

***Dependence on leverage by certain of our funds and by our funds' investee companies subjects us to volatility and contractions in the debt financing markets and could materially and adversely affect our ability to achieve attractive rates of return on those investments.***

MCC, SIC and our funds' investee companies rely on the use of leverage, and our ability to achieve attractive rates of return on investments will depend on our ability to access sufficient sources of indebtedness at attractive rates. While our permanent capital vehicles, MCC and SIC, are our only funds that currently rely on the use of leverage, certain of our other funds may in the future rely on the use of leverage. If our funds or the companies in which our funds invest raise capital in the structured credit, leveraged loan and high yield bond markets, the results of their operations may suffer if such markets experience dislocations, contractions or volatility. Any such events could adversely impact the availability of credit to business generally and could lead to an overall weakening of the U.S. and global economies. Any economic downturn could materially and adversely affect the financial resources of our funds and their investments (in particular those investments that depend on credit from third parties or that otherwise participate in the credit markets) and their ability to make principal and interest payments on, or refinance, outstanding debt when due. Moreover, these events could affect the terms of available debt financing with, for example, higher rates, higher equity requirements and/or more restrictive covenants.

The absence of available sources of sufficient debt financing for extended periods of time or an increase in either the general levels of interest rates or in the risk spread demanded by sources of indebtedness would make it more expensive to finance those investments. Certain investments may also be financed through borrowings on fund-level debt facilities, which may or may not be available for a refinancing at the end of their respective terms. Finally, the interest payments on the indebtedness used to finance our funds' investments are generally deductible expenses for income tax purposes, subject to limitations under applicable tax law and policy. Any change in such tax law or policy to eliminate or substantially limit these income tax deductions, as has been

21

discussed from time to time in various jurisdictions, would reduce the after-tax rates of return on the affected investments, which may have an adverse impact on our business and financial results.

Similarly, our funds' investee companies regularly utilize the corporate debt markets to obtain additional financing for their operations. Our investee companies are typically highly leveraged. Those that have credit ratings are typically non-investment grade and those that do not have credit ratings would likely be non-investment grade if they were rated. If the credit markets render such financing difficult to obtain or more expensive, this may negatively impact the operating performance of those investee companies and, therefore, the investment returns of our funds. In addition, if the markets make it difficult or impossible to refinance debt that is maturing in the near term, some of our investee companies may be unable to repay such debt at maturity and may be forced to sell assets, undergo a recapitalization or seek bankruptcy protection. Any of the foregoing circumstances could have a material adverse effect on our business, results of operations and financial condition.

Our funds may choose to use leverage as part of their respective investment programs. As of December 31, 2019, MCC and SIC were our only funds that relied on leverage. As of December 31, 2019, MCC had a NAV of $220.6 million, $0.4 billion of AUM and an asset coverage ratio of 206.1%. As of December 31, 2019, SIC had a NAV of $591.1 million, $1.1 billion of AUM and an asset coverage ratio of 279.9%. The use of leverage poses a significant degree of risk and enhances the possibility of a significant loss to investors. A fund may borrow money from time to time to make investments or may enter into derivative transactions with counterparties that have embedded leverage. The interest expense and other costs incurred in connection with such borrowing may not be recovered by returns on such investments and may be lost, and the timing and magnitude of such losses may be accelerated or exacerbated, in the event of a decline in the market value of such investments. Gains realized with borrowed funds may cause the fund's NAV to increase at a faster rate than would be the case without borrowings. However, if investment results fail to cover the cost of borrowings, the fund's NAV could also decrease faster than if there had been no borrowings. In addition, as BDCs registered under the Investment Company Act, MCC and SIC are each permitted to issue senior securities in amounts such that its asset coverage ratio equals at least 200% after each issuance of senior securities. Each of MCC's and SIC's ability to pay dividends will be restricted if its asset coverage ratio falls below at least 200% and any amounts that it uses to service its indebtedness are not available for dividends to its common stockholders. An increase in interest rates could also decrease the value of fixed-rate debt investments that our funds make. Any of the foregoing circumstances could have a material adverse effect on our business, results of operations and financial condition.

***Some of our funds may invest in companies that are highly leveraged, which may increase the risk of loss associated with those investments.***

Some of our funds may invest in companies whose capital structures involve significant leverage. For example, in many non-distressed private equity investments, indebtedness may be as much as 75% or more of an investee company's total debt and equity capitalization, including debt that may be incurred in connection with the investment, whether incurred at or above the investment-level entity. In distressed situations, indebtedness may exceed 100% or more of an investee company's capitalization. Additionally, the debt positions originated or acquired by our funds may be the most junior in what could be a complex capital structure, and thus subject us to the greatest risk of loss.

Investments in highly leveraged entities are also inherently more sensitive to declines in revenues, increases in expenses and interest rates and adverse economic, market and industry developments.

Furthermore, the incurrence of a significant amount of indebtedness by an entity could, among other things:

· subject the entity to a number of restrictive covenants, terms and conditions, any violation of which could be viewed by creditors as an event of default and could materially impact our funds' ability to realize value from the investment;

· allow even moderate reductions in operating cash flow to render the entity unable to service its indebtedness, leading to a bankruptcy or other reorganization of the entity and a loss of part or all of our funds' equity investment in it;

· give rise to an obligation to make mandatory prepayments of debt using excess cash flow, which might limit the entity's ability to respond to changing industry conditions if additional cash is needed for the response, to make unplanned but necessary capital expenditures or to take advantage of growth opportunities;

· limit the entity's ability to adjust to changing market conditions, thereby placing it at a competitive disadvantage compared to its competitors that have relatively less debt;

· limit the entity's ability to engage in strategic acquisitions that might be necessary to generate attractive returns or further growth; and

· limit the entity's ability to obtain additional financing or increase the cost of obtaining such financing, including for capital expenditures, working capital or other general corporate purposes.

As a result, the risk of loss associated with a leveraged entity is generally greater than for companies with comparatively less debt. For example, a number of investments consummated by private equity sponsors during 2005, 2006 and 2007 that utilized significant amounts of leverage subsequently experienced severe economic stress and, in certain cases, defaulted on their debt obligations due to a decrease in revenues and cash flows precipitated by the subsequent economic downturn during 2008 and 2009.

***We generally do not control the business operations of our investee companies and, due to the illiquid nature of our investments, may not be able to dispose of such investments.***

Investments by our funds generally consist of debt instruments and equity securities of companies that we do not control. We do not expect to control most of our investee companies, even though we may have board representation or board observation rights, and our debt agreements may impose certain restrictive covenants on our borrowers. As a result, we are subject to the risk that an investee company in which our funds invest may make business decisions with which we disagree and the management of such company, as representatives of the holders of their common equity, may take risks or otherwise act in ways that do not serve our interests as debt investors. Due to the lack of liquidity for our investments in private companies, we may not be able to dispose of our interests in our investee companies as readily as we would like or at an appropriate valuation. As a result, an investee company may make decisions that could decrease the value of our investment holdings.

***A substantial portion of our investments may be recorded at fair value as determined in good faith by or under the direction of our respective funds' boards of directors or similar bodies and, as a result, there may be uncertainty regarding the value of our funds' investments.***

The debt and equity instruments in which our funds invest for which market quotations are not readily available will be valued at fair value as determined in good faith by or under the direction of such respective funds' boards of directors or similar bodies. Most, if not all, of our funds' investments (other than cash and cash equivalents) are classified as Level III under Accounting Standards Codification ("ASC") Topic 820 - *Fair Value Measurements and Disclosures*. This means that our funds' portfolio valuations will be based on unobservable inputs and our funds' assumptions about how market participants would price the asset or liability in question. We expect that inputs into the determination of fair value of our funds' portfolio investments will require significant management judgment or estimation. Even if observable market data were available, such information may be the result of consensus pricing information or broker quotes, which include a disclaimer that the broker would not be held to such a price in an actual transaction. The non-binding nature of consensus pricing and/or quotes accompanied by disclaimers materially reduces the reliability of such information. Our funds retain the services of an independent service provider to review the valuation of these loans and securities.

The types of factors that the board of directors, general partner or similar body may take into account in determining the fair value of a fund's investments generally include, as appropriate, comparison to publicly traded securities including such factors as yield, maturity and measures of credit quality, the enterprise value of an investee company, the nature and realizable value of any collateral, the investee company's ability to make payments and its earnings and discounted cash flow, the markets in which the investee company does business and other relevant factors. Because such valuations, and particularly valuations of private securities and private companies, are inherently uncertain, may fluctuate over short periods of time and may be based on estimates, our determinations of fair value may differ materially from the values that would have been used if a ready market for these loans and securities existed. Our funds' NAV could be materially and adversely affected if determinations regarding the fair value of such funds' investments were materially higher than the values that such funds' ultimately realize upon the disposal of such loans and securities.

***We may need to pay "clawback" obligations if and when they are triggered under the governing agreements with respect to certain of our funds and SMAs.***

Generally, if at the termination of a fund (and sometimes at interim points in the life of a fund), the fund has not achieved investment returns that (in most cases) exceed the preferred return threshold or (in all cases) the general partner receives net profits over the life of the fund in excess of its allocable share under the applicable partnership agreement, we will be obligated to repay an amount equal to the extent to which carried interest that was previously distributed to us exceeds the amounts to which we are ultimately entitled. This obligation is known as a "clawback" obligation. Medley received a carried interest distribution of $0.3 million from one of its managed funds, which was liquidated as of December 31, 2019. Prior to the receipt of this distribution during the year ended December 31, 2019, Medley has not received any carried interest, other than tax distributions, a portion of which is subject to clawback. As of December 31, 2019, we recorded a $7.2 million clawback obligation that would need to be paid if the funds were liquidated at fair value as of the end of the reporting period. Had we assumed all existing investments were worthless as of December 31, 2019, there would be no additional amounts subject to clawback.

Although a clawback obligation is several to each person who received a distribution, and not a joint obligation, the governing agreements of our funds generally provide that, if a recipient does not fund his or her respective share, we may have to fund such additional amounts beyond the amount of carried interest we retained, although we generally will retain the right to pursue remedies

against those carried interest recipients who fail to fund their obligations. We may need to use or reserve cash to repay such clawback obligations instead of using the cash for other purposes. See *"Management's Discussion and Analysis of Financial Condition and Results of Operations - Contingent Obligations."*

*Our funds may face risks relating to undiversified investments.*

While diversification is generally an objective of our funds, there can be no assurance as to the degree of diversification, if any, that will be achieved in any fund investments. Difficult market conditions or slowdowns affecting a particular asset class, geographic region or other category of investment could have a significant adverse impact on a fund if its investments are concentrated in that area, which would result in lower investment returns. This lack of diversification may expose a fund to losses disproportionate to economic conditions or market declines in general if there are disproportionately greater adverse movements in the particular investments. If a fund holds investments concentrated in a particular issuer, security, asset class or geographic region, such fund may be more susceptible than a more widely diversified investment portfolio to the negative consequences of a single corporate, economic, political or regulatory event. Accordingly, a lack of diversification on the part of a fund could materially adversely affect a fund's performance and, as a result, our results of operations and financial condition.

*Third-party investors in our private funds may not satisfy their contractual obligation to fund capital calls when requested, which could materially adversely affect a fund's operations and performance.*

Investors in our private funds make capital commitments to those funds that we are entitled to call from those investors at any time during prescribed periods. We depend on investors fulfilling and honoring their commitments when we call capital from them for those funds to consummate investments and otherwise pay their obligations when due. Any investor that did not fund a capital call would be subject to several possible penalties, including having a meaningful amount of its existing investment forfeited in that fund. However, the impact of the penalty is directly correlated to the amount of capital previously invested by the investor in the fund and if an investor has invested little or no capital, for instance early in the life of the fund, then the forfeiture penalty may not be as meaningful. Investors may also negotiate for lesser or reduced penalties at the outset of the fund, thereby limiting our ability to enforce the funding of a capital call. Third-party investors in private funds often use distributions from prior investments to meet future capital calls. In cases where valuations of existing investments fall and the pace of distributions slows, investors may be unable to make new commitments to third-party managed investment funds such as those advised by us. A failure of investors to honor a significant amount of capital calls for any particular fund or funds could have a material adverse effect on the operation and performance of those funds.

*Our funds may be forced to dispose of investments at a disadvantageous time.*

Our funds may make investments that they do not advantageously dispose of prior to the date the applicable fund is dissolved, either by expiration of such fund's term or otherwise. Although we generally expect that investments will be disposed of prior to dissolution or be suitable for in-kind distribution at dissolution, and the general partners of the funds have only a limited ability to extend the term of the fund with the consent of fund investors or the advisory board of the fund, as applicable, our funds may have to sell, distribute or otherwise dispose of investments at a disadvantageous time as a result of dissolution. This would result in a lower than expected return on the investments and, perhaps, on the fund itself.

*Hedging strategies may materially and adversely affect the returns on our funds' investments.*

When managing our exposure to market risks, we may (on our own behalf or on behalf of our funds) from time to time use forward contracts, options, swaps (including total return swaps), caps, collars, floors, foreign currency forward contracts, currency swap agreements, currency option contracts or other strategies. The success of any hedging or other derivative transactions generally will depend on our ability to correctly predict market or foreign exchange changes, the degree of correlation between price movements of a derivative instrument and the position being hedged, the creditworthiness of the counterparty and other factors. As a result, while we may enter into a transaction to reduce our or a fund's exposure to market risks, the transaction may result in poorer overall investment performance than if it had not been executed. Such transactions may also limit the opportunity for gain if the value of a hedged position increases.

While such hedging arrangements may reduce certain risks, such arrangements themselves may entail certain other risks. These arrangements may require the posting of cash collateral at a time when we or a fund has insufficient cash or illiquid assets such that the posting of the cash is either impossible or requires the sale of assets at prices that do not reflect their underlying value. Moreover, these hedging arrangements may generate significant transaction costs, including potential tax costs, that may reduce the returns generated by a fund. Finally, the CFTC has made several public statements that it may soon issue a proposal for certain foreign exchange products to be subject to mandatory clearing, which could increase the cost of entering into currency hedges.

24

***Our business depends in large part on our ability to raise capital from investors. If we were unable to raise such capital, we would be unable to collect management fees or deploy such capital into investments, which would materially and adversely affect our business, results of operations and financial condition.***

Our ability to raise capital from investors depends on a number of factors, including many that are outside our control. Investors may downsize their investment allocations to credit focused private funds or BDCs or to rebalance a disproportionate weighting of their overall investment portfolio among asset classes. Poor performance of our funds could also make it more difficult for us to raise new capital. Our investors and potential investors continually assess our funds' performance independently and relative to market benchmarks and our competitors, and our ability to raise capital for existing and future funds depends on our funds' performance. If economic and market conditions deteriorate, we may be unable to raise sufficient amounts of capital to support the investment activities of future funds. If we were unable to successfully raise capital, our business, results of operations and financial condition would be adversely affected.

***We depend on our senior management team, senior investment professionals and other key personnel, and our ability to retain them and attract additional qualified personnel is critical to our success and our growth prospects.***

We depend on the diligence, skill, judgment, business contacts and personal reputations of our senior management team, including Brook Taube and Seth Taube, our co-Chief Executive Officers, senior investment professionals and other key personnel. Our future success will depend upon our ability to retain our senior professionals and other key personnel and our ability to recruit additional qualified personnel. These individuals possess substantial experience and expertise in investing, are responsible for locating and executing our funds' investments, have significant relationships with the institutions that are the source of many of our funds' investment opportunities and, in certain cases, have strong relationships with our investors. Therefore, if any of our senior professionals or other key personnel join competitors or form competing companies, it could result in the loss of significant investment opportunities and certain existing investors.

The departure for any reason of any of our senior professionals could have a material adverse effect on our ability to achieve our investment objectives, cause certain of our investors to withdraw capital they invest with us or elect not to commit additional capital to our funds or otherwise have a material adverse effect on our business and our prospects. The departure of some or all of those individuals could also trigger certain "key man" provisions in the documentation governing certain of our funds, which would permit the investors in those funds to suspend or terminate such funds' investment periods or, in the case of certain funds, permit investors to withdraw their capital prior to expiration of the applicable lock-up date. We do not carry any "key man" insurance that would provide us with proceeds in the event of the death or disability of any of our senior professionals, and we do not have a policy that prohibits our senior professionals from traveling together.

We anticipate that it will be necessary for us to add investment professionals both to grow our business and to replace those who depart. However, the market for qualified investment professionals is extremely competitive and we may not succeed in recruiting additional personnel or we may fail to effectively replace current personnel who depart with qualified or effective successors. Our efforts to retain and attract investment professionals may also result in significant additional expenses, which could adversely affect our profitability or result in an increase in the portion of our performance fees that we grant to our investment professionals.

***Our failure to appropriately address conflicts of interest could damage our reputation and adversely affect our business.***

As we have expanded and as we continue to expand the number and scope of our business activities, we increasingly confront potential conflicts of interest relating to our funds' investment activities. Certain of our funds may have overlapping investment objectives, including funds that have different fee structures, and potential conflicts may arise with respect to our decisions regarding how to allocate investment opportunities among those funds. For example, a decision to receive material non-public information about a company while pursuing an investment opportunity for a particular fund gives rise to a potential conflict of interest when it results in our having to restrict the ability of other funds to take any action.

In most cases, Medley is permitted to co-invest among our private funds, our SMAs, our public business development companies and other advisory clients pursuant to an exemptive order issued by the SEC. We have adopted an order aggregation and trade allocation policy designed to ensure that all of our clients are treated fairly and to prevent this form of conflict from influencing the allocation of investment opportunities among clients. Allocations will generally be made pro rata principally based on each fund or advisory client's capital available for investment. It is Medley's policy to base its determinations as to the amounts of capital available for investment on such factors as: the amount of cash on hand, existing capital commitments and reserves, if any, the targeted leverage level, the targeted asset mix and diversification requirements and other investment policies and restrictions or otherwise imposed by applicable laws, rules, regulations or interpretations.

We may also cause different funds to invest in a single investee company, for example, where the fund that made an initial investment no longer has capital available to invest. We may also cause different funds that we advise to purchase different classes

of investments or securities in the same investee company. For example, certain of our funds hold minority equity interests, or have the right to acquire such equity interests, in some of our investee companies. As a result, we may face conflicts of interests in connection with making business decisions for these investee companies to the extent that such decisions affect the debt and equity holders in these investee companies differently. In addition, we may face conflicts of interests in connection with making investment or other decisions, including granting loan waivers or concessions with respect to these investee companies given that we also manage private funds that may hold equity interests in these investee companies. In addition, conflicts of interest may exist in the valuation of our investments and regarding decisions about the allocation of specific investment opportunities among us and our funds and the allocation of fees and costs among us and our funds. Though we believe we have developed appropriate policies and procedures to resolve these conflicts, our judgment on any particular allocation could be challenged. If we fail to appropriately address any such conflicts, it could negatively impact our reputation and ability to raise additional funds and the willingness of counterparties to do business with us or result in potential litigation against us.

Actions by activist investors relating to our affiliates can be costly and time-consuming, disrupt our operations and divert the attention of management and our employees. Stockholder activism could create perceived uncertainties, which could result in the loss of potential business opportunities and make it more difficult for us to attract and retain qualified personnel and business partners. Furthermore, stockholder activism could adversely affect our ability to effectively and timely implement strategic plans, including in connection with the proposed mergers.

***Growth of our business may be difficult to sustain and may place significant demands on our administrative, operational and financial resources.***

Our assets under management have grown significantly in the past and we are pursuing further growth. Our growth has placed, and planned growth, if successful, will continue to place, significant demands on our legal, compliance, accounting and operational infrastructure, and has increased expenses associated with all of the foregoing. In addition, we are required to continuously develop our systems and infrastructure in response to the increasing sophistication of the investment management market and legal, accounting, regulatory and tax developments. Our future growth will depend in part on our ability to maintain an operating platform and management system sufficient to address our growth and will require us to incur significant additional expenses and to commit additional senior management and operational resources. As a result, we face significant challenges:

• in maintaining adequate financial, regulatory (legal, tax and compliance) and business controls;

• in implementing new or updated information and financial systems and procedures; and

• in training, managing and appropriately sizing our work force and other components of our business on a timely and cost-effective basis.

We may not be able to manage our expanding operations effectively or be able to continue to grow, and any failure to do so could adversely affect our ability to generate revenue and control our expenses.

***We may enter into new lines of business and expand into new investment strategies, geographic markets and business, each of which may result in additional risks and uncertainties in our businesses.***

We intend to grow our business by increasing assets under management in existing business and, if market conditions warrant, by expanding into complementary investment strategies, geographic markets and businesses. Accordingly, we may pursue growth through acquisitions of other investment management companies, acquisitions of critical business partners or other strategic initiatives, which may include entering into new lines of business. Attempts to expand our business involve a number of special risks, including some or all of the following:

• the required investment of capital and other resources;

• the assumption of liabilities in any acquired business;

• the disruption of our ongoing business;

• entry into markets or lines of business in which we may have limited or no experience;

• increasing demands on our operational and management systems and controls;

• compliance with additional regulatory requirements;

• potential increase in investor concentration; and

• the broadening of our geographic footprint, increasing the risks associated with conducting operations in certain foreign jurisdictions where we currently have no presence.

26

Entry into certain lines of business may subject us to new laws and regulations with which we are not familiar, or from which we are currently exempt, and may lead to increased litigation and regulatory risk. If a new business does not generate sufficient revenues or if we are unable to efficiently manage our expanded operations, our results of operations will be adversely affected. Our strategic initiatives may include joint ventures, in which case we will be subject to additional risks and uncertainties in that we may be dependent upon, and subject to liability, losses or reputational damage relating to systems, controls and personnel that are not under our control. Because we have not yet identified these potential new investment strategies, geographic markets or lines of business, we cannot identify for you all the risks we may face and the potential adverse consequences on us and your investment that may result from any attempted expansion.

***Extensive regulation affects our activities, increases the cost of doing business and creates the potential for significant liabilities and penalties that could adversely affect our business and results of operations.***

Our business is subject to extensive regulation, including periodic examinations by governmental agencies and self-regulatory organizations in the jurisdictions in which we operate. The SEC oversees the activities of our subsidiaries that are registered investment advisers under the Investment Advisers Act. In addition, we regularly rely on exemptions from various requirements of the Securities Act, the Securities Exchange Act of 1934, as amended (the "Exchange Act"), the Investment Company Act, the Commodity Exchange Act and the U.S. Employee Retirement Income Security Act of 1974. These exemptions are sometimes highly complex and may in certain circumstances depend on compliance by third parties who we do not control. If for any reason these exemptions were to be revoked or challenged or otherwise become unavailable to us, we could be subject to regulatory action or third-party claims, which could have a material adverse effect on our business.

The SEC has indicated that investment advisers who receive transaction-based compensation for investment banking or acquisition activities relating to fund investee companies may be required to register as broker-dealers. Specifically, the SEC staff has noted that if a firm receives fees from a fund investee company in connection with the acquisition, disposition or recapitalization of such investee company, such activities could raise broker-dealer concerns under applicable regulations related to broker dealers. If we receive such transaction fees and the SEC takes the position that such activities render us a "broker" under the applicable rules and regulations of the Exchange Act, we could be subject to additional regulation. If receipt of transaction fees from an investee company is determined to require a broker-dealer license, receipt of such transaction fees in the past or in the future during any time when we did not or do not have a broker-dealer license could subject us to liability for fines, penalties, damages or other remedies.

Since 2010, certain states and other regulatory authorities have begun to require investment managers to register as lobbyists in connection with their solicitation of commitments from governmental entities, including state and municipal pension funds. We have registered as such in a number of jurisdictions, including California and New York. Other states or municipalities may consider similar legislation or adopt regulations or procedures with similar effect. These registration requirements impose significant compliance obligations and restrictions on registered lobbyists and their employers, which may include annual registration fees, periodic disclosure reports and internal recordkeeping, and may also prohibit the payment of contingent fees.

Each of the regulatory bodies with jurisdiction over us has regulatory powers dealing with many aspects of financial services, including the authority to grant, and in specific circumstances to cancel, permissions to carry on particular activities. A failure to comply with the obligations imposed by the Investment Advisers Act, including recordkeeping, advertising and operating requirements, disclosure obligations and prohibitions on fraudulent activities, could result in investigations, sanctions and reputational damage. We are involved regularly in trading activities that implicate a broad number of U.S. securities law regimes, including laws governing trading on inside information, market manipulation and a broad number of technical trading requirements that implicate fundamental market regulation policies. Violation of these laws could result in severe restrictions on our activities and damage to our reputation.

Our failure to comply with applicable laws or regulations could result in fines, censure, suspensions of personnel or other sanctions, including revocation of the registration of our relevant subsidiaries as investment advisers or registered broker-dealers. The regulations to which our business is subject are designed primarily to protect investors in our funds and to ensure the integrity of the financial markets. They are not designed to protect MDLY stockholders. Even if a sanction imposed against us, one of our subsidiaries or our personnel by a regulator is for a small monetary amount, the adverse publicity related to the sanction could harm our reputation, which in turn could have a material adverse effect on our business in a number of ways, making it harder for us to raise new funds and discouraging others from doing business with us.

***Failure to comply with "pay to play" regulations implemented by the SEC and certain states, and changes to the "pay to play" regulatory regimes, could adversely affect our business.***

In recent years, the SEC and several states have initiated investigations alleging that certain private equity firms and hedge funds or agents acting on their behalf have paid money to current or former government officials or their associates in exchange for improperly soliciting contracts with state pension funds. In June 2010, the SEC approved Rule 206(4)-5 under the Investment

27

Advisers Act regarding "pay to play" practices by investment advisers involving campaign contributions and other payments to government officials able to exert influence on potential government entity clients. Among other restrictions, the rule prohibits investment advisers from providing advisory services for compensation to a government entity for two years, subject to very limited exceptions, after the investment adviser, its senior executives or its personnel involved in soliciting investments from government entities make contributions to certain candidates and officials in a position to influence the hiring of an investment adviser by such government entity. Advisers are required to implement compliance policies designed, among other matters, to track contributions by certain of the adviser's employees and engagements of third parties that solicit government entities and to keep certain records to enable the SEC to determine compliance with the rule. In addition, there have been similar rules on a state level regarding "pay to play" practices by investment advisers.

As a number of public pension plans are investors in our funds, these rules could impose significant economic sanctions on our business if we or one of the other persons covered by the rules make any such contribution or payment, whether or not material or with an intent to secure an investment from a public pension plan. In addition, such investigations may require the attention of senior management and may result in fines or forfeitures of fees paid and an obligation to provide services without payment of fees if any of our funds are deemed to have violated any regulations, thereby imposing additional expenses on us. Any failure on our part to comply with these rules could cause us to lose compensation for our advisory services or expose us to significant penalties and reputational damage.

*New or changed laws or regulations governing our funds' operations and changes in the interpretation thereof could adversely affect our business.*

The laws and regulations governing the operations of our funds, as well as their interpretation, may change from time to time, and new laws and regulations may be enacted. Accordingly, any change in these laws or regulations, changes in their interpretation, or newly enacted laws or regulations and any failure by our funds to comply with these laws or regulations, could require changes to certain of our business practices, negatively impact our operations, assets under management or financial condition, impose additional costs on us or otherwise adversely affect our business. See *"Business - Regulatory and Compliance Matters"* for a discussion of our regulatory and compliance environment. The following includes the most significant regulatory risks facing our business:

*Changes in capital requirements may increase the cost of our financing.*

If regulatory capital requirements - whether under the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Dodd-Frank Act"), Basel III, or other regulatory action - were to be imposed on our funds, they may be required to limit, or increase the cost of, financing they provide to others. Among other things, this could potentially require our funds to sell assets at an inopportune time or price, which could negatively impact our operations, assets under management or financial condition.

*The imposition of additional legal or regulatory requirements could make compliance more difficult and expensive, affect the manner in which we conduct our business and adversely affect our profitability.*

In July 2010, President Obama signed into law the Dodd-Frank Act. The Dodd-Frank Act, among other things, imposes significant regulations on nearly every aspect of the U.S. financial services industry, including new registration, recordkeeping and reporting requirements on private fund investment advisers. Importantly, while numerous key aspects of the Dodd-Frank Act have been defined through final rules, additional regulations thereunder or amendments thereunder may continue to be implemented by various regulatory bodies in the future. While we already have several subsidiaries registered as investment advisers subject to SEC examinations, the imposition of any additional legal or regulatory requirements could make compliance more difficult and expensive, affect the manner in which we conduct our business and materially and adversely affect our profitability.

*The implementation of the Volcker Rule could have adverse implications on our ability to raise funds from certain entities.*

In December 2013, the Federal Reserve and other federal regulatory agencies adopted a final rule implementing a section of the Dodd-Frank Act that has become known as the "Volcker Rule." The Volcker Rule generally prohibits insured banks or thrifts, any bank holding company or savings and loan holding company, any non-U.S. bank with a U.S. branch, agency or commercial lending company and any subsidiaries and affiliates of such entities, regardless of geographic location, from investing in or sponsoring "covered funds," which include private equity funds or hedge funds and certain other proprietary activities. Although we do not currently anticipate that the Volcker Rule will adversely affect our fundraising to any significant extent, there remains uncertainty regarding the implementation of the Volcker Rule and its practical implications (including as a result of the long-term effects of the Volcker Rule, as well as potential changes to the rule in light of the OCC's August 2017 solicitation of public comments on how the rule should be revised to better accomplish its purpose), and there could be adverse implications on our ability to raise funds from the types of entities mentioned above as a result of this prohibition.

***Increased regulation on banks' leveraged lending activities could negatively affect the terms and availability of credit to our funds and their investee companies.***

In March 2013, the Office of the Comptroller of the Currency, the Department of the Treasury, the Board of Governors of the Federal Reserve System and the Federal Deposit Insurance Corporation published revised guidance regarding expectations for banks' leveraged lending activities. This guidance, and related or similar regulations restrict credit availability, as well as potentially restrict certain of our investing activities that rely on banks' lending activities. This could negatively affect the terms and availability of credit to our funds and their investee companies.

***New restrictions on compensation could limit our ability to recruit and retain investment professionals.***

The Dodd-Frank Act authorizes federal regulatory agencies to review and, in certain cases, prohibit compensation arrangements at financial institutions that give employees incentives to engage in conduct deemed to encourage inappropriate risk-taking by covered financial institutions. Such restrictions could limit our ability to recruit and retain investment professionals and senior management executives.

***Regulatory uncertainty could negatively impact our ability to efficiently project, plan and operate our business impacting profitability.***

In early February 2017, the Trump administration issued an executive order calling for a review of laws and regulations affecting the U.S. financial industry in order to determine their consistency with a set of core principles identified in the executive order. Several bills are pending in Congress that, if enacted, would amend the Dodd-Frank Act. The Economic Growth, Regulatory Relief and Consumer Protection Act was enacted into law in 2018. The Administration has expressed support for such proposals and encouraged the House and Senate to work together to present legislation to the President as quickly as possible. Such enacted and pending legislation could change the process and criteria for designating systemically important financial institutions, modify the Volcker Rule and make reforms to the Consumer Financial Protection Bureau, among other amendments to the Dodd-Frank Act.

It is difficult to determine the full extent of the impact on us of any other new laws, regulations or initiatives that may be proposed or whether any of the proposals will become law. In addition, as a result of proposed legislation, shifting areas of focus of regulatory enforcement bodies or otherwise, regulatory compliance practices may shift such that formerly accepted industry practices become disfavored or less common. Any changes or other developments in the regulatory framework applicable to our businesses, including the changes described above and changes to formerly accepted industry practices, may impose additional costs on us, require the attention of our senior management or result in limitations on the manner in which we conduct our businesses. Moreover, as calls for additional regulation have increased, there may be a related increase in regulatory investigations of the trading and other investment activities of alternative asset management funds, including our funds. In addition, we may be adversely affected by changes in the interpretation or enforcement of existing laws and rules by these governmental authorities and self-regulatory organizations. Compliance with any new laws or regulations could make compliance more difficult and expensive, affect the manner in which we conduct our businesses and materially and adversely affect our profitability.

***Present and future BDCs for which we serve as investment adviser are subject to regulatory complexities that limit the way in which they do business and may subject them to a higher level of regulatory scrutiny.***

MCC and SIC, and other BDCs for which we may serve as investment adviser in the future, operate under a complex regulatory environment. Such BDCs require the application of complex tax and securities regulations and may entail a higher level of regulatory scrutiny. In addition, regulations affecting BDCs generally affect their ability to take certain actions. For example, each of MCC and SIC has elected to be treated as a RIC for United States federal income tax purposes. To maintain their status as a RIC, such vehicles must meet, among other things, certain source of income, asset diversification and annual distribution requirements. If any of our BDCs fails to qualify for RIC tax treatment for any reason and remains or becomes subject to corporate income tax, the resulting corporate taxes could, among other things, substantially reduce such BDC's net assets.

In addition, MCC and SIC are subject to complex rules under the Investment Company Act, including rules that restrict certain of our funds from engaging in transactions with MCC and SIC. Under the regulatory and business environment in which they operate, MCC and SIC must periodically access the capital markets to raise cash to fund new investments in excess of their repayments to grow. This results from MCC and SIC each being required to generally distribute to their respective stockholders at least 90% of its investment company taxable income to maintain its RIC status, combined with regulations under the Investment Company Act that, subject to certain exceptions, generally prohibit MCC and SIC from issuing and selling their common stock at a price below NAV per share and from incurring indebtedness (including for this purpose, preferred stock), if their asset coverage, as calculated pursuant to the Investment Company Act, equals less than 200% after such incurrence. If our BDCs are found to be in violation of the Investment Company Act, they could lose their status as BDCs. If either of our BDCs fails to continuously qualify as a BDC, such BDC might be subject to regulation as a registered closed-end investment company under the 1940 Act,

which would significantly decrease its operating flexibility. In addition, failure to comply with the requirements imposed on BDCs by the 1940 Act could cause the SEC to bring an enforcement action against such BDC, which could have a material adverse effect on us.

***We are subject to risks in using custodians, counterparties, administrators and other agents.***

Some of our funds depend on the services of custodians, counterparties, administrators, prime brokers and other agents to carry out certain financing, securities and derivatives transactions. The terms of these contracts are often customized and complex, and many of these arrangements occur in markets or relate to products that are not subject to regulatory oversight, although the Dodd-Frank Act provides for new regulation of the derivatives market. In particular, some of our funds utilize arrangements with a relatively limited number of counterparties, which has the effect of concentrating the transaction volume (and related counterparty default risk) of such funds with these counterparties.

Our funds are subject to the risk that the counterparty to one or more of these contracts defaults, either voluntarily or involuntarily, on its performance under the contract. Any such default may occur suddenly and without notice to us. Moreover, if a counterparty defaults, we may be unable to take action to cover our exposure, either because we lack contractual recourse or because market conditions make it difficult to take effective action. This inability could occur in times of market stress, which is when defaults are most likely to occur.

In addition, our risk-management process may not accurately anticipate the impact of market stress or counterparty financial condition, and as a result, we may not have taken sufficient action to reduce our risks effectively. Default risk may arise from events or circumstances that are difficult to detect, foresee or evaluate. In addition, concerns about, or a default by, one large participant could lead to significant liquidity problems for other participants, which may in turn expose us to significant losses.

Although we have risk-management processes to ensure that we are not exposed to a single counterparty for significant periods of time, given the large number and size of our funds, we often have large positions with a single counterparty. For example, some of our funds have credit lines. If the lender under one or more of those credit lines were to become insolvent, we may have difficulty replacing the credit line and one or more of our funds may face liquidity problems.

In the event of a counterparty default, particularly a default by a major investment bank or a default by a counterparty to a significant number of our contracts, one or more of our funds may have outstanding trades that they cannot settle or are delayed in settling. As a result, these funds could incur material losses and the resulting market impact of a major counterparty default could harm our business, results of operation and financial condition.

In the event of the insolvency of a prime broker, custodian, counterparty or any other party that is holding assets of our funds as collateral, our funds might not be able to recover equivalent assets in full as they will rank among the prime broker's, custodian's or counterparty's unsecured creditors in relation to the assets held as collateral. In addition, our funds' cash held with a prime broker, custodian or counterparty generally will not be segregated from the prime broker's, custodian's or counterparty's own cash, and our funds may therefore rank as unsecured creditors in relation thereto. If our derivatives transactions are cleared through a derivatives clearing organization, the CFTC has issued final rules regulating the segregation and protection of collateral posted by customers of cleared and uncleared swaps. The CFTC is also working to provide new guidance regarding prime broker arrangements and intermediation generally with regard to trading on swap execution facilities.

The counterparty risks that we face have increased in complexity and magnitude as a result of disruption in the financial markets in recent years. For example, the consolidation and elimination of counterparties has increased our concentration of counterparty risk and decreased the universe of potential counterparties. Our funds are generally not restricted from dealing with any particular counterparty or from concentrating any or all of their transactions with a single counterparty. In addition, counterparties have generally reacted to recent market volatility by tightening their underwriting standards and increasing their margin requirements for all categories of financing, which has the result of decreasing the overall amount of leverage available and increasing the costs of borrowing.

***A portion of our revenue and cash flow is variable, which may impact our ability to achieve steady earnings growth on a quarterly basis.***

We believe that base management fees are consistent and predictable. For all periods presented, over 40% of total revenues was derived from base management fees. Due to our investment strategy and the nature of our fees, a portion of our revenue and cash flow is variable, due primarily to the fact that the performance fees from our long-dated private funds and SMAs can vary from quarter to quarter and year to year. For the year ended December 31, 2017, total revenue of $65.0 million included a reversal of performance fees of $2.0 million. As a result of the adoption of the new revenue recognition standard on January 1, 2018, we did not recognize any performance fees in 2019 or 2018, as we determined that it was not probable that a significant reversal of such fees would not occur in the future. Additionally, we may also experience fluctuations in our results from quarter to quarter and year to year due to a number of other factors, including changes in the values of our funds' investments, changes in our operating

expenses, the degree to which we encounter competition and general economic and market conditions. Such variability may cause our results for a particular period not to be indicative of our performance in a future period.

***We may be subject to litigation risks and may face liabilities and damage to our professional reputation as a result.***

In recent years, the volume of claims and amount of damages claimed in litigation and regulatory proceedings against investment managers have been increasing. We make investment decisions on behalf of investors in our funds that could result in substantial losses. This may subject us to the risk of legal liabilities or actions alleging negligent misconduct, breach of fiduciary duty or breach of contract. Further, we may be subject to third-party litigation arising from allegations that we improperly exercised control or influence over portfolio investments. In addition, we and our affiliates that are the investment managers and general partners of our funds, our funds themselves and those of our employees who are our, our subsidiaries' or the funds' officers and directors are each exposed to the risks of litigation specific to the funds' investment activities and investee companies and, in the case where our funds own controlling interests in public companies, to the risk of shareholder litigation by the public companies' other shareholders. Moreover, we are exposed to risks of litigation or investigation by investors or regulators relating to our having engaged, or our funds having engaged, in transactions that presented conflicts of interest that were not properly addressed.

Legal liability could have a material adverse effect on our business, financial condition or results of operations or cause reputational harm to us, which could harm our business. We depend to a large extent on our business relationships and our reputation for integrity and high-caliber professional services to attract and retain investors and to pursue investment opportunities for our funds. As a result, allegations of improper conduct by private litigants or regulators, whether the ultimate outcome is favorable or unfavorable to us, as well as negative publicity and press speculation about us, our investment activities or the investment industry in general, whether or not valid, may harm our reputation, which may be damaging to our business.

***Employee misconduct could harm us by impairing our ability to attract and retain investors and subjecting us to significant legal liability, regulatory scrutiny and reputational harm. Fraud and other deceptive practices or other misconduct at our investee companies could similarly subject us to liability and reputational damage and also harm our business.***

Our ability to attract and retain investors and to pursue investment opportunities for our funds depends heavily upon the reputation of our professionals, especially our senior professionals. We are subject to a number of obligations and standards arising from our investment management business and our authority over the assets managed by our investment management business. The violation of these obligations and standards by any of our employees could adversely affect investors in our funds and us. Our business often requires that we deal with confidential matters of great significance to companies in which our funds may invest. If our employees were to use or disclose confidential information improperly, we could suffer serious harm to our reputation, financial position and current and future business relationships. It is not always possible to detect or deter employee misconduct, and the extensive precautions we take to detect and prevent this activity may not be effective in all cases. If one or more of our employees were to engage in misconduct or were to be accused of such misconduct, our business and our reputation could be adversely affected and a loss of investor confidence could result, which would adversely impact our ability to raise future funds.

In addition, we could be adversely affected as a result of actual or alleged misconduct by personnel of investee companies in which our funds invest. For example, failures by personnel at our investee companies to comply with anti-bribery, trade sanctions or other legal and regulatory requirements could expose us to litigation or regulatory action and otherwise adversely affect our business and reputation. Such misconduct could undermine our due diligence efforts with respect to such companies and could negatively affect the valuation of a fund's investments.

***Our substantial indebtedness could adversely affect our financial condition, our ability to pay our debts or raise additional capital to fund our operations, our ability to operate our business and our ability to react to changes in the economy or our industry and could divert our cash flow from operations for debt payments.***

We have a significant amount of indebtedness. As of December 31, 2019, our total indebtedness, excluding unamortized discount, premium, and issuance costs, was approximately $142.2 million. Our substantial debt obligations could have important consequences, including:

- requiring a substantial portion of cash flow from operations to be dedicated to the payment of principal and interest on our indebtedness, thereby reducing our ability to use our cash flow to fund our operations and pursue future business opportunities;

- exposing us to increased interest expense, as our degree of leverage may cause the interest rates of any future indebtedness (whether fixed or floating rate interest) to be higher than they would be otherwise;

- exposing us to the risk of increased interest rates because certain of our indebtedness is at variable rates of interest;

- making it more difficult for us to satisfy our obligations with respect to our indebtedness, and any failure to comply with the obligations of any of our debt instruments, including any restrictive covenants, could result in an event of default that accelerates our obligation to repay indebtedness;

31

- increasing our vulnerability to adverse economic, industry or competitive developments;

- restricting us from making strategic acquisitions or causing us to make non-strategic divestitures;

- limiting our ability to obtain additional financing for working capital, product development, satisfaction of debt service requirements, acquisitions and general corporate or other purposes; and

- limiting our flexibility in planning for, or reacting to, changes in our business or market conditions and placing us at a competitive disadvantage compared to our competitors who may be better positioned to take advantage of opportunities that our leverage prevents us from exploiting.

***Servicing our indebtedness will require a significant amount of cash. Our ability to generate sufficient cash depends on many factors, some of which are not within our control.***

Our ability to make payments on our indebtedness and to fund planned capital expenditures will depend on our ability to generate cash in the future. To a certain extent, this is subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond our control. If we are unable to generate sufficient cash flow to service our debt and meet our other commitments, we may need to restructure or refinance all or a portion of our debt, sell material assets or operations or raise additional debt or equity capital. We may not be able to effect any of these actions on a timely basis, on commercially reasonable terms or at all, and these actions may not be sufficient to meet our capital requirements. In addition, the terms of our existing or future debt arrangements may restrict us from effecting any of these alternatives.

***Despite our current level of indebtedness, we may incur substantially more debt and enter into other transactions, which could further exacerbate the risks to our financial condition described above.***

Although we terminated our prior $15.0 million senior secured revolving credit facility in May 2019, we may enter into a new revolving or other credit facility in the future or incur significant other or additional indebtedness in the future. Additional indebtedness incurred by the Company from time to time or at any time in the future could be substantial. To the extent new debt is added to our current debt levels, the substantial leverage risks described in the preceding two risk factors would increase.

***Operational risks may disrupt our business, result in losses or limit our growth.***

Our business relies heavily on financial, accounting and other information systems and technology. We face various security threats, including cyber security attacks to our information technology infrastructure and attempts to gain access to our proprietary information, destroy data or disable, degrade or sabotage our systems. These security threats could originate from a wide variety of sources, including unknown third parties outside of Medley. Although we have not yet been subject to cyber-attacks or other cyber incidents and we utilize various procedures and controls to monitor and mitigate these threats, there can be no assurance that these procedures and controls will be sufficient to prevent disruptions to our systems. If any of these systems do not operate properly or are disabled for any reason or if there is any unauthorized disclosure of data, whether as a result of tampering, a breach of our network security systems, a cyber-incident or attack or otherwise, we could suffer financial loss, a disruption of our business, liability to our funds, regulatory intervention or reputational damage.

In addition, our information systems and technology may not continue to be able to accommodate our growth, and the cost of maintaining the systems may increase from its current level. Such a failure to accommodate growth, or an increase in costs related to the information systems, could have a material adverse effect on our business and results of operations.

Furthermore, we depend on our office in New York, where a substantial portion of our personnel are located, for the continued operation of our business. An earthquake or other disaster or a disruption in the infrastructure that supports our business, including a disruption involving electronic communications or other services used by us or third parties with whom we conduct business, or directly affecting our headquarters, could have a material adverse effect on our ability to continue to operate our business without interruption. Although we have disaster recovery programs in place, these may not be sufficient to mitigate the harm that may result from such a disaster or disruption. In addition, insurance and other safeguards might only partially reimburse us for our losses, if at all.

Finally, we rely on third-party service providers for certain aspects of our business, including for certain information systems, technology and administration of our funds and compliance matters. Any interruption or deterioration in the performance of these third parties or failures of their information systems and technology could impair the quality of our funds' operations and could impact our reputation, adversely affect our business and limit our ability to grow.

***If we fail to maintain an effective system of internal control over financial reporting, we may not be able to accurately report our financial results or prevent fraud.***

Effective internal controls over financial reporting are necessary for us to provide reliable financial reports and, together with adequate disclosure controls and procedures, are designed to prevent fraud. Any failure to implement required new or improved controls, or difficulties encountered in their implementation could cause us to fail to meet our reporting obligations. In addition, any testing by us conducted in connection with Section 404 of the Sarbanes-Oxley Act of 2002, or any subsequent testing by our independent registered public accounting firm, may reveal deficiencies in our internal controls over financial reporting that are deemed to be material weaknesses or that may require prospective or retroactive changes to our financial statements or identify other areas for further attention or improvement.

We are required to disclose changes made in our internal controls and procedures on a quarterly basis and our management is required to assess the effectiveness of these controls annually. However, our independent registered public accounting firm is not required to formally attest to the effectiveness of our internal control over financial reporting until the first annual report required to be filed with the SEC following the date we are no longer an accelerated filer as defined in the Rule 12b-2 promulgated under the Exchange Act. We cannot assure you that there will not be material weaknesses or significant deficiencies in our internal controls in the future. Matters impacting our internal control may cause us to be unable to report our financial information on a timely basis and thereby subject us to adverse regulatory consequences, including sanctions by the SEC or violations of applicable stock exchange listing rules. Confidence in the reliability of our financial statements would also suffer if we or our independent registered public accounting firm were to report a material weakness in our internal controls over financial reporting.

***Our tax treatment depends on our status as a partnership for United States federal and state income tax purposes. If the Internal Revenue Service ("IRS") were to treat us as a corporation for United States federal income tax purposes, which would subject us to entity-level taxation, or if we were subjected to a material amount of additional entity-level taxation by individual states, then our cash available for payments on our debt obligations could be substantially reduced.***

It is possible, in certain circumstances, for us to be taxed as a corporation for United States federal income tax purposes. Although we do not believe that we are or will be (or should have been) so treated, if we were treated as a "publicly traded partnership," we might be taxed as a corporation for United States federal income tax purposes. If we were taxed as a corporation for United States federal income tax purposes, it would pay United States federal income tax on its taxable income at the corporate tax rate, which is currently a maximum of 21%, and would likely pay state and local income tax at varying rates. Therefore, our treatment as a corporation would result in a material reduction in its anticipated cash flow and could materially adversely affect its ability to make payments on our debt obligations. In addition, changes in current state law may subject us to additional entity-level taxation by individual states. Because of widespread state budget deficits and other reasons, several states are evaluating ways to subject partnerships to entity-level taxation through the imposition of state income, franchise and other forms of taxation. Imposition of any such taxes may substantially reduce our cash available for payments on debt obligations.

***Legislation could subject us to federal income tax liability.***

Pursuant to the Bipartisan Budget Act of 2015, for tax years beginning after December 31, 2017, if the IRS makes audit adjustments to our federal income tax returns, it may assess and collect any taxes (including any applicable penalties and interest) resulting from such audit adjustment directly from us. If, as a result of any such audit adjustment, we are required to make payments of taxes, penalties and interest, our cash available for payments on our debt obligations may be substantially reduced. These rules are not applicable to us for tax years beginning on or prior to December 31, 2017.

***Although the Notes are listed on the NYSE, an active trading market for the Notes may not develop, which could limit the market price of the Notes or your ability to sell them.***

Although the Notes are listed on the NYSE, we cannot provide any assurances that an active trading market will develop or be sustained for the Notes or that you will be able to sell your Notes. The market price of the Notes may decline depending on prevailing interest rates, the market for similar securities, our credit ratings, general economic conditions, our financial condition, performance and prospects and other factors. We cannot assure you that a liquid trading market will develop or be sustained for the Notes, that you will be able to sell your Notes at a particular time or that the price you receive when you sell will be favorable. To the extent an active trading market does not develop, the liquidity and trading price for the Notes may be harmed.

***A downgrade, suspension or withdrawal of the credit rating assigned by a rating agency to us or the Notes, if any, or change in the debt markets could cause the liquidity or market value of the Notes to decline significantly.***

Any credit ratings assigned by a rating agency to us are an assessment by rating agencies of our ability to pay our debts when due. Consequently, real or anticipated changes in our credit ratings will generally affect the market value of the Notes. These credit

ratings may not reflect the potential impact of risks relating to the structure or marketing of the Notes. Credit ratings are not a recommendation to buy, sell or hold any security, and may be revised or withdrawn at any time by the issuing organization in its sole discretion. Neither we nor any agent undertakes any obligation to maintain any credit ratings assigned to us or the Notes or to advise holders of Notes of any changes in our credit ratings. The conditions of the financial markets and prevailing interest rates have fluctuated in the past and are likely to fluctuate in the future, which could have an adverse effect on the market prices of the Notes.

## Risks Relating to the Mergers

On July 29, 2019, the Company entered into the Amended MDLY Merger Agreement, pursuant to which MDLY and the Company will, on the terms and subject to the conditions set forth in the Amended MDLY Merger Agreement, merge with and into Merger Sub, with Merger Sub as the surviving company in the MDLY Merger. Pursuant to the Amended MCC Merger Agreement, MCC will, on the terms and subject to the conditions set forth in the Amended MCC Merger Agreement, merge with and into Sierra, with Sierra as the surviving company in the MCC Merger. Pursuant to terms of the Amended MCC Merger Agreement, the consummation of the MCC Merger is conditioned upon the satisfaction or waiver of each of the conditions to closing under the Amended MDLY Merger Agreement and the consummation of the MDLY Merger. However, pursuant to the terms of the Amended MDLY Merger Agreement, the consummation of the MDLY Merger is not conditioned upon the consummation of the MCC Merger. If the Mergers are or only the MDLY Merger is consummated, Sierra's common stock will be listed on the NYSE under the symbol "SRA", with such listing expected to be effective as of the closing date of the Mergers, or the MDLY Merger, as applicable. If the MCC Merger is also consummated, Sierra's common stock will be listed on the TASE, with such listing expected to be effective as of the closing date of the Mergers. Upon completion of both of the Mergers, the investment portfolios of the Company and Sierra would be combined, Merger Sub, as a successor to MDLY, would be a wholly owned subsidiary of the Combined Company, and the Combined Company would be internally managed by its wholly controlled adviser subsidiary. If the MDLY Merger is consummated and the MCC Merger is not consummated, Sierra's common stock would be listed on the NYSE (but not the TASE), and the investment portfolios of MCC and Sierra would not be combined. Set forth below are certain risks relating to the Mergers. For more information, please refer to Medley Management Inc.'s definitive proxy statement on Schedule 14A that will be filed with the SEC when available.

***The completion of the Mergers is subject to several conditions, including, the receipt of SEC exemptive relief and, with respect to the MCC Merger, court approval of the Settlement. There can be no assurances when or if the Mergers will be completed.***

Although the Company, MDLY, Sierra, and MCC expect to complete the Mergers or the MDLY Merger, as applicable, as early as the first quarter of 2020, there can be no assurances as to the exact timing of completion of the MCC Merger and/or the MDLY Merger, applicable, or that the Mergers will be completed at all. The completion of the Mergers or the MDLY Merger, as applicable, is subject to numerous conditions, including, among others, the continued effectiveness of the Registration Statement on Form N-14; the approval of Sierra's common stock (including the Settlement Shares (as defined in the Amended MCC Merger Agreement) and the shares of Sierra's common stock to be issued in the Mergers or the MDLY Merger, applicable for listing on the NYSE; receipt of requisite approvals of each of MDLY's stockholders, Sierra's stockholders, and MCC's stockholders; receipt of required regulatory approvals, including from the SEC (including necessary exemptive relief to consummate the Mergers); the settlement of the Delaware Action in accordance with the Settlement; any necessary approvals under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, amended, and, if applicable, state securities regulators; there being no recession of the confirmation that Merger Sub, as the surviving company in the MDLY Merger, will be treated as a portfolio investment of the Combined Company or the Sierra/MDLY Company, as applicable, and reflected in the Combined Company's or the Sierra/MDLY Company's, as applicable, consolidated financial statements at fair value for accounting purposes (i.e., not consolidated into the financial statements of the Combined Company or the Sierra/MDLY Company, as applicable); the relevant parties having taken all actions reasonably required in order to keep existing indebtedness outstanding following the Mergers or the MDLY Merger, as applicable; receipt of necessary consents relating to joint ventures of Sierra and MCC; receipt of a specified level of consents from third-party advisory clients of the Company; with respect to the MCC Merger, satisfaction (or appropriate wavier) of the conditions to closing of the MDLY Merger; and other customary closing conditions. There is no assurance that any of the foregoing conditions will be satisfied.

MDLY, Sierra, and MCC cannot assure their respective stockholders that the conditions required to complete the Mergers or the MDLY Merger, applicable, will be satisfied or waived on the anticipated schedule, or at all. If the Mergers are or the MDLY Merger is, as applicable, not completed, the resulting failure of the Mergers or the MDLY Merger, as applicable, could have a material adverse impact on the Company's, Sierra's, and MCC's financial condition, results of operations, assets or business. In addition, if the Mergers are not completed, the Company, Sierra, and MCC will have incurred substantial expenses for which

34

no ultimate benefit will have been received. See "*If the MDLY Merger does not close, we will not benefit from the expenses incurred in connection therewith*" below. Moreover, if either the Amended MCC Merger Agreement or the Amended MDLY Merger Agreement is terminated under certain circumstances, the Company, Sierra, or MCC may be obligated to pay the other party to the applicable merger agreement a termination fee. See "*Under certain circumstances, we may be obligated to pay a termination fee upon termination of the Amended MDLY Merger Agreement.*" Any decision that MDLY's stockholders, Sierra's stockholders, and MCC's stockholders make should be made with the understanding that the completion of the Mergers may not happen as scheduled, or at all.

If the Mergers are completed, certain additional risks regarding the Combined Company following the Mergers may be presented. In addition, if the MDLY Merger is completed and the MCC Merger is not completed certain additional risks regarding the Sierra/MDLY Company following the MDLY Merger may be presented.

***Because the NAV of Sierra may change, MDLY stockholders cannot be sure of the value of the stock portion of the merger consideration, they will receive until the MDLY Merger effective time.***

Under the Amended MDLY Merger Agreement, the MDLY exchange ratios and the cash consideration amount was fixed on July 29, 2019, the date of the signing of the Amended MDLY Merger Agreement. The MDLY exchange ratios and the cash consideration amount are not subject to adjustment based on changes in the NAV of Sierra or the market price of MDLY Class A common stock before the MDLY Merger effective time, provided that the MDLY Merger is consummated by March 31, 2020, or, if consummated after March 31, 2020, only if the parties subsequently agree to extend the closing date on the same terms and conditions.

Accordingly, at the time of the MDLY stockholder meeting, MDLY stockholders will not know or be able to calculate with certainty the value of the merger consideration they would receive upon the completion of the MDLY Merger and such value may vary materially from the value of the merger consideration determined as of the date the MDLY Merger was announced, as of the date that the subsequent proxy supplement describing the Amended MDLY Merger Agreement is mailed to MDLY's stockholders, and as of the date of the special meeting of MDLY's stockholders. Any change in the NAV of Sierra prior to completion of the MDLY Merger will affect the value (either positively or negatively) of the merger consideration to be paid by Sierra, and to be received by MDLY's stockholders upon the completion of the MDLY Merger relative to the value of the merger consideration determined as of the date the MDLY Merger was announced.

***The value of the stock portion of the merger consideration that MDLY's stockholders will receive upon the completion of the Mergers or the MDLY Merger, as applicable, may be affected, either positively or negatively, by the trading performance of Sierra's common stock following the Mergers or the MDLY Merger, as applicable.***

There is currently no public trading market for Sierra's common stock and there is no way to predict with certainty how the shares of Sierra's common stock, including the shares of Sierra's common stock to be issued in the Mergers or the MDLY Merger, as applicable, will trade following consummation of the Mergers or the MDLY Merger, as applicable. Any change in the trading price of Sierra's common stock following completion of the Mergers or the MDLY Merger, as applicable, will affect the value (either positively or negatively) of the stock portion of the merger consideration received by MDLY's stockholders upon the completion of the MDLY Merger. Stock price changes may result from a variety of factors, including, among other things:

- changes in the business, operations or prospects of the Combined Company or the Sierra/MDLY Company, as applicable;
- the financial condition of current or prospective portfolio companies of the Combined Company or the Sierra/MDLY Company, as applicable;
- interest rates or general market or economic conditions;
- the supply and demand for the Combined Company's common stock or the Sierra/MDLY Company's common stock, as applicable; and
- market perception of the future probability of the Combined Company or the Sierra/MDLY Company, as applicable.

These factors are generally beyond the control of MDLY, Sierra, and MCC prior to completion of the Mergers or the MDLY Merger, as applicable, and, following completion of both of the Mergers or only the MDLY Merger, will generally be beyond the control of the Combined Company or the Sierra/MDLY Company, as applicable. As noted above, there is currently no public trading market for Sierra's common stock and there is no way to predict with certainty how the shares of Sierra's common stock will trade following consummation of the Mergers or the MDLY Merger, as applicable. During the 12-month period ending December 31, 2019, the NAV per share of Sierra's common stock varied from a low of $5.78 to a high of $6.72 and the closing

35

price per share of our Class A common stock varied from a low of $2.33 to a high of $4.94. However, the historical NAV per share of Sierra, and the historic trading prices of MDLY Class A common stock, are not necessarily indicative of future performance of Sierra's common stock following the Mergers or the MDLY Merger, as applicable.

*The inability of Sierra, MCC and/or MDLY to obtain certain third-party consents and approvals could delay or prevent the completion of the Mergers or the MDLY Merger, as applicable.*

Pursuant to the Amended MDLY Merger Agreement, each of Sierra's and MDLY's obligations to complete the MDLY Merger is conditioned upon, among other things, and in addition to the regulatory approvals described below (see "*The completion of the Mergers is subject to several conditions, including, the receipt of SEC exemptive relief and, with respect to the MCC Merger, court approval of the Settlement. There can be no assurances when or if the Mergers will be completed*"), prior receipt by MDLY of written consents to the continuation, following the MDLY Merger effective time, of the advisory relationship with private funds and managed accounts representing 65% of the Company's total revenues from private funds and managed accounts for the 12-month period ended June 30, 2018. In addition to the foregoing mutual conditions for closing, Sierra and MDLY must obtain all consents and approvals, and take all necessary steps, in order to keep their respective indebtedness outstanding following the MDLY Merger effective time. Although Sierra and MDLY expect that all such approvals and consents will be obtained and remain in effect and all conditions related to such consents will be satisfied, if they are not, the closing of the Mergers or the MDLY Merger, as applicable, could be significantly delayed, only the MDLY Merger may occur, or both Mergers may not occur at all.

Pursuant to the Amended MCC Merger Agreement, each of Sierra's and MCC's obligations to complete the MCC Merger is conditioned upon, among other things, and in addition to the regulatory approvals described below (see "*The completion of the Mergers is subject to several conditions, including, the receipt of SEC exemptive relief and, with respect to the MCC Merger, court approval of the Settlement. There can be no assurances when or if the Mergers will be completed*"), the prior receipt by Sierra or MCC, as applicable, of third party consents and approvals relating to the joint venture arrangements of Sierra and MCC. In addition, each of Sierra's and MCC's obligations to complete the MCC Merger is conditioned upon completion of the MDLY Merger, pursuant to the Amended MDLY Merger Agreement, having received written consents to the continuation, following the MDLY Merger effective time, of the advisory relationship with private funds and managed accounts representing 65% of the Company's total revenues from private funds and managed accounts for the 12-month period ended June 30, 2018. In addition to the foregoing mutual conditions for closing, Sierra and MCC must obtain also, and take all necessary steps, in order to keep their respective indebtedness outstanding following the MCC Merger effective time. Although Sierra and MCC expect that all such approvals and consents will be obtained and remain in effect and all conditions related to such consents will be satisfied, if they are not, the closing of the Mergers or the MDLY Merger, as applicable, could be significantly delayed, only the MDLY Merger may occur, or both Mergers may not occur at all.

*The opinion obtained by MDLY's special committee from its financial advisor will not reflect changes in circumstances after the date of the opinion between signing of the Amended MDLY Merger Agreement and the MDLY Merger effective time.*

Our special committee has not obtained updated opinions from its financial advisor and does not anticipating obtaining updated opinions prior to the MDLY Merger effective time. Changes in the operations and prospects of the Company and Sierra, general market and economic conditions and other factors beyond the control of MDLY or Sierra, and on which MDLY's special committee's financial advisor's opinion was based may significantly alter the value of Sierra or MDLY or the prices at which shares of MDLY's Class A common stock trade or the NAV per share of Sierra's common stock by the time the MDLY Merger is completed. The opinion of such financial advisor speaks only to the date such opinion was rendered and do not speak as of the time the MDLY Merger will be completed or as of any other date. MDLY's special committee does not expect to obtain an updated opinion from its financial advisor.

*The MDLY Merger consideration was the product of extensive negotiations among the special committees of the Company and Sierra and therefore may include business considerations beyond share price, NAV or other financial or valuation metrics relating to the Company and Sierra.*

The MDLY Merger was the product of extensive negotiations among the parties and each special committee considered a number of factors in determining to enter into the Amended MDLY Merger Agreement. As a result, the terms of the Amended MDLY Merger Agreement are not necessarily reflective of the share price, NAV or other financial or valuation metrics relating to MDLY and Sierra at the time the Amended MDLY Merger Agreement was entered into, and may reflect additional business considerations.

***We have been named as a defendant in various securities class action and derivative lawsuits, and may be named in additional ones in the future, which has resulted in, and which may result in the future, substantial costs and may delay or prevent the completion of the Mergers.***

The Company is currently a defendant in the New York Actions and the Delaware Action. For more information about such legal proceedings, see "Item 3, Legal Proceedings." The Company may be a target of additional securities class action and derivative lawsuits. Securities class action lawsuits and derivative lawsuits are often brought against companies that have entered into merger agreements in an effort to enjoin the merger or seek monetary relief from such companies. Even if the lawsuits are without merit, defending against these claims can result in substantial costs and divert management time and resources. We cannot predict the outcome of these lawsuits, or others, if any, nor can we predict the amount of time and expense that will be required to resolve any such litigation. An unfavorable resolution of any such litigation surrounding the Mergers could delay or prevent their consummation. In addition, the costs defending the litigation, even if resolved in our favor, could be substantial and such litigation could distract us from pursuing the consummation of the Mergers and other potentially beneficial business opportunities. It is a condition of the MCC Merger that the Delaware Action be settled in accordance with the terms of the Settlement.

***If the MDLY Merger does not close, we will not benefit from the expenses incurred in connection therewith.***

The Company has incurred, and will continue to incur, substantial expenses in connection with the Mergers. The MDLY Merger may not be completed. If the MDLY Merger is not completed, we will have incurred substantial expenses for which no ultimate benefit will have been received. We have incurred out-of-pocket expenses in connection with the MDLY Merger for investment banking, legal and accounting fees and financial printing and other costs and expenses, much of which will be incurred even if the MDLY Merger is not completed. In addition, depending upon the circumstances surrounding termination of the Amended MDLY Merger Agreement, as applicable, we may be obligated to pay a termination fee to the other party to the Amended MDLY Merger Agreement. See "*Under certain circumstances, the Company or Sierra may be obligated to pay a termination fee upon termination of the Amended MDLY Merger Agreement*" below.

***Failure to complete the MDLY Merger could negatively impact the business, financial results, and ability to pay dividends and distributions, if any or at its current level, to MDLY's stockholders, and negatively impact MDLY's stock prices.***

If the MDLY Merger is not completed, our ongoing business may be adversely affected.  We may experience negative reactions from the financial markets and from our creditors and customers if the anticipated benefits of the MDLY Merger are not able to be realized. Such anticipated benefits include, among others, the expected increase in distributions to the stockholders of the Combined Company, the benefits of the larger balance sheet of the Combined Company and potential for greater scale, the fee earning potential of Merger Sub's asset management business, the enhanced market value of Sierra's common stock following the completion of the Mergers upon listing on the NYSE and the TASE (in connection with the MCC Merger), and the benefits of operational efficiencies, cost savings, and synergies.  If the Mergers are not consummated, we cannot assure MDLY's stockholders that the risks described above will not negatively impact the business, financial results, and ability to pay dividends and distributions, if any or at its current level to MDLY's stockholders, and negatively impact MDLY's stock prices.

***Termination of the Amended MDLY Merger Agreement or failure to otherwise complete the MDLY Merger could negatively impact us.***

Termination of the Amended MDLY Merger Agreement or any failure to otherwise complete the MDLY Merger may result in various consequences, including:

- our business may have been adversely impacted by the failure to pursue other beneficial opportunities due to the focus of management on the MDLY Merger, without realizing any of the anticipated benefits of completing the MDLY Merger;

- the market price of MDLY's Class A common stock may decline to the extent that the market price prior to termination reflects a market assumption that the MDLY Merger will be completed;

- in the case of the Company, it may not be able to find a party willing to pay an equivalent or more attractive price than the price Sierrs have agreed to pay in the MDLY Merger; and

- the payment of any termination fee, if required under the circumstances, could adversely affect our financial condition and liquidity.

*Under certain circumstances, Sierra or the Company may be obligated to pay a termination fee upon termination of the Amended MDLY Merger Agreement.*

The Amended MDLY Merger Agreement provides for the payment by Sierra or the Company to the other party a termination fee of $3,000,000 in cash if the Amended MDLY Merger Agreement is terminated by the Company or Sierra under certain circumstances.

*The Amended MDLY Merger Agreement limits our ability to actively pursue alternatives to the MDLY Merger and to accept a superior proposal from third parties, although MCC had the right to actively pursue alternatives during the go-shop period.*

The Amended MDLY Merger Agreement contains provisions that limit the Company's ability to actively solicit, discuss or negotiate competing third-party proposals for strategic transactions. Although these provisions, which are customary for transactions of this type, allows us to engage in negotiations regarding, and to ultimately accept, a "Superior Proposal" (as such term is defined in the Amended MDLY Merger Agreement) in certain circumstances, subject to the payment of a termination fee, such provisions might discourage a potential competing acquirer that might have an interest in acquiring all or a significant part of the Company from considering or proposing a "Superior Proposal" to us, or might result in a potential competing acquirer proposing to pay a lower price to acquire us than it might otherwise have proposed to pay.

*In certain circumstances, Sierra, MCC, and the Company may waive one or more conditions to the Mergers or the MDLY Merger, as applicable, or amend the Amended MCC Merger Agreement or the Amended MDLY Merger Agreement, without resoliciting stockholder approval.*

Certain conditions to Sierra's and MDLY's obligations to complete the MDLY Merger may be waived, in whole or in part, to the extent legally allowed, either unilaterally or by agreement of Sierra and MDLY. In addition, certain conditions to Sierra's and MCC's obligations to complete the MCC Merger may be waived, in whole or in part, to the extent legally allowed, either unilaterally or by agreement of Sierra and MCC. In the event that any such waiver does not require re-solicitation of stockholders, the parties to the Amended MDLY Merger Agreement and the Amended MCC Merger Agreement will have the discretion to complete the MDLY Merger and the MCC Merger, respectively, without seeking further stockholder approval. However, certain conditions, such as the conditions requiring the approval of Sierra's stockholders, MCC's stockholders and MDLY's stockholders, are required under applicable law or the applicable company's charter documents and may not be waived.

The Amended MDLY Merger Agreement and the Amended MCC Merger Agreement may be amended by the respective parties at any time before or after receipt of approval by Sierra's stockholders, MDLY's stockholders, or MCC's stockholders, as the case may be; provided, however, that after receipt of the relevant stockholder approvals, there may not be any amendment of the Amended MDLY Merger Agreement or the Amended MCC Merger Agreement that requires further approval under applicable law or its charter documents of the relevant stockholders without receipt of such further approvals.

In addition to the foregoing, waiver or amendment of the Amended MDLY Merger Agreement requires the consent of MCC to the extent such waiver or amendment would adversely affect the economic or other rights or interests of MCC and MCC's stockholders under the Amended MDLY Merger Agreement in any material respect. Conversely, waiver or amendment of the Amended MCC Merger Agreement requires the consent of MDLY to the extent such waiver or amendment would adversely affect the economic or other rights or interests of MDLY and its stockholders under the Amended MCC Merger Agreement in any material respect.

*Certain persons related to us have interests in the Mergers that differ from the interests of MDLY's stockholders.*

Certain of our directors and executive officers have financial interests in the Mergers that are different from, or in addition to, the interests of MDLY's stockholders. MDLY's special committee, comprised solely of the independent directors of MDLY's Board of Directors, and, acting on the recommendation of MDLY's special committee, MDLY board of directors were aware of and considered these interests, among other matters, in evaluating the Amended MDLY Merger Agreement, including the MDLY Merger, and in recommending to MDLY's stockholders to approve the adoption of the Amended MDLY Merger Agreement.

*We will be subject to business uncertainties and contractual restrictions while the Mergers are pending.*

Uncertainty about the effect of the Mergers may have an adverse effect on us and, consequently, on the Combined Company following completion of the Mergers or the Sierra/MDLY Company if only the MDLY Merger is completed. These uncertainties

38

could cause those that deal with us to seek to change their existing business relationships with us. In addition, each of the Amended MDLY Merger Agreement and the Amended MCC Merger Agreement restricts us from taking actions that we might otherwise consider to be in our best interests. These restrictions may prevent us from pursuing certain business opportunities that may arise prior to the completion of the Mergers.

***The shares of Sierra's common stock to be received by MDLY's stockholders as a result of the MDLY Merger will have different rights associated with them than shares of our common stock currently held by them.***

The rights associated with MDLY common stock are different from the rights associated with Sierra's common stock following the Mergers or the MDLY Merger, as applicable.

***The MDLY Merger and the MCC Merger are conditioned on the Company, Sierra, MCC and certain of its affiliates receiving exemptive relief from the SEC.***

The MDLY Merger and the MCC Merger are conditioned on MDLY, Sierra, MCC, and certain of their affiliates, as applicable, receiving exemptive relief from the SEC from: (i) Sections 17(d) and 57(a)(1), (2), and (4) of the 1940 Act and Rule 17d-1 thereunder because the Mergers would involve a joint arrangement among two affiliated BDCs and their investment advisers and (ii) Sections 12(d)(3) and 60 of the 1940 Act because, in connection with the MDLY Merger, the Company, a registered investment adviser, will be become a wholly owned subsidiary of the Combined Company or the Sierra/MDLY Company, as applicable. In addition, Sierra and certain of its affiliates are requesting exemptive relief from the SEC from Sections 23(a), 23(b), 23(c), and 63 and pursuant to Section 61(a)(3)(B) and Sections 57(a)(4) and 57(i) of the 1940 Act and Rule 17d-1 thereunder that would permit the Combined Company or the Sierra/MDLY Company, as applicable, to grant stock options, restricted stock, and restricted stock units in exchange for and in recognition of services by its directors, executive officers and employees. There can be no assurance if or when MDLY, Sierra and MCC will receive the exemptive relief.

***MDLY stockholders could be subject to significant U.S. federal income tax liabilities as a result of the MDLY Merger being a taxable transaction for U.S. federal income tax purposes and MDLY's stockholders may not receive cash sufficient to pay any tax.***

MDLY and Sierra anticipate that the MDLY Merger will be a taxable transaction. The parties have not requested, and it is not a condition of the MDLY Merger for the parties to receive, a tax opinion with respect to the MDLY Merger. MDLY stockholders could be subject to certain U.S. federal income tax consequences and, among others, the MDLY Merger will result in the recognition of gain or loss to MDLY stockholders in the amount equal to the difference between their tax basis in their shares of MDLY Class A common stock and the value of the MDLY Merger consideration for U.S. federal income tax purposes. Because MDLY stockholders will receive only a portion of the MDLY Merger consideration in the form of cash, MDLY stockholders may need to sell Sierra's common stock received in the MDLY Merger, or use cash from other sources, to pay any tax obligations resulting from the MDLY Merger in excess of the cash received as part of the MDLY Merger consideration. MDLY stockholders will receive a new tax basis in the shares of Sierra's common stock they receive (initially equal to the value of such shares at the time of the MDLY Merger) for calculation of gain or loss upon their ultimate disposition and would start a new holding period for such shares.

The U.S. federal income tax consequences to MDLY's stockholders as a result of the MDLY Merger is complex. MDLY stockholders are urged to consult their tax advisors regarding the U.S. federal income tax consequences that may be applicable to them as a result of the MDLY Merger.

## Item 1B.    Unresolved Staff Comments

None.

## Item 2.    Properties

Our principal executive offices are located in leased office space at 280 Park Avenue, New York, New York, 10017. We consider these facilities to be suitable and adequate for the management and operation of our business. We do not own any real property.

## Item 3.    Legal Proceedings

From time to time, the Company is involved in various legal proceedings, lawsuits and claims incidental to the conduct of its business. Its business is also subject to extensive regulation, which may result in regulatory proceedings against it. Except as described below, the Company is not currently party to any material legal proceedings.

One of the Company's subsidiaries, MCC Advisors LLC, was named as a defendant in a lawsuit on May 29, 2015, by Moshe Barkat and Modern VideoFilm Holdings, LLC ("MVF Holdings") against MCC, MOF II, MCC Advisors LLC, Deloitte Transactions and Business Analytics LLP A/K/A Deloitte ERG ("Deloitte"), Scott Avila ("Avila"), Charles Sweet, and Modern VideoFilm, Inc. ("MVF"). The lawsuit is pending in the California Superior Court, Los Angeles County, Central District, as Case No. BC 583437. The lawsuit was filed after MCC, as agent for the lender group, exercised remedies following a series of defaults by MVF and MVF Holdings on a secured loan with an outstanding balance at the time in excess of $65 million. The lawsuit sought damages in excess of $100 million. Deloitte and Avila have settled the claims against them in exchange for payment of $1.5 million. On June 6, 2016, the court granted the Medley defendants' demurrers on several counts and dismissed Mr. Barkat's claims with prejudice except with respect to his claim for intentional interference with contract. On March 18, 2018, the court granted the Medley defendants' motion for summary adjudication with respect to Mr. Barkat's sole remaining claim against the Medley Defendants for intentional interference. Now that the trial court has ruled in favor of the Medley defendants on all counts, the only remaining claims in the Barkat litigation are MCC and MOF II's affirmative counterclaims against Mr. Barkat and MVF Holdings, which MCC and MOF II are diligently prosecuting.

On August 29, 2016, MVF Holdings filed another lawsuit in the California Superior Court, Los Angeles County, Central District, as Case No. BC 631888 (the "Derivative Action"), naming MCC Advisors LLC and certain of Medley's employees as defendants, among others. The plaintiff in the Derivative Action, asserts claims against the defendants for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, unfair competition, breach of the implied covenant of good faith and fair dealing, interference with prospective economic advantage, fraud, and declaratory relief. MCC Advisors LLC and the other defendants believe the causes of action asserted in the Derivative Action are without merit and all defendants intend to continue to assert a vigorous defense. A trial has been set for May 19, 2020.

Medley LLC, Medley Capital Corporation, Medley Opportunity Fund II LP, Medley Management, Inc., Medley Group, LLC, Brook Taube, and Seth Taube were named as defendants, along with other various parties, in a putative class action lawsuit captioned as Royce Solomon, Jodi Belleci, Michael Littlejohn, and Giulianna Lomaglio v. American Web Loan, Inc., AWL, Inc., Mark Curry, MacFarlane Group, Inc., Sol Partners, Medley Opportunity Fund, II, LP, Medley LLC, Medley Capital Corporation, Medley Management, Inc., Medley Group, LLC, Brook Taube, Seth Taube, DHI Computing Service, Inc., Middlemarch Partners, and John Does 1-100, filed on December 15, 2017, amended on March 9, 2018, and amended a second time on February 15, 2019, in the United States District Court for the Eastern District of Virginia, Newport News Division, as Case No. 4:17-cv-145 (hereinafter, "Class Action 1"). Medley Opportunity Fund II LP and Medley Capital Corporation were also named as defendants, along with various other parties, in a putative class action lawsuit captioned George Hengle and Lula Williams v. Mark Curry, American Web Loan, Inc., AWL, Inc., Red Stone, Inc., Medley Opportunity Fund II LP, and Medley Capital Corporation, filed February 13, 2018, in the United States District Court, Eastern District of Virginia, Richmond Division, as Case No. 3:18-cv-100 ("Class Action 2"). Medley Opportunity Fund II LP and Medley Capital Corporation were also named as defendants, along with various other parties, in a putative class action lawsuit captioned John Glatt, Sonji Grandy, Heather Ball, Dashawn Hunter, and Michael Corona v. Mark Curry, American Web Loan, Inc., AWL, Inc., Red Stone, Inc., Medley Opportunity Fund II LP, and Medley Capital Corporation, filed August 9, 2018 in the United States District Court, Eastern District of Virginia, Newport News Division, as Case No. 4:18-cv-101 ("Class Action 3") (together with Class Action 1 and Class Action 2, the "Virginia Class Actions"). Medley Opportunity Fund II LP was also named as a defendant, along with various other parties, in a putative class action lawsuit captioned Christina Williams and Michael Stermel v. Red Stone, Inc. (as successor in interest to MacFarlane Group, Inc.), Medley Opportunity Fund II LP, Mark Curry, Brian McGowan, Vincent Ney, and John Doe entities and individuals, filed June 29, 2018 and amended July 26, 2018, in the United States District Court for the Eastern District of Pennsylvania, as Case No. 2:18-cv-2747 (the "Pennsylvania Class Action") (together with the Virginia Class Actions, the "Class Action Complaints"). The plaintiffs in the Class Action Complaints filed their putative class actions alleging claims under the Racketeer Influenced and Corrupt Organizations Act, and various other claims arising out of the alleged payday lending activities of American Web Loan. The claims against Medley Opportunity Fund II LP, Medley LLC, Medley Capital Corporation, Medley Management, Inc., Medley Group, LLC, Brook Taube, and Seth Taube (in Class Action 1, as amended); Medley Opportunity Fund II LP and Medley Capital Corporation (in Class Action 2 and Class Action 3); and Medley Opportunity Fund II LP (in the Pennsylvania Class Action), allege that those defendants in each respective action exercised control over, or improperly derived income from, and/or obtained an improper interest in, American Web Loan's payday lending activities as a result of a loan to American Web Loan. The loan was made by Medley Opportunity Fund II LP in 2011. American Web Loan repaid the loan from Medley Opportunity Fund II LP in full in February of 2015, more than 1 year and 10 months prior to any of the loans allegedly made by American Web Loan to the alleged class plaintiff representatives in Class Action 1. In Class Action 2, the alleged class plaintiff representatives have not alleged when they received any loans from

40

American Web Loan. In Class Action 3, the alleged class plaintiff representatives claim to have received loans from American Web Loan at various times from February 2015 through April 2018. In the Pennsylvania Class Action, the alleged class plaintiff representatives claim to have received loans from American Web Loan in 2017. By orders dated August 7, 2018 and September 17, 2018, the Court presiding over the Virginia Class Actions consolidated those cases for all purposes. On October 12, 2018, Plaintiffs in Class Action 3 filed a notice of voluntary dismissal of all claims, and on October 29, 2018, Plaintiffs in Class Action 2 filed a notice of voluntary dismissal of all claims. Medley LLC, Medley Capital Corporation, Medley Management, Inc., Medley Group, LLC, Brook Taube, and Seth Taube never made any loans or provided financing to, or had any other relationship with, American Web Loan. Medley Opportunity Fund II LP, Medley LLC, Medley Capital Corporation, Medley Management, Inc., Medley Group, LLC, Brook Taube, Seth Taube are seeking indemnification from American Web Loan, various affiliates, and other parties with respect to the claims in the Class Action Complaints. Medley Opportunity Fund II LP, Medley LLC, Medley Capital Corporation, Medley Management, Inc., Medley Group, LLC, Brook Taube, and Seth Taube believe the alleged claims in the Class Action Complaints are without merit and they intend to defend these lawsuits vigorously.

On January 25, 2019, two purported class actions were commenced in the Supreme Court of the State of New York, County of New York, by alleged stockholders of Medley Capital Corporation, captioned, respectively, Helene Lax v. Brook Taube, et al., Index No. 650503/2019, and Richard Dicristino, et al. v. Brook Taube, et al., Index No. 650510/2019 (together with the Lax Action, the "New York Actions"). Named as defendants in each complaint are Brook Taube, Seth Taube, Jeffrey Tonkel, Arthur S. Ainsberg, Karin Hirtler-Garvey, John E. Mack, Mark Lerdal, Richard T. Allorto, Jr., Medley Capital Corporation, Medley Management Inc., Sierra Income Corporation, and Sierra Management, Inc. The complaints in each of the New York Actions allege that the individuals named as defendants breached their fiduciary duties in connection with the proposed merger of MCC with and into Sierra, and that the other defendants aided and abetted those alleged breaches of fiduciary duties. Compensatory damages in unspecified amounts were sought. On December 20, 2019, the Delaware court entered an Order and Final Judgment approving the settlement of the Delaware Action (defined below). The release in the Delaware Action also operate to release the claims asserted in the New York Actions. The attorneys for the plaintiffs in New York Action have informed the Court that they reserve the right to seek an award of attorneys' fees on account of their purported contributions to the settlement of the Delaware Action, which the defendants reserve the right to oppose.

On February 11, 2019, a purported stockholder class action was commenced in the Court of Chancery of the State of Delaware (the "Delaware Court of Chancery") by FrontFour Capital Group LLC and FrontFour Master Fund, Ltd. (together, "FrontFour"), captioned FrontFour Capital Group LLC, et al. v. Brook Taube, et al., Case No. 2019-0100 (the "Delaware Action"), against defendants Brook Taube, Seth Taube, Jeff Tonkel, Mark Lerdal, Karin Hirtler-Garvey, John E. Mack, Arthur S. Ainsberg, MDLY, Sierra, MCC, MCC Advisors LLC ("MCC Advisors"), Medley Group LLC, and Medley LLC. The complaint, as amended on February 12, 2019, alleged that the individuals named as defendants breached their fiduciary duties to MCC's stockholders in connection with the "MCC Merger", and that MDLY, Sierra, MCC Advisors, Medley Group LLC, and Medley LLC aided and abetted those alleged breaches of fiduciary duties. The complaint sought to enjoin the vote of MCC's stockholders on the proposed merger and enjoin enforcement of certain provisions of the MCC Merger Agreement.

The Delaware Court of Chancery held a trial on the plaintiffs' motion for a preliminary injunction and issued a Memorandum Opinion (the "Decision") on March 11, 2019. The Delaware Court of Chancery denied the plaintiffs' requests to (i) permanently enjoin the proposed merger and (ii) require MCC to conduct a "shopping process" for MCC on terms proposed by the plaintiffs in their complaint. The Delaware Court of Chancery held that MCC's directors breached their fiduciary duties in entering into the proposed merger, but rejected the plaintiffs' claim that Sierra aided and abetted those breaches of fiduciary duties. The Delaware Court of Chancery ordered the defendants to issue corrective disclosures consistent with the Decision, and enjoined a vote of MCC's stockholders on the proposed merger until such disclosures had been made and stockholders had the opportunity to assimilate this information.

On March 20, 2019, another purported stockholder class action was commenced by Stephen Altman against Brook Taube, Seth Taube, Jeff Tonkel, Arthur S. Ainsberg, Karin Hirtler-Garvey, Mark Lerdal, and John E. Mack in the Delaware Court of Chancery, captioned Altman v. Taube, Case No. 2019-0219 (the "Altman Action"). The complaint alleged that the defendants breached their fiduciary duties to stockholders of MCC in connection with the vote of MCC's stockholders on the proposed mergers. On April 8, 2019, the Delaware Court of Chancery granted a stipulation consolidating the Delaware Action and the Altman Action, designating the amended complaint in the Delaware Action as the operative complaint, and designating the plaintiffs in the Delaware Action and their counsel the lead plaintiffs and lead plaintiffs' counsel, respectively.

On December 20, 2019, the Delaware Court of Chancery entered an Order and Final Judgment approving the settlement of the Delaware Action (the "Settlement"). Pursuant to the Settlement, the Company agreed to certain amendments to (i) the MCC Merger Agreement and (ii) the MDLY Merger Agreement, which amendments are reflected in the Amended MCC Merger Agreement and the Amended MDLY Merger Agreement. The Settlement also provides for, if the MCC Merger is consummated, the creation of a settlement fund, consisting of $17 million in cash and $30 million of Sierra's common stock, with the number

41

of shares of Sierra's common stock to be calculated using the pro forma net asset value of $6.37 per share as of June 30, 2019, which will be distributed to eligible members of the Settlement Class (as defined in the Settlement). In addition, in connection with the Settlement, on July 29, 2019, MCC entered into a Governance Agreement with FrontFour Capital Group LLC, FrontFour Master Fund, Ltd., FrontFour Capital Corp., FrontFour Opportunity Fund, David A. Lorber, Stephen E. Loukas and Zachary R. George, pursuant to which, among other matters, FrontFour is subject to customary standstill restrictions and required to vote in favor of the amended MCC Merger at a meeting of stockholders to approve the Amended MCC Merger Agreement. . The Settlement also provides for mutual releases between and among FrontFour and the Settlement Class, on the one hand, and the Medley Parties, on the other hand, of all claims that were or could have been asserted in the Delaware Action through September 26, 2019.

The Delaware Court of Chancery also awarded attorney's fees as follows: (i) an award of $3,000,000 to lead plaintiffs' counsel and $75,000 to counsel to plaintiff Stephen Altman (the "Therapeutics Fee Award") and $420,334.97 of plaintiff counsel expenses payable to the lead plaintiff's counsel, which were paid by MCC on December 23, 2019, and (ii) an award that is contingent upon the closing of the proposed merger transactions (the "Contingent Fee Award"), consisting of:

a. $100,000 for the agreement by Sierra's board of directors to appoint one independent director of MCC who will be selected by the independent directors of Sierra on the board of directors of the post-merger company upon the closing of the Mergers; and

b. the amount calculated by solving for A in the following formula:

$$Award[A]=(Monetary\ Fund[M]+Award[A]-Look\ Through[L])*Percentage[P]$$

Whereas

A    shall be the amount of the Additional Fee (excluding the $100,000 award for the agreement by Sierra's board of directors to appoint one independent director of MCC who will be selected by the independent directors of Sierra on the board of directors of the post-merger company upon the closing of the Mergers);

M    shall be the sum of (i) the $17 million cash component of the Settlement Fund and (ii) the value of the post-merger company stock component of the Settlement Fund, which shall be calculated as the product of the VPS (as defined below) and 4,709,576.14 (the number of shares of post-merger company's stock comprising the stock component of the net settlement amount);

L    shall be the amount representing the estimated value of the decrease in shares to be received by eligible class members arising by operation of the change in the "Exchange Ratio" under the Amended MCC Merger Agreement, calculated as follows:

$$L = ((ES * 68\%) - (ES * 66\%)) * VPS$$

Where:

ES    shall be the number of eligible shares;

VPS    shall be the pro forma net asset value per share of the post-merger company's common stock as of the closing as reported in the public disclosure filed nearest in time and after the closing (the "Closing NAV Disclosure"); and

P    shall equal 0.26

The Contingent Fee Award is contingent upon the closing of the MCC Merger. Payment of the Contingent Fee Award will be made in two stages. First, within five (5) business days of the establishment of the Settlement Fund, MCC or its successor shall (i) pay the plaintiffs' counsel an estimate of the Contingent Fee Award (the "Additional Fee Estimate"), less twenty (20) percent (the "Additional Fee Estimate Payment"), and (ii) deposit the remaining twenty (20) percent of the Additional Fee Estimate into escrow (the "Escrowed Fee"). For purposes of calculating such estimate, MCC or its successor shall use the formula set above, except that VPS shall equal the pro forma net asset value of the post-merger company's common stock as reported in the public disclosure filed nearest in time and prior to the closing (the "Closing NAV Estimate").

Second, within five (5) business days of the Closing NAV Disclosure (as defined in the Order and Final Judgment), (i) if the Additional Fee is greater than the Additional Fee Estimate Payment, an amount of the Escrowed Fee shall be released to plaintiffs' counsel such that the total payments made to plaintiffs' counsel equal the Additional Fee and the remainder of the Escrowed Fee, if any, shall be released to MCC or its successor, (ii) if the Additional Fee is less than the Additional Fee Estimate Payment, plaintiffs' counsel shall return to MCC or its successor the difference between the Additional Fee Estimate and the Additional Fee

and the Escrowed Fee shall be released to MCC or its successor, or (iii) if the Additional Fee is equal to the Additional Fee Estimate Payment, the Escrowed Fee shall be released to MCC or its successor.

On January 17, 2020, MCC and Sierra filed a notice of appeal with the Delaware Supreme Court from those provisions of the Order and Final Judgment with respect to the Contingent Fee Award.

On March 1, 2019, Marilyn Adler, a former employee who served as a Managing Director of Medley Capital LLC, filed suit in the New York Supreme Court, Commercial Part, against Medley Capital LLC, MCC Advisors, Medley SBIC GP, LLC, MMC, the Company, as well as Brook Taube, and Seth Taube, individually. The action is captioned in Marilyn S. Adler v. Medley Capital LLC et al. (Supreme Court of New York, March 2019). In her complaint, Ms. Adler alleged that she was due in excess of $6.5 million in compensation based upon her role with Medley's SBIC Fund. Her claims were for breach of contract, unjust enrichment, conversion, tortious interference, as well as a claim for an accounting of funds maintained by the defendants. The Company denied the allegation and asserted counterclaims against Ms. Adler for breach of contract and breach of fiduciary duties. In response to the Company's motion to dismiss the breach of contract claim, Ms. Adler has conceded there was no written contract.

After Medley filed its counterclaims, on February 7, 2020, the parties reached a settlement, exchanged mutual releases and dismissed the Adler litigation with prejudice.  Medley did not make any payment to or for the benefit of Adler whatsoever in connection with the settlement. In connection with the settlement, Medley released Adler from certain obligations under a Confidentiality, Non-Interference, and Invention Assignment Agreement between Adler and Medley and Adler paid Medley an undisclosed amount

While management currently believes that the ultimate outcome of these proceedings will not have a material adverse effect on the Company's consolidated financial position or overall trends in consolidated results of operations, litigation is subject to inherent uncertainties. The Company reviews relevant information with respect to litigation and regulatory matters on a quarterly and annual basis. The Company establishes liabilities for litigation and regulatory actions when it is probable that a loss has been incurred and the amount of the loss can be reasonably estimated. For matters where a loss is believed to be reasonably possible, but not probable, no liability is established.

## Item 3A.    Executive Officers of the Registrant

Medley Management Inc. (the "Manager") is the managing member of Medley LLC. The Manager was incorporated as a Delaware corporation on June 13, 2014, and its sole asset is a controlling equity interest in Medley LLC. The Manager's day-to-day operations are conducted by the officers of the Company.

The following table sets forth certain information about our executive officers as of March 20, 2020.

| Name | Age | Position |
|------|-----|----------|
| Brook Taube | 50 | Co-Chief Executive Officer and Co-Chairman of the Board of Directors |
| Seth Taube | 50 | Co-Chief Executive Officer and Co-Chairman of the Board of Directors |
| Richard T. Allorto, Jr. | 48 | Chief Financial Officer |
| John D. Fredericks | 56 | General Counsel and Secretary |

*Brook Taube*, 50, co-founded Medley in 2006 and has served as our Co-Chief Executive Officer since then and as Co-Chairman of the Board of Directors of Medley Management Inc. since its formation. He has also served as Chief Executive Officer and Chairman of the Board of Directors of Medley Capital Corporation since 2011, has served on the Board of Directors of Sierra Income Corporation since its inception in 2012 and the Board of Trustees of Sierra Total Return Fund since its inception in 2016. Prior to forming Medley, Mr. Taube was a Partner with CN Opportunity Fund, T3 Group, a principal and advisory firm focused on distressed asset and credit investments, and Griphon Capital Management. Mr. Taube began his career at Bankers Trust in leveraged finance in 1992. Mr. Taube received a B.A. from Harvard University.

*Seth Taube*, 50, co-founded Medley in 2006 and has served as our Co-Chief Executive Officer since then and as Co-Chairman of the Board of Directors of Medley Management Inc. since its formation. He has also served as Chief Executive Officer and Chairman of the Board of Directors of Sierra Income Corporation since its inception in 2012, Chief Executive Officer and Chairman of the Board of Trustees of Sierra Total Return Fund since its inception in 2016 and on the Board of Directors of Medley Capital Corporation since its inception in 2011. Prior to forming Medley, Mr. Taube was a Partner with CN Opportunity Fund, T3 Group, a principal and advisory firm focused on distressed asset and credit investments, and Griphon Capital Management. Mr. Taube previously worked with Tiger Management and held positions with Morgan Stanley & Co. in the Investment Banking and Institutional Equity Divisions. Mr. Taube received a B.A. from Harvard University, an M. Litt. in Economics from St. Andrew's

University in Great Britain, where he was a Rotary Foundation Fellow, and an M.B.A. from the Wharton School at the University of Pennsylvania.

**Richard T. Allorto, Jr.**, 48, has served as our Chief Financial Officer since July 2010. Mr. Allorto has also served as the Chief Financial Officer and Secretary of Medley Capital Corporation and Sierra Income Corporation. Prior to joining Medley, Mr. Allorto held various positions at GSC Group, Inc., a registered investment adviser, including, Chief Financial Officer of GSC Investment Corp, a business development company that was externally managed by GSC Group. Mr. Allorto began his career at Arthur Andersen in public accounting in 1994. Mr. Allorto is a licensed CPA and received a B.S. in Accounting from Seton Hall University.

**John D. Fredericks**, 56, has served as our General Counsel since June 2013. Mr. Fredericks has also served as the Chief Compliance Officer of Medley Capital Corporation and Sierra Income Corporation since February 2014 and as the Chief Compliance Officer of Sierra Total Return Fund since 2016. Prior to joining Medley, Mr. Fredericks was a partner with Winston & Strawn, LLP from February 2003 to May 2013, where he was a member of the firm's restructuring and insolvency and corporate lending groups. Before joining Winston & Strawn, LLP, from 2000 to 2003, Mr. Fredericks was a partner with Murphy Sheneman Julian & Rogers and, from 1993 to 2000, an associate at Murphy, Weir & Butler. Mr. Fredericks was admitted to the California State Bar in 1993. Mr. Fredericks received a B.A. from the University of California Santa Cruz and a J.D. from University of San Francisco.

### *Family Relationships of Directors and Executive Officers*

Messrs. Brook and Seth Taube, each a Co-Chief Executive Officer and Co-Chairman of the Board of Directors, are brothers. There are no other family relationships among any of our directors or executive officers.

### Item 4.    Mine Safety Disclosures

Not Applicable.

### PART II.

### Item 5.    Market For Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities

There is no established public trading market for any class of our equity. Medley Management Inc. owns 100% of the voting equity interests in Medley LLC and 19.3% of the issued and outstanding LLC Units of Medley LLC. The remaining LLC Units (80.7%) are held by the Senior Management Owners. The LLC Units do not have any voting rights.

### Item 6. Selected Financial Data

The following selected consolidated financial data presents selected data on the financial condition and results of operations of Medley LLC. This financial data should be read together with "*Management's Discussion and Analysis of Financial Condition and Results of Operations*" and the historical financial statements and related notes thereto included in this Form 10-K.

We derived the following selected consolidated financial data of Medley LLC as of December 31, 2019 and 2018 and for the years ended December 31, 2019, 2018 and 2017 from the audited consolidated financial statements included in this Form 10-K. The following selected consolidated statement of operations data for the years ended December 31, 2016 and 2015 and the selected financial condition data as of December 31, 2017 were derived from our audited consolidated financial statements not included in this Form 10-K.

Our historical results are not necessarily indicative of the results expected for any future period.

| | For the Years Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2019 | 2018 | 2017 | 2016 | 2015 |
| | (Dollars in thousands) | | | | |
| **Statement of Operations Data:** | | | | | |
| **Revenues**[1][2] | | | | | |
| Management fees | $      39,473 | $      47,085 | $      58,104 | $      65,496 | $      75,675 |
| Performance fees | — | — | (1,974) | 2,443 | (3,055) |
| Other revenues and fees | 9,703 | 10,503 | 9,201 | 8,111 | 7,436 |
| Investment income (loss): | | | | | |
| Carried Interest | 819 | 142 | 230 | (22) | (12,630) |
| Other investment (loss) | (1,154) | (1,221) | (528) | (87) | (833) |
| Total revenues | 48,841 | 56,509 | 65,033 | 75,941 | 66,593 |
| | | | | | |
| **Expenses** | | | | | |
| Compensation and benefits[3] | 28,925 | 31,666 | 26,558 | 27,481 | 18,719 |
| Consolidated Funds expenses | — | — | — | — | — |
| General, administrative and other expenses | 17,186 | 19,366 | 13,045 | 28,540 | 16,836 |
| Total expenses | 46,111 | 51,032 | 39,603 | 56,021 | 35,555 |
| | | | | | |
| **Other income (expense)** | | | | | |
| Dividend income | 1,119 | 4,311 | 4,327 | 1,304 | 886 |
| Interest expense | (11,497) | (10,806) | (11,855) | (9,226) | (8,469) |
| Other (expenses) income, net | (4,412) | (20,250) | 1,361 | (983) | (808) |
| Total other income (expense), net | (14,790) | (26,745) | (6,167) | (8,905) | (8,391) |
| (Loss) income before income taxes | (12,060) | (21,268) | 19,263 | 11,015 | 22,647 |
| Provision for (Benefit from) income taxes | 3,559 | (300) | 596 | 464 | 392 |
| **Net (loss) income** | (15,619) | (20,968) | 18,667 | 10,551 | 22,255 |
| Net (loss) income attributable to redeemable non-controlling interests and non-controlling interests in consolidated subsidiaries | (3,696) | (11,082) | 6,718 | 2,549 | (885) |
| **Net (loss) income attributable to Medley LLC** | $      (11,923) | $      (9,886) | $      11,949 | $      8,002 | $      23,140 |

45

| | As of December 31, | | | | |
|---|---|---|---|---|---|
| | **2019** | **2018** | **2017** | **2016** | **2015** |
| | | | (Dollars in thousands) | | |
| **Balance Sheet Data:** | | | | | |
| **Assets** | | | | | |
| Cash and cash equivalents | $ 10,377 | $ 16,970 | $ 36,215 | $ 49,566 | $ 71,300 |
| Restricted cash equivalents | — | — | — | 4,897 | — |
| Investments, at fair value | 13,287 | 36,425 | 56,632 | 31,904 | 16,360 |
| Management fees receivable | 8,104 | 10,274 | 14,714 | 12,630 | 16,172 |
| Performance fees receivable | — | — | 2,987 | 4,961 | 2,518 |
| Right-of-use assets under operating leases[4] | 6,564 | — | — | — | — |
| Other assets | 9,727 | 14,145 | 15,493 | 17,004 | 11,797 |
| Total assets | $ 48,059 | $ 77,814 | $ 126,041 | $ 120,962 | $ 118,147 |
| | | | | | |
| **Liabilities and Equity** | | | | | |
| Senior unsecured debt | $ 118,382 | $ 117,618 | $ 116,892 | $ 49,793 | $ — |
| Loans payable | 10,000 | 9,892 | 9,233 | 52,178 | 100,871 |
| Due to former minority interest holder | 8,145 | 11,402 | — | — | — |
| Operating lease liabilities | 8,267 | — | — | — | — |
| Accounts payable, accrued expenses and other liabilities | 21,886 | 26,444 | 24,415 | 37,178 | 36,046 |
| Total liabilities | 166,680 | 165,356 | 150,540 | 139,149 | 136,917 |
| | | | | | |
| **Redeemable Non-controlling Interests** | (748) | 23,186 | 53,741 | 30,805 | |
| | | | | | |
| **Equity** | | | | | |
| Accumulated Other Comprehensive Income | — | — | (10,968) | 166 | — |
| Non-controlling interests in consolidated subsidiaries | (391) | (747) | (1,702) | (1,717) | (459) |
| Member's deficit | (117,482) | (109,981) | (65,570) | (47,441) | (18,311) |
| Total deficit | (117,873) | (110,728) | (78,240) | (48,992) | (18,770) |
| Total liabilities, redeemable non-controlling interests and equity | $ 48,059 | $ 77,814 | $ 126,041 | $ 120,962 | $ 118,147 |

(1). On January 1, 2018, we adopted ASU 2014-9,*Revenue from Contracts with Customers (Topic 606)*, and related amendments, which provide guidance for recognizing revenue from contracts with customers. We adopted ASU 2014-9 on a modified retrospective basis, and, as such, revenues presented prior to 2018 have not been adjusted to reflect the new revenue recognition guidance.

(2). Upon adoption of ASU 2014-9, performance allocations that represent a performance-based capital allocation from fund limited partners to us (commonly known as "carried interest") are accounted for as earnings from financial assets within the scope of ASC 323, *Investments - Equity Method and Joint Ventures*, and therefore are not in the scope of ASU 2014-9. We applied this change in accounting principle on a full retrospective basis, which resulted in a reclassification of amounts previously reported as performance fees to carried interest, a component of investment income (loss) in our consolidated statements of operations. Contractual fees which do not represent a capital allocation of income to the general partner or investment manager that are earned based on the performance of certain funds, typically, the Company's separately managed accounts are not within the scope of ASC 321 and are accounted for under ASU 2014-9 and are included in performance fees on our consolidated statements of operations.

(3). Performance fee compensation reported in the prior period has been reclassified to compensation and benefits to conform to the current period presentation in the consolidated statements of operations. This reclassification had no effect on the reported results of operations. The amount of performance fee compensation included in compensation and benefits for the years ended December 31, 2019, 2018, 2017, 2016 and 2015 were $0, $0.5 million, ($0.9) million, ($0.3) million and ($8.0) million, respectively.

(4). On January 1, 2019, we adopted ASU 2016-2, *Leases (Topic 842)*, and related amendments, which requires lessees to recognize all leases with an expected term of twelve months, as defined in the standard, on the balance sheet by recording right-of-use assets and operating lease liabilities. We adopted ASU 2016-2 on a modified retrospective basis, and, as such, total assets and total liabilities prior to 2019 have not been adjusted to reflect the new lease recognition guidance.

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations**

The following discussion and analysis should be read in conjunction with our audited consolidated financial statements and related notes as of December 31, 2019 and 2018 and for the years ended December 31, 2019, 2018 and 2017 included in this Form 10-K.

## Overview

We are an alternative asset management firm offering yield solutions to retail and institutional investors. We focus on credit-related investment strategies, primarily originating senior secured loans to private middle market companies in the U.S. that have revenues between $50 million and $1 billion. We generally hold these loans to maturity. Our national direct origination franchise provides capital to the middle market in the U.S. Over the past 18 years, we have provided capital to over 400 companies across 35 industries in North America.

We manage three permanent capital vehicles, two of which are BDCs and one interval fund, as well as long-dated private funds and SMAs, focusing on senior secured credit.

- Permanent capital vehicles: MCC, SIC and STRF, have a total AUM of $1.5 billion as of December 31, 2019.
- Long-dated private funds and SMAs: MOF II, MOF III, MOF III Offshore, MCOF, Aspect, Aspect B, MCC JV, SIC JV and SMAs, have a total AUM of $2.6 billion as of December 31, 2019.

As of December 31, 2019, we had $4.1 billion of AUM, $1.5 billion in permanent capital vehicles and $2.6 billion in long-dated private funds and SMAs. Our AUM as of December 31, 2019 declined by 13% year-over-year which was driven primarily by: (i) the termination of MCC's revolver commitment with ING, (ii) MCC's repayment of debt, (iii) distributions and (iv) changes in fund values. Our compounded annual AUM growth rate from December 31, 2010 through December 31, 2019 was 17% and our compounded annual Fee Earning AUM growth rate was 10%, both of which have been driven in large part by the growth in our permanent capital vehicles. As of December 31, 2019, we had $2.1 billion of Fee Earning AUM which consisted of $1.4 billion in permanent capital vehicles and $0.8 billion in long-dated private funds and SMAs. Typically the investment periods of our institutional commitments range from 18 to 24 months and we expect our Fee Earning AUM to increase as capital commitments included in AUM are invested.

In general, our institutional investors do not have the right to withdraw capital commitments and, to date, we have not experienced any withdrawals of capital commitments. For a description of the risk factor associated with capital commitments, see "*Risk Factors – Third-party investors in our private funds may not satisfy their contractual obligation to fund capital calls when requested, which could adversely affect a fund's operations and performance*" included in this Annual Report on Form 10-K.

Direct origination, careful structuring and active monitoring of the loan portfolios we manage are important success factors in our business, which can be adversely affected by difficult market and political conditions. Since our inception in 2006, we have adhered to a disciplined investment process that employs these principles with the goal of delivering strong risk-adjusted investment returns while protecting investor capital. We believe that our ability to directly originate, structure and lead deals enables us to achieve these goals. In addition, the loans we manage generally have a contractual maturity of between three and seven years and are typically floating rate, which we believe positions our business well for rising interest rates.

The significant majority of our revenue is derived from management fees, which include base management fees earned on all of our investment products as well as Part I incentive fees earned from our permanent capital vehicles and certain of our long-dated private funds. Our base management fees are generally calculated based upon fee earning assets and paid quarterly in cash. Our Part I incentive fees are typically calculated based upon net investment income, subject to a hurdle rate, and are paid quarterly in cash.

We also may earn carried interest from our long-dated funds and contractual performance fees from our SMAs. Typically, these fees are 15.0% to 20.0% of the total return above a hurdle rate. Carried interest represent fees that are a capital allocation to the general partner or investment manager, are accrued quarterly and paid after the return of all invested capital and an amount sufficient to achieve the hurdle rate of return.

We also may receive incentive fees related to realized capital gains in our permanent capital vehicles and certain of our long-dated private funds that we refer to as Part II incentive fees. Part II incentive fees are payable annually and are calculated at the end of each applicable year by subtracting the sum of cumulative realized capital losses and unrealized capital depreciation from cumulative aggregate realized capital gains. If the amount calculated is positive, then the Part II incentive fee for such year is equal to 20% of such amount, less the aggregate amount of Part II incentive fees paid in all prior years. If such amount is negative, then no Part II incentive fee will be payable for such year. As our investment strategy is focused on generating yield from senior secured credit, historically we have not generated Part II incentive fees.

For the year ended December 31, 2019, 82% of our revenues were generated from management fees and carried interest derived primarily from net interest income on senior secured loans.

Our primary expenses are compensation to our employees and general, administrative and other expenses. Compensation includes salaries, discretionary bonuses, stock-based compensation, performance based compensation and benefits paid and payable to our employees. General and administrative expenses include costs primarily related to professional services, office rent and

48

related expenses, depreciation and amortization, travel and related expenses, information technology, communication and information services, placement fees and third-party marketing expenses and other general operating items.

**Registered Public Offering of Medley LLC Notes**

On August 9, 2016, we completed a registered public offering of $25.0 million of an aggregate principal amount of 6.875% senior notes due 2026 (the "2026 Notes") at a public offering price of 100% of the principal amount. On October 18, 2016, we completed a public offering of an additional $28.6 million in aggregate principal amount of the 2026 Notes at a public offering price of $24.45 for each $25.00 principal amount of notes. The notes mature on August 15, 2026 and interest is payable quarterly. The notes will be redeemable in whole or in part at our option on or after August 15, 2019 at a redemption price of 100% of the aggregate principal amount plus accrued and unpaid interest payments. We used the net proceeds from the offering to repay a portion of the outstanding indebtedness under our Term Loan Facility. The 2026 Notes are listed on the New York Stock Exchange and trades thereon under the trading symbol "MDLX."

On January 18, 2017, we completed a registered public offering of $34.5 million of an aggregate principal amount of 7.25% senior notes due 2024 (the "2024 Notes") at a public offering price of 100% of the principal amount. On February 22, 2017, we completed a public offering of an additional $34.5 million in aggregate principal amount of the 2024 Notes at a public offering price of $25.25 for each $25.00 principal amount of notes. The 2024 Notes mature on January 30, 2024 and interest is payable quarterly commencing on April 30, 2017. The notes will be redeemable in whole or in part at our option on or after January 30, 2020 at a redemption price of 100% of the aggregate principal amount plus accrued and unpaid interest payment. We used the net proceeds from the offering to repay the remaining outstanding indebtedness under the Term Loan Facility and for general corporate purposes. The 2024 Notes are listed on the New York Stock Exchange and trade thereon under the trading symbol "MDLQ."

**Reorganization and Initial Public Offering**

In connection with the Initial Public Offering ("IPO") of Medley Management Inc., Medley LLC amended and restated its limited liability agreement to modify its capital structure by reclassifying the 23,333,333 interests held by the pre-IPO members into a single new class of units. The pre-IPO members also entered into an exchange agreement under which they (or certain permitted transferees thereof) have the right, subject to the terms of the exchange agreement, to exchange their LLC Units for shares of Medley Management Inc.'s Class A common stock on a one-for-one basis, subject to customary conversion rate adjustments for stock splits, stock dividends and reclassifications. In addition, pursuant to the amended and restated limited liability agreement, Medley Management Inc. became the sole managing member of Medley LLC. Medley Management Inc. is controlled by the PreIPO owners who are subject to limited exceptions, were prohibited from transferring any LLC Units held by them or any shares of Class A common stock received upon exchange of such LLC units, until the third anniversary of the date of the closing of the IPO of Medley Management Inc. without the consent of the managing member. Therefore and prior to the fourth and fifth anniversaries of the closing of the IPO of Medley Management Inc., such holders could not transfer more than 33 1/3% and 66 2/3%, respectively, of the number of LLC Units held by them, together with the number of any shares of Class A common stock received by them upon exchange therefore, without the consent of the managing member.

**Our Structure**

Medley LLC is a partially owned subsidiary of Medley Management Inc., a holding company whose sole material asset is its controlling equity interest in Medley LLC. Medley Management Inc. operates and controls all of the business and affairs and consolidates the financial results of Medley LLC and its subsidiaries. Medley Management Inc. owns 100% of the voting interest in Medley LLC and 19.3% of the issues and outstanding LLC Units of Medley LLC. The remaining LLC Units (80.7%) are held by Brook Taube, Seth Taube and other members of senior management ("Senior Management Owners"). The LLC Units do not have voting rights. Medley Management Inc. and the Senior Management Owners have also entered into an exchange agreement under which the Senior Management Owners (or certain permitted transferees) have the right (subject to the terms of the exchange agreement), to exchange their equity interest in Medley LLC for shares of Medley Management Inc. Class A common stock on a one-for-one basis, subject to customary conversion rate adjustments for stock splits, stock dividends and reclassifications.

Medley Group LLC, an entity wholly-owned by the pre-IPO owners, holds all 100 issued and outstanding shares of Medley Management Inc.'s Class B common stock. For so long as the pre-IPO owners and then-current Medley personnel hold at least 10% of the aggregate number of shares of Class A common stock and LLC Units (excluding those LLC Units held by Medley Management Inc.), which we refer to as the "Substantial Ownership Requirement," the Class B common stock entitles Medley Group LLC, without regard to the number of shares of Class B common stock held by it, to a number of votes that is equal to 10 times the aggregate number of LLC Units held by all non-managing members of Medley LLC that do not themselves hold shares of Class B common stock and entitle each other holder of Class B common stock, without regard to the number of shares of Class B common stock held by such other holder, to a number of votes that is equal to 10 times the number of LLC Units held by such holder. For purposes of calculating the Substantial Ownership Requirement, shares of Class A common stock deliverable to the pre-IPO owners and then-current Medley personnel pursuant to outstanding equity awards will be deemed then outstanding and shares of Class A common stock and LLC Units held by any estate, trust, partnership or limited liability company or other similar entity of which any pre-IPO owner or then-current Medley personnel, or any immediate family member thereof, is a trustee, partner,

member or similar party will be considered held by such pre-IPO owner or other then-current Medley personnel. From and after the time that the Substantial Ownership Requirement is no longer satisfied, the Class B common stock will entitle Medley Group LLC, without regard to the number of shares of Class B common stock held by it, to a number of votes that is equal to the aggregate number of LLC Units held by all non-managing members of Medley LLC that do not themselves hold shares of Class B common stock and entitle each other holder of Class B common stock, without regard to the number of shares of Class B common stock held by such other holder, to a number of votes that is equal to the number of LLC Units held by such holder. At the completion of Medley Management Inc.'s IPO, the pre-IPO owners were comprised of all of the non-managing members of Medley LLC. However, Medley LLC may in the future admit additional non-managing members that would not constitute pre-IPO owners. If at any time the ratio at which LLC Units are exchangeable for shares of Medley Management Inc.'s Class A common stock changes from one-for-one as set forth in the Exchange Agreement, the number of votes to which Class B common stockholders are entitled will be adjusted accordingly. Holders of shares of our Class B common stock will vote together with holders of our Class A common stock as a single class on all matters on which stockholders are entitled to vote generally, except as otherwise required by law.

Holders of equity interests in Medley LLC (other than Medley Management Inc.) are subject to limited exceptions, prohibited from transferring any LLC Units held by them as of September 23, 2014, (the date of consummation of the IPO of Medley Management Inc.), or any shares of Medley Management Inc.'s Class A common stock received upon exchange of such LLC Units, until September 23, 2017, without Medley Management Inc.'s consent. Thereafter and prior to September 23, 2018 and September 23, 2019, such holders were not able to transfer more than 33 1/3% and 66 2/3%, respectively, of the number of any shares of Medley LLC's equity interest held by them upon consummation of Medley Management Inc.'s IPO, together with the number of any shares of Medley Management Inc.'s Class A common stock received by them upon exchange therefor, without Medley Management Inc.'s consent. While this agreement could have been amended or waived by Medley Management Inc., the holders of of the equity interest in Medley LLC (other than Medley Management Inc.) did not seek any waivers of these restrictions.The diagram below depicts our organizational structure (excluding those operating subsidiaries with no material operations or assets) as of March 20, 2020:



(1)   The Class B common stock provides Medley Group LLC with a number of votes that is equal to 10 times the aggregate number of LLC Units held by all non-managing members of Medley LLC. From and after the time that the Substantial Ownership Requirement is no longer satisfied, the Class B common stock will provide Medley Group LLC with a number of votes that is equal to the aggregate number of LLC Units held by all non-managing members of Medley LLC that do not themselves hold shares of Class B common stock.
(2)   If our pre-IPO owners exchanged all of their vested and unvested LLC Units for shares of Class A common stock, they would hold 80.8% of the outstanding shares of Class A common stock, entitling them to an equivalent percentage of economic interests and voting power in Medley Management Inc., Medley Group LLC would hold no voting power or economic interests in Medley Management Inc. and Medley Management Inc. would hold 100% of outstanding LLC Units and 100% of the voting power in Medley LLC.
(3)   Medley LLC holds 96.5% of the Class B economic interests in Medley (Aspect) Management LLC.
(4)   Medley LLC holds 100% of the outstanding Common Interest, and DB MED Investor I LLC holds 100% of the outstanding Preferred Interest in each of Medley Seed Funding I LLC and Medley Seed Funding II LLC.
(5)   Medley Seed Funding III LLC holds 100% of the senior preferred interest, Strategic Capital Advisory Services, LLC holds 100% of the junior preferred interest, and Medley LLC holds 100% of the common interest in STRF Advisors LLC.
(6)   Medley LLC holds 95.5% of the Class B economic interests in MCOF Management LLC.
(7)   Medley LLC holds 100% of the outstanding Common Interest, and DB MED Investor II LLC holds 100% of the outstanding Preferred Interest in Medley Seed Funding III LLC.
(8)   Medley GP Holdings LLC holds 95.5% of the Class B economic interests in MCOF GP LLC.

(9)   Certain employees, former employees and former members of Medley LLC hold approximately 40.3% of the limited liability company interests in MOF II GP LLC, the entity that serves as general partner of MOF II, entities controlled by Medley LLC own the remaining interests in MOF II and MOF III.

(10)  Medley GP Holdings LLC holds 96.5% of the Class B economic interests in Medley (Aspect) GP LLC.

50

(11) Certain employees of Medley LLC hold approximately 70.1% of the limited liability company interests in Medley Caddo Investors LLC, entitling the holders to share the carried earned from Caddo Investors Holdings I LLC.

(12) Certain employees of Medley LLC hold approximately 69.9% of the limited liability company interests in Medley Real D Investors LLC, entitling the holders to share the carried earned from Medley Real D (Annuity) LLC.

(13) Certain employees of Medley LLC hold approximately 70.2% of the limited liability company interests in Medley Avantor Investors LLC, entitling the holders to share the carried earned from Medley Tactical Opportunities LLC.

(14) Certain employees of Medley LLC hold approximately 70.1% of the limited liability company interests in Medley Cloverleaf Investors LLC, entitling the holders to share the carried earned from Medley Chiller Holdings LLC.

### *Agreements and Plans of Merger*

On August 9, 2018, MDLY entered into the Agreement and Plan of Merger (the "MDLY Merger Agreement"), dated as of August 9, 2018, by and among MDLY, the Company, Sierra and Sierra Management, Inc., a wholly owned subsidiary of Sierra ("Merger Sub"), pursuant to which the Company would, on the terms and subject to the conditions set forth in the MDLY Merger Agreement, merge with and into Merger Sub, with Merger Sub as the surviving company in the merger (the "MDLY Merger"). In the MDLY Merger, each share of MDLY Class A common stock, issued and outstanding immediately prior to the MDLY Merger effective time (other than Dissenting Shares (as defined in the MDLY Merger Agreement) and shares of MDLY Class A common stock held by MDLY, the Company, Sierra or their respective wholly owned subsidiaries) would be converted into the right to receive (i) 0.3836 shares of Sierra's common stock; plus (ii) cash in an amount equal to $3.44 per share. In addition, MDLY stockholders would have the right to receive certain dividends and/or other payments. Simultaneously, pursuant to the Agreement and Plan of Merger, dated as of August 9, 2018, by and between Medley Capital Corporation ("MCC") and Sierra (the "MCC Merger Agreement"), MCC would, on the terms and subject to the conditions set forth in the MCC Merger Agreement, merge with and into Sierra, with Sierra as the surviving company in the merger (the "MCC Merger" together with the MDLY Merger, the "Mergers"). In the MCC Merger, each share of MCC's common stock issued and outstanding immediately prior to the MCC Merger effective time (other than shares of MCC's common stock held by MCC, Sierra or their respective wholly owned subsidiaries) would be converted into the right to receive 0.8050 shares of Sierra's common stock.

On July 29, 2019, MDLY entered into the Amended and Restated Agreement and Plan of Merger, dated as of July 29, 2019 (the "Amended MDLY Merger Agreement"), by and among MDLY, the Company, Sierra, and Merger Sub, pursuant to which the Company will, on the terms and subject to the conditions set forth in the Amended MDLY Merger Agreement, merge with and into Merger Sub, with Merger Sub as the surviving company in the MDLY Merger. In the MDLY Merger, each share of MDLY Class A common stock, issued and outstanding immediately prior to the MDLY Merger effective time (other than shares of MDLY Class A common stock held by MDLY, the Company, Sierra or their respective wholly owned subsidiaries (the "Excluded MDLY Shares") and the Dissenting Shares (as defined in the Amended MDLY Merger Agreement), held, immediately prior to the MDLY Merger effective time, by any person other than a holder of LLC Units), will be exchanged for (i) 0.2668 shares of Sierra's common stock; plus (ii) cash in an amount equal to $2.96 per share. In addition, in the MDLY Merger, each share of MDLY Class A common stock issued and outstanding immediately prior to the MDLY Merger effective time, other than the Excluded MDLY Shares and the Dissenting Shares, held, immediately prior to the MDLY Merger effective time, by holders of LLC Units will be exchanged for (i) 0.2072 shares of Sierra's common stock; plus (ii) cash in an amount equal to $2.66 per share. Under the Amended MDLY Merger Agreement, the MDLY exchange ratios and the cash consideration amount was fixed on July 29, 2019, the date of the signing of the Amended MDLY Merger Agreement. The MDLY exchange ratios and the cash consideration amount are not subject to adjustment based on changes in the NAV of Sierra or the market price of MDLY Class A common stock before the MDLY Merger effective time, provided that the MDLY Merger is consummated by March 31, 2020, or, if consummated after March 31, 2020, only if the parties subsequently agree to extend the closing date on the same terms and conditions.

In addition, on July 29, 2019, MCC and Sierra announced the execution of the Amended and Restated Agreement and Plan of Merger, dated as of July 29, 2019 (the "Amended MCC Merger Agreement"), by and between MCC and Sierra, pursuant to which MCC will, on the terms and subject to the conditions set forth in the Amended MCC Merger Agreement, merge with and into Sierra , with Sierra as the surviving company in the MCC Merger. In the MCC Merger, each share of MCC's common stock (other than shares of MCC's common stock held by MCC, Sierra or their respective wholly owned subsidiaries), will be exchanged for the right to receive (i) 0.68 shares of Sierra's common stock if the attorneys' fees of plaintiffs' counsel and litigation expenses paid or incurred by plaintiffs' counsel or advanced by plaintiffs in connection with the Delaware Action, as described below (such fees and expenses, the "Plaintiff Attorney Fees") are less than or equal to $10,000,000; (ii) 0.66 shares of Sierra's common stock if the Plaintiff Attorney Fees are equal to or greater than $15,000,000; (iii) between 0.68 and 0.66 per share of Sierra's common stock if the Plaintiff Attorney Fees are greater than $10,000,000 but less than $15,000,000, calculated on a descending basis, based on straight line interpolation between $10,000,000 and $15,000,000; or (iv) 0.66 shares of Sierra's common stock in the event that the Plaintiff Attorney Fees are not fully and finally determined prior to the closing of the MCC Merger (such ratio, the "MCC Merger Exchange Ratio"). Based upon the Plaintiff Attorney Fees approved by the Court of Chancery of the State of Delaware (the "Delaware Court of Chancery") as set forth in the Order and Final Judgment entered into on December 20, 2019, as described below (the "Delaware Order"), the MCC Merger Exchange Ratio will be 0.66 shares of Sierra's common stock. MCC and Sierra are appealing the Delaware Order with respect to the Delaware Court of Chancery's ruling on the Plaintiff Attorney Fees. Under

the Amended MCC Merger Agreement, the MCC Merger exchange ratio is not subject to adjustment based on changes in the NAV of Sierra or the market price of MCC's common stock before the MCC Merger effective time. In addition, under the Settlement (as described below), the defendant parties to the Settlement (other than the Company) shall, among other things, deposit or cause to be deposited the Settlement shares, the number of shares of which is to be calculated using the pro forma NAV of $6.37 per share as of June 30, 2019, and is not subject to subsequent adjustment based on changes in the NAV of Sierra or the market price of MCC's common stock before the MCC Merger effective time, provided that the MCC Merger is consummated by March 31, 2020, or, if consummated after March 31, 2020, only if the parties subsequently agree to extend the closing date on the same terms and conditions.

Pursuant to terms of the Amended MCC Merger Agreement, the consummation of the MCC Merger is conditioned upon the satisfaction or waiver of each of the conditions to closing under the Amended MDLY Merger Agreement and the consummation of the MDLY Merger. However, pursuant to the terms of the Amended MDLY Merger Agreement, the consummation of the MDLY Merger is not contingent upon the consummation of the MCC Merger. If both Mergers are successfully consummated, Sierra's common stock would be listed on the NYSE, with such listing expected to be effective as of the closing date of the Mergers, and Sierra's common stock will be listed on the Tel Aviv Stock Exchange, with such listing expected to be effective as of the closing date of the MCC Merger. If, however, only the MDLY Merger is consummated, Sierra's common stock would be listed on the NYSE. If both Mergers are successfully consummated, the investment portfolios of MCC and Sierra would be combined, Merger Sub, as a successor to MDLY, would be a wholly owned subsidiary of Sierra (the "Combined Company"), and the Combined Company would be internally managed by MCC Advisors LLC, its wholly controlled adviser subsidiary. If only the MDLY Merger is consummated, while the investment portfolios of MCC and Sierra would not be combined, the investment management function relating to the operation of the Company, as the surviving company, would still be internalized (the "Sierra/MDLY Company") and the Sierra/MDLY Company would be managed by MCC Advisors LLC.

The Mergers are subject to approval by the stockholders of MDLY, Sierra, and MCC, regulators, including the SEC, court approval of the Settlement (as described below), other customary closing conditions and third-party consents. There is no assurance that any of the foregoing conditions will be satisfied. MDLY and Sierra have the right to terminate the Amended MDLY Merger Agreement under certain circumstances, including (subject to certain limitations set forth in the Amended MDLY Merger Agreement), among others: (i) by mutual written agreement of each party; (ii) any governmental entity whose consent or approval is a condition to closing set forth in Section 8.1 of the Amended MDLY Merger Agreement has denied the granting of any such consent or approval and such denial has become final and nonappealable, or any governmental entity of competent jurisdiction shall have issued a final and nonappealable order, injunction or decree permanently enjoining or otherwise prohibiting or making illegal the consummation of the transactions contemplated by the Amended MDLY Merger Agreement; (iii) the MDLY Merger has not closed on or prior to March 31, 2020; or (iv) either party has failed to obtain stockholder approval or the Amended MCC Merger Agreement has been terminated.

Set forth below is a description of the Decision (as defined below), which should be read in the context of the impact of the Delaware Order and corresponding Settlement.

On February 11, 2019, a purported stockholder class action related to the MCC Merger was commenced in the Delaware Court of Chancery by FrontFour Capital Group LLC and FrontFour Master Fund, Ltd. (together, "FrontFour"), captioned FrontFour Capital Group LLC, et al. v. Brook Taube et al., Case No. 2019-0100 (the "Delaware Action") against defendants Brook Taube, Seth Taube, Jeff Tonkel, Mark Lerdal, Karin Hirtler-Garvey, John E. Mack, Arthur S. Ainsberg, MDLY, Sierra, MCC, MCC Advisors LLC, Medley Group LLC, and Medley LLC. The complaint, as amended on February 12, 2019, alleged that the individuals named as defendants breached their fiduciary duties to MCC's stockholders in connection with the MCC Merger, and that MDLY, Sierra, MCC Advisors LLC, Medley Group LLC, and Medley LLC aided and abetted those alleged breaches of fiduciary duties. The complaint sought to enjoin the vote of MCC's stockholders on the MCC Merger and enjoin enforcement of certain provisions of the MCC Merger Agreement.

The Delaware Court of Chancery held a trial on the plaintiffs' motion for a preliminary injunction and issued a Memorandum Opinion (the "Decision") on March 11, 2019. The Delaware Court of Chancery denied the plaintiffs' requests to (i) permanently enjoin the MCC Merger and (ii) require MCC to conduct a "shopping process" for MCC on terms proposed by FrontFour in its complaint. The Delaware Court of Chancery held that MCC's directors breached their fiduciary duties in entering into the MCC Merger, but rejected FrontFour's claim that Sierra aided and abetted those breaches of fiduciary duties. The Delaware Court of Chancery ordered the defendants to issue corrective disclosures consistent with the Decision, and enjoined a vote of MCC's stockholders on the MCC Merger until such disclosures had been made and stockholders had the opportunity to assimilate that information.

On December 20, 2019, the Delaware Court of Chancery entered into the Delaware Order approving the settlement of the Delaware Action (the "Settlement"). Pursuant to the Settlement, MCC agreed to certain amendments to (i) the MCC Merger Agreement and (ii) the MDLY Merger Agreement, which amendments are reflected in the Amended MCC Merger Agreement and

the Amended MDLY Merger agreement. The Settlement also provides for, if the MCC Merger is consummated, the creation of a settlement fund, consisting of $17 million in cash and $30 million of Sierra's common stock, with the number of shares of Sierra's common stock to be calculated using the pro forma net asset value of $6.37 per share as of June 30, 2019, which will be distributed to eligible members of the Settlement Class (as defined in the Settlement). In addition, in connection with the Settlement, on July 29, 2019, MCC entered into a Governance Agreement with FrontFour Capital Group LLC, FrontFour Master Fund, Ltd., FrontFour Capital Corp., FrontFour Opportunity Fund, David A. Lorber, Stephen E. Loukas and Zachary R. George, pursuant to which, among other matters, FrontFour is subject to customary standstill restrictions and required to vote in favor of the revised MCC Merger at a meeting of stockholders to approve the revised MCC Merger Agreement. The Settlement also provides for mutual releases between and among FrontFour and the Settlement Class, on the one hand, and the Medley Parties, on the other hand, of all claims that were or could have been asserted in the Delaware Action through September 26, 2019.

The Delaware Court of Chancery also awarded attorney's fees as follows: (i) an award of $3,000,000 to lead plaintiffs' counsel and $75,000 to counsel to plaintiff Stephen Altman (the "Therapeutics Fee Award") and $420,334.97 of plaintiff counsel expenses payable to the lead plaintiff's counsel, which were paid by MCC on December 23, 2019, and (ii) an award that is contingent upon the closing of the proposed merger transactions (the "Contingent Fee Award"), consisting of:

a.   $100,000 for the agreement by Sierra's board of directors to appoint one independent director of MCC who will be selected by the independent directors of Sierra on the board of directors of the post-merger company upon the closing of the Mergers; and

b.   the amount calculated by solving for A in the following formula:

*Award[A]=(Monetary Fund[M]+Award[A]-Look Through[L])\*Percentage[P]*

Whereas

A    shall be the amount of the Additional Fee (excluding the $100,000 award for the agreement by Sierra's board of directors to appoint one independent director of MCC who will be selected by the independent directors of Sierra on the board of directors of the post-merger company upon the closing of the Mergers);

M    shall be the sum of (i) the $17 million cash component of the Settlement Fund and (ii) the value of the post-merger company stock component of the Settlement Fund, which shall be calculated as the product of the VPS (as defined below) and 4,709,576.14 (the number of shares of post-merger company's stock comprising the stock component of the net settlement amount);

L    shall be the amount representing the estimated value of the decrease in shares to be received by eligible class members arising by operation of the change in the "Exchange Ratio" under the Amended MCC Merger Agreement, calculated as follows:

*L = ((ES \* 68%) - (ES \* 66%)) \* VPS*

Where:

ES   shall be the number of eligible shares;

VPS  shall be the pro forma net asset value per share of the post-merger company's common stock as of the closing as reported in the public disclosure filed nearest in time and after the closing (the "Closing NAV Disclosure"); and

P    shall equal 0.26

The Contingent Fee Award is contingent upon the closing of the MCC Merger. Payment of the Contingent Fee Award will be made in two stages. First, within five (5) business days of the establishment of the Settlement Fund, MCC or its successor shall (i) pay the plaintiffs' counsel an estimate of the Contingent Fee Award (the "Additional Fee Estimate"), less twenty (20) percent (the "Additional Fee Estimate Payment"), and (ii) deposit the remaining twenty (20) percent of the Additional Fee Estimate into escrow (the "Escrowed Fee"). For purposes of calculating such estimate, MCC or its successor shall use the formula set above, except that VPS shall equal the pro forma net asset value of the post-merger company's common stock as reported in the public disclosure filed nearest in time and prior to the closing (the "Closing NAV Estimate").

Second, within five (5) business days of the Closing NAV Disclosure (as defined in the Order and Final Judgment), (i) if the Additional Fee is greater than the Additional Fee Estimate Payment, an amount of the Escrowed Fee shall be released to plaintiffs' counsel such that the total payments made to plaintiffs' counsel equal the Additional Fee and the remainder of the Escrowed Fee, if any, shall be released to MCC or its successor, (ii) if the Additional Fee is less than the Additional Fee Estimate Payment,

plaintiffs' counsel shall return to MCC or its successor the difference between the Additional Fee Estimate and the Additional Fee and the Escrowed Fee shall be released to MCC or its successor, or (iii) if the Additional Fee is equal to the Additional Fee Estimate Payment, the Escrowed Fee shall be released to MCC or its successor.

On January 17, 2020, MCC and Sierra filed a notice of appeal with the Delaware Supreme Court from those provisions of the Order and Final Judgment with respect to the Contingent Fee Award.

Transaction expenses related to the MDLY Merger are included in general, administrative and other expenses and primarily consist of professional fees. Such expenses amounted to $4.6 million and $3.8 million for the years ending December 31, 2019 and 2018, respectively. There were no transaction expenses related to the MDLY Merger during the year ended December 2017.

**Trends Affecting Our Business**

Our results of operations, including the fair value of our AUM, are affected by a variety of factors, including conditions in the global financial markets as well as economic and political environments, particularly in the U.S.

During the year ended December 31, 2019, the domestic economy slowed slightly compared to the comparative periods in the previous year, while LIBOR rates decreased. Across the lending spectrum, year over year loan issuances decreased, driven primarily by reduced merger and acquisition activity offset in part by increased refinancing activity. Our platform provides us the ability to lend across the capital structure and at varying interest rates providing our firm access to a larger borrower subset, over time.

In addition to these macroeconomic trends and market factors, our future performance is dependent on our ability to attract new capital. We believe the following factors will influence our future performance:

- *The extent to which investors favor directly originated private credit investments.* Our ability to attract additional capital is dependent on investors' views of directly originated private credit investments relative to traditional assets. We believe fundraising efforts will continue to be impacted by certain fundamental asset management trends that include: (i) the increasing importance of directly originated private credit investment strategies for institutional investors; (ii) increasing demand for directly originated private credit investments from retail investors; (iii) recognition by the consultant channel, which serves endowment and pension fund investors, that directly originated private credit is an important component of asset allocation; (iv) increasing demand from insurance companies seeking alternatives to investing in the liquid credit markets; and (v) de-leveraging of the global banking system, bank consolidation and increased bank regulatory requirements.

- *Our ability to generate strong, stable returns and retain investor capital throughout market cycles.* The capital we are able to attract and retain drives the growth of our AUM, fee earning AUM and management fees. We believe we are well positioned to invest through market cycles given our AUM is in either permanent capital vehicles or long-dated private funds and SMAs.

- *Our ability to source investments with attractive risk-adjusted returns.* Our ability to grow our revenue is dependent on our continued ability to source attractive investments and deploy the capital that we have raised. We believe that the current economic environment provides attractive investment opportunities. Our ability to identify attractive investments and execute on those investments is dependent on a number of factors, including the general macroeconomic environment, valuation, size and the liquidity of these investment opportunities. A significant decrease in the quality or quantity of investment opportunities in the directly originated private credit market, a substantial increase in corporate default rates, an increase in competition from new entrants providing capital to the private debt market and a decrease in recovery rates of directly originated private credit could adversely affect our ability to source investments with attractive risk-adjusted returns.

- *The attractiveness of our product offering to investors.* We believe defined contribution plans, retail investors, public institutional investors, pension funds, endowments, sovereign wealth funds and insurance companies are increasing exposure to directly originated private credit investment products to seek differentiated returns and current yield. Our permanent capital vehicles and long-dated private funds and SMAs benefit from this demand by offering institutional and retail investors the ability to invest in our private credit investment strategy. We believe that the breadth, diversity and number of investment vehicles we offer allow us to maximize our reach with investors.

- *The strength of our investment process, operating platform and client servicing capabilities.* Following the most recent financial crisis, investors in alternative investments, including those managed by us, have heightened their focus on matters such as manager due diligence, reporting transparency and compliance infrastructure. Since inception, we have invested heavily in our investment monitoring systems, compliance and enterprise risk management systems to proactively address investor expectations and the evolving regulatory landscape. We believe these investments in operating infrastructure will continue to support our growth in AUM.

**Components of Our Results of Operations**

**Revenues**

*Management Fees.* Management fees include both base management fees as well as Part I incentive fees.

- *Base Management Fees.* Base management fees are generally based on a defined percentage of (i) average or total gross assets, including assets acquired with leverage, (ii) total commitments, (iii) net invested capital, (iv) NAV or (v) lower of cost or market value of a fund's portfolio investments. These fees are calculated quarterly and are paid in cash in advance or in arrears. Base management fees are recognized as revenue in the period advisory services are rendered, subject to our assessment of collectability.

  In addition, we also receive non asset-based management fees that may include special fees such as origination fees, transaction fees and similar fees paid to us in connection with portfolio investments of our funds. These fees are specific to particular transactions and the contractual terms of the portfolio investments, and are recognized when earned.

- *Part I Incentive Fees.* We also include Part I incentive fees that we receive from our permanent capital vehicles and certain of our long-dated private funds in management fees. Part I incentive fees are paid quarterly, in cash, and are driven primarily by net interest income on senior secured loans. As it relates to MCC, these fees are subject to netting against realized and unrealized losses. We are primarily an asset manager of yield-oriented products and our incentive fees are primarily derived from spread income rather than trading or capital gains. In addition, we also carefully manage interest rate risk. We are generally positioned to benefit from a raising rate environment, which should benefit fees paid to us from our vehicles and funds.

- *Part II Incentive Fees.* For our permanent capital vehicles and certain of our long-dated private funds, Part II incentive fees generally represent 20.0% of each fund's cumulative realized capital gains (net of realized capital losses and unrealized capital depreciation). We have not received these fees historically, and do not expect such fees to be material in the future given our focus on senior secured lending.

*Performance Fees.* Performance fees are contractual fees which do not represent a capital allocation to the general partner or investment manager that are earned based on the performance of certain funds, typically our separately managed accounts. Performance fees are earned based upon fund performance during the period, subject to the achievement of minimum return levels in accordance with the respective terms set out in each fund's investment management agreement. We recognize these contractual based performance fees as revenue when it is probable that a significant reversal of such fees will not occur in the future.

The timing and amount of performance fees generated by our funds is uncertain. If we were to have a realization event in a particular quarter or year, it may have a significant impact on our results for that particular quarter or year that may not be replicated in subsequent periods. Refer to "*Risk Factors — Risks Related to Our Business and Industry*" included in this Annual Report on Form 10-K.

*Other Revenues and Fees.* We provide administrative services to certain of our vehicles that are reported as other revenues and fees. Such fees are recognized as revenue in the period that administrative services are rendered. These fees are generally based on expense reimbursements for the portion of overhead and other expenses incurred by certain professionals directly attributable to each respective fund. We also act as the administrative agent on certain deals for which we may earn loan administration fees and transaction fees. We may also earn consulting fees for providing non-advisory services related to our managed funds. Additionally, this line item includes reimbursable origination and deal expenses as well as reimbursable entity formation and organizational expenses.

*Carried Interest.* Carried interest are performance based fees that represent a capital allocation of income to the general partner or investment manager. Carried interest are allocated to us based on cumulative fund performance to date, subject to the achievement of minimum return levels in accordance with the respective terms set out in each fund's governing documents and are accounted for under the equity method of accounting. Accordingly, these performance fees are reflected as carried interest within investment income on our consolidated statements of operations and balances due for such fees are included as a part of equity method investments within Investments, at fair value on our consolidated balance sheets.

We record carried interest based upon an assumed liquidation of that fund's net assets as of the reporting date, regardless of whether such amounts have been realized. For any given period, carried interest on our consolidated statements of operations may include reversals of previously recognized carried interest due to a decrease in the value of a particular fund that results in a decrease of cumulative fees earned to date. Since fund return hurdles are cumulative, previously recognized carried interest also may be reversed in a period of appreciation that is lower than the particular fund's hurdle rate.

Carried interest received in prior periods may be required to be returned by us in future periods if the funds' investment performance declines below certain levels. Each fund is considered separately in this regard and, for a given fund, carried interest

can never be negative over the life of a fund. If upon a hypothetical liquidation of a fund's investments, at their then current fair values, previously recognized and distributed carried interest would be required to be returned, a liability is established for the potential clawback obligation. For the year ended December 31, 2019, the Company received a carried interest distribution of $0.3 million from one of its managed funds, which has been fully liquidated as of December 31, 2019. Prior to the receipt of this distribution, the Company had not received any carried interest distributions, except for tax distributions related to the Company's allocation of net income, which included an allocation of carried interest. Pursuant to the organizational documents of each respective fund, a portion of these tax distributions may be subject to clawback. As of December 31, 2019 and 2018, we have accrued $7.2 million for clawback obligations that would need to be paid if the funds were liquidated at fair value as of the end of the reporting period. Our actual obligation, however, would not become payable or realized until the end of a fund's life.

*Other Investment income.* Other investment income is comprised of unrealized appreciation (depreciation) resulting from changes in fair value of our equity method investments in addition to the income/expense allocations from such investments.

In certain cases, the entities that receive management and incentive fees from our funds are owned by Medley LLC together with other persons. See "*Critical Accounting Policies*" and Note 2, "*Summary of Significant Accounting Policies,*" to our consolidated financial statements included in this Form 10-K for additional information regarding the manner in which management fees, performance fees, carried interest, investment income and other fees are recognized.

**Expenses**

*Compensation and Benefits.* Compensation and benefits consists primarily of salaries, discretionary bonuses and benefits paid and payable to our employees, performance fee compensation and stock-based compensation associated with the grants of equity-based awards to our employees. Compensation expense relating to equity based awards are measured at fair value as of the grant date, reduced for actual forfeitures when they occur, and expensed over the vesting period on a straight-line basis. Bonuses are accrued over the service period to which they relate.

Guaranteed payments made to our senior professionals who are members of Medley LLC are recognized as compensation expense. The guaranteed payments to our Co-Chief Executive Officers are performance based and periodically set subject to maximums based on our total assets under management. For each of the Co-Chief Executive Officers such maximums aggregated to $2.5 million for each of the years ending December 31, 2019, 2018 and 2017. During the years ending December 31, 2019, 2018 and 2017, neither of our Co-Chief Executive Officers received any guaranteed payments.

*General, Administrative and Other Expenses.* General and administrative expenses include costs primarily related to professional services, office rent, depreciation and amortization, general insurance, recruiting, travel and related expenses, information technology, communication and information services and other general operating items.

**Other Income (Expense)**

*Dividend Income.* Dividend income consists of dividends associated with our investments in SIC and MCC. Dividends are recognized on an accrual basis to the extent that such amounts are declared and expected to be collected.

*Interest Expense.* Interest expense consists primarily of interest expense relating to debt incurred by us.

*Other (Income) Expenses, Net.* Other income (expenses), net consists primarily of expenses associated with our revenue share payable and unrealized gains (losses) from our investment in shares of MCC.

*Provision for (Benefit from) Income Taxes.* We are treated as a partnership for income tax purposes and therefore are not subject to U.S. federal, state and local corporate income taxes. The Company is subject to New York City's unincorporated business tax attributable to taxable income allocable to New York City.

Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statements carrying amounts of existing assets and liabilities and their respective tax basis. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. To the extent it is more likely than not that the deferred tax assets will not be recognized, a valuation allowance is provided to offset their benefit.

We recognize the benefit of an income tax position only if it is more likely than not that the tax position will be sustained upon tax examination, based solely on the technical merits of the tax position. Otherwise, no benefit is recognized. The tax benefits recognized are measured based on the largest benefit that has a greater than 50% percent likelihood of being realized upon ultimate settlement. Interest expense and penalties related to income tax matters are recognized as a component of the provision for income taxes.

*Net Income (Loss) Attributable to Redeemable Non-Controlling Interests and Non-Controlling Interests in Consolidated Subsidiaries.* Net income (loss) attributable to redeemable non-controlling interests and non-controlling interests in consolidated subsidiaries represents the ownership interests that third parties hold in certain consolidated subsidiaries.

*Net Income (Loss) Attributable to Non-Controlling Interests in Medley LLC.* Net income (loss) attributable to non-controlling interests in Medley LLC represents the ownership interests that non-managing members' hold in Medley LLC.

Our private funds are closed-end funds, and accordingly do not permit investors to redeem their interests other than in limited circumstances that are beyond our control, such as instances in which retaining the limited partnership interest could cause the limited partner to violate a law, regulation or rule. In addition, SMAs for a single investor may allow such investor to terminate the investment management agreement at the discretion of the investor pursuant to the terms of the applicable documents. We manage assets for MCC and SIC, both of which are BDCs. The capital managed by MCC and SIC is permanently committed to these funds and cannot be redeemed by investors.

**Managing Business Performance**

*Non-GAAP Financial Information*

In addition to analyzing our results on a GAAP basis, management also makes operating decisions and assesses business performance based on the financial and operating metrics and data that are presented without the consolidation of any fund(s). Core Net Income and Core EBITDA are non-GAAP financial measures that are used by management to assess the performance of our business. There are limitations associated with the use of non-GAAP financial measures as compared to the use of the most directly comparable U.S. GAAP financial measure and these measures supplement and should be considered in addition to and not in lieu of the results of operations discussed further under "*Results of Operations*,'' which are prepared in accordance with U.S. GAAP. Furthermore, such measures may be inconsistent with measures presented by other companies. For a reconciliation of these measures to the most comparable measure in accordance with U.S. GAAP, see "*Reconciliation of Certain Non-GAAP Performance Measures to Consolidated U.S. GAAP Financial Measures*.''

*Core Net Income.* Core Net Income is an income measure that is used by management to assess the performance of our business through the removal of non-core items, as well as non-recurring expenses associated with the IPO of Medley Management Inc. It is calculated by adjusting net income (loss) attributable to Medley LLC to exclude reimbursable expenses associated with the launch of funds, amortization of stock-based compensation expense associated with grants of restricted stock units at the time of Medley Management Inc.'s IPO, expenses associated with strategic initiatives and other non-core items and the income tax impact of these adjustments.

*Core Earnings Before Interest, Income Taxes, Depreciation and Amortization (Core EBITDA).* Core EBITDA is an income measure also used by management to assess the performance of our business. Core EBITDA is calculated as Core Net Income before interest expense, income taxes, depreciation and amortization.

**Key Performance Indicators**

When we review our performance we focus on the indicators described below:

| | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
| | **2019** | **2018** | **2017** |
| | (dollars in thousands, except AUM, share and per share amounts) | | |
| **Consolidated Financial Data:** | | | |
| Net income (loss) attributable to Medley | $ (11,923) | $ (9,886) | $ 927 |
| | | | |
| **Non-GAAP Data:** | | | |
| Core Net Income (Loss) | $ (5,060) | $ 4,615 | $ 5,426 |
| Core EBITDA | $ 10,946 | $ 17,977 | $ 19,562 |
| | | | |
| **Other Data (at period end, in millions):** | | | |
| AUM | $ 4,122 | $ 4,712 | $ 5,198 |
| Fee Earning AUM | $ 2,138 | $ 2,785 | $ 3,158 |

**AUM**

AUM refers to the assets of our funds. We view AUM as a metric to measure our investment and fundraising performance as it reflects assets generally at fair value plus available uncalled capital. For our funds, our AUM equals the sum of the following:

- Gross asset values or NAV of such funds;

- the drawn and undrawn debt (at the fund-level, including amounts subject to restrictions); and

- uncalled committed capital (including commitments to funds that have yet to commence their investment periods).

The below table provides the roll forward of AUM from December 31, 2016 to December 31, 2019.

| | Permanent Capital Vehicles | | Long-dated Private Funds and SMAs | | Total | | % of AUM | |
| | | | | | | | Permanent Capital Vehicles | Long-dated Private Funds and SMAs |
|---|---|---|---|---|---|---|---|---|
| | | | (Dollars in millions) | | | | | |
| Ending balance, December 31, 2016 | $ | 2,527 | $ | 2,808 | $ | 5,335 | 47% | 53% |
| Commitments [1] | | (7) | | 254 | | 247 | | |
| Capital reduction [2] | | (44) | | — | | (44) | | |
| Distributions [3] | | (100) | | (175) | | (275) | | |
| Change in fund value [4] | | (39) | | (26) | | (65) | | |
| Ending balance, December 31, 2017 | $ | 2,337 | $ | 2,861 | $ | 5,198 | 45% | 55% |
| Commitments [1] | | (210) | | 116 | | (94) | | |
| Distributions [2] | | (107) | | (144) | | (251) | | |
| Change in fund value [3] | | (103) | | (38) | | (141) | | |
| Ending balance, December 31, 2018 | $ | 1,917 | $ | 2,795 | $ | 4,712 | 41% | 59% |
| Commitments [1] | | (48) | | 6 | | (42) | | |
| Capital reduction [2] | | (135) | | — | | (135) | | |
| Distributions [3] | | (67) | | (173) | | (240) | | |
| Change in fund value [4] | | (119) | | (54) | | (173) | | |
| Ending balance, December 31, 2019 | $ | 1,548 | $ | 2,574 | $ | 4,122 | 38% | 62% |

[1] With respect to permanent capital vehicles, represents decreases during the period for debt repayments offset, in part, by equity and debt offerings. With respect to long-dated private funds and SMAs, represents new commitments as well as any increases in available undrawn borrowings.

[2] Represents the permanent reduction in equity or leverage during the period.

[3] With respect to permanent capital vehicles, represents distributions of income. With respect to long-dated private funds and SMAs, represents return of capital, given our funds' stage in their respective life cycle and the prioritization of capital distributions.

[4] Includes interest income, realized and unrealized gains (losses), fees and/or expenses.

AUM decreased by $590.0 million to $4.1 billion as of December 31, 2019 compared to December 31, 2018. Our permanent capital vehicles decreased AUM by $369.0 million as of December 31, 2019 and our long-dated private funds and SMAs decreased AUM by $221.0 million as of December 31, 2019 in each case as compared with December 31, 2018.

AUM was $4.7 billion as of December 31, 2018 compared to $5.2 billion of AUM as of December 31, 2017. Our permanent capital vehicles decreased by $420.0 million as of December 31, 2018, primarily due to MCC voluntarily satisfying and terminating its commitments under its revolving credit facility with ING Capital LLC in accordance with its terms, along with distributions and changes in fund values. Our long-dated private funds and SMAs decreased AUM by $66.0 million.

AUM was $5.2 billion as of December 31, 2017 compared to $5.3 billion of AUM as of December 31, 2016. Our permanent capital vehicles decreased by $190.0 million as of December 31, 2017, primarily due to distributions and realized and unrealized losses. Our long-dated private funds and SMAs increased AUM by $53.0 million, or 2%, primarily associated with new debt commitments, partly offset by distributions as some of our vehicles are no longer in the investment period.

**Fee Earning AUM**

Fee earning AUM refers to assets under management on which we directly earn base management fees. We view fee earning AUM as a metric to measure changes in the assets from which we earn management fees. Our fee earning AUM is the sum of all the individual fee earning assets of our funds that contribute directly to our management fees and generally equals the sum of:

- for our permanent capital vehicles, the average or total gross asset value, including assets acquired with the proceeds of leverage (see "*Fee earning AUM based on gross asset value*" in the "*Components of Fee Earning AUM*" table below for the amount of this component of fee earning AUM as of each period);

- for certain long-dated private funds within their investment period, the amount of limited partner capital commitments (see "*Fee earning AUM based on capital commitments*" in the "*Components of Fee Earning AUM*" table below for the amount of this component of fee earning AUM as of each period); and

- for the aforementioned funds beyond their investment period and certain managed accounts within their investment period, the amount of limited partner invested capital, the NAV of the fund or lower of cost or market value of a fund's portfolio investments (see "Fee earning AUM based on invested capital or NAV" in the "Components of Fee Earning AUM" table below for the amount of this component of fee earning AUM as of each period).

Our calculations of fee earning AUM and AUM may differ from the calculations of other asset managers and, as a result, this measure may not be comparable to similar measures presented by others. In addition, our calculations of fee earning AUM and AUM may not be based on any definition of fee earning AUM or AUM that is set forth in the agreements governing the investment funds that we advise.

**Components of Fee Earning AUM**

| | As of December 31, | | | |
|---|---|---|---|---|
| | **2019** | | **2018** | |
| | (in millions) | | | |
| Fee earning AUM based on gross asset value | $ | 1,361 | $ | 1,743 |
| Fee earning AUM based on invested capital, NAV or capital commitments | | 777 | | 1,042 |
| Total fee earning AUM | $ | 2,138 | $ | 2,785 |

As of December 31, 2019, fee earning AUM based on gross asset value decreased by $382.0 million, compared to December 31, 2018. The decrease was primarily due to capital reductions resulting from debt repayments, distributions and changes in fund value.

As of December 31, 2019, fee earning AUM based on invested capital, NAV or capital commitments decreased by $265.0 million compared to December 31, 2018. The decrease was primarily due to the return of portfolio investment capital to the respective fund.

The table below presents the roll forward of fee earning AUM from December 31, 2016 to December 31, 2019.

59

| | Permanent Capital Vehicles | Long-dated Private Funds and SMAs | Total | % of Fee Earning AUM | |
| --- | --- | --- | --- | --- | --- |
| | | | | Permanent Capital Vehicles | Long-dated Private Funds and SMAs |
| | (Dollars in millions) | | | | |
| Ending balance, December 31, 2016 | $ 2,207 | $ 983 | $ 3,190 | 69% | 31% |
| Commitments [1] | 22 | 308 | 330 | | |
| Distributions [3] | (100) | (178) | (278) | | |
| Change in fund value [4] | (39) | (45) | (84) | | |
| Ending balance, December 31, 2017 | $ 2,090 | $ 1,068 | $ 3,158 | 66% | 34% |
| Commitments [1] | (137) | 237 | 100 | | |
| Distributions [2] | (107) | (159) | (266) | | |
| Change in fund value [3] | (103) | (104) | (207) | | |
| Ending balance, December 31, 2018 | $ 1,743 | $ 1,042 | $ 2,785 | 63% | 37% |
| Commitments [1] | (66) | 113 | 47 | | |
| Capital reduction [2] | (135) | — | (135) | | |
| Distributions [3] | (67) | (293) | (360) | | |
| Change in fund value [4] | (114) | (85) | (199) | | |
| Ending balance, December 31, 2019 | $ 1,361 | $ 777 | $ 2,138 | 64% | 36% |

[1] With respect to permanent capital vehicles, represents increases or temporary reductions during the period through equity and debt offerings, as well as any increases in capital commitments. With respect to long-dated private funds and SMAs, represents new commitments or gross inflows, respectively.

[2] Represents the permanent reduction in equity or leverage during the period.

[3] Represents distributions of income, return of capital and return of portfolio investment capital to the fund.

[4] Includes interest income, realized and unrealized gains (losses), fees and/or expenses.

Total fee earning AUM decreased by $647.0 million, or 23%, to $2.1 billion as of December 31, 2019 compared to December 31, 2018, due primarily to distributions, debt repayments representing capital reductions and changes in fund value.

Total fee earning AUM decreased by $373.0 million, or 12%, to $2.8 billion as of December 31, 2018 compared to December 31, 2017, primarily due to changes in fund value and distributions, partially offset by capital deployment by our private funds and SMAs.

Total fee earning AUM decreased by $32.0 million, or 1%, to $3.2 billion as of December 31, 2017 compared to December 31, 2016, primarily due to distributions from all permanent capital vehicles and private funds and SMAs and realized and unrealized losses within our fund portfolios, partly offset by capital deployment by our private funds and SMAs.

**Returns**

The following section sets forth historical performance for our active funds.

*Sierra Income Corporation (SIC)*

We launched SIC, our first public non-traded permanent capital vehicle, in April 2012. SIC primarily focuses on direct lending to middle market borrowers in the United States. Since inception, we have provided capital for a total of 428 investments and have invested a total of $2.5 billion. As of December 31, 2019, the fee earning AUM was $928 million. The performance for SIC as of December 31, 2019 is summarized below:

| | |
| --- | --- |
| Annualized Net Total Return [1] | 3.0% |
| Annualized Realized Losses on Invested Capital | 1.3% |
| Average Recovery [3] | 57.0% |

*Medley Capital Corporation (MCC)*

We launched MCC, our first permanent capital vehicle in January 2011. MCC primarily focuses on direct lending to private middle market borrowers in the United States. Since inception, we have provided capital for a total of 249 investments and have invested a total of $2.2 billion. As of December 31, 2019 the fee earning AUM was $432 million. The performance for MCC as of December 31, 2019 is summarized below:

| | |
|---|---|
| Annualized Net Total Return[2] | (2.2)% |
| Annualized Realized Losses on Invested Capital | 3.1 % |
| Average Recovery[3] | 37.3 % |

*Medley Opportunity Fund II LP (MOF II)*

MOF II is a long-dated private investment fund that we launched in December 2010. MOF II lends to middle market private borrowers, with a focus on providing senior secured loans. Since inception, we have provided capital for a total of 87 investments and have invested a total of $978 million. As of December 31, 2019, the fee earning AUM was $139 million. MOF II is currently fully invested and actively managing its assets. The performance for MOF II as of December 31, 2019, is summarized below:

| | |
|---|---|
| Gross Portfolio Internal Rate of Return[4]: | 6.3% |
| Net Investor Internal Rate of Return[5]: | 2.4% |
| Annualized Realized Losses on Invested Capital: | 3.2% |
| Average Recovery[3]: | 38.2% |

*Medley Opportunity Fund III LP (MOF III)*

MOF III is a long-dated private investment fund that we launched in December 2014. MOF III lends to middle market private borrowers in the U.S., with a focus on providing senior secured loans. Since inception, we have provided capital for a total of 50 investments and have invested a total of $211 million. As of December 31, 2019, the fee earning AUM was $77 million. The performance for MOF III as of December 31, 2019 is summarized below:

| | |
|---|---|
| Gross Portfolio Internal Rate of Return[4]: | 9.9% |
| Net Investor Internal Rate of Return[5]: | 5.9% |
| Annualized Realized Losses on Invested Capital: | —% |
| Average Recovery: | N/A |

*Separately Managed Accounts (SMAs)*

In the case of our separately managed accounts, the investor, rather than us, may control the assets or investment vehicle that holds or has custody of the related investments. Certain subsidiaries of Medley LLC serve as the investment adviser for our SMAs. Since inception, we have provided capital for a total of 234 investments and have invested a total of $1.3 billion. As of December 31, 2019, the fee earning AUM in our SMAs was $446 million. The aggregate performance of our SMAs as of December 31, 2019, is summarized below:

| | |
|---|---|
| Gross Portfolio Internal Rate of Return[4]: | 7.6% |
| Net Investor Internal Rate of Return[6]: | 6.3% |
| Annualized Realized Losses on Invested Capital: | 1.1% |
| Average Recovery[3]: | 31.9% |

*Other Long-Dated Private Funds and Permanent Capital Vehicles*

We launched Aspect-Medley Investment Platform A LP ("Aspect") in November 2016 and Aspect-Medley Investment Platform B LP ("Aspect-B") in May 2018 to meet the current demand for equity capital solutions in the traditional corporate debt-backed collateralized loan obligation ("CLO") market. Its investment objective is to generate current income, and also to generate capital appreciation through investing in CLO equity, as well as, equity and junior debt tranches trading in the secondary market.

We launched Medley Credit Opportunity Fund ("MCOF") in July 2016 to meet the current demand for equity capital solutions in the traditional corporate debt-backed collateralized loan obligation ("CLO") market. Its investment objective is to generate

current income, and also to generate capital appreciation through investing in CLO equity, as well as, equity and junior debt tranches trading in the secondary market.

We launched Sierra Total Return Fund ("STRF"), a public non-traded permanent capital vehicle, in June 2017. The Fund seeks to provide a total return through a combination of current income and long-term capital appreciation by investing in a portfolio of debt securities and fixed-income related equity securities.

We launched Medley Opportunity Fund Offshore III LP ("MOF III Offshore") in May 2017. MOF III Offshore invests in senior secured loans made to middle market private borrowers in the US.

The performance of Aspect, Aspect-B, MCOF, STRF and MOF III Offshore as of December 31, 2019 is not meaningful given the funds' limited capital invested to date.

[1]  Annualized Net Total Return for SIC represents the annualized return assuming an investment at SIC's inception, reinvestments of all distributions at prices obtained under SIC's dividend reinvestment plan and no sales charge.

[2]  Annual Net Total Return for MCC represents the annualized return assuming an investment at the initial public offering price, reinvestments of all dividends and distributions at prices obtained under MCC's dividend reinvestment plan and selling at NAV as of the measurement date.

[3]  Average Recovery includes only those realized investments in which we experience a loss of principal on a cumulative cash flow basis and is calculated by dividing the total actual cash inflows for each respective investment, including all interest, principal and fee note repayments, dividends and transactions fees, if applicable, by the total actual cash outflows for each respective investment.

[4]  For MOF II, MOF III, and SMAs, the Gross Internal Rate of Return represents the cumulative investment performance from inception of each respective fund through December 31, 2019. The Gross Internal Rate of Return includes both realized and unrealized investments and excludes the impact of base management fees, incentive fees and other fund related expenses. For realized investments, the investment returns were calculated based on the actual cash outflows and inflows for each respective investment and include all interest, principal and fee note repayments, dividends and transactions fees, if applicable. For unrealized investments, the investment returns were calculated based on the actual cash outflows and inflows for each respective investment and include all interest, principal and fee note repayments, dividends and transactions fees, if applicable. The investment return assumes that the remaining unrealized portion of the investment is realized at the investment's most recent fair value, as calculated in accordance with GAAP. There can be no assurance that the investments will be realized at these fair values and actual results may differ significantly.

[5]  Net Internal Rate of Return for MOF II and MOF III was calculated net of all management fees and carried interest allocation since inception and was computed based on the actual dates of capital contributions and the ending aggregate partners' capital at the end of the period.

[6]  Net Internal Rate of Return for our SMAs was calculated using the Gross Internal Rate of Return, as described in note 4, and includes the actual management fees, incentive fees and general fund related expenses.

**Results of Operations**

The following table and discussion sets forth information regarding our consolidated results of operations for the years ended December 31, 2019, 2018 and 2017. The consolidated financial statements of Medley have been prepared on substantially the same basis for all historical periods presented.

|  | For the Years Ended December 31, | | |
|  | 2019 | 2018 | 2017 |
|  | (Amounts in thousands, except AUM data) | | |
| **Revenues** | | | |
| Management fees (includes Part I incentive fees of $176, $0 and $4,874 for the years ending 2019, 2018 and 2017, respectively) | $ 39,473 | $ 47,085 | $ 58,104 |
| Performance fees | — | — | (1,974) |
| Other revenues and fees | 9,703 | 10,503 | 9,201 |
| Investment income: | | | |
| Carried interest | 819 | 142 | 230 |
| Other investment loss, net | (1,154) | (1,221) | (528) |
| Total Revenues | 48,841 | 56,509 | 65,033 |
| | | | |
| **Expenses** | | | |
| Compensation and benefits | 28,925 | 31,666 | 26,558 |
| General, administrative and other expenses | 17,186 | 19,366 | 13,045 |
| Total Expenses | 46,111 | 51,032 | 39,603 |
| | | | |
| **Other Income (Expense)** | | | |
| Dividend income | 1,119 | 4,311 | 4,327 |
| Interest expense | (11,497) | (10,806) | (11,855) |
| Other (expenses) income, net | (4,412) | (20,250) | 1,361 |
| Total Other Income (Expenses), Net | (14,790) | (26,745) | (6,167) |
| (Loss) income before income taxes | (12,060) | (21,268) | 19,263 |
| (Benefit from) provision for income taxes | 3,559 | (300) | 596 |
| Net (Loss) Income | (15,619) | (20,968) | 18,667 |
| Net income (loss) attributable to redeemable non-controlling interests and non-controlling interests in consolidated subsidiaries | (3,696) | (11,082) | 6,718 |
| Net (Loss) Income Attributable to Medley Management Inc. | $ (11,923) | $ (9,886) | $ 11,949 |
| | | | |
| **Other data (at period end, in millions):** | | | |
| AUM | $ 4,122 | $ 4,712 | $ 5,198 |
| Fee earning AUM | $ 2,138 | $ 2,785 | $ 3,158 |

**Year Ended December 31, 2019 Compared to Year Ended December 31, 2018**

*Revenues*

*Management Fees.* Total management fees decreased by $7.6 million, or 16%, to $39.5 million during the year ended December 31, 2019 as compared to the year ended December 31, 2018.

- Our management fees from permanent capital vehicles decreased by $5.3 million, or 16%, during the year ended December 31, 2019 as compared 2018. The decrease was due primarily to lower base management fees from both SIC and MCC as a result of a decrease in fee earning assets under management driven by a reduction in leverage and changes in fund values, which was mainly driven by a decline in portfolio valuations.

- Our management fees from long-dated private funds and SMAs decreased by $2.3 million, or 16%, during the year ended December 31, 2019 as compared to 2018. The decrease was due primarily to lower base management fees from MOF II and MOF III as a result of a decrease in fee earning assets under management driven by investment realizations and changes in fund value.

*Other Revenues and Fees.* Other revenues and fees decreased by $0.8 million, or 8%, to $9.7 million during the year ended December 31, 2019 as compared to 2018. The decrease was due primarily to lower reimbursable expenses and transaction fees from closed deals, offset by a $0.3 million increase in consulting fees for providing non-advisory services to one of our private long-dated funds.

*Investment Income.* Investment income increased by approximately $0.7 million to a net investment loss of $0.3 million during the year ended December 31, 2019 compared to a net investment loss of $1.1 million during the year ended December 31, 2018. The increase was due primarily to an increase in carried interest earned during 2019 as compared to 2018.

*Expenses*

*Compensation and Benefits.* Compensation and benefits expenses decreased by $2.7 million, or 9%, to $28.9 million for the year ended December 31, 2019 as compared to 2018. The decrease was due primarily to a 9% decrease in average employee headcount in 2019 as compared to 2018.

*General, Administrative and Other Expenses.* General, administrative and other expenses decreased by $2.2 million, or 11%, to $17.2 million during the year ended December 31, 2019 compared to the same period in 2018. The decrease was due primarily to a $1.0 million decrease in expenses associated with our consolidated fund, STRF and a $0.7 million decrease in professional fees. The reduction in expenses associated with STRF is primarily attributed to the amortization of its deferred offering costs in 2018 as well as reductions in fund accounting and administration expenses. The reduction in professional fees is primarily driven by the timing and nature of services being provided in connection with our pending merger with Sierra.

*Other Income (Expense)*

*Dividend Income.* Dividend income decreased by $3.2 million to $1.1 million during the year ended December 31, 2019 compared to 2018. The decrease was due to a reduction in dividend income from our investment in shares of MCC.

*Interest Expense.* Interest expense increased by $0.7 million, or 6%, to $11.5 million during the year ended December 31, 2019 compared to 2018. The increase was due primarily to an interest expense associated with our former minority interest holder liability which was entered into on December 31, 2018.

*Other Income (Expenses), net.* Other expenses decreased by $15.8 million to $4.4 million during the year ended December 31, 2019 compared to the same period in 2018. The decrease was attributed primarily to a decline in unrealized losses on our investment in shares of MCC. During the year ended December 31, 2019 we recorded unrealized losses of $4.1 million compared to $19.9 million in 2018. All of the $4.1 million in unrealized losses during the year ended December 31, 2019 and $16.3 million of the $19.9 million in unrealized losses during 2018 were allocated to redeemable non-controlling interests in consolidated subsidiaries which did not have any impact on the net income (loss) attributed to Medley Management Inc. and non-controlling interests in Medley LLC.

*Provision for Income Taxes*

Our effective income tax rate was 29.5% and 1.4% for the year ended December 31, 2019 and 2018, respectively. Our tax rate is affected by recurring items, such as permanent differences and income allocated to certain redeemable non-controlling interests which is not subject to New York City's unincorporated business tax. Our effective tax rate is also impacted by discrete items that may occur in any given period, but are not consistent from period to period.

The variance in our effective tax rate from 2018 is due primarily to the establishment of a full valuation allowance against our deferred tax assets as of December 31, 2019. Due to the uncertain nature of the ultimate realization of its deferred tax assets,

we established a valuation allowance, against the benefits of its deferred tax assets and will recognize these benefits only as reassessment demonstrates they are realizable. Ultimate realization is dependent upon several factors, among which is future earnings and reversing temporary differences. While the need for this valuation allowance is subject to periodic review, if the allowance is reduced, the tax benefits of the net deferred tax assets will be recorded in future operations as a reduction of our income tax expense.

### Redeemable Non-Controlling Interests and Non-Controlling Interests in Consolidated Subsidiaries

Net loss attributable to redeemable non-controlling interests and non-controlling interests in consolidated subsidiaries decreased by $7.4 million to $3.7 million for the year ended December 31, 2019 as compared to 2018. The decrease was due primarily to the allocation of unrealized losses and dividend income on shares of MCC to one of our redeemable non-controlling interests, based on its preferred ownership interests held in one of our consolidated subsidiaries.

### Year Ended December 31, 2018 Compared to Year Ended December 31, 2017

### Revenues

*Management Fees.* Total management fees decreased by $11.0 million, or 19%, to $47.1 million for the year ended December 31, 2018 compared to the year ended December 31, 2017.

- Our management fees from permanent capital vehicles decreased by $10.8 million during the year ended December 31, 2018 compared to the same period in 2017. The decrease was primarily due to lower base management fees from both SIC and MCC as a result of a decrease in fee earning assets under management, as well as a $4.7 million decrease in Part 1 incentive fees from SIC.

- Our management fees from long-dated private funds and SMAs decreased by $0.3 million to $14.6 million during the year ended December 31, 2018, compared to the same period in 2017.

*Performance Fees.* We did not recognize any performance fees during the year ended December 31, 2018 compared to a reversal of performance fees of $2.0 million during the same period 2017. As a result of the adoption of the new revenue recognition standard on January 1, 2018, we did not recognize any performance fees during 2018 as we determined that it was not probable that a significant reversal of such fees would not occur in the future.

*Other Revenues and Fees.* Other revenues and fees increased by $1.3 million to $10.5 million during the year ended December 31, 2018 compared to the same period in 2017. The increase was due primarily to reimbursable origination and deal related expenses which were recognized in 2018 as a result of the adoption of the new revenue recognition standard on January 1, 2018. Depending on whether the Company is acting as the principal or as an agent, certain reimbursable expenses that were previously recorded net are now presented on a gross basis on the Company's consolidated statements of operations (See Note 2 to our Consolidated Financial Statements).

*Investment Income.* Investment income decreased by approximately $0.8 million to a loss of $1.1 million during the year ended December 31, 2018 compared to the same period in 2017. The decrease was primarily due to losses from our equity method investments and lower carried interest from our long dated private funds.

### Expenses

*Compensation and Benefits.* Compensation and benefits increased by $3.7 million, or 14% to $31.2 million for the year ended December 31, 2018 compared to the same period in 2017. The variance was primarily due to a $2.7 million increase in stock based compensation and a $1.5 million increase in severance expense associated with the consolidation of our business activities to our New York office. These increases were partially offset by a $1.3 million decrease in salaries expense.

*Performance Fee Compensation.* Performance fee compensation expense amounted to $0.5 million for the year ended December 31, 2018 compared to a reversal of performance fee compensation of $0.9 million during 2017. During the fourth quarter of 2018, we granted equity awards to certain key employees of one of our business units. The equity awards were in the form of limited liability interests in certain subsidiaries which were formed for the object and purpose of receiving carried interest from certain funds managed by us. The grant date fair value of the awards was $0.6 million and was immediately recognized as performance fee compensation expense as the awards were fully vested on the date of grant.

*General, Administrative and Other Expenses.* General, administrative and other expenses increased by $6.3 million to $19.4 million during the year ended December 31, 2018 compared to the same period in 2017. The increase was due primarily to a $4.7 million increase in professional fees related to strategic initiatives, including fees associated with our pending merger with SIC. The remaining increase was due primarily to reimbursable origination and deal related expenses which were recognized in 2018

as a result of the adoption of the new revenue recognition standard on January 1, 2018. Depending on whether the Company is acting as the principal or as an agent, certain reimbursable expenses that were previously recorded net are now presented on a gross basis on the Company's consolidated statements of operations (See Note 2 to our Consolidated Financial Statements).

### Other Income (Expense)

*Dividend Income.* Dividend income remained constant at $4.3 million during the year ended December 31, 2018 compared to the same period in 2017.

*Interest Expense.* Interest expense decreased by $1.0 million, or 9%, to $10.8 million during the year ended December 31, 2018 compared to the same period in 2017. The decrease in interest expense in 2018 was due primarily to the 2017 impact of the acceleration of amortization of debt issuance costs and discount relating to prepayments made on our Term Loan Facility as a result of the refinancing of our indebtedness from the issuance of senior unsecured debt. In addition, our average debt outstanding during the years ended December 31, 2018 and 2017 was $135.4 million and $127.8 million, respectively.

*Other Income (Expenses), net.* Other income (expenses), net decreased by $21.6 million to a loss of $20.3 million for the year ended December 31, 2018 compared to the same period in 2017. The decrease was primarily due to a $19.9 million unrealized loss incurred during the year ended December 31, 2018 related to our investment in shares of MCC. Of the $19.9 million of unrealized losses, $16.3 million was allocated to non-controlling interests in consolidated subsidiaries which did not have any impact on the net income attributed to Medley LLC. During 2017, any unrealized gains or losses attributed to our investment in shares of MCC were recorded in other comprehensive income and not part of other income (expense).

### Provision for Income Taxes

Our effective income tax rate was 1.4% and 3.1% for the years ended December 31, 2018 and 2017, respectively. Our tax rate is affected by recurring items, such as permanent differences and income or losses allocated to certain redeemable non-controlling interests which are not subject to New York City's Unincorporated business tax. The decrease in our effective tax rate from 2017 is attributed primarily to losses allocated to redeemable non-controlling interests that are not subject to income taxes which resulted in no tax benefit being recorded in our tax provision as well as the valuation allowance recorded during the year ended December 31, 2018 related to unrealized losses on our shares held of MCC. Such impact was partly offset by an increase in the effective tax rate used to calculate deferred taxes as we expect a future increase in the apportionment of taxable income to New York City resulting from consolidating our business activities to New York.

### Redeemable Non-Controlling Interests in Consolidated Subsidiaries

Net (loss) income attributable to redeemable non-controlling interests in consolidated subsidiaries decreased by $17.8 million to a loss of $11.1 million for the year ended December 31, 2018 compared to the same period in 2017. The decrease was primarily due to the allocation of unrealized loss in shares of MCC to DB MED Investor I LLC, a third party, based on its preferred ownership interests held in one of our consolidated subsidiaries.

### Reconciliation of Certain Non-GAAP Performance Measures to Consolidated U.S. GAAP Financial Measures

In addition to analyzing our results on a GAAP basis, management also makes operating decisions and assesses business performance based on the financial and operating metrics and data that are presented in the table below. Management believes that these measures provide analysts, investors and management with helpful information regarding our underlying operating performance and our business, as they remove the impact of items management believes are not reflective of underlying operating performance. These non-GAAP measures are also used by management for planning purposes, including the preparation of internal budgets; and for evaluating the effectiveness of operational strategies. Additionally, we believe these non-GAAP measures provide another tool for investors to use in comparing our results with other companies in our industry, many of whom use similar non-GAAP measures. There are limitations associated with the use of non-GAAP financial measures as compared to the use of the most directly comparable U.S. GAAP financial measure and these measures supplement and should be considered in addition to and not in lieu of the results of operations discussed below. Furthermore, such measures may be inconsistent with measures presented by other companies.

Net income (loss) attributable to Medley LLC is the U.S. GAAP financial measure most comparable to Core Net Income and Core EBITDA.

The following table is a reconciliation of net income (loss) attributable to Medley LLC on a consolidated basis to Core Net Income and Core EBITDA.

| | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2019 | 2018 | 2017 |
| | (in thousands, except share and per share amounts) | | |
| Net income (loss) attributable to Medley LLC | $ (11,923) | $ (9,886) | $ 927 |
| Reimbursable fund startup expenses | 290 | 1,483 | 1,510 |
| IPO date award stock-based compensation | 777 | 1,446 | 461 |
| Expenses associated with strategic initiatives | 4,556 | 4,833 | 737 |
| Other non-core items: | | | |
| Unrealized (losses) gains on shares of MCC | (70) | 3,543 | — |
| Severance expense | 1,558 | 2,730 | 1,184 |
| Acceleration of debt issuance costs [1] | — | — | 1,150 |
| Other [2] | — | 1,967 | 20 |
| Income tax effect on adjustments | (248) | (1,501) | (563) |
| Core Net (Loss) Income | $ (5,060) | $ 4,615 | $ 5,426 |
| Interest expense | 11,497 | 10,806 | 10,705 |
| Income taxes | 3,807 | 1,760 | 2,519 |
| Depreciation and amortization | 702 | 796 | 912 |
| Core EBITDA | $ 10,946 | $ 17,977 | $ 19,562 |

[1] For the year ended December 31, 2017, this amount related to additional interest expense associated with the acceleration of amortization of debt issuance costs and discount relating to prepayments made on our Term Loan Facility as a result of the refinancing of our indebtedness from the issuance of Senior Unsecured Debt.

[2] For the year ended December 31, 2018, other items consist primarily of expenses related to the consolidation of our business activities to our New York office. For the year ended December 31, 2017, other items consist of less than $0.1 million of expenses related to other expenses.

**Liquidity and Capital Resources**

Our primary cash flow activities involve: (i) generating cash flow from operations, which largely includes management fees; (ii) making distributions to our members and redeemable non-controlling interests; (iii) borrowings, interest payments and repayments under our debt facilities. As of December 31, 2019, we had $10.4 million in cash and cash equivalents.

Our material source of cash from our operations is management fees, which are collected quarterly. We primarily use cash flows from operations to pay compensation and benefits, general, administrative and other expenses, income taxes, debt service costs and distributions to members and redeemable non-controlling interests. Our cash flows, together with the proceeds from debt issuances, are also used to fund investments in limited partnerships, purchase publicly traded securities, and purchase fixed assets and other capital items. If cash flows from operations were insufficient to fund distributions, we expect that we would suspend paying such distributions.

*Debt Instruments*

**Senior Unsecured Debt**

On August 9, 2016, Medley LLC completed a registered public offering of $25.0 million of an aggregate principal amount of 6.875% senior notes due 2026 (the "2026 Notes"). On October 18, 2016, Medley LLC completed a registered public offering of an additional $28.6 million in aggregate principal amount of the 2026 Notes. The 2026 Notes mature on August 15, 2026.

On January 18, 2017, Medley LLC completed a registered public offering of $34.5 million in aggregate principal amount of 7.25% senior notes due 2024 (the "2024 Notes"). On February 22, 2017, Medley LLC completed a registered public offering of an additional $34.5 million in aggregate principal amount of 2024 Notes. The 2024 Notes mature on January 30, 2024.

As of December 31, 2019, the outstanding senior unsecured debt balance was $118.4 million, and is reflected net of unamortized discount, premium and debt issuance costs of $4.2 million.

See Note 8, "*Senior Unsecured Debt*", to our consolidated financial statements included in this Form 10-K for additional information on the 2026 and the 2024 Notes.

**Revolving Credit Facility**

On August 19, 2014, we entered into a $15.0 million senior secured revolving credit facility with City National Bank (as amended, the "Revolving Credit Facility"), as administrative agent and collateral agent thereunder, and the lenders from time to time party thereto. On September 22, 2017 we amended the Revolving Credit Facility to, among other things, extend the maturity date until March 31, 2020 and provide for an incremental facility in an amount up to $10.0 million upon the satisfaction of certain customary conditions.

Effective May 13, 2019 we terminated the Revolving Credit Facility. There were no early termination penalties incurred by us with the termination of the Revolving Credit Facility. We had not incurred any borrowings under the Revolving Credit Facility from its inception through the date of termination.

**Non-Recourse Promissory Notes**

In April 2012, we borrowed $5.0 million under a non-recourse promissory note with a foundation, and $5.0 million under a non-recourse promissory note with a trust. These notes are scheduled to mature on March 31, 2020.

See Note 9 "*Loans Payable*" to our consolidated financial statements included in this Form 10-K for additional information regarding the promissory notes.

**Cash Flows**

The significant captions and amounts from our consolidated statements of cash flows are summarized below. Negative amounts represent a net outflow, or use of cash.

| | For the For the Years Ended December 31, | | |
| --- | --- | --- | --- |
| | **2019** | **2018** | **2017** |
| | (in thousands) | | |
| **Statements of cash flows data** | | | |
| Net cash provided by operating activities | $ 2,213 | $ 15,572 | $ 12,803 |
| Net cash provided by (used in) investing activities | 93 | (1,594) | (35,203) |
| Net cash (used in) provided by financing activities | (8,899) | (33,223) | 4,152 |
| Net decrease in cash and cash equivalents | $ (6,593) | $ (19,245) | $ (18,248) |

*Operating Activities*

Our net cash inflow from operating activities was $2.2 million during the year ended December 31, 2019. During the year ended December 31, 2019, net cash provided by operating activities was attributed to a net loss of $15.6 million, non-cash adjustments of $21.3 million and a net decrease in operating assets and liabilities of $3.4 million driven primarily by 2018 accrued bonuses of $6.5 million which were paid out in 2019.

*Investing Activities*

Our investing activities generally reflect cash used to acquire fixed assets, purchase investments, and make capital contributions to our equity method investments. Cash provided by our investing activities generally reflect return of capital distributions received from our investment held at cost less impairment. During the year ended December 31, 2019, distributions received from our investment held at cost less impairment were $0.2 million.

*Financing Activities*

Our financing activities generally reflect cash used to make distributions to members, non-controlling interests and redeemable non-controlling interests, make principal payments on our debt and payments of tax withholdings related to net share settlement of restricted stock units. During the year ended December 31, 2019, cash used in financing activities consisted of (i) distributions to members, non-controlling interests and redeemable non-controlling interests of $4.5 million and (ii) payments to a former minority interest holder of $4.4 million.

68

*Sources and Uses of Liquidity*

Our sources of liquidity are (i) cash on hand, (ii) net working capital, (iii) cash flows from operations, (iv) realizations on our investments, (v) issuances of publicly-registered debt and (vi) other potential financings. We believe that these sources of liquidity will be sufficient to fund our working capital requirements and to meet our commitments in the foreseeable future. We expect that our primary liquidity needs will be comprised of cash to (i) provide capital to facilitate the growth of our existing investment management business, (ii) fund our commitments to funds that we advise, (iii) provide capital to facilitate our expansion into businesses that are complementary to our existing investment management business, (v) fund capital expenditures, (vi) pay taxes, and (vii) make distributions to our members, non-controlling interests and redeemable non-controlling interests.

Our ability to fund distributions to our members, non-controlling interests and redeemable non-controlling interests is dependent on a myriad of factors, including among others: general economic and business conditions; our strategic plans and prospects; our business and investment opportunities; timing of capital calls by our funds in support of our commitments; our financial condition and operating results; working capital requirements and other anticipated cash needs; contractual restrictions and obligations; legal, tax and regulatory restrictions; restrictions on the payment of distributions by our subsidiaries to us; and other relevant factors.

## Critical Accounting Policies

We prepare our consolidated financial statements in accordance with U.S. GAAP. In applying many of these accounting principles, we need to make assumptions, estimates or judgments that affect the reported amounts of assets, liabilities, revenues and expenses in our consolidated financial statements. We base our estimates and judgments on historical experience and other assumptions that we believe are reasonable under the circumstances. These assumptions, estimates or judgments, however, are both subjective and subject to change, and actual results may differ from our assumptions and estimates. If actual amounts are ultimately different from our estimates, the revisions are included in our results of operations for the period in which the actual amounts become known. We believe the following critical accounting policies could potentially produce materially different results if we were to change underlying assumptions, estimates or judgments. See Note 2, "*Summary of Significant Accounting Policies,*" to our consolidated financial statements included in this Form 10-K for a summary of our significant accounting policies.

*Principles of Consolidation*

In accordance with ASC 810, *Consolidation*, we consolidate those entities where we have a direct and indirect controlling financial interest based on either a variable interest model or voting interest model. As such, we consolidate entities that we conclude are VIEs, for which we are deemed to be the primary beneficiary and entities in which we hold a majority voting interest or have majority ownership and control over the operational, financial and investing decisions of that entity.

For legal entities evaluated for consolidation, we must determine whether the interests that it holds and fees paid to it qualify as a variable interest in an entity. This includes an evaluation of the management fees and performance fees paid to us when acting as a decision maker or service provider to the entity being evaluated. Fees received by us that are customary and commensurate with the level of services provided, and we don't hold other economic interests in the entity that would absorb more than an insignificant amount of the expected losses or returns of the entity, would not be considered a variable interest. We factor in all economic interests including proportionate interests through related parties, to determine if fees are considered a variable interest.

An entity in which we hold a variable interest is a VIE if any one of the following conditions exist: (a) the total equity investment at risk is not sufficient to permit the legal entity to finance its activities without additional subordinated financial support, (b) the holders of equity investment at risk have the right to direct the activities of the entity that most significantly impact the legal entity's economic performance, or (c) the voting rights of some investors are disproportionate to their obligation to absorb losses or rights to receive returns from a legal entity. For limited partnerships and other similar entities, non-controlling investors must have substantive rights to either dissolve the fund or remove the general partner ("kick-out rights") in order to qualify as a VIE.

For those entities that qualify as a VIE, the primary beneficiary is generally defined as the party who has a controlling financial interest in the VIE. We are generally deemed to have a controlling financial interest if we have the power to direct the activities of a VIE that most significantly impact the VIE's economic performance, and the obligation to absorb losses or receive benefits from the VIE that could potentially be significant to the VIE. We determine whether we are the primary beneficiary of a VIE at the time we become initially involved with the VIE and we reconsider that conclusion continuously. The primary beneficiary evaluation is generally performed qualitatively on the basis of all facts and circumstances. However, quantitative information may also be considered in the analysis, as appropriate. These assessments require judgments. Each entity is assessed for consolidation on a case-by-case basis.

69

For those entities evaluated under the voting interest model, we consolidate the entity if we have a controlling financial interest. We have a controlling financial interest in a voting interest entity ("VOE") if we own a majority voting interest in the entity.

*Performance Fees*

Performance fees are contractual fees which do not represent a capital allocation of income to the general partner or investment manager that are earned based on the performance of certain funds, typically, our separately managed accounts. Performance fees are earned based on the fund performance during the period, subject to the achievement of minimum return levels in accordance with the respective terms set out in each fund's investment management agreement. We account for performance fees in accordance with ASC 606, *Revenue from Contracts with Customers*, and we will only recognize performance fees when it is probable that a significant reversal of such fees will not occur in the future.

*Carried Interest*

Carried interest are performance-based fees that represent a capital allocation of income to the general partner or investment manager. Carried interest is allocated to us based on cumulative fund performance to date, subject to the achievement of minimum return levels in accordance with the respective terms set out in each fund's governing documents.

We account for carried interest under, ASC 323, *Investments-Equity Method and Joint Ventures*. Under this standard, we record carried interest in a consistent manner as we historically had which is based upon an assumed liquidation of that fund's net assets as of the reporting date, regardless of whether such amounts have been realized. For any given period, carried interest on our condensed consolidated statements of operations may include reversals of previously recognized carried interest due to a decrease in the value of a particular fund that results in a decrease of cumulative fees earned to date. Since fund return hurdles are cumulative, previously recognized carried interest also may be reversed in a period of appreciation that is lower than the particular fund's hurdle rate.

Carried interest received in prior periods may be required to be returned by us in future periods if the funds' investment performance declines below certain levels. Each fund is considered separately in this regard and, for a given fund, carried interest can never be negative over the life of a fund. If upon a hypothetical liquidation of a fund's investments, at their then current fair values, previously recognized and distributed carried interest would be required to be returned, a liability is established for the potential clawback obligation. Our actual obligation, however, would not become payable or realized until the end of a fund's life.

*Income Taxes*

We account for income taxes using the asset and liability approach, which requires the recognition of tax benefits or expenses for temporary differences between the financial reporting and tax basis of assets and liabilities. A valuation allowance is established when necessary to reduce deferred tax assets to the amounts expected to be realized. We also recognize a tax benefit from uncertain tax positions only if it is "more likely than not" that the position is sustainable based on its technical merits. Our policy is to recognize interest and penalties on uncertain tax positions and other tax matters as a component of income tax expense. For interim periods, we account for income taxes based on our estimate of the effective tax rate for the year. Discrete items and changes in our estimate of the annual effective tax rate are recorded in the period they occur.

We are treated as a partnership for income tax purposes and are therefore not subject to U.S. federal, state and local income taxes. We are subject to New York City's unincorporated business tax attributable to taxable income allocable to New York City.

We analyze our tax filing positions in all of the U.S. federal, state and local tax jurisdictions where we are required to file income tax returns, as well as for all open tax years in these jurisdictions. If, based on this analysis, we determine that uncertainties in tax positions exist, a liability is established.

*Stock-based Compensation*

We account for stock-based compensation in accordance with ASC 718, *Compensation – Stock Compensation*. Under the fair value recognition provision of this guidance, share-based compensation cost is measured at the grant date based on the fair value of the award and is recognized as expense over the requisite service period and reduced for actual forfeitures in the period they occur. Stock-based compensation is included as a component of compensation and benefits in our consolidated statements of operations.

**Recent Accounting Pronouncements**

Information regarding recent accounting pronouncements and their impact on us can be found in Note 2, "*Summary of Significant Accounting Policies*," to our consolidated financial statements included in this Form 10-K.

**Off-Balance Sheet Arrangements**

In the normal course of business, we may engage in off-balance sheet arrangements, including transactions in guarantees, commitments, indemnifications and potential contingent repayment obligations.

See Note 12, "*Commitments and Contingencies*," to our consolidated financial statements included in this Form 10-K for a discussion of our commitments and contingencies.

## Contractual Obligations

The following table sets forth information relating to our contractual obligations as of December 31, 2019.

| | Less than 1 year | | 1 - 3 years | | 4 - 5 years | | More than 5 years | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | (in thousands) | | | | | |
| **Medley Obligations** | | | | | | | | | | |
| Operating lease obligations [1] | $ | 2,846 | $ | 4,924 | $ | 1,822 | $ | — | $ | 9,592 |
| Loans payable [2] | | 10,000 | | — | | — | | — | | 10,000 |
| Senior unsecured debt [3] | | — | | — | | 69,000 | | 53,595 | | 122,595 |
| Payable to former minority interest holder of SIC Advisors LLC (Note 10) | | 3,500 | | 6,125 | | — | | — | | 9,625 |
| Revenue share payable | | 1,177 | | 1,139 | | — | | — | | 2,316 |
| Capital commitments to funds [4] | | 256 | | — | | — | | — | | 256 |
| Total | $ | 17,779 | $ | 12,188 | $ | 70,822 | $ | 53,595 | $ | 154,384 |

[1] We lease office space in New York and San Francisco under non-cancelable lease agreements. The amounts in this table represent the minimum lease payments required over the term of the lease, and include operating leases for office equipment.

[2] We have included all loans described in Note 9, "*Loans Payable*," to our consolidated financial statements included in this Form 10-K.

[3] We have included all our obligations described in Note 8, "*Senior Unsecured Debt*," to our consolidated financial statements included in this Form 10-K. In addition to the principal amounts above, the Company is required to make quarterly interest payments of $1.2 million related to our 2024 Notes and $0.9 million related to our 2026 Notes.

[4] Represents equity commitments by us to certain long-dated private funds managed by us. These amounts are generally due on demand and are therefore presented in the less than one year category.

## Indemnifications

In the normal course of business, we enter into contracts that contain indemnities for our affiliates, persons acting on our behalf or such affiliates and third parties. The terms of the indemnities vary from contract to contract and the maximum exposure under these arrangements, if any, cannot be determined and has neither been recorded in our consolidated financial statements. As of December 31, 2019, we have not had prior claims or losses pursuant to these contracts and expect the risk of loss to be remote.

## Contingent Obligations

The partnership documents governing our funds generally include a clawback provision that, if triggered, may give rise to a contingent obligation that may require the general partner to return amounts to the fund for distribution to investors. Therefore, carried interest, generally, is subject to reversal in the event that the funds incur future losses. These losses are limited to the extent of the cumulative carried interest recognized in income to date, net of a portion of taxes paid. Due in part to our investment performance and the fact that our carried interest is generally determined on a liquidation basis, as of December 31, 2019, we accrued $7.2 million for clawback obligations that would need to be paid had the funds been liquidated as of that date. There can be no assurance that we will not incur additional clawback obligations in the future. If all of the existing investments were valued at $0, the amount of cumulative carried interest that has been recognized would be reversed. We believe that the possibility of all of the existing investments becoming worthless is remote. At December 31, 2019, had we assumed all existing investments were valued at $0, the net amount of carried interest subject to additional reversal would have been approximately $0.9 million.

Carried interest is also affected by changes in the fair values of the underlying investments in the funds that we advise. Valuations, on an unrealized basis, can be significantly affected by a variety of external factors including, but not limited to, bond yields and industry trading multiples. Under the governing agreements of certain of our funds, we may have to fund additional amounts on account of clawback obligations beyond what we received in performance fee compensation on account of distributions of performance fee payments made to current or former professionals from such funds if they do not fund their respective shares of such clawback obligations. We will generally retain the right to pursue any remedies that we have under such governing agreements against those carried interest recipients who fail to fund their obligations.

Additionally, at the end of the life of the funds, there could be a payment due to a fund by us if we have recognized more carried interest than was ultimately earned. The general partner obligation amount, if any, will depend on final realized values of investments at the end of the life of the fund.

**Recent Developments**

On October 22, 2019, Medley LLC, Medley Seed Funding I LLC ("Seed Funding I"), Medley Seed Funding II LLC ("Seed Funding II"), and Medley Seed Funding III LLC ("Seed Funding III") received notice from DB MED Investor I LLC and DEB MED Investor II LLC (the "Investors") that the Investors were exercising their put option rights under the Master Investment Agreement (the "Agreement"). In accordance with their obligations under the Agreement, on October 25, 2019 and October 28, 2019, (i) Seed Funding I distributed to the Investors all of its assets (including the 7,756,938 shares of Medley Capital Corporation), and (iii) Seed Funding III distributed to the Investors all of its assets (including its preferred interest in STRF Advisors LLC). By March 31, 2020, Seed Funding II expects to distribute to the Investors all of its remaining assets, (including approximately 82,121 shares held by Seed Investor II in Sierra Total Return Fund). These distributions of assets by Seed Funding I, Seed Funding II and Seed Funding III are not expected to have a net economic impact on our consolidated financial statements.

**Item 7A. Quantitative and Qualitative Disclosures About Market Risk**

Our primary exposure to market risk is related to our role as general partner or investment advisor to our investment funds and the sensitivity to movements in the fair value of their investments, including the effect on management fees, performance fees and investment income.

The market price of investments may significantly fluctuate during the period of investment. Investments may decline in value due to factors affecting securities markets generally or particular industries represented in the securities markets. The value of an investment may decline due to general market conditions which are not specifically related to such investment, such as real or perceived adverse economic conditions, changes in the general outlook for corporate earnings, changes in interest or currency rates or adverse investor sentiment generally. They may also decline due to factors that affect a particular industry or industries, such as labor shortages or increased production costs and competitive conditions within an industry.

*Effect on Management Fees*

Management fees are generally based on a defined percentage of gross asset values, total committed capital, net invested capital and NAV of the investment funds managed by us as well as a percentage of net interest income over a performance hurdle. Management fees calculated based on fair value of assets or net investment income are affected by short-term changes in market values.

The overall impact of a short-term change in market value may be mitigated by fee definitions that are not based on market value including invested capital and committed capital, market value definitions that exclude the impact of realized and/or unrealized gains and losses, market value definitions based on beginning of the period values or a form of average market value including daily, monthly or quarterly averages, as well as monthly or quarterly payment terms.

As such, based on an incremental 10% short-term increase in fair value of the investments in our permanent capital vehicles, long-dated private funds and SMAs as of December 31, 2019, we calculated approximately a $2.3 million increase in management fees for the year ended December 31, 2019. In the case of a 10% short-term decline in fair value of the investments in our permanent capital, long-dated funds and SMAs as of December 31, 2019, we calculated approximately a $3.0 million decrease in management fees for the year ended December 31, 2019.

*Effect on Performance Fees*

Performance fees are based on certain specific hurdle rates as defined in the funds' applicable investment management or partnership agreements. Performance fees for any period are based upon the probability that there will not be a significant future revenue reversal of such fees in the future. We exercise significant judgments when determining if any performance fees should be recognized in a given period including the below.

- whether the fund is near final liquidation

- whether the fair value of the remaining assets in the fund is significantly in excess of the threshold at which the Company would earn an incentive fee

- the probability of significant fluctuations in the fair value of the remaining assets

- the SMA's remaining investments are under contract for sale with contractual purchase prices that would result in no clawback and it is highly likely that the contracts will be consummated

72

Short-term changes in the fair values of funds' investments usually do not impact accrued performance fees. The overall impact of a short-term change in market value may be mitigated by a number of factors including, but not limited to, the way in which carried interest performance fees are calculated, which is not ultimately dependent on short-term moves in fair market value, but rather realize cumulative performance of the investments through the end of the long-dated private funds, and SMAs lives.

We have not recognized any performance fees for the years ended December 31, 2019 and 2018. As such, we would not be impacted by an incremental 10% short-term increase or decrease in fair value of the investments in our separately management accounts.

*Effect on Part I and Part II Incentive Fees*

Incentive fees are based on certain specific hurdle rates as defined in our permanent capital vehicles' applicable investment management agreements. The Part II incentive fees are based upon realized gains netted against cumulative realized and unrealized losses. The Part I incentive fees are not subject to clawbacks as our carried interest performance fees are.

Short-term changes in the fair values of the investments of our permanent capital vehicles may materially impact Part II incentive fees depending on the respective vehicle's performance relative to applicable hurdles to the extent there were realized gains that we would otherwise earn Part II incentive fees on.

As such, based on an incremental 10% short-term increase in fair value of the investments in our permanent capital vehicles as of December 31, 2019, we calculated no change in Part I and II incentive fees for the year ended December 31, 2019. In the case of a 10% short-term decline in fair value of the investments in our permanent capital vehicles as of December 31, 2019, we calculated no change in Part I and II incentive fees for the year ended December 31, 2019.

*Effect on Carried Interest*

Carried interest are performance based fees that represent a capital allocation of income to the general partner or investment manager. Carried interest are allocated to the Company based on cumulative fund performance to date, subject to the achievement of minimum return levels in accordance with the respective terms set out in each fund's governing documents.

Short-term changes in the fair values of funds' investments may materially impact accrued carried interest depending on the respective funds' performance relative to applicable return levels. The overall impact of a short-term change in market value may be mitigated by a number of factors including, but not limited to, the way in which carried interest are calculated, which is not ultimately dependent on short-term moves in fair market value, but rather realized cumulative performance of the investments through the end of the long-dated private funds' lives. However, short-term moves can meaningfully impact our ability to accrue carried interest and receive cash payments in any given period.

As such, based on an incremental 10% short-term increase in fair value of the investments in our long-dated private funds as of December 31, 2019, we calculated approximately a $2.9 million increase in carried interest for the year ended December 31, 2019. In the case of a 10% short-term decline in fair value of investments in our long-dated private funds as of December 31, 2019, we calculated approximately a $0.5 million decrease in carried interest for the year ended December 31, 2019.

*Interest Rate Risk*

As of December 31, 2019, we had $136.5 million of debt outstanding, net of unamortized discount, premium, and issuance costs, presented as senior unsecured debt, loans payable and amount due to former minority interest holder in our audited financial statements included elsewhere in this Form 10-K. Our debt bears interest at fixed rates, and therefore is not subject to interest rate fluctuation risk.

As credit-oriented investors, we are also subject to interest rate risk through the securities we hold in our funds. A 100 basis point increase in interest rates would be expected to negatively affect prices of securities that accrue interest income at fixed rates and therefore negatively impact net change in unrealized appreciation on the funds' investments. The actual impact is dependent on the average duration of such holdings. Conversely, securities that accrue interest at variable rates would be expected to benefit from a 100 basis points increase in interest rates because these securities would generate higher levels of current income and therefore positively impact interest and dividend income, subject to LIBOR. In the cases where our funds pay management fees based on NAV, we would expect management fees to experience a change in direction and magnitude corresponding to that experienced by the underlying portfolios.

*Credit Risk*

We are party to agreements providing for various financial services and transactions that contain an element of risk in the event that the counterparties are unable to meet the terms of such agreements. In such agreements, we depend on the respective counterparty to make payment or otherwise perform. We generally endeavor to minimize our risk of exposure by limiting to reputable financial institutions the counterparties with which we enter into financial transactions. In other circumstances, availability

of financing from financial institutions may be uncertain due to market events, and we may not be able to access these financing markets.

**Item 8. Financial Statements and Supplementary Data**

**Index to Consolidated Financial Statements**

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F- 1 |
| Consolidated Balance Sheets as of December 31, 2019 and 2018 | F- 2 |
| Consolidated Statements of Operations for the Years Ended December 31, 2019, 2018 and 2017 | F- 3 |
| Consolidated Statements of Comprehensive Income (Loss) for the Years Ended December 31, 2019, 2018 and 2017 | F- 4 |
| Consolidated Statements of Changes in Members' Equity for the Years Ended December 31, 2019, 2018 and 2017 | F- 5 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2019, 2018 and 2017 | F- 6 |
| Notes to Consolidated Financial Statements | F- 8 |

**Report of Independent Registered Public Accounting Firm**

To the Members and the Board of Directors of Medley LLC

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Medley LLC and its subsidiaries (the Company) as of December 31, 2019 and 2018, the related consolidated statements of operations, comprehensive income (loss), changes in equity and cash flows for each of the three years in the period ended December 31, 2019, and the related notes to the consolidated financial statements (collectively, the financial statements). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2019 and 2018, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2019, in conformity with accounting principles generally accepted in the United States of America.

**Change in Method of Accounting**

As discussed in Note 2 to the consolidated financial statements, the Company has changed its method of accounting for leases in 2019 due to the adoption of Accounting Standards Update 2016-02, "Leases" as of January 1, 2019.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ RSM US LLP

We have served as the Company's auditor since 2014.

New York, New York
March 30, 2020

F- 1

**Medley LLC**
**Consolidated Balance Sheets**
(Dollars in thousands)

| | As of December 31, | |
| --- | --- | --- |
| | **2019** | **2018** |
| **Assets** | | |
| Cash and cash equivalents | $ 10,377 | $ 16,970 |
| Investments, at fair value | 13,287 | 36,425 |
| Management fees receivable | 8,104 | 10,274 |
| Right-of-use assets under operating leases | 6,564 | — |
| Other assets | 9,727 | 14,145 |
| Total Assets | $ 48,059 | $ 77,814 |
| | | |
| **Liabilities, Redeemable Non-controlling Interests and Members' Deficit** | | |
| Liabilities | | |
| Senior unsecured debt, net | $ 118,382 | $ 117,618 |
| Loans payable, net | 10,000 | 9,892 |
| Due to former minority interest holder, net | 8,145 | 11,402 |
| Operating lease liabilities | 8,267 | — |
| Accounts payable, accrued expenses and other liabilities | 21,886 | 26,444 |
| Total Liabilities | 166,680 | 165,356 |
| | | |
| **Commitments and Contingencies (Note 12)** | | |
| | | |
| **Redeemable Non-controlling Interests** | (748) | 23,186 |
| | | |
| **Members' Deficit** | | |
| Members' deficit | (117,482) | (109,981) |
| Non-controlling interests in consolidated subsidiaries | (391) | (747) |
| Total deficit | (117,873) | (110,728) |
| Total Liabilities, Redeemable Non-controlling Interests and Members' Deficit | $ 48,059 | $ 77,814 |

See accompanying notes to consolidated financial statements

F- 2

**Medley LLC**
**Consolidated Statements of Operations**
(Dollars in thousands)

| | For the Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2019** | | **2018** | | **2017** | |
| **Revenues** | | | | | | |
| Management fees (includes Part I incentive fees of $176, $0 and $4,874 for the years ending 2019, 2018 and 2017, respectively) | $ | 39,473 | $ | 47,085 | $ | 58,104 |
| Performance fees | | — | | — | | (1,974) |
| Other revenues and fees | | 9,703 | | 10,503 | | 9,201 |
| Investment income: | | | | | | |
| Carried interest | | 819 | | 142 | | 230 |
| Other investment loss, net | | (1,154) | | (1,221) | | (528) |
| Total Revenues | | 48,841 | | 56,509 | | 65,033 |
| | | | | | | |
| **Expenses** | | | | | | |
| Compensation and benefits | | 28,925 | | 31,666 | | 26,558 |
| General, administrative and other expenses | | 17,186 | | 19,366 | | 13,045 |
| Total Expenses | | 46,111 | | 51,032 | | 39,603 |
| | | | | | | |
| **Other Income (Expenses)** | | | | | | |
| Dividend income | | 1,119 | | 4,311 | | 4,327 |
| Interest expense | | (11,497) | | (10,806) | | (11,855) |
| Other (expenses) income, net | | (4,412) | | (20,250) | | 1,361 |
| Total other (expenses) income, net | | (14,790) | | (26,745) | | (6,167) |
| (Loss) income before income taxes | | (12,060) | | (21,268) | | 19,263 |
| Provision for (benefit from) income taxes | | 3,559 | | (300) | | 596 |
| Net (Loss) Income | | (15,619) | | (20,968) | | 18,667 |
| Net (loss) income attributable to redeemable non-controlling interests and non-controlling interests in consolidated subsidiaries | | (3,696) | | (11,082) | | 6,718 |
| Net (Loss) Income Attributable to Medley LLC | $ | (11,923) | $ | (9,886) | $ | 11,949 |

See accompanying notes to consolidated financial statements

F- 3

**Medley LLC**
**Consolidated Statements of Comprehensive Income (Loss)**
(Dollars in thousands)

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | **2019** | **2018** | **2017** |
| Net (Loss) Income | $ (15,619) | $ (20,968) | $ 18,667 |
| Other Comprehensive Income (Loss): | | | |
| Change in fair value of available-for-sale securities (net of income tax benefit of $0.3 million for the year ended December 31, 2017) | — | — | (11,162) |
| Total Comprehensive (Loss) Income | (15,619) | (20,968) | 7,505 |
| Comprehensive (loss) income attributable to redeemable non-controlling interests and non-controlling interests in consolidated subsidiaries | (3,696) | (11,082) | 6,690 |
| Comprehensive (Loss) Income Attributable to Medley LLC | $ (11,923) | $ (9,886) | $ 815 |

See accompanying notes to consolidated financial statements

F- 4

**Medley LLC**
**Consolidated Statements of Changes in Members' Equity**
(in thousands, except share and per share amounts)

| | Members' Deficit | Accumulated Other Comprehensive Loss | Non-controlling Interests in Consolidated Subsidiaries | Total Deficit |
|---|---|---|---|---|
| Balance at December 31, 2016 | $ (47,441) | $ 166 | $ (1,717) | $ (48,992) |
| Cumulative effect of accounting change due to the adoption of ASU 2016-09, improvements to employee stock-based compensation | 32 | — | — | 32 |
| Net income | 11,949 | — | 16 | 11,965 |
| Change in fair value of available-for-sale securities, net of income tax benefit | — | (11,134) | — | (11,134) |
| Reclass of cumulative dividends on forfeited RSUs to compensation and benefits expense | 668 | — | — | 668 |
| Repurchases of LLC Units | (3,590) | — | — | (3,590) |
| Contributions | 2,771 | — | — | 2,771 |
| Distributions | (29,959) | — | (1) | (29,960) |
| Balance at December 31, 2017 | (65,570) | (10,968) | (1,702) | (78,240) |
| Cumulative effect of accounting change due to the adoption of the new revenue recognition standard (Note 2) | (3,599) | — | — | (3,599) |
| Cumulative effect of accounting change due to the adoption of updated guidance on equity securities not accounted for under the equity method of accounting and the tax effects stranded in other comprehensive loss as a result of tax reform (Note 2) | (10,968) | 10,968 | — | — |
| Net (loss) income | (9,886) | — | 279 | (9,607) |
| Reclass of cumulative dividends on forfeited RSUs to compensation and benefits expense | 98 | — | — | 98 |
| Contributions | 5,404 | — | 2 | 5,406 |
| Distributions | (26,425) | — | — | (26,425) |
| Issuance of non-controlling interest in consolidated subsidiaries at fair value | — | — | 674 | 674 |
| Fair value adjustment to redeemable non-controlling interest in SIC Advisors LLC (Note 16) | 965 | — | — | 965 |
| Balance at December 31, 2018 | (109,981) | — | (747) | (110,728) |
| Net (loss) income | (11,923) | — | 579 | (11,344) |
| Reclass of cumulative dividends on forfeited restricted stock units to compensation and benefits expense | 343 | — | — | 343 |
| Contributions | 5,423 | — | — | 5,423 |
| Distributions | (972) | — | (223) | (1,195) |
| Recognition of deferred tax asset in connection with the acquisition of a minority interest holder's ownership interests in a consolidated subsidiary (Note 14) | 440 | — | — | 440 |
| Fair value adjustment to redeemable non-controlling interest in Medley Seed Fund I LLC and Medley Seed Funding II LLC (Note 16) | (812) | — | — | (812) |
| Balance at December 31, 2019 | $ (117,482) | $ — | $ (391) | $ (117,873) |

See accompanying notes to consolidated financial statements
F- 5

# Medley LLC
## Consolidated Statements of Cash Flows
### (Amounts in thousands)

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2019 | 2018 | 2017 |
| **Cash flows from operating activities** | | | |
| Net (loss) income | $ (15,619) | $ (20,968) | $ 18,667 |
| **Adjustments to reconcile net income (loss) to net cash provided by operating activities:** | | | |
| Stock-based compensation | 7,222 | 5,404 | 2,771 |
| Amortization of debt issuance costs | 754 | 741 | 1,579 |
| Accretion of debt discount | 1,297 | 667 | 1,126 |
| Provision for (benefit from) deferred taxes | 3,524 | (1,162) | (85) |
| Depreciation and amortization | 702 | 1,076 | 911 |
| Net change in unrealized depreciation on investments | 5,287 | 20,900 | 554 |
| Non-cash based performance fee compensation | — | 619 | — |
| Income from equity method investments | (482) | 6 | (274) |
| Impairment on investments held at cost | — | 90 | — |
| Reclassification of cumulative dividends paid on forfeited restricted stock units to compensation and benefits expense | 343 | 98 | 668 |
| Non-cash lease costs | 2,434 | — | — |
| Other non-cash amounts | 178 | 56 | (13) |
| **Changes in operating assets and liabilities:** | | | |
| Management fees receivable | 2,170 | 4,440 | (2,084) |
| Performance fees receivable | — | — | 1,974 |
| Distributions of income received from equity method investments | 1,211 | 691 | 629 |
| Purchase of investments | (706) | (1,861) | (2,005) |
| Sale of investments | 1,111 | 1,920 | — |
| Other assets | (258) | 794 | 1,037 |
| Operating lease liabilities | (2,725) | — | — |
| Accounts payable, accrued expenses and other liabilities | (4,230) | 2,061 | (12,652) |
| Net cash provided by operating activities | 2,213 | 15,572 | 12,803 |
| **Cash flows from investing activities** | | | |
| Purchases of fixed assets | (126) | (56) | (73) |
| Distributions received from investment held at cost less impairment | 222 | — | — |
| Capital contributions to equity method investments | (3) | (1,538) | (322) |
| Distributions received from equity method investment | — | — | 172 |
| Purchases of investments | — | — | (34,980) |
| Net cash provided by (used in) investing activities | 93 | (1,594) | (35,203) |
| **Cash flows from financing activities** | | | |
| Payments to former minority interest holder | (4,375) | (847) | — |
| Repayments of loans payable | — | — | (44,800) |
| Proceeds from issuance of senior unsecured debt | — | — | 69,108 |
| Capital contributions from non-controlling interests | — | 2 | 23,000 |
| Distributions to members, non-controlling interests and redeemable non-controlling interests | (4,524) | (32,378) | (36,698) |
| Debt issuance costs | — | — | (2,868) |
| Repurchases of LLC Units | — | — | (3,590) |
| Net cash (used in) provided by financing activities | (8,899) | (33,223) | 4,152 |
| Net decrease in cash and cash equivalents | (6,593) | (19,245) | (18,248) |
| Cash and cash equivalents, beginning of period | 16,970 | 36,215 | 54,463 |
| Cash and cash equivalents, end of period | $ 10,377 | $ 16,970 | $ 36,215 |

See accompanying notes to consolidated financial statements

**Medley LLC**
**Consolidated Statements of Cash Flows**
(Amounts in thousands)

|  | For the Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
|  | **2019** | | **2018** | | **2017** | |
| **Supplemental cash flow information** | | | | | | |
| Interest paid | $ | 9,446 | $ | 9,396 | $ | 8,664 |
| Income taxes paid | | 143 | | 955 | | 933 |
| **Supplemental disclosure of non-cash operating, investing and financing activities** | | | | | | |
| Recognition of right-of-use assets under operating leases upon adoption of new leasing standard | $ | 8,233 | $ | — | $ | — |
| Recognition of operating lease liabilities offset against right-of-use assets under operating leases upon adoption of new leasing standard | | 10,229 | | — | | — |
| Distribution of shares of MCC incurred in connection with the exercise of a put option right by a former minority interest holder (Notes 11 and 16) | | (16,498) | | — | | — |
| Recognition of deferred tax asset in connection with the acquisition of a minority interest holder's ownership interests in a consolidated subsidiary of Medley LLC | | 440 | | — | | — |
| Reclassification of redeemable non-controlling interest in Medley Seed Funding I LLC and Medley Seed Funding II LLC to accounts payable, accrued expenses and other liabilities, including fair value adjustment of $812 (Note 16) | | (18,109) | | — | | — |
| Net deferred tax impact on cumulative effect of accounting change due to the adoption of the new revenue recognition standard | | — | | (125) | | — |
| Reclassification of the income tax impact on cumulative effect of accounting change due to the adoption of accounting standards update 2016-01 | | — | | 649 | | — |
| Reclassification of the income tax impact of the Tax Cuts and Jobs Act on items within accumulated other comprehensive loss to retained earnings due to the early adoption of accounting standards update 2018-02 | | — | | 207 | | — |
| Deferred tax asset impact on cumulative effect of accounting change due to the adoption of accounting standards update 2016-09 | | — | | — | | 118 |
| Reclassification of redeemable non-controlling interest in SIC Advisors LLC, including fair value adjustment of $965 (Note 16) | | — | | (12,275) | | — |
| Change in fair value of available-for-sale securities, net of income tax benefit | | — | | — | | 10,306 |

See accompanying notes to consolidated financial statements

## 1. ORGANIZATION AND BASIS OF PRESENTATION

Medley LLC is an alternative asset management firm offering yield solutions to retail and institutional investors. The Company's national direct origination franchise provides capital to the middle market in the United States of America. Medley LLC, provides investment management services to permanent capital vehicles, long-dated private funds and separately managed accounts and serves as the general partner to the private funds, which are generally organized as pass-through entities. Medley LLC and its consolidated subsidiaries (collectively "Medley" or the "Company") is headquartered in New York City.

Medley's business is currently comprised of only one reportable segment, the investment management segment, and substantially all of the Company operations are conducted through this segment. The investment management segment provides investment management services to permanent capital vehicles, long-dated private funds and separately managed accounts. The Company conducts its investment management business in the U.S., where substantially all its revenues are generated.

### *Registered Public Offering of Medley LLC Notes*

On August 9, 2016, Medley LLC completed a registered public offering of $25.0 million of an aggregate principal amount of 6.875% senior notes due 2026 (the "2026 Notes") at a public offering price of 100% of the principal amount. On October 18, 2016, Medley LLC completed a public offering of an additional $28.6 million in aggregate principal amount of the 2026 Notes at a public offering price of $24.45 for each $25.00 principal amount of notes. The notes mature on August 15, 2026 and interest is payable quarterly. The notes will be redeemable in whole or in part at Medley's option on or after August 15, 2019 at a redemption price of 100% of the aggregate principal amount plus accrued and unpaid interest payments. The Company used the net proceeds from the offering to repay a portion of the outstanding indebtedness under the Company's Term Loan Facility. The 2026 Notes are listed on the New York Stock Exchange and trades thereon under the trading symbol "MDLX."

On January 18, 2017, Medley LLC completed a registered public offering of $34.5 million of an aggregate principal amount of 7.25% senior notes due 2024 (the "2024 Notes") at a public offering price of 100% of the principal amount. On February 22, 2017, Medley LLC completed a public offering of an additional $34.5 million in aggregate principal amount of the 2024 Notes at a public offering price of $25.25 for each $25.00 principal amount of notes. The 2024 Notes mature on January 30, 2024 and interest is payable quarterly commencing on April 30, 2017. The notes will be redeemable in whole or in part at Medley's option on or after January 30, 2020 at a redemption price of 100% of the aggregate principal amount plus accrued and unpaid interest payment. The Company used the net proceeds from the offering to repay the remaining outstanding indebtedness under the Term Loan Facility and for general corporate purposes. The 2024 Notes are listed on the New York Stock Exchange and trade thereon under the trading symbol "MDLQ."

### *Medley LLC Reorganization*

In connection with the IPO of Medley Management Inc. ("MDLY"), Medley LLC amended and restated its limited liability agreement to modify its capital structure by reclassifying the 23,333,333 interests held by the pre-IPO members into a single new class of units ("LLC Units"). The pre-IPO members also entered into an exchange agreement under which they (or certain permitted transferees thereof) have the right, subject to the terms of an exchange agreement, to exchange their LLC Units for shares of Medley Management Inc.'s Class A common stock on a one-for-one basis, subject to customary conversion rate adjustments for stock splits, stock dividends and reclassifications. In addition, pursuant to the amended and restated limited liability agreement, Medley Management Inc. became the sole managing member of Medley LLC.

The pre-IPO owners were, subject to limited exceptions, prohibited from transferring any LLC Units held by them or any shares of Class A common stock received upon exchange of such LLC Units, until September 29, 2017, which was the third anniversary of the date of the closing of the IPO, without the Company's consent. Thereafter and prior to the fourth and fifth anniversaries of the closing of the IPO, such holders could not transfer more than 33 1/3% and 66 2/3%, respectively, of the number of LLC Units held by them, together with the number of any shares of Class A common stock received by them upon exchange therefore, without the Company's consent.

### *Agreement and Plan of Merger*

On August 9, 2018, MDLY entered into the Agreement and Plan of Merger (the "MDLY Merger Agreement"), dated as of August 9, 2018, by and among MDLY, Sierra Income Corporation ("Sierra" or "SIC") and Sierra Management, Inc., a wholly owned subsidiary of Sierra ("Merger Sub"), pursuant to which MDLY would, on the terms and subject to the conditions set forth in the MDLY Merger Agreement, merge with and into Merger Sub, with Merger Sub as the surviving company in the merger (the "MDLY Merger"). In the MDLY Merger, each share of MDLY Class A common stock, issued and outstanding immediately prior to the MDLY Merger effective time (other than Dissenting Shares (as defined in the MDLY Merger Agreement) and shares of MDLY Class A common stock held by the Company, Sierra or their respective wholly owned subsidiaries) would be converted into the right to receive (i) 0.3836 shares of Sierra's common stock; plus (ii) cash in an amount equal to $3.44 per share. In addition,

MDLY stockholders would have the right to receive certain dividends and/or other payments. Simultaneously, pursuant to the Agreement and Plan of Merger, dated as of August 9, 2018, by and between Medley Capital Corporation ("MCC") and Sierra (the "MCC Merger Agreement"), MCC would, on the terms and subject to the conditions set forth in the MCC Merger Agreement, merge with and into Sierra, with Sierra as the surviving company in the merger (the "MCC Merger" together with the MDLY Merger, the "Mergers"). In the MCC Merger, each share of MCC's common stock issued and outstanding immediately prior to the MCC Merger effective time (other than shares of MCC's common stock held by MCC, Sierra or their respective wholly owned subsidiaries) would be converted into the right to receive 0.8050 shares of Sierra's common stock.

On July 29, 2019, MDLY entered into the Amended and Restated Agreement and Plan of Merger, dated as of July 29, 2019 (the "Amended MDLY Merger Agreement"), by and among MDLY, Sierra, and Merger Sub, pursuant to which MDLY and the Company will, on the terms and subject to the conditions set forth in the Amended MDLY Merger Agreement, merge with and into Merger Sub, with Merger Sub as the surviving company in the MDLY Merger. In the MDLY Merger, each share of MDLY Class A common stock, issued and outstanding immediately prior to the MDLY Merger effective time (other than shares of MDLY Class A common stock held by the Company, Sierra or their respective wholly owned subsidiaries (the "Excluded MDLY Shares") and the Dissenting Shares (as defined in the Amended MDLY Merger Agreement), held, immediately prior to the MDLY Merger effective time, by any person other than a holder of LLC Units), will be exchanged for (i) 0.2668 shares of Sierra's common stock; plus (ii) cash in an amount equal to $2.96 per share. In addition, in the MDLY Merger, each share of MDLY Class A common stock issued and outstanding immediately prior to the MDLY Merger effective time, other than the Excluded MDLY Shares and the Dissenting Shares, held, immediately prior to the MDLY Merger effective time, by holders of LLC Units will be exchanged for (i) 0.2072 shares of Sierra's common stock; plus (ii) cash in an amount equal to $2.66 per share. Under the Amended MDLY Merger Agreement, the MDLY exchange ratios and the cash consideration amount was fixed on July 29, 2019, the date of the signing of the Amended MDLY Merger Agreement. The MDLY exchange ratios and the cash consideration amount are not subject to adjustment based on changes in the NAV of Sierra or the market price of MDLY Class A common stock before the MDLY Merger effective time, provided that the MDLY Merger is consummated by March 31, 2020, or, if consummated after March 31, 2020, only if the parties subsequently agree to extend the closing date on the same terms and conditions.

In addition, on July 29, 2019, MCC and Sierra announced the execution of the Amended and Restated Agreement and Plan of Merger, dated as of July 29, 2019 (the "Amended MCC Merger Agreement"), by and between MCC and Sierra, pursuant to which MCC will, on the terms and subject to the conditions set forth in the Amended MCC Merger Agreement, merge with and into Sierra, with Sierra as the surviving company in the MCC Merger. In the MCC Merger, each share of MCC's common stock (other than shares of MCC's common stock held by MCC, Sierra or their respective wholly owned subsidiaries), will be exchanged for the right to receive (i) 0.68 shares of Sierra's common stock if the attorneys' fees of plaintiffs' counsel and litigation expenses paid or incurred by plaintiffs' counsel or advanced by plaintiffs in connection with the Delaware Action, as described below (such fees and expenses, the "Plaintiff Attorney Fees") are less than or equal to $10,000,000; (ii) 0.66 shares of Sierra's common stock if the Plaintiff Attorney Fees are equal to or greater than $15,000,000; (iii) between 0.68 and 0.66 per share of Sierra's common stock if the Plaintiff Attorney Fees are greater than $10,000,000 but less than $15,000,000, calculated on a descending basis, based on straight line interpolation between $10,000,000 and $15,000,000; or (iv) 0.66 shares of Sierra's common stock in the event that the Plaintiff Attorney Fees are not fully and finally determined prior to the closing of the MCC Merger (such ratio, the "MCC Merger Exchange Ratio"). Based upon the Plaintiff Attorney Fees approved by the Court of Chancery of the State of Delaware (the "Delaware Court of Chancery") as set forth in the Order and Final Judgment entered into on December 20, 2019, as described above (the "Delaware Order"), the MCC Merger Exchange Ratio will be 0.66 shares of Sierra's common stock. MCC and Sierra are appealing the Delaware Order with respect to the Delaware Court of Chancery's ruling on the Plaintiff Attorney Fees. Under the Amended MCC Merger Agreement, the MCC Merger exchange ratio is not subject to adjustment based on changes in the NAV of Sierra or the market price of MCC's common stock before the MCC Merger effective time. In addition, under the Settlement (as described below), the defendant parties to the Settlement (other than the Company) shall, among other things, deposit or cause to be deposited the Settlement shares, the number of shares of which is to be calculated using the pro forma NAV of $6.37 per share as of June 30, 2019, and is not subject to subsequent adjustment based on changes in the NAV of Sierra or the market price of MCC's common stock before the MCC Merger effective time, provided that the MCC Merger is consummated by March 31, 2020, or, if consummated after March 31, 2020, only if the parties subsequently agree to extend the closing date on the same terms and conditions.

Pursuant to terms of the Amended MCC Merger Agreement, the consummation of the MCC Merger is conditioned upon the satisfaction or waiver of each of the conditions to closing under the Amended MDLY Merger Agreement and the consummation of the MDLY Merger. However, pursuant to the terms of the Amended MDLY Merger Agreement, the consummation of the MDLY Merger is not contingent upon the consummation of the MCC Merger. If both Mergers are successfully consummated, Sierra's common stock would be listed on the NYSE, with such listing expected to be effective as of the closing date of the Mergers, and Sierra's common stock will be listed on the Tel Aviv Stock Exchange, with such listing expected to be effective as of the closing

F- 9

date of the MCC Merger. If, however, only the MDLY Merger is consummated, Sierra's common stock would be listed on the NYSE. If both Mergers are successfully consummated, the investment portfolios of MCC and Sierra would be combined, Merger Sub, as a successor to MDLY, would be a wholly owned subsidiary of Sierra (the "Combined Company"), and the Combined Company would be internally managed by MCC Advisors LLC, its wholly controlled adviser subsidiary. If only the MDLY Merger is consummated, while the investment portfolios of MCC and Sierra would not be combined, the investment management function relating to the operation of the Company, as the surviving company, would still be internalized (the "Sierra/MDLY Company") and the Sierra/MDLY Company would be managed by MCC Advisors LLC.

The Mergers are subject to approval by the stockholders of MDLY, Sierra, and MCC, regulators, including the SEC, court approval of the Settlement (as described below), other customary closing conditions and third-party consents. There is no assurance that any of the foregoing conditions will be satisfied. MDLY and Sierra have the right to terminate the Amended MDLY Merger Agreement under certain circumstances, including (subject to certain limitations set forth in the Amended MDLY Merger Agreement), among others: (i) by mutual written agreement of each party; (ii) any governmental entity whose consent or approval is a condition to closing set forth in Section 8.1 of the Amended MDLY Merger Agreement has denied the granting of any such consent or approval and such denial has become final and nonappealable, or any governmental entity of competent jurisdiction shall have issued a final and nonappealable order, injunction or decree permanently enjoining or otherwise prohibiting or making illegal the consummation of the transactions contemplated by the Amended MDLY Merger Agreement; (iii) the MDLY Merger has not closed on or prior to March 31, 2020; or (iv) either party has failed to obtain stockholder approval or the Amended MCC Merger Agreement has been terminated.

Set forth below is a description of the Decision (as defined below), which should be read in the context of the impact of the Delaware Order and corresponding Settlement.

On February 11, 2019, a purported stockholder class action related to the MCC Merger was commenced in the Delaware Court of Chancery by FrontFour Capital Group LLC and FrontFour Master Fund, Ltd. (together, "FrontFour"), captioned FrontFour Capital Group LLC, et al. v. Brook Taube et al., Case No. 2019-0100 (the "Delaware Action") against defendants Brook Taube, Seth Taube, Jeff Tonkel, Mark Lerdal, Karin Hirtler-Garvey, John E. Mack, Arthur S. Ainsberg, MDLY, Sierra, MCC, MCC Advisors LLC, Medley Group LLC, and Medley LLC. The complaint, as amended on February 12, 2019, alleged that the individuals named as defendants breached their fiduciary duties to MCC's stockholders in connection with the MCC Merger, and that MDLY, Sierra, MCC Advisors LLC, Medley Group LLC, and Medley LLC aided and abetted those alleged breaches of fiduciary duties. The complaint sought to enjoin the vote of MCC's stockholders on the MCC Merger and enjoin enforcement of certain provisions of the MCC Merger Agreement.

The Delaware Court of Chancery held a trial on the plaintiffs' motion for a preliminary injunction and issued a Memorandum Opinion (the "Decision") on March 11, 2019. The Delaware Court of Chancery denied the plaintiffs' requests to (i) permanently enjoin the MCC Merger and (ii) require MCC to conduct a "shopping process" for MCC on terms proposed by FrontFour in its complaint. The Delaware Court of Chancery held that MCC's directors breached their fiduciary duties in entering into the MCC Merger, but rejected FrontFour's claim that Sierra aided and abetted those breaches of fiduciary duties. The Delaware Court of Chancery ordered the defendants to issue corrective disclosures consistent with the Decision, and enjoined a vote of MCC's stockholders on the MCC Merger until such disclosures had been made and stockholders had the opportunity to assimilate that information.

On December 20, 2019, the Delaware Court of Chancery entered into the Delaware Order approving the settlement of the Delaware Action (the "Settlement"). Pursuant to the Settlement, MCC agreed to certain amendments to (i) the MCC Merger Agreement and (ii) the MDLY Merger Agreement, which amendments are reflected in the Amended MCC Merger Agreement and the Amended MDLY Merger Agreement. The Settlement also provides for, if the MCC Merger is consummated, the creation of a settlement fund, consisting of $17 million in cash and $30 million of Sierra's common stock, with the number of shares of Sierra's common stock to be calculated using the pro forma net asset value of $6.37 per share as of June 30, 2019, which will be distributed to eligible members of the Settlement Class (as defined in the Settlement). In addition, in connection with the Settlement, on July 29, 2019, MCC entered into a Governance Agreement with FrontFour Capital Group LLC, FrontFour Master Fund, Ltd., FrontFour Capital Corp., FrontFour Opportunity Fund, David A. Lorber, Stephen E. Loukas and Zachary R. George, pursuant to which, among other matters, FrontFour is subject to customary standstill restrictions and required to vote in favor of the revised MCC Merger at a meeting of stockholders to approve the revised MCC Merger Agreement. The Settlement also provides for mutual releases between and among FrontFour and the Settlement Class, on the one hand, and the Medley Parties, on the other hand, of all claims that were or could have been asserted in the Delaware Action through September 26, 2019.

The Delaware Court of Chancery also awarded attorney's fees as follows: (i) an award of $3,000,000 to lead plaintiffs' counsel and $75,000 to counsel to plaintiff Stephen Altman (the "Therapeutics Fee Award") and $420,334.97 of plaintiff counsel

expenses payable to the lead plaintiff's counsel, which were paid by MCC on December 23, 2019, and (ii) an award that is contingent upon the closing of the proposed merger transactions (the "Contingent Fee Award"), consisting of:

    a.    $100,000 for the agreement by Sierra's board of directors to appoint one independent director of MCC who will be selected by the independent directors of Sierra on the board of directors of the post-merger company upon the closing of the Mergers; and

    b.    the amount calculated by solving for A in the following formula:

$$Award[A] = (Monetary\ Fund[M] + Award[A] - Look\ Through[L]) * Percentage[P]$$

Whereas

A    shall be the amount of the Additional Fee (excluding the $100,000 award for the agreement by Sierra's board of directors to appoint one independent director of MCC who will be selected by the independent directors of Sierra on the board of directors of the post-merger company upon the closing of the Mergers);

M    shall be the sum of (i) the $17 million cash component of the Settlement Fund and (ii) the value of the post-merger company stock component of the Settlement Fund, which shall be calculated as the product of the VPS (as defined below) and 4,709,576.14 (the number of shares of post-merger company's stock comprising the stock component of the net settlement amount);

L    shall be the amount representing the estimated value of the decrease in shares to be received by eligible class members arising by operation of the change in the "Exchange Ratio" under the Amended MCC Merger Agreement, calculated as follows:

$$L = ((ES * 68\%) - (ES * 66\%)) * VPS$$

Where:

ES    shall be the number of eligible shares;

VPS    shall be the pro forma net asset value per share of the post-merger company's common stock as of the closing as reported in the public disclosure filed nearest in time and after the closing (the "Closing NAV Disclosure"); and

P    shall equal 0.26

The Contingent Fee Award is contingent upon the closing of the MCC Merger. Payment of the Contingent Fee Award will be made in two stages. First, within five (5) business days of the establishment of the Settlement Fund, MCC or its successor shall (i) pay the plaintiffs' counsel an estimate of the Contingent Fee Award (the "Additional Fee Estimate"), less twenty (20) percent (the "Additional Fee Estimate Payment"), and (ii) deposit the remaining twenty (20) percent of the Additional Fee Estimate into escrow (the "Escrowed Fee"). For purposes of calculating such estimate, MCC or its successor shall use the formula set above, except that VPS shall equal the pro forma net asset value of the post-merger company's common stock as reported in the public disclosure filed nearest in time and prior to the closing (the "Closing NAV Estimate").

Second, within five (5) business days of the Closing NAV Disclosure (as defined in the Order and Final Judgment), (i) if the Additional Fee is greater than the Additional Fee Estimate Payment, an amount of the Escrowed Fee shall be released to plaintiffs' counsel such that the total payments made to plaintiffs' counsel equal the Additional Fee and the remainder of the Escrowed Fee, if any, shall be released to MCC or its successor, (ii) if the Additional Fee is less than the Additional Fee Estimate Payment, plaintiffs' counsel shall return to MCC or its successor the difference between the Additional Fee Estimate and the Additional Fee and the Escrowed Fee shall be released to MCC or its successor, or (iii) if the Additional Fee is equal to the Additional Fee Estimate Payment, the Escrowed Fee shall be released to MCC or its successor.

On January 17, 2020, MCC and Sierra filed a notice of appeal with the Delaware Supreme Court from those provisions of the Order and Final Judgment with respect to the Contingent Fee Award.

Transaction expenses related to the MDLY Merger are included in the Company's general, administrative and other expenses and consist primarily of professional fees. Such expenses amounted to $4.6 million and $3.8 million for the years ending December 31, 2019 and 2018, respectively. There were no transaction expenses related to the MDLY Merger during the year ended December 31, 2017.

*Basis of Presentation*

The accompanying consolidated financial statements have been prepared on the accrual basis of accounting in conformity with U.S. generally accepted accounting principles ("GAAP") and include the accounts of Medley LLC and its consolidated subsidiaries. Intercompany balances and transactions have been eliminated in consolidation.

*Reclassification of Prior Period Presentation*

Performance fee compensation reported in the prior period has been reclassified to compensation and benefits to conform to the current period presentation in the consolidated statements of operations. This reclassification had no effect on the reported results of operations.

## 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

*Principles of Consolidation*

In accordance with Accounting Standards Codification ("ASC") 810, *Consolidation*, the Company consolidates those entities where it has a direct and indirect controlling financial interest based on either a variable interest model or voting interest model. As such, the Company consolidates entities that the Company concludes are variable interest entities ("VIEs"), for which the Company is deemed to be the primary beneficiary and entities in which it holds a majority voting interest or has majority ownership and control over the operational, financial and investing decisions of that entity.

For legal entities evaluated for consolidation, the Company must determine whether the interests that it holds and fees paid to it qualify as a variable interest in an entity. This includes an evaluation of the management fee and performance fee paid to the Company when acting as a decision maker or service provider to the entity being evaluated. If fees received by the Company are customary and commensurate with the level of services provided, and the Company does not hold other economic interests in the entity that would absorb more than an insignificant amount of the expected losses or returns of the entity, the interest that the Company holds would not be considered a variable interest. The Company factors in all economic interests including proportionate interests through related parties, to determine if fees are considered a variable interest.

An entity in which the Company holds a variable interest is a VIE if any one of the following conditions exist: (a) the total equity investment at risk is not sufficient to permit the legal entity to finance its activities without additional subordinated financial support, (b) the holders of the equity investment at risk have the right to direct the activities of the entity that most significantly impact the legal entity's economic performance, or (c) the voting rights of some investors are disproportionate to their obligation to absorb losses or rights to receive returns from a legal entity. For limited partnerships and other similar entities, non-controlling investors must have substantive rights to either dissolve the fund or remove the general partner ("kick-out rights") in order to not qualify as a VIE.

For those entities that qualify as a VIE, the primary beneficiary is generally defined as the party who has a controlling financial interest in the VIE. The Company is generally deemed to have a controlling financial interest if it has the power to direct the activities of a VIE that most significantly impact the VIE's economic performance, and the obligation to absorb losses or receive benefits from the VIE that could potentially be significant to the VIE. The Company determines whether it is the primary beneficiary of a VIE at the time it becomes initially involved with the VIE and reconsiders that conclusion continuously. The primary beneficiary evaluation is generally performed qualitatively on the basis of all facts and circumstances. However, quantitative information may also be considered in the analysis, as appropriate. These assessments require judgment. Each entity is assessed for consolidation on a case-by-case basis.

For those entities evaluated under the voting interest model, the Company consolidates the entity if it has a controlling financial interest. The Company has a controlling financial interest in a voting interest entity ("VOE") if it owns a majority voting interest in the entity.

*Consolidated Variable Interest Entities*

As of December 31, 2019, Medley LLC had seven subsidiaries, Medley Seed Funding I LLC, Medley Seed Funding II LLC, STRF Advisors LLC, Medley Caddo Investors Holdings 1 LLC, Medley Avantor Investors LLC, Medley Cloverleaf Investors LLC and Medley Real D Investors LLC, which are consolidated VIEs. Each of these entities was organized as a limited liability company and was legally formed to either manage a designated fund or to strategically invest capital as well as isolate business risk. As of December 31, 2019, total assets and total liabilities, after eliminating entries, of these VIEs reflected in the consolidated balance sheets were $1.2 million and less than $0.1 million, respectively. As of December 31, 2018, Medley LLC had five majority owned subsidiaries, Medley Seed Funding I LLC, Medley Seed Funding II LLC, STRF Advisors LLC, Medley Caddo Investors Holdings 1 LLC and Medley Avantor LLC. As of December 31, 2018, total assets and total liabilities, after eliminating entries, of these VIEs reflected in the consolidated balance sheets were $22.6 million and less than $0.1 million, respectively. Except to the

F- 12

extent of the assets of these VIEs that are consolidated, the holders of the consolidated VIEs' liabilities generally do not have recourse to the Company.

*Seed Investments*

The Company accounts for seed investments through the application of the voting interest model under ASC 810-10-25-1 through 25-14 and consolidates a seed investment when the investment advisor holds a controlling interest, which is, in general, 50% or more of the equity in such investment. For seed investments in which the Company does not hold a controlling interest, the Company accounts for such seed investment under the equity method of accounting, at its ownership percentage of such seed investment's net asset value.

The Company seed funded $2.1 million to Sierra Total Return Fund ("STRF"), which commenced investment operations in June 2017. As of and since inception through December 31, 2019, the Company owned 100% of the equity of STRF and, as such, consolidates STRF in its consolidated financial statements.

The condensed balance sheet of STRF as of December 31, 2019 and 2018 is presented in the table below.

|  | As of December 31, | | | |
|  | 2019 | | 2018 | |
|---|---|---|---|---|
| **Assets** | (in thousands) | | | |
| Cash and cash equivalents | $ | 682 | $ | 274 |
| Investments, at fair value |  | 1,441 |  | 1,952 |
| Other assets |  | 29 |  | 248 |
| Total assets | $ | 2,152 | $ | 2,474 |
| **Liabilities and Equity** | | | | |
| Accounts payable, accrued expenses and other liabilities | $ | 342 | $ | 330 |
| Equity |  | 1,810 |  | 2,144 |
| Total liabilities and equity | $ | 2,152 | $ | 2,474 |

As of December 31, 2019, the Company's consolidated balance sheet reflects the elimination of $0.2 million of other assets and $1.8 million of equity as a result of the consolidation of STRF. As of December 31, 2018, the Company's consolidated balance sheet reflects the elimination of $0.2 million of other assets, $0.1 million of accrued expenses and other liabilities and $2.1 million of equity as a result of the consolidation of STRF. During the year ended December 31, 2019, 2018, and 2017 this fund did not generate any significant income or losses from operations.

In October 2019, a former minority interest holder exercised its put option right on its interest in MSF I and MSF II, which will result in the majority of the STRF shares held by the Company to be transferred to that minority interest and the Company will no longer consolidate STRF in its consolidated financial statements. This share transfer is expected to take place by the end of the first quarter ending March 31, 2020 (Notes 11 and 16).

*Non-Consolidated Variable Interest Entities*

The Company holds interests in certain VIEs that are not consolidated because the Company is not deemed to be the primary beneficiary. The Company's interest in these entities is in the form of insignificant equity interests and fee arrangements. The maximum exposure to loss represents the potential loss of assets by the Company relating to these non-consolidated entities.

As of December 31, 2019, the Company recorded investments, at fair value, attributed to these non-consolidated VIEs of $3.0 million, receivables of $1.3 million included as a component of other assets and a clawback obligation of $7.2 million included as a component of accounts payable, accrued expenses and other liabilities on the Company's consolidated balance sheets. As of December 31, 2018, the Company recorded investments, at fair value, attributed to non-consolidated VIEs of $4.2 million, receivables of $1.8 million included as a component of other assets and a clawback obligation of $7.2 million included as a component of accounts payable, accrued expenses and other liabilities on the Company's consolidated balance sheets. As of December 31, 2019, the Company's maximum exposure to losses from these entities is $4.3 million.

*Concentration of Credit and Market Risk*

In the normal course of business, the Company's underlying funds encounter significant credit and market risk. Credit risk is the risk of default on investments in debt securities, loans and derivatives that result from a borrower's or derivative counterparty's inability or unwillingness to make required or expected payments. Credit risk is increased in situations where the Company's

underlying funds are investing in distressed assets or unsecured or subordinate loans or in securities that are a material part of its respective business. Market risk reflects changes in the value of investments due to changes in interest rates, credit spreads or other market factors. The Company's underlying funds may make investments outside of the United States. These non-U.S. investments are subject to the same risks associated with U.S. investments, as well as additional risks, such as fluctuations in foreign currency exchange rates, unexpected changes in regulatory requirements, heightened risk of political and economic instability, difficulties in managing the investments, potentially adverse tax consequences, and the burden of complying with a wide variety of foreign laws.

*Use of Estimates*

The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosures of contingent assets and liabilities at the date of the financial statements and the reported amounts of income and expenses during the reporting period. Management's estimates are based on historical experience and other factors, including expectations of future events that management believes to be reasonable under the circumstances. These assumptions and estimates also require management to exercise judgment in the process of applying the Company's accounting policies. Significant estimates and assumptions by management affect the carrying value of investments, deferred tax assets, performance compensation payable and certain accrued liabilities. Actual results could differ from these estimates, and such differences could be material.

*Indemnification*

In the normal course of business, the Company enters into contractual agreements that provide general indemnifications against losses, costs, claims and liabilities arising from the performance of individual obligations under such agreements. The Company has not experienced any prior claims or payments pursuant to such agreements. The Company's individual maximum exposure under these arrangements is unknown, as this would involve future claims that may be made against the Company that have not yet occurred. However, based on management's experience, the Company expects the risk of loss to be remote.

*Non-Controlling Interests in Consolidated Subsidiaries*

Non-controlling interests in consolidated subsidiaries represent the component of equity in such consolidated entities held by third-parties and certain employees. These interests are adjusted for contributions to and distributions from Medley entities and are allocated income or loss from Medley entities based on their ownership percentages.

*Redeemable Non-Controlling Interests*

Redeemable non-controlling interests represents interests of certain third parties that are not mandatorily redeemable but redeemable for cash or other assets at a fixed or determinable price or a fixed or determinable date, at the option of the holder or upon the occurrence of an event that is not solely within the control of the Company. These interests are classified in the mezzanine section on the Company's consolidated balance sheets.

*Cash and Cash Equivalents*

Cash and cash equivalents include liquid investments in money market funds and demand deposits. The Company had cash balances with financial institutions in excess of Federal Deposit Insurance Corporation insured limits as of December 31, 2019 and 2018. The Company monitors the credit standing of these financial institutions and has not experienced, and has no expectations of experiencing, any losses with respect to such balances.

*Investments*

Investments include equity method investments that are not consolidated but over which the Company exerts significant influence. The Company measures the carrying value of its privately-held equity method investments by recording its share of the earnings or losses of its investee in the periods for which they are reported by the investee in the investee's financial statements rather than in the period in which an investee declares a dividend or distribution. For the Company's public non-traded equity method investment, it measures the carrying value of such investment at Net Asset Value ("NAV") per share. Unrealized appreciation (depreciation) resulting from changes in fair value of the equity method investments is reflected as a component of investment income in the consolidated statements of operations along with the income and expense allocations from such investments.

The carrying amounts of equity method investments are reflected in Investments, at fair value on the Company's consolidated balance sheets. As the underlying entities that the Company manages and invests in are, for U.S. GAAP purposes, primarily investment companies which reflect their investments at estimated fair value, the carrying value of the Company's equity method investments in such entities approximates fair value. The Company evaluates its equity-method investments for impairment whenever events or changes in circumstances indicate that the carrying amounts of such investments may not be recoverable.

For presentation in its consolidated statements of cash flows, the Company treats distributions received from certain equity method investments using the cumulative earnings approach. Under the cumulative earnings approach, an investor would compare the distributions received to its cumulative equity-method earnings since inception. Any distributions received up to the amount of cumulative equity earnings would be considered a return on investment and classified in operating activities. Any excess distributions would be considered a return of investment and classified in investing activities.

Investments also include publicly traded common stock. The Company measures the fair value of its publicly traded common stock at the quoted market price on the primary market or exchange on which the underlying shares trade. Any realized gains (losses) from the sale of investments and unrealized appreciation (depreciation) resulting from changes in fair value are recorded in other income (expense), net.

*Investments of Consolidated Fund*

In accordance with ASC 820, *Fair Value Measurements and Disclosures*, the Company's consolidated fund has categorized its investments carried at fair value, based on the priority of the valuation technique, into a three-level fair value hierarchy as discussed in Note 5. Fair value is a market-based measure considered from the perspective of the market participant who holds the financial instrument rather than an entity specific measure. Investments for which market quotations are readily available are valued at such market quotations, which are generally obtained from an independent pricing service or multiple broker-dealers or market makers. The consolidated fund weighs the use of third-party broker quotations, if any, in determining fair value based on management's understanding of the level of actual transactions used by the broker to develop the quote and whether the quote was an indicative price or binding offer. However, debt investments with remaining maturities within 60 days that are not credit impaired are valued at cost plus unamortized discount, or minus amortized premium, which approximates fair value. Investments for which market quotations are not readily available are valued at fair value as determined by the consolidated fund's board of trustees based upon input from management and third party valuation firms. Because these investments are illiquid and because there may not be any directly comparable companies whose financial instruments have observable market values, these loans are valued using a fundamental valuation methodology, consistent with traditional asset pricing standards, that is objective and consistently applied across all loans and through time.

*Fixed Assets*

Fixed assets consist primarily of furniture and fixtures, computer equipment, and leasehold improvements and are recorded at cost, less accumulated depreciation and amortization. The Company calculates depreciation expense for furniture and fixtures, and computer equipment using the straight-line method over the estimated useful life used for the respective assets, which generally ranges from three to seven years. Amortization of leasehold improvements is provided on a straight-line basis over the shorter of the remaining term of the underlying lease or estimated useful life of the improvement. Useful lives of leasehold improvements range from three to eight years. Expenditures for major additions and improvements are capitalized, while minor replacements, maintenance and repairs are charged to expense as incurred. When property is retired or otherwise disposed of, the cost and accumulated depreciation are removed from accounts and any resulting gain or loss is reflected in Other income (expense), net in the Company's consolidated statements of operations.

*Debt Issuance Costs*

Debt issuance costs represent direct costs incurred in obtaining financing and are amortized over the term of the underlying debt using the effective interest method. Debt issuance costs associated with the Company's revolving credit facility are presented as a deferred charge and are included as a component of other assets on the Company's consolidated balance sheets. Debt issuance costs associated with the Company's senior unsecured debt are presented as a direct reduction in the carrying value of such debt, consistent with the presentation of debt discount. Amortization of debt issuance costs is included as a component of interest expense in the Company's consolidated statement of operations.

*Revenues*

Effective January 1, 2018, the Company recognizes revenue in accordance with ASC 606, *Revenues from Contracts with Customers*. The Company recognizes revenue under the core principle of depicting the transfer of promised goods or services to customers in an amount that reflects the consideration to which it expects to be entitled in exchange for such goods or services. To achieve this, the Company applies a five step approach: (1) identify the contract(s) with a customer, (2) identify the performance obligations within the contract, (3) determine the transaction price, (4) allocate the transaction price to the separate performance obligations and (5) recognize revenue when, or as, each performance obligation is satisfied.

Carried interest are performance based fees that represent a capital allocation of income to the general partner or investment manager. Such fees are accounted for under ASC 323, *Investments - Equity Method and Joint Ventures* and, therefore, are not in the scope of ASC 606.

As a result of the adoption of this new revenue guidance, the Company recorded a cumulative effect decrease to equity of $3.6 million, net of benefit from income taxes of $0.1 million, as of January 1, 2018, which relates to (1) certain performance fee revenue that would not have met the "probable that significant reversal will not occur" criteria of $3.0 million and (2) the reversal of reimbursable fund formation costs which were deferred on the Company's consolidated balance sheet of $0.7 million.

*Management Fees*

Medley provides investment management services to both public and private investment vehicles. Management fees include base management fees, other management fees, and Part I incentive fees, as described below.

Base management fees are calculated based on either (i) the average or ending gross assets balance for the relevant period, (ii) limited partners' capital commitments to the funds, (iii) invested capital, (iv) NAV or (v) lower of cost or market value of a fund's portfolio investments. Depending upon the contracted terms of the investment management agreement, management fees are paid either quarterly in advance or quarterly in arrears, and are recognized as earned over the period the services are provided.

Certain management agreements provide for Medley to receive other management fee revenue derived from up front origination fees paid by the funds' and/or separately managed accounts' underlying portfolio companies. These fees are recognized when the Company becomes entitled to such fees.

Certain management agreements also provide for Medley to receive Part I incentive fee revenue derived from net investment income (excluding gains and losses) above a hurdle rate. As it relates to MCC, these fees are subject to netting against realized and unrealized losses. Part I incentive fees are paid quarterly and are recognized as earned in the period the services are provided.

*Performance Fees*

Performance fees are contractual fees which do not represent a capital allocation of income to the general partner or investment manager that are earned based on the performance of certain funds, typically, the Company's separately managed accounts. Performance fees are earned based on each fund's performance during the period, subject to the achievement of minimum return levels in accordance with the respective terms set out in each fund's investment management agreement.

*Other Revenues and Fees*

Medley provides administrative services to certain affiliated funds and is reimbursed for direct and allocated expenses incurred in providing such administrative services, as set forth in the respective underlying agreements. These fees are recognized as revenue in the period administrative services are rendered. Medley also acts as the administrative agent on certain deals for which Medley may earn loan administration fees and transaction fees. Medley may also earn consulting fees for providing non-advisory services related to its managed funds. These fees are recognized as revenue over the period the services are performed.

*Investment Income (loss) - Carried Interest*

Carried interest are performance based fees that represent a capital allocation of income to the general partner or investment manager. Carried interest are allocated to the Company based on cumulative fund performance to date, subject to the achievement of minimum return levels in accordance with the respective terms set out in each fund's governing documents and are accounted for under the equity method of accounting. Accordingly, these performance fees are reflected as carried interest within investment income on the Company's consolidated statements of operations and balances due for such fees are included as a part of equity method investments within Investments, at fair value on the Company's consolidated balance sheets.

The Company records carried interest based upon an assumed liquidation of that fund's net assets as of the reporting date, regardless of whether such amounts have been realized. For any given period, carried interest on the Company's consolidated statements of operations may include reversals of previously recognized carried interest due to a decrease in the value of a particular fund that results in a decrease of cumulative fees earned to date. Since fund return hurdles are cumulative, previously recognized carried interest also may be reversed in a period of appreciation that is lower than the particular fund's hurdle rate.

Carried interest received in prior periods may be required to be returned by the Company in future periods if the funds' investment performance declines below certain levels. Each fund is considered separately in this regard and, for a given fund, carried interest can never be negative over the life of a fund. If upon a hypothetical liquidation of a fund's investments, at their then current fair values, previously recognized and distributed carried interest would be required to be returned, a liability is established for the potential clawback obligation. During the year ended December 31, 2019, the Company received a carried interest distribution of $0.3 million from one of its managed funds, which has been fully liquidated as of December 31, 2019. Prior to the receipt of this distribution, the Company had not received any carried interest distributions, except for tax distributions

related to the Company's allocation of net income, which included an allocation of carried interest. Pursuant to the organizational documents of each respective fund, a portion of these tax distributions may be subject to clawback. As of December 31, 2019 and 2018, the Company had accrued $7.2 million for clawback obligations that would need to be paid if the funds were liquidated at fair value as of the end of the reporting period. The Company's actual obligation, however, would not become payable or realized until the end of a fund's life.

For each of the years ended December 31, 2019, 2018 and 2017, the Company's reversal of previously recognized carried interest were not in excess of $0.1 million.

*Investment Income (loss) - Other*

Other investment income is comprised of unrealized appreciation (depreciation) resulting from changes in fair value of the Company's equity method investments in addition to the income and expense allocations from such investments.

### Stock-based Compensation

Stock-based compensation expense relating to equity based awards are measured at fair value as of the grant date, reduced for actual forfeitures in the period they occur, and expensed over the requisite service period on a straight-line basis as a component of compensation and benefits on the Company's consolidated statements of operations.

### Income Taxes

The Company is treated as a partnership for income tax purposes and is therefore not subject to U.S. federal, state or local income taxes since all income, gains and losses are passed through to its members. However, a portion of taxable income from Medley LLC and its subsidiaries are subject to New York City's unincorporated business tax, which is included in the Company's provision for income taxes.

The Company accounts for income taxes using the asset and liability approach, which requires the recognition of tax benefits or expenses for temporary differences between the financial reporting and tax basis of assets and liabilities. A valuation allowance is established when necessary to reduce deferred tax assets to the amounts expected to be realized. The Company also recognizes a tax benefit from uncertain tax positions only if it is "more likely than not" that the position is sustainable based on its technical merits. The Company's policy is to recognize interest and penalties on uncertain tax positions and other tax matters as a component of its provision for income taxes. For interim periods, the Company accounts for income taxes based on its estimate of the effective tax rate for the year. Discrete items and changes in its estimate of the annual effective tax rate are recorded in the period in which they occur.

### Recently Issued Accounting Pronouncements Adopted as of January 1, 2019

In February 2016, the FASB issued ASU 2016-02, *Leases (Topic 842)* to increase the transparency and comparability among organizations as it relates to lease assets and lease liabilities, by requiring lessees to recognize a right-of-use asset and lease liability for all leases with an expected term of more than 12 months. Effective January 1, 2019, the Company adopted this guidance using a modified retrospective approach, which was required for all leases that exist at or commence after the date of the initial application with an option to use certain practical expedients. The Company has elected to use these practical expedients, which allow the Company to treat lease and non-lease components of its leases as a single component, have the ability to use hindsight in determining the lease term and assessing impairment of right-of-use assets, not to reassess lease classification or whether an arrangement is or contains a lease and not to reassess its initial accounting for direct lease costs.

The adoption of the new lease standard at January 1, 2019 resulted in the recognition of right-of-use assets and lease liabilities of $8.2 million and $10.2 million, respectively, consisting primarily of operating leases related to the rental of office space. The adoption of this guidance did not have a significant impact on the Company's consolidated statements of operations or cash flows. Additionally, this adoption did not impact any covenants associated with the Company's financial obligations.

### Recently Issued Accounting Pronouncements Not Yet Adopted

In August 2018, the FASB issued ASU 2018-13, *Fair Value Measurement (Topic 820): Disclosure Framework –Changes to the Disclosure Requirements for Fair Value Measurement*. This ASU modifies the disclosure requirements in Topic 820, *Fair Value Measurement*, by removing certain disclosure requirements related to the fair value hierarchy, modifying existing disclosure requirements related to measurement uncertainty, and adding new disclosure requirements. This ASU is effective for fiscal years beginning after December 15, 2019, including interim periods within those fiscal years. Early adoption is permitted. The Company adopted this ASU effective January 1, 2020 and its adoption is not expected to have a material impact on the Company's consolidated financial statements.

In June 2016, the FASB issued ASU 2016-13, *Financial Instruments—Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments*. The amendments in this ASU require the measurement of all expected credit losses for financial

assets held at the reporting date based on historical experience, current conditions, and reasonable and supportable forecasts and requires enhanced disclosures related to the significant estimates and judgments used in estimating credit losses, as well as the credit quality and underwriting standards of an organization's portfolio. In addition, the ASU amends the accounting for credit losses on available-for-sale debt securities and purchased financial assets with credit deterioration. The amendments in this ASU are effective for fiscal years beginning after December 15, 2019, including interim periods within those fiscal years. This ASU is effective for the Company on January 1, 2021 and will be adopted prospectively. The Company does not expect the adoption of this ASU to have a material impact on its consolidated financial statements.

In August 2018, the FASB issued ASU 2018-15, *Intangibles-Goodwill and Other-Internal-Use Software (Subtopic 350-40): Customer's Accounting for Implementation Costs Incurred in a Cloud Computing Arrangement That Is a Service Contract (a consensus of the FASB Emerging Issues Task Force).* This ASU aligns the accounting for costs incurred to implement a cloud computing arrangement that is a service arrangement with the guidance on capitalizing costs associated with developing or obtaining internal-use software. It addresses when costs should be capitalized rather than expensed, the term to use when amortizing capitalized costs, and how to evaluate the unamortized portion of these capitalized implementation costs for impairment. This ASU also includes guidance on how to present implementation costs in the financial statements and creates additional disclosure requirements. The accounting for the service element of a hosting arrangement that is a service contract is not affected by these amendments. Early adoption is permitted and can be applied either retrospectively or prospectively. The Company adopted this ASU on January 1, 2020 and has applied this new ASU on a prospective basis. The Company does not expect the adoption of this ASU to have a material impact on its consolidated financial statements.

In December 2019, the FASB issued ASU 2019-12, *Income Taxes (Topic 740): Simplifying the Accounting for Income Taxes.* The guidance in this ASU clarifies and amends existing guidance. It is effective for public entities for annual reporting periods beginning after December 15, 2020 and interim periods within those reporting periods, with early adoption permitted. While the Company does not expect the adoption of ASU 2019-12 to have a material effect on its business, it is evaluating the potential impact ASU 2019-12 may have on its financial position, results of operations and cash flows.

The Company does not believe any other recently issued, but not yet effective, revisions to authoritative guidance will have a material effect on its consolidated balance sheets, results of operations or cash flows.

## 3. REVENUES FROM CONTRACTS WITH CUSTOMERS

The majority of the Company's revenues are derived from investment management and advisory contracts that are accounted for in accordance with ASC 606.

### *Performance Obligations*

Performance obligations are the unit of account under the revenue recognition standard and represent the distinct goods or services that are promised to the customer. The majority of the Company's contracts have a single performance obligation to provide asset management, advisory and other related services to permanent capital vehicles, long-dated private funds and separately managed accounts. The Company also has a separate performance obligation to act as an agent for certain third party lenders and provide loan administration services to certain borrowers. These loan administration services also represent a single performance obligation.

The Company primarily provides investment management services to a fund by managing the fund's investments and maximizing returns on those investments. The Company's asset management, advisory and other related services are transferred over time to the customer on a day-to-day basis. The contracts with each fund create a distinct performance obligation for each quarter the Company provides the promised services to the customer, from which the customer can benefit from each individual quarter of service. Furthermore, each quarter of the promised services is considered separately identifiable because there is no integration of the promised services between quarters, each quarter does not modify services provided prior to that quarter, and the services provided are not interdependent or interrelated. Most services provided to these funds are provided continuously over the contract period, so the services in the contract generally represent a single performance obligation comprising a series of distinct service periods. A contract's transaction price is allocated to the series of distinct services that constitute a single performance obligation and recognized as revenue when, or as, the performance obligation is satisfied.

The management fees earned by the Company are largely dependent on fluctuations in the market and, thus, the determination of such fees is highly susceptible to factors outside the Company's influence. Management fees typically have a large number and broad range of possible consideration amounts and historical experience is generally not indicative of future performance of the market. Hence, the Company is applying the exemption provided under the new revenue recognition guidance as the Company is unable to estimate the aggregate amount of the transaction price allocated to the performance obligations that are unsatisfied and the variable consideration is allocated entirely to a wholly unsatisfied performance obligation.

Reimbursement of certain expenses incurred on behalf of the Company's funds are reported on a gross basis on the statements of operations if the Company is determined to be acting as the principal in those transactions.

*Significant Judgments*

The Company's contracts with customers generally include a single performance obligation to provide asset management, advisory and other related services on a quarterly basis. Revenues are recognized as such performance obligation is satisfied and the constraint on the management fees is lifted on a quarterly basis, hence, the Company does not need to exercise significant judgments in regards to management fees. Consideration for management fees is received on a quarterly basis as the performance obligations are satisfied.

With respect to performance fees based on the economic performance of its SMAs, significant judgment is required when determining recognition of revenues. Such judgments include:

• whether the fund is near final liquidation

• whether the fair value of the remaining assets in the fund is significantly in excess of the threshold at which the Company would earn an incentive fee

• the probability of significant fluctuations in the fair value of the remaining assets

• whether the SMA's remaining investments are under contract for sale with contractual purchase prices that would result in no clawback and it is highly likely that the contracts will be consummated

As such, the Company will consider the above factors at each reporting period to determine whether there is an amount of the SMA performance fees which should be recognized as revenue because it is probable that there will not be a significant future revenue reversal, hence, the "constraint" on the performance fees has been lifted.

The Company accounts for performance fees which represent capital allocations to the general partner or investment manager pursuant to accounting rules relating to investments accounted for under the equity method of accounting. As such, these types of performance fees are not within the scope of the new revenue recognition standard and the above significant judgments and constraints do not apply to them. Refer to Note 2, "*Summary of Significant Accounting Policies*", and Note 4, "*Investments*", for additional information.

*Revenue by Category*

The following table presents the Company's revenue from contracts with customers disaggregated by type of customer for the years ended December 31, 2019 and 2018:

| | Permanent Capital Vehicles | Long-dated Private Funds | SMAs | Other | Total |
|---|---|---|---|---|---|
| **For the year ended December 31, 2019** | | | (in thousands) | | |
| Management fees | $ 27,208 | $ 6,641 | $ 5,624 | $ — | $ 39,473 |
| Other revenues and fees | 6,325 | — | — | 3,378 | 9,703 |
| Total revenues from contracts with customers | $ 33,533 | $ 6,641 | $ 5,624 | $ 3,378 | $ 49,176 |
| | | | | | |
| **For the year ended December 31, 2018** | | | | | |
| Management fees | $ 32,471 | $ 8,122 | $ 6,492 | $ — | $ 47,085 |
| Other revenues and fees | 6,895 | — | — | 3,608 | 10,503 |
| Total revenues from contracts with customers | $ 39,366 | $ 8,122 | $ 6,492 | $ 3,608 | $ 57,588 |

The Other revenues and fees balances above primarily consist of: (i) revenues earned by Medley while serving as loan administrative agent on certain deals, including loan administration fees and transaction fees, (ii) reimbursable origination and deal expenses, (iii) reimbursable entity formation and organizational expenses and (iv) consulting fees for providing non-advisory services related to one of our managed funds.

The Company's asset management, advisory and other related services are transferred over time and the Company recognizes these revenues over time as well.

*Contract Balances*

For certain customers, the Company has a performance obligation to provide loan administration services. The timing of revenue recognition may differ from the timing of invoicing to such customers or receiving consideration. For the majority of these services cash deposits are received prior to the performance obligation being met. The performance obligation of acting as a loan administrator is satisfied over time, therefore, the Company defers any payments received upfront as deferred revenue and recognizes revenue on a pro-rata basis over time as the loan administrative services are performed.

These contract liabilities are reported as deferred revenue within accounts payable, accrued expenses and other liabilities on the Company's consolidated balance sheets and amounted to $0.2 million and $0.3 million as of December 31, 2019 and 2018, respectively. During the years ended December 31, 2019 and 2018, the Company recognized revenue from amounts included in deferred revenue of $0.7 million for each of the years then ended, and received cash deposits of $0.5 million and $0.8 million, respectively.

The Company did not have any contract assets as of December 31, 2019 or 2018.

*Assets Recognized for the Costs to Obtain or Fulfill a Contract*

As part of providing investment management services to a fund, the Company might incur certain placement fees to third parties for obtaining new investors for the fund. Any placement fees incurred to third party placement agents for placing investors into a fund are variable as it is based on a percentage of future fees and cannot be reasonably estimated. The Company determined that placement fees which are paid in cash over time as fees are earned, do not relate to a new contract at the time the payment is made. These costs do not represent a cost to obtain a new contract but rather a cost to fulfill an existing contract. The Company does not recognize any assets for the incremental costs of obtaining or fulfilling a contract with a customer and expenses placement fees as incurred.

## 4. INVESTMENTS

Investments consist of the following:

| | As of December 31, | | | |
|---|---|---|---|---|
| | **2019** | | **2018** | |
| | (in thousands) | | | |
| Equity method investments, at fair value | $ | 11,650 | $ | 13,422 |
| Investment in shares of MCC, at fair value | | — | | 20,633 |
| Investment held at cost less impairment | | 196 | | 418 |
| Investments of consolidated fund | | 1,441 | | 1,952 |
| Total investments, at fair value | $ | 13,287 | $ | 36,425 |

*Equity Method Investments*

Medley measures the carrying value of its public non-traded equity method investment in Sierra Income Corporation ("SIC" or "Sierra"), a related party, at NAV per share. Unrealized appreciation (depreciation) resulting from changes in NAV per share is reflected as a component of other investment loss, net on the Company's consolidated statements of operations. The carrying value of the Company's privately-held equity method investments is determined based on the amounts invested by the Company plus the equity in earnings or losses of the investee allocated based on the respective underlying agreements, less distributions received.

The Company evaluates its equity method investments for impairment whenever events or changes in circumstances indicate that the carrying amounts of such investments may not be recoverable. There were no impairment losses recorded during the years ended December 31, 2019, 2018 and 2017.

The Company's equity method investment in shares of Sierra were $6.4 million and $7.4 million as of December 31, 2019 and 2018, respectively. The remaining balance as of December 31, 2019 and 2018 relates primarily to the Company's investments in Medley Opportunity Fund II, LP ("MOF II"), Medley Opportunity Fund III LP ("MOF III"), Medley Opportunity Fund Offshore III LP ("MOF III Offshore") and Aspect-Medley Investment Platform B LP ("Aspect B").

For performance fees earned which represent a capital allocation to the general partner or investment manager, the Company accounts for them under the equity method of accounting. As of December 31, 2019 and 2018, the balance due to the Company for such performance fees was $0.9 million and $0.4 million, respectively. Revenues associated with these performance fees are classified as carried interest within investment income on the Company's consolidated statements of operations.

The entities in which the Company's investments are accounted for under the equity method are considered to be related parties.

***Investments in shares of MCC, at fair value***

Investments in shares of MCC were carried at fair value based upon the quoted market price on the exchange on which the shares are traded. As of December 31, 2018 and 2017, the Company held 7,756,938 shares of MCC. In October 2019, all of the shares were distributed to a former minority interest holder of the entity in which the shares were held as a result of the exercise of the former minority interest holder's put option right (Notes 11 and 16).

During the years ended December 31, 2019 and 2018, the Company recognized unrealized losses of $4.1 million and $19.9 million, respectively, which are included as a component of other income (expenses), net on the Company's consolidated statements of operations.

Prior to the adoption of ASU 2016-01 on January 1, 2018, the Company's investment in shares of MCC were classified as available-for-sale securities, with cumulative unrealized gains (losses) recorded in other comprehensive income (loss). During the year ended December 31, 2017, the Company recorded unrealized losses of $11.1 million, respectively, as a component of other comprehensive income.

***Investment Held at Cost Less Impairment***

The Company measures its investment in CK Pearl Fund, LP at cost less impairment, adjusted for observable price changes for an identical or similar investment of the same issuer as well as any distributions received during the period. The carrying amount of this investment was $0.2 million and $0.4 million as of December 31, 2019 and 2018, respectively. The Company performs a quantitative and qualitative assessment at each reporting date to determine whether the investment is impaired and an impairment loss equal to the difference between the carrying value and fair value is recorded within other income (expenses), net on the Company's consolidated statement of operations if an impairment has been determined. There were no impairment losses recorded during the years ended December 31, 2019 and 2017. During the year ended December 31, 2018, the Company recorded a $0.1 million impairment loss on its investment in CK Pearl, which is included as a component of other income (expense), net on the consolidated statements of operations.

***Investments of consolidated fund***

Medley measures the carrying value of investments held by its consolidated fund at fair value. As of December 31, 2019, investments held by the Company's consolidated fund consisted of $0.2 million of equity investments and $1.3 million of senior secured loans. As of December 31, 2018, investments of the consolidated fund consisted of $0.4 million of equity investments and $1.6 million of senior secured loans. Refer to Note 5, *Fair Value Measurements*, for additional information.

***Significant equity method investments***

In accordance with Rules 3-09 and 4-08(g) of Regulation S-X, the Company must assess whether any of its equity method investments are significant equity method investments. In evaluating the significance of these investments, the Company performed the income test, the investment test and the asset test described in S-X 3-05 and S-X 1-02(w). Rule 3-09 of Regulation S-X requires separate audited financial statements of an equity method investee in an annual report if either the income or investment test exceeds 20%. Rule 4-08(g) of Regulation S-X requires summarized financial information in an annual report if any of the three tests exceeds 10%, or 20% in the case of smaller reporting companies. Under the asset test, the Company's proportionate share of its equity method investees' aggregated assets exceeded the applicable threshold of 20% for smaller reporting companies, and the Company has determined to hold significant equity method investments and is required to provide summarized financial information for these investees for all periods presented in this Form 10-K. The Company believes that the financial captions below are the most meaningful given that the investees are investment companies.

The following table provides summarized balance sheet information for the Company's equity method investees, as of December 31, 2019 and 2018.

| | As of December 31, | | | |
|---|---|---|---|---|
| | **2019** | | **2018** | |
| **Balance Sheet Data** | | (in thousands) | | |
| Investments, at fair value | $ | 1,020,709 | $ | 1,417,176 |
| Cash | | 255,738 | | 97,889 |
| Other assets | | 37,139 | | 57,677 |
| Total assets | $ | 1,313,586 | $ | 1,572,742 |
| | | | | |
| Debt | $ | 338,988 | $ | 367,424 |
| Other liabilities | | 13,775 | | 20,686 |
| Total liabilities | | 352,763 | | 388,110 |
| | | | | |
| Net assets | $ | 960,823 | $ | 1,184,632 |

The following table provides summarized income statement information for the Company's equity method investees, for the years ended December 31, 2019, 2018 and 2017.

| | For the Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2019** | | **2018** | | **2017** | |
| **Summary of Operations** | | | (in thousands) | | | |
| Total revenues | $ | 110,877 | $ | 142,431 | $ | 162,386 |
| Total expenses | | 59,684 | | 64,339 | | 64,517 |
| Net realized and unrealized gain/(loss) on investments | | (104,228) | | (131,554) | | (89,508) |
| Net income (loss) | $ | (53,035) | $ | (53,462) | $ | 8,361 |

## 5. FAIR VALUE MEASUREMENTS

Fair value is the price that would be received from the sale of an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Where available, fair value is based on observable market prices or parameters, or derived from such prices or parameters. Where observable prices or inputs are not available, valuation models are applied. These valuation models involve some level of management estimation and judgment, the degree of which is dependent on the price transparency for the instruments or market and the instruments' complexity. The Company's fair value analysis includes an analysis of the value of any unfunded loan commitments. Financial investments recorded at fair value in these consolidated financial statements are categorized for disclosure purposes based upon the level of judgment associated with the inputs to the valuation of the investment as of the measurement date. Investments which are valued using NAV as a practical expedient are excluded from this hierarchy:

- *Level I* – Valuations based on quoted prices in active markets for identical assets or liabilities at the measurement date.

- *Level II* – Valuations based on inputs other than quoted prices in active markets included in Level I, which are either directly or indirectly observable at the measurement date. This category includes quoted prices for similar assets or liabilities in active markets, quoted prices for identical or similar assets or liabilities in non-active markets including actionable bids from third parties for privately held assets or liabilities, and observable inputs other than quoted prices such as yield curves and forward currency rates that are entered directly into valuation models to determine the value of derivatives or other assets or liabilities.

- *Level III* – Valuations based on inputs that are unobservable and where there is little, if any, market activity at the measurement date. The inputs for the determination of fair value may require significant management judgment or estimation and are based upon management's assessment of the assumptions that market participants would use in

Medley LLC
Notes to Consolidated Financial Statements

pricing the assets and liabilities. These investments include debt and equity investments in private companies or assets valued using the Market or Income Approach and may involve pricing models whose inputs require significant judgment or estimation because of the absence of any meaningful current market data for identical or similar investments. The inputs in these valuations may include, but are not limited to, capitalization and discount rates, beta and EBITDA multiples. The information may also include pricing information or broker quotes which include a disclaimer that the broker would not be held to such a price in an actual transaction. The non-binding nature of consensus pricing and/or quotes accompanied by disclaimer would result in classification as Level III information, assuming no additional corroborating evidence.

The following tables summarize the fair value hierarchy of the Company's financial assets and liabilities measured at fair value:

|  | As of December 31, 2019 | | | | | | | |
|  | Level I | | Level II | | Level III | | Total | |
|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | (in thousands) | | | | |
| Investments of consolidated fund | $ | 110 | $ | — | $ | 1,331 | $ | 1,441 |
| Total Assets | $ | 110 | $ | — | $ | 1,331 | $ | 1,441 |
| **Liabilities** | | | | | | | | |
| Due to DB Med Investors (Note 11) | $ | — | $ | — | $ | 1,750 | $ | 1,750 |
| Total Liabilities | $ | — | $ | — | $ | 1,750 | $ | 1,750 |

|  | As of December 31, 2018 | | | | | | | |
|  | Level I | | Level II | | Level III | | Total | |
|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | (in thousands) | | | | |
| Investments of consolidated fund | $ | 258 | $ | — | $ | 1,694 | $ | 1,952 |
| Investment in shares of MCC | | 20,633 | | — | | — | | 20,633 |
| Total Assets | $ | 20,891 | $ | — | $ | 1,694 | $ | 22,585 |

Included in investments of consolidated fund as of December 31, 2019 are Level I assets of $0.1 million in equity investments and Level III assets of $1.3 million, which consists of senior secured loans and equity investments. Included in investments of consolidated fund as of December 31, 2018 are Level I assets of $0.3 million in equity investments and Level III assets of $1.7 million, which consists of senior secured loans and preferred equity investments. The significant unobservable inputs used in the fair value measurement of Level III assets of the consolidated fund's investments in senior secured loans include market yields. Significant increases or decreases in market yields in isolation would result in a significantly higher or lower fair value measurement. There were no significant unrealized gains or losses related to the investments of consolidated fund for the years ended December 31, 2019, 2018 and 2017.

The following is a summary of changes in fair value of the Company's financial assets and liabilities that have been categorized within Level III of the fair value hierarchy:

| | Level III Financial Assets as of December 31, 2019 | | | | | | |
| | Balance at December 31, 2018 | Purchases | Transfers In or (Out) of Level III | Realized and Unrealized Depreciation | Sale of Level III Assets | | Balance at December 31, 2019 |
|---|---|---|---|---|---|---|---|
| | | | (in thousands) | | | | |
| Investments of consolidated fund | $ 1,694 | 539 | — | (125) | (777) | $ | 1,331 |

F- 23

| | Level III Financial Assets as of December 31, 2019 | | | | |
|---|---|---|---|---|---|
| | Balance at December 31, 2018 | Reclassification from Redeemable Non-controlling Interests | Payments | Realized and Unrealized Depreciation | Balance at December 31, 2019 |
| | | | (in thousands) | | |
| Due to DB Med Investors (Note 11) | $ — | 18,109 | (16,537) | 178 | $ 1,750 |

A review of the fair value hierarchy classifications is conducted on a quarterly basis. Changes in the observability of valuation inputs may result in a reclassification for certain financial assets or liabilities. Reclassifications impacting all levels of the fair value hierarchy are reported as transfers in or out of Level I, II or III category as of the beginning of the quarter during which the reclassifications occur. There were no transfers between levels in the fair value hierarchy during the year ended December 31, 2019.

When determining the fair value of publicly traded equity securities, the Company uses the quoted closing market price as of the valuation date on the primary market or exchange on which they trade. Our equity method investments for which fair value is measured at NAV per share, or its equivalent, using the practical expedient, are not categorized in the fair value hierarchy.

The Company's investments of consolidated fund are treated as investments at fair value and any realized and unrealized gains and losses from those investments are recorded through the Company's consolidated statements of operations. The Company's treatment is consistent with that of STRF, which is considered an investment company under ASC 946, *Financial Services - Investment Companies,* for standalone reporting purposes. The fair value of the Company's liability to DB Med Investors balance is derived from the net asset value of shares of STRF which is held by the Company as such shares will be distributed to DB Med Investors in satisfaction of the liability. Changes in unrealized losses related to the Company's due to DB Med Investors liability were all included in earnings. For the year ended December 31, 2019, there was no change in the fair value of the due to DB Med Investors liability resulting from instrument-specific credit risk.

## 6. LEASES

On January 1, 2019, the Company adopted ASC 842, *Leases,* under the modified retrospective method where any transition adjustments are recorded through a cumulative adjustment to retained earnings in the period of adoption. This new accounting standard requires a dual approach for lessee accounting whereby a lessee accounts for lease arrangements as either operating leases or finance leases. A lease is defined as a contract, or part of a contract, that conveys the right to control the use of identified property, plant or equipment for a period of time in exchange for consideration. The Company has elected the transition relief package of practical expedients permitted within ASC 842. Accordingly, the Company has not reassessed the classification of its existing leases as of the transition date, whether existing contracts at the transition date contain a lease, or whether unamortized initial direct costs before the transition adjustments would have met the definition of initial direct costs at lease commencement. The Company also applied practical expedients to not separate lease and non-lease components for all new leases as well as leases commencing before the effective date, if certain criteria are met, and does not record leases on its consolidated balance sheet with expected terms of twelve months or less. Upon adoption of ASC 842, the Company recognized $8.2 million of right-of-use assets

under operating leases and operating lease liabilities of $10.2 million.

Under ASC 842, at the inception of an arrangement, the Company determines whether the arrangement is or contains a lease based on the circumstances present. Leases with a term greater than one year are recognized on the balance sheet as right-of-use assets and lease liabilities. Lease liabilities and the corresponding right-of-use assets are recorded based on the present values of lease payments over the expected lease terms. The Company's expected lease terms may include options to extend or terminate the lease when it is reasonably certain that it will exercise that option. When determining if a renewal option is reasonably certain of being exercised, the Company considers several factors, including but not limited to, the significance of leasehold improvements incurred on the property, whether the asset is difficult to replace, or specific characteristics unique to the particular lease that would make it reasonably certain that the Company would exercise such option. The Company has concluded that renewal and early termination options are not reasonably certain of being exercised by the Company and thus not included in the calculation of its right-of-use assets and operating lease liabilities. The interest rate implicit in lease contracts is typically not readily determinable. As such, the Company utilizes the appropriate incremental borrowing rates, which are the rates that would be incurred to borrow on a collateralized basis, over similar terms, amounts equal to the lease payments in a similar economic environment. Variable payments that do not depend on a rate or index are not included in the lease liability and are recognized as incurred. If significant events, changes in circumstances, or other events indicate that the lease term or other inputs have changed, the Company would reassess lease classification, re-measure the lease liability by using revised inputs as of the reassessment date, and adjust the underlying right-of-use asset.

Substantially all of the Company's operating leases are comprised of its office space in New York City and San Francisco which expire at various times through September 2023. The Company does not have any contracts that would be classified as a finance lease or any operating leases that contain variable payments.

The components of lease cost and other information for the year ended December 31, 2019 are as follows (in thousands):

**Lease cost**

| | | |
|---|---|---|
| Operating lease costs | $ | 2,554 |
| Variable lease costs | | — |
| Sublease income | | (454) |
| Total lease cost | $ | 2,100 |

Supplemental balance sheet information related to leases as of December 31, 2019 are as follows:

| | |
|---|---|
| Weighted-average remaining lease term (in years) | 3.5 |
| Weighted-average discount rate | 8.2% |

Future payments for operating leases as of December 31, 2019 are as follows (in thousands):

| | | |
|---|---|---|
| 2020 | $ | 2,846 |
| 2021 | | 2,483 |
| 2022 | | 2,441 |
| 2023 | | 1,822 |
| Total future lease payments | | 9,592 |
| Less imputed interest | | (1,325) |
| Operating lease liabilities, as reported | $ | 8,267 |

For the years ended December 31, 2018 and 2017, rent expense amounted to $2.3 million and $2.4 million, respectively. There is no material difference between the amount of lease expense recognized under the new lease accounting standard versus the superseded lease accounting standard.

## 7. OTHER ASSETS

Other assets consist of the following:

| | As of December 31, | | |
| --- | --- | --- | --- |
| | **2019** | | **2018** |
| | (in thousands) | | |
| Fixed assets, net of accumulated depreciation and amortization of $3,847 and $3,446, respectively | $ | 2,564 | $ | 3,140 |
| Security deposits | | 1,975 | | 1,975 |
| Administrative fees receivable (Note 13) | | 1,073 | | 1,645 |
| Deferred tax assets, net (Note 14) | | — | | 3,144 |
| Due from affiliates (Note 13) | | 2,693 | | 2,215 |
| Prepaid expenses and income taxes | | 746 | | 761 |
| Other assets | | 676 | | 1,265 |
| Total other assets | $ | 9,727 | $ | 14,145 |

## 8. SENIOR UNSECURED DEBT

The carrying value of the Company's senior unsecured debt consist of the following:

| | As of December 31, | | |
| --- | --- | --- | --- |
| | **2019** | | **2018** |
| | (in thousands) | | |
| 2026 Notes, net of unamortized discount and debt issuance costs of $2,584 and $2,946, respectively | $ | 51,011 | $ | 50,649 |
| 2024 Notes, net of unamortized premium and debt issuance costs of $1,629 and $2,031 respectively | | 67,371 | | 66,969 |
| Total senior unsecured debt | $ | 118,382 | $ | 117,618 |

*2026 Notes*

On August 9, 2016 and October 18, 2016, the Company issued debt consisting of $53.6 million in aggregate principal amount of senior unsecured notes due 2026 at a stated coupon rate of 6.875% (the "2026 Notes"). The net proceeds from these offerings were used to pay down a portion of the Company's outstanding indebtedness under its Term Loan Facility. Interest is payable quarterly. The 2026 Notes are subject to redemption in whole or in part at any time or from time to time, at the option of the Company, on or after August 15, 2019 at a redemption price per security equal to 100% of the outstanding principal amount thereof plus accrued and unpaid interest payments. The 2026 notes were recorded net of discount and direct issuance costs of $3.8 million which are being amortized over the term of the notes using the effective interest rate method. The 2026 Notes are listed on the New York Stock Exchange and trade thereon under the trading symbol "MDLX." The fair value of the 2026 Notes based on their underlying quoted market price was $36.0 million as of December 31, 2019.

Interest expense on the 2026 Notes, including accretion of note discount and amortization of debt issuance costs, was $4.0 million for each of the years ended December 31, 2019, 2018 and 2017.

*2024 Notes*

On January 18, 2017 and February 22, 2017, the Company issued $69.0 million in aggregate principal amount of senior unsecured notes due 2024 at a stated coupon rate of 7.25% (the "2024 Notes"). The net proceeds from these offerings were used to pay down the remaining portion of the Company's outstanding indebtedness under its Term Loan Facility with the remaining to be used for general corporate purposes. Interest is payable quarterly and interest payments commenced on April 30, 2017. The 2024 Notes are subject to redemption in whole or in part at any time or from time to time, at the option of the Company, on or after January 30, 2020 at a redemption price per security equal to 100% of the outstanding principal amount thereof plus accrued and unpaid interest payments. The 2024 notes were recorded net of premium and direct issuance costs of $2.8 million which are being amortized over the term of the notes using the effective interest rate method. The 2024 Notes are listed on the New York Stock Exchange and trade thereon under the trading symbol "MDLQ." The fair value of the 2024 Notes based on their underlying quoted market price was $48.4 million as of December 31, 2019.

Interest expense on the 2024 Notes, including amortization of debt premium and debt issuance costs, was $5.4 million for each of the years ended December 31, 2019 and 2018, and was $4.9 million for the year ended December 31, 2017.

## 9. LOANS PAYABLE

Loans payable consist of the following:

| | As of December 31, | | | |
|---|---|---|---|---|
| | **2019** | | **2018** | |
| | (in thousands) | | | |
| Non-recourse promissory notes, net of unamortized discount of $108 at December 31, 2018 | $ | 10,000 | $ | 9,892 |
| Total loans payable | $ | 10,000 | $ | 9,892 |

### *Non-Recourse Promissory Notes*

In April 2012, the Company borrowed $10.0 million under two non-recourse promissory notes. Proceeds from the borrowings were used to purchase 1,108,033 shares of common stock of SIC, which were pledged as collateral for the obligations. Interest on the notes is paid monthly and is equal to the dividends received by the Company related to the pledged shares. The Company may prepay the notes in whole or in part at any time without penalty and the lenders may call the notes if certain conditions are met. The proceeds from the notes were recorded net of issuance costs of $3.8 million and were being accreted, using the effective interest method, over the original term of the non-recourse promissory notes. Total interest expense under these notes, including accretion of the notes discount, was $0.9 million for the year ended December 31, 2019, and $1.4 million for each of the years ended December 31, 2018 and 2017. The notes had an original maturity date of March 31, 2019. Through various amendments dated February 28, 2019, June 28, 2019 and December 8, 2019, the maturity date had been extended with the latest amendment extending the maturity date to March 31, 2020. In consideration for the June 28, 2019 amendment, the interest rate on these notes were increased by 1.0% per annum. The Company is currently in discussions with the lenders to extend the March 31, 2020 maturity date to June 30, 2020. The fair value of the outstanding balance of the notes was $10.0 million as of December 31, 2019 and 2018.

On January 31, 2019, the Company entered into a termination agreement with the lenders which will become effective upon the closing of the Company's pending merger with Sierra. In accordance with the provisions of the termination agreement, the Company will be required to pay the lenders $6.5 million on or prior to the merger closing date, reimburse the lenders for their out of pocket legal fees and enter into a new $6.5 million promissory note ("New Promissory Note"). The New Promissory Note will bear interest at LIBOR plus 7.0% and maturity will be six months after the merger closing date. Such consideration would be for the full satisfaction of the two aforementioned non-recourse promissory notes and related agreements, including the Company's revenue share payable, as further described in Note 12.

### *Credit Suisse Term Loan Facility*

On August 14, 2014, the Company entered into a $110.0 million senior secured term loan credit facility (as amended, "Term Loan Facility") with Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent thereunder, Credit Suisse Securities (USA) LLC, as bookrunner and lead arranger, and the lenders from time-to-time party thereto, which had an original maturity date of June 15, 2019. In February 2017, borrowings under this facility were paid off using the proceeds from the issuance of senior unsecured debt and the Term Loan Facility was terminated.

During the year ending December 31, 2017, interest expense under the Term Loan Facility, including accretion of the note discount and amortization of debt issuance costs were $1.5 million.

F- 27

*Contractual Maturities of Loans Payable*

As further described above, upon closing of the Company's pending merger with Sierra, the Company's two non-recourse promissory notes and revenue sharing arrangement would be settled for payment of $6.5 million on or prior to the merger closing date and delivery of the New Promissory Note. If the pending merger does not close, $10.0 million of future principal payments will be due, relating to loans payable, on March 31, 2020.

*CNB Credit Agreement*

On August 19, 2014, the Company entered into a $15.0 million senior secured revolving credit facility with City National Bank (as amended, the "Revolving Credit Facility"). The Company intended to use any proceeds from borrowings under the Revolving Credit Facility for general corporate purposes, including funding of its working capital needs. Borrowings under the Revolving Credit Facility bore interest, at the option of the Company, either (i) at an Alternate Base Rate, as defined, plus an applicable margin not to exceed 0.25% or (ii) at an Adjusted LIBOR plus an applicable margin not to exceed 2.5%.

The Revolving Credit Facility also contained financial covenants, customary negative covenants and other customary events of default, including defaults based on events of bankruptcy and insolvency, dissolution, nonpayment of principal, interest or fees when due, breach of specified covenants, change in control and material inaccuracy of representations and warranties.

Effective May 13, 2019, the Company terminated the Revolving Credit Facility. There were no early termination penalties incurred by the Company. For the each of the years ended December 31, 2019, 2018 and 2017, amortization of deferred issuance costs associated with the Revolving Credit Facility were $0.1 million.

## 10. DUE TO FORMER MINORITY INTEREST HOLDER

This balance consists of the following:

| | As of December 31, | | | |
|---|---|---|---|---|
| | **2019** | | **2018** | |
| | (in thousands) | | | |
| Due to former minority interest holder, net of unamortized discount of $1,480 and $2,598, respectively | $ | 8,145 | $ | 11,402 |
| Total due to former minority interest holder | $ | 8,145 | $ | 11,402 |

In January 2016, the Company executed an amendment to SIC Advisors' operating agreement which provided the Company with the right to redeem membership units owned by the minority interest holder, Strategic Capital Advisory Services, LLC. The Company's redemption right was triggered by the termination of the dealer manager agreement between Sierra and SC Distributors LLC ("DMA Termination"), an affiliate of the minority interest holder. As a result of this redemption feature, the Company reclassified the non-controlling interest in SIC Advisors from the equity section of its consolidated balance sheet to redeemable non-controlling interests in the mezzanine section of its consolidated balance sheet based on its fair value as of the amendment date. On July 31, 2018, a DMA Termination event occurred and, as a result, the Company reclassified the redeemable non-controlling interest in SIC Advisors from redeemable non-controlling interests in the mezzanine section of its consolidated balance sheet to due to former minority interest holder, a component of total liabilities on the Company's consolidated balance sheet, based on its fair value as of that date.

In December 2018, the Company entered into a Letter Agreement with Strategic Capital Advisory Services, LLC, whereby consideration of $14.0 million was agreed upon for the satisfaction in full of all amounts owed by the Company under the LLC Agreement. The amount due will be paid in sixteen equal installments through August 5, 2022. The Company evaluated this agreement under ASC 470-50, *Debt - Modifications and Extinguishment*, to determine if modification or extinguishment treatment was necessary. After performing this analysis, the Company determined modification treatment was appropriate and a new effective interest rate was established on the modification date.

As of December 31, 2019 future payments due to the former minority interest holder are as follows (in thousands):

| | | |
|---|---|---|
| 2020 | $ | 3,500 |
| 2021 | | 3,500 |
| 2022 | | 2,625 |
| Total future payments | $ | 9,625 |

**Medley LLC**
**Notes to Condensed Consolidated Financial Statements (unaudited)**

The amount due is payable in quarterly installments over a four year period, beginning in January 2019. For the years ended December 31, 2019 and 2018, the amortization of the discount of $2.8 million was $1.1 million and less than $0.1 million, respectively, and is included as a component of interest expense on the Company's consolidated statements of operations.

F- 29

## 11. ACCOUNTS PAYABLE, ACCRUED EXPENSES AND OTHER LIABILITIES

Accounts payable, accrued expenses and other liabilities consist of the following:

| | As of December 31, | | |
|---|---|---|---|
| | **2019** | | **2018** |
| | (in thousands) | | |
| Accrued compensation and benefits | $ | 6,161 | $ | 7,438 |
| Due to affiliates (Note 13) | | 7,212 | | 7,635 |
| Revenue share payable (Note 12) | | 2,316 | | 2,976 |
| Accrued interest | | 1,294 | | 1,294 |
| Professional fees | | 1,481 | | 2,594 |
| Deferred rent | | — | | 2,035 |
| Deferred tax liabilities (Note 14) | | — | | 60 |
| Due to DB Med Investors, at fair value | | 1,750 | | — |
| Accounts payable and other accrued expenses | | 1,672 | | 2,412 |
| Total accounts payable, accrued expenses and other liabilities | $ | 21,886 | $ | 26,444 |

On June 3, 2016, the Company entered into a Master Investment Agreement with DB MED Investor I LLC and DB MED Investor II LLC ("DB Med Investors") to invest in new and existing Medley managed funds (the "Joint Venture"). Under the Master Investment Agreement, as amended (the "MIA"), DB Med Investors have the right upon the occurrence of certain events (the "Put Option Trigger Event") to redeem their interests in the Joint Venture. In October 2019, a Put Option Trigger Event had occurred. On October 22, 2019, Medley LLC, Medley Seed Funding I LLC ("Seed Funding I") and Medley Seed Funding II LLC ("Seed Funding II") received notice from DB Med Investors that they exercised their put option right under the MIA. In connection with the exercise of DB Med Investors put option right, the Company reclassified the Joint Venture's minority interest balance from redeemable non-controlling interests in the mezzanine section of its consolidated balance sheet (Note 16) to due to DB Med Investors, at fair value, a component of accounts payable, accrued expenses and other liabilities, at its then fair value of $18.1 million. In addition, the Company elected to subsequently remeasure the liability under ASC 825, Financial Instruments, with changes recorded through earnings. Management elected the fair value option to measure this liability as the liability will ultimately be settled by delivering assets of the Medley Seed Funding entities which are measured at their fair value on the company's consolidated balance sheets. The net change in fair value during the year ended December 31, 2019 was $0.2 million and is included as a component of other (expenses) income, net on the Company's consolidated statement of operations.

In accordance with its obligations under the MIA, on October 25, 2019 and October 28, 2019, Seed Funding I distributed to DB Med Investors all of its assets, including the 7,756,938 shares of MCC, which had an aggregate fair value on the date of transfer of $16.5 million, and cash of less than $0.1 million. Seed Funding II expects to distribute to DB Med Investors all of its assets, including cash of less than $0.1 million and approximately 82,121 shares held by Seed Investor II in Sierra Total Return Fund by March 31, 2020.

## 12. COMMITMENTS AND CONTINGENCIES

### *Operating Leases*

Refer to Note 6 to these consolidated financial statements.

### *Consolidation of Business Activities*

During the first quarter of 2018, the Company initiated the consolidation of its business activities to its New York office. The Company believes this will enhance operations by consolidating origination, underwriting and asset management operations and personnel in a single location. During the year ended December 30, 2018, the Company recorded $2.7 million in severance costs and a $0.2 million loss from subleasing its San Francisco office space.

### *Capital Commitments to Funds*

As of December 31, 2019 and 2018, the Company had aggregate unfunded commitments of $0.3 million to certain long-dated private funds.

Medley LLC
Notes to Condensed Consolidated Financial Statements (unaudited)

*Other Commitments*

In April 2012, the Company entered into an obligation to pay to a third party a fixed percentage of management and incentive fees received by the Company from Sierra. The agreement was entered into contemporaneously with the $10.0 million non-recourse promissory notes that were issued to the same parties (Note 9). The two transactions were deemed to be related freestanding contracts and the $10.0 million of loan proceeds were allocated to the contracts using their relative fair value. At inception, the Company recognized an obligation of $4.4 million representing the present value of the future cash flows expected to be paid under this agreement. As of December 31, 2019 and 2018, this obligation amounted to $2.3 million and $3.0 million, respectively, and is recorded as revenue share payable, a component of accounts payable, accrued expenses and other liabilities on the Company's consolidated balance sheets. The change in the estimated cash flows for this obligation is recorded in other expenses, net on the Company's consolidated statements of operations.

On January 31, 2019, the Company entered into a termination agreement with the lenders which would become effective upon the closing of the Company's pending merger with Sierra. In accordance with the provisions of the termination agreement, the Company would pay the lenders $6.5 million on or prior to the merger closing date, reimburse the lenders for their out of pocket legal fees and enter into a six month $6.5 million promissory note. The promissory note would bear interest at seven percentage points over the LIBOR Rate, as defined in the termination agreement. Such consideration would be for the full satisfaction of the two non-recourse promissory notes disclosed in Note 9 as well as the Company's revenue share obligation described above.

*Legal Proceedings*

From time to time, the Company is involved in various legal proceedings, lawsuits and claims incidental to the conduct of its business. Its business is also subject to extensive regulation, which may result in regulatory proceedings against it. Except as described below, the Company is not currently party to any material legal proceedings.

One of the Company's subsidiaries, MCC Advisors LLC, was named as a defendant in a lawsuit on May 29, 2015, by Moshe Barkat and Modern VideoFilm Holdings, LLC ("MVF Holdings") against MCC, MOF II, MCC Advisors LLC, Deloitte Transactions and Business Analytics LLP A/K/A Deloitte ERG ("Deloitte"), Scott Avila ("Avila"), Charles Sweet, and Modern VideoFilm, Inc. ("MVF"). The lawsuit is pending in the California Superior Court, Los Angeles County, Central District, as Case No. BC 583437. The lawsuit was filed after MCC, as agent for the lender group, exercised remedies following a series of defaults by MVF and MVF Holdings on a secured loan with an outstanding balance at the time in excess of $65 million. The lawsuit sought damages in excess of $100 million. Deloitte and Avila have settled the claims against them in exchange for payment of $1.5 million. On June 6, 2016, the court granted the Medley defendants' demurrers on several counts and dismissed Mr. Barkat's claims with prejudice except with respect to his claim for intentional interference with contract. On March 18, 2018, the court granted the Medley defendants' motion for summary adjudication with respect to Mr. Barkat's sole remaining claim against the Medley Defendants for intentional interference. Now that the trial court has ruled in favor of the Medley defendants on all counts, the only remaining claims in the Barkat litigation are MCC and MOF II's affirmative counterclaims against Mr. Barkat and MVF Holdings, which MCC and MOF II are diligently prosecuting.

On August 29, 2016, MVF Holdings filed another lawsuit in the California Superior Court, Los Angeles County, Central District, as Case No. BC 631888 (the "Derivative Action"), naming MCC Advisors LLC and certain of Medley's employees as defendants, among others. The plaintiff in the Derivative Action, asserts claims against the defendants for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, unfair competition, breach of the implied covenant of good faith and fair dealing, interference with prospective economic advantage, fraud, and declaratory relief. MCC Advisors LLC and the other defendants believe the causes of action asserted in the Derivative Action are without merit and all defendants intend to continue to assert a vigorous defense. A trial has been set for May 19, 2020.

Medley LLC, Medley Capital Corporation, Medley Opportunity Fund II LP, Medley Management, Inc., Medley Group, LLC, Brook Taube, and Seth Taube were named as defendants, along with other various parties, in a putative class action lawsuit captioned as Royce Solomon, Jodi Belleci, Michael Littlejohn, and Giulianna Lomaglio v. American Web Loan, Inc., AWL, Inc., Mark Curry, MacFarlane Group, Inc., Sol Partners, Medley Opportunity Fund, II, LP, Medley LLC, Medley Capital Corporation, Medley Management, Inc., Medley Group, LLC, Brook Taube, Seth Taube, DHI Computing Service, Inc., Middlemarch Partners, and John Does 1-100, filed on December 15, 2017, amended on March 9, 2018, and amended a second time on February 15, 2019, in the United States District Court for the Eastern District of Virginia, Newport News Division, as Case No. 4:17-cv-145 (hereinafter, "Class Action 1"). Medley Opportunity Fund II LP and Medley Capital Corporation were also named as defendants, along with various other parties, in a putative class action lawsuit captioned George Hengle and Lula Williams v. Mark Curry, American Web Loan, Inc., AWL, Inc., Red Stone, Inc., Medley Opportunity Fund II LP, and Medley Capital Corporation, filed February 13, 2018, in the United States District Court, Eastern District of Virginia, Richmond Division, as Case No. 3:18-cv-100 ("Class Action 2"). Medley Opportunity Fund II LP and Medley Capital Corporation were also named as defendants, along with various other parties, in a putative class action lawsuit captioned John Glatt, Sonji Grandy, Heather Ball, Dashawn Hunter, and Michael Corona v. Mark

F- 31

Curry, American Web Loan, Inc., AWL, Inc., Red Stone, Inc., Medley Opportunity Fund II LP, and Medley Capital Corporation, filed August 9, 2018 in the United States District Court, Eastern District of Virginia, Newport News Division, as Case No. 4:18-cv-101 ("Class Action 3") (together with Class Action 1 and Class Action 2, the "Virginia Class Actions"). Medley Opportunity Fund II LP was also named as a defendant, along with various other parties, in a putative class action lawsuit captioned Christina Williams and Michael Stermel v. Red Stone, Inc. (as successor in interest to MacFarlane Group, Inc.), Medley Opportunity Fund II LP, Mark Curry, Brian McGowan, Vincent Ney, and John Doe entities and individuals, filed June 29, 2018 and amended July 26, 2018, in the United States District Court for the Eastern District of Pennsylvania, as Case No. 2:18-cv-2747 (the "Pennsylvania Class Action") (together with the Virginia Class Actions, the "Class Action Complaints"). The plaintiffs in the Class Action Complaints filed their putative class actions alleging claims under the Racketeer Influenced and Corrupt Organizations Act, and various other claims arising out of the alleged payday lending activities of American Web Loan. The claims against Medley Opportunity Fund II LP, Medley LLC, Medley Capital Corporation, Medley Management, Inc., Medley Group, LLC, Brook Taube, and Seth Taube (in Class Action 1, as amended); Medley Opportunity Fund II LP and Medley Capital Corporation (in Class Action 2 and Class Action 3); and Medley Opportunity Fund II LP (in the Pennsylvania Class Action), allege that those defendants in each respective action exercised control over, or improperly derived income from, and/or obtained an improper interest in, American Web Loan's payday lending activities as a result of a loan to American Web Loan. The loan was made by Medley Opportunity Fund II LP in 2011. American Web Loan repaid the loan from Medley Opportunity Fund II LP in full in February of 2015, more than 1 year and 10 months prior to any of the loans allegedly made by American Web Loan to the alleged class plaintiff representatives in Class Action 1. In Class Action 2, the alleged class plaintiff representatives have not alleged when they received any loans from American Web Loan. In Class Action 3, the alleged class plaintiff representatives claim to have received loans from American Web Loan at various times from February 2015 through April 2018. In the Pennsylvania Class Action, the alleged class plaintiff representatives claim to have received loans from American Web Loan in 2017. By orders dated August 7, 2018 and September 17, 2018, the Court presiding over the Virginia Class Actions consolidated those cases for all purposes. On October 12, 2018, Plaintiffs in Class Action 3 filed a notice of voluntary dismissal of all claims, and on October 29, 2018, Plaintiffs in Class Action 2 filed a notice of voluntary dismissal of all claims. Medley LLC, Medley Capital Corporation, Medley Management, Inc., Medley Group, LLC, Brook Taube, and Seth Taube never made any loans or provided financing to, or had any other relationship with, American Web Loan. Medley Opportunity Fund II LP, Medley LLC, Medley Capital Corporation, Medley Management, Inc., Medley Group, LLC, Brook Taube, Seth Taube are seeking indemnification from American Web Loan, various affiliates, and other parties with respect to the claims in the Class Action Complaints. Medley Opportunity Fund II LP, Medley LLC, Medley Capital Corporation, Medley Management, Inc., Medley Group, LLC, Brook Taube, and Seth Taube believe the alleged claims in the Class Action Complaints are without merit and they intend to defend these lawsuits vigorously.

On January 25, 2019, two purported class actions were commenced in the Supreme Court of the State of New York, County of New York, by alleged stockholders of Medley Capital Corporation, captioned, respectively, Helene Lax v. Brook Taube, et al., Index No. 650503/2019, and Richard Dicristino, et al. v. Brook Taube, et al., Index No. 650510/2019 (together with the Lax Action, the "New York Actions"). Named as defendants in each complaint are Brook Taube, Seth Taube, Jeffrey Tonkel, Arthur S. Ainsberg, Karin Hirtler-Garvey, John E. Mack, Mark Lerdal, Richard T. Allorto, Jr., Medley Capital Corporation, Medley Management Inc., Sierra Income Corporation, and Sierra Management, Inc. The complaints in each of the New York Actions allege that the individuals named as defendants breached their fiduciary duties in connection with the proposed merger of MCC with and into Sierra, and that the other defendants aided and abetted those alleged breaches of fiduciary duties. Compensatory damages in unspecified amounts were sought. On December 20, 2019, the Delaware court entered an Order and Final Judgment approving the settlement of the Delaware Action (defined below). The release in the Delaware Action also operate to release the claims asserted in the New York Actions. The attorneys for the plaintiffs in New York Action have informed the Court that they reserve the right to seek an award of attorneys' fees on account of their purported contributions to the settlement of the Delaware Action, which the defendants reserve the right to oppose.

On February 11, 2019, a purported stockholder class action was commenced in the Court of Chancery of the State of Delaware (the "Delaware Court of Chancery") by FrontFour Capital Group LLC and FrontFour Master Fund, Ltd. (together, "FrontFour"), captioned FrontFour Capital Group LLC, et al. v. Brook Taube, et al., Case No. 2019-0100 (the "Delaware Action"), against defendants Brook Taube, Seth Taube, Jeff Tonkel, Mark Lerdal, Karin Hirtler-Garvey, John E. Mack, Arthur S. Ainsberg, MDLY, Sierra, MCC, MCC Advisors LLC ("MCC Advisors"), Medley Group LLC, and Medley LLC. The complaint, as amended on February 12, 2019, alleged that the individuals named as defendants breached their fiduciary duties to MCC's stockholders in connection with the "MCC Merger", and that MDLY, Sierra, MCC Advisors, Medley Group LLC, and Medley LLC aided and abetted those alleged breaches of fiduciary duties. The complaint sought to enjoin the vote of MCC's stockholders on the proposed merger and enjoin enforcement of certain provisions of the MCC Merger Agreement.

The Delaware Court of Chancery held a trial on the plaintiffs' motion for a preliminary injunction and issued a Memorandum Opinion (the "Decision") on March 11, 2019. The Delaware Court of Chancery denied the plaintiffs' requests to (i) permanently enjoin the proposed merger and (ii) require MCC to conduct a "shopping process" for MCC on terms proposed by the plaintiffs

in their complaint. The Delaware Court of Chancery held that MCC's directors breached their fiduciary duties in entering into the proposed merger, but rejected the plaintiffs' claim that Sierra aided and abetted those breaches of fiduciary duties. The Delaware Court of Chancery ordered the defendants to issue corrective disclosures consistent with the Decision, and enjoined a vote of MCC's stockholders on the proposed merger until such disclosures had been made and stockholders had the opportunity to assimilate this information.

On March 20, 2019, another purported stockholder class action was commenced by Stephen Altman against Brook Taube, Seth Taube, Jeff Tonkel, Arthur S. Ainsberg, Karin Hirtler-Garvey, Mark Lerdal, and John E. Mack in the Delaware Court of Chancery, captioned Altman v. Taube, Case No. 2019-0219 (the "Altman Action"). The complaint alleged that the defendants breached their fiduciary duties to stockholders of MCC in connection with the vote on the proposed mergers. On April 8, 2019, the Delaware Court of Chancery granted a stipulation consolidating the Delaware Action and the Altman Action, designating the amended complaint in the Delaware Action as the operative complaint, and designating the plaintiffs in the Delaware Action and their counsel the lead plaintiffs and lead plaintiffs' counsel, respectively.

On December 20, 2019, the Delaware Court of Chancery entered an Order and Final Judgment approving the settlement of the Delaware Action (the "Settlement"). Pursuant to the Settlement, the Company agreed to certain amendments to (i) the MCC Merger Agreement and (ii) the MDLY Merger Agreement, which amendments are reflected in the Amended MCC Merger Agreement and the Amended MDLY Merger Agreement. The Settlement also provides for, if the MCC Merger is consummated, the creation of a settlement fund, consisting of $17 million in cash and $30 million of Sierra's common stock, with the number of shares of Sierra's common stock to be calculated using the pro forma net asset value of $6.37 per share as of June 30, 2019, which will be distributed to eligible members of the Settlement Class (as defined in the Settlement). In addition, in connection with the Settlement, on July 29, 2019, MCC entered into a Governance Agreement with FrontFour Capital Group LLC, FrontFour Master Fund, Ltd., FrontFour Capital Corp., FrontFour Opportunity Fund, David A. Lorber, Stephen E. Loukas and Zachary R. George, pursuant to which, among other matters, FrontFour is subject to customary standstill restrictions and required to vote in favor of the amended MCC Merger Agreement. . The Settlement also provides for mutual releases between and among FrontFour and the Settlement Class, on the one hand, and the Medley Parties, on the other hand, of all claims that were or could have been asserted in the Delaware Action through September 26, 2019.

The Delaware Court of Chancery also awarded attorney's fees as follows: (i) an award of $3,000,000 to lead plaintiffs' counsel and $75,000 to counsel to plaintiff Stephen Altman (the "Therapeutics Fee Award") and $420,334.97 of plaintiff counsel expenses payable to the lead plaintiff's counsel, which were paid by MCC on December 23, 2019, and (ii) an award that is contingent upon the closing of the proposed merger transactions (the "Contingent Fee Award"), consisting of:

a.  $100,000 for the agreement by Sierra's board of directors to appoint one independent director of MCC who will be selected by the independent director of Sierra on the board of directors of the post-merger company upon the closing of the mergers; and

b.  the amount calculated by solving for A in the following formula:

$Award[A]=(Monetary\ Fund[M]+Award[A]-Look\ Through[L])*Percentage[P]$

Whereas

A    shall be the amount of the Additional Fee (excluding the $100,000 award for the agreement by the Sierra board of directors to appoint one independent director of MCC who will be selected by the independent director of Sierra on the board of directors of the post-merger company upon the closing of the Mergers);

M    shall be the sum of (i) the $17 million cash component of the Settlement Fund and (ii) the value of the post-merger company stock component of the Settlement Fund, which shall be calculated as the product of the VPS (as defined below) and 4,709,576.14 (the number of shares of post-merger company's stock comprising the stock component of the net settlement amount);

L    shall be the amount representing the estimated value of the decrease in shares to be received by eligible class members arising by operation of the change in the "Exchange Ratio" under the Amended MCC Merger Agreement, calculated as follows:

$L = ((ES * 68\%) - (ES * 66\%)) * VPS$

Where:

ES    shall be the number of eligible shares;

F- 33

**Medley LLC**
Notes to Condensed Consolidated Financial Statements (unaudited)

| | |
|---|---|
| VPS | shall be the pro forma net asset value per share of the post-merger company's common stock as of the closing as reported in the public disclosure filed nearest in time and after the closing (the "Closing NAV Disclosure"); and |
| P | shall equal 0.26 |

The Contingent Fee Award is contingent upon the closing of the MCC Merger. Payment of the Contingent Fee Award will be made in two stages. First, within five (5) business days of the establishment of the Settlement Fund, MCC or its successor shall (i) pay the plaintiffs' counsel an estimate of the Contingent Fee Award (the "Additional Fee Estimate"), less twenty (20) percent (the "Additional Fee Estimate Payment"), and (ii) deposit the remaining twenty (20) percent of the Additional Fee Estimate into escrow (the "Escrowed Fee"). For purposes of calculating such estimate, MCC or its successor shall use the formula set above, except that VPS shall equal the pro forma net asset value of the post-merger company's common stock as reported in the public disclosure filed nearest in time and prior to the closing (the "Closing NAV Estimate").

Second, within five (5) business days of the Closing NAV Disclosure (as defined in the Order and Final Judgment), (i) if the Additional Fee is greater than the Additional Fee Estimate Payment, an amount of the Escrowed Fee shall be released to plaintiffs' counsel such that the total payments made to plaintiffs' counsel equal the Additional Fee and the remainder of the Escrowed Fee, if any, shall be released to MCC or its successor, (ii) if the Additional Fee is less than the Additional Fee Estimate Payment, plaintiffs' counsel shall return to MCC or its successor the difference between the Additional Fee Estimate and the Additional Fee and the Escrowed Fee shall be released to MCC or its successor, or (iii) if the Additional Fee is equal to the Additional Fee Estimate Payment, the Escrowed Fee shall be released to MCC or its successor.

On January 17, 2020, MCC and Sierra filed a notice of appeal with the Delaware Supreme Court from those provisions of the Order and Final Judgment with respect to the Contingent Fee Award.

On March 1, 2019, Marilyn Adler, a former employee who served as a Managing Director of Medley Capital LLC, filed suit in the New York Supreme Court, Commercial Part, against Medley Capital LLC, MCC Advisors, Medley SBIC GP, LLC, MMC, the Company, as well as Brook Taube, and Seth Taube, individually. The action is captioned in Marilyn S. Adler v. Medley Capital LLC et al. (Supreme Court of New York, March 2019). In her complaint, Ms. Adler alleged that she was due in excess of $6.5 million in compensation based upon her role with Medley's SBIC Fund. Her claims were for breach of contract, unjust enrichment, conversion, tortious interference, as well as a claim for an accounting of funds maintained by the defendants. The Company denied the allegations and asserted counterclaims against Ms. Adler for breach of contract and breach of fiduciary duties. In response to the Company's motion to dismiss the breach of contract claim, Ms. Adler has conceded there was no written contract.

After Medley filed its counterclaims, on February 7, 2020, the parties reached a settlement, exchanged mutual releases and dismissed the Adler litigation with prejudice. Medley did not make any payment to or for the benefit of Adler whatsoever in connection with the settlement. In connection with the settlement, Medley released Adler from certain obligations under a Confidentiality, Non-Interference, and Invention Assignment Agreement between Adler and Medley and Adler paid Medley an undisclosed amount

While management currently believes that the ultimate outcome of these proceedings will not have a material adverse effect on the Company's consolidated financial position or overall trends in consolidated results of operations, litigation is subject to inherent uncertainties. The Company reviews relevant information with respect to litigation and regulatory matters on a quarterly and annual basis. The Company establishes liabilities for litigation and regulatory actions when it is probable that a loss has been incurred and the amount of the loss can be reasonably estimated. For matters where a loss is believed to be reasonably possible, but not probable, no liability is established.

***Employment Agreements***

In connection with the MDLY Merger, certain pre-IPO owners entered into employment agreements that would become effective upon the closing date of the MDLY Merger (the "Effective Date"). Each employment agreement sets forth a base salary, which is subject to change at the discretion of the board of directors or compensation committee of the Combined Company or the Sierra/MDLY Company, as applicable. The employment agreements provide for an initial term of 24 months (or 30 months in the case of the Chief Executive Officer) following the Effective Date. Upon effectiveness of the employment agreements, the combined initial base salaries of the pre-IPO members would be $2.5 million. Under the employment agreements, each pre-IPO owner is eligible to receive each year a short-term incentive paid in cash and a long-term incentive in the form of an equity award, each paid after the end of the year. Each employment agreement provides that the board of directors or compensation committee of the Combined Company or the Sierra/MDLY Company, as applicable, will establish a target annual bonus for each year of no less than a specified percentage of each pre-IPO owner's base salary and will establish performance and other objectives for the

year for such annual bonus, in consultation with the management of the Combined Company or the Sierra/MDLY Company, as applicable. No annual bonuses would be earned unless such pre-IPO owner remains employed through the date of payment.

The employment agreements also set forth a dollar amount of annual bonuses for 2019, payable in 2020, that the board of directors or the compensation committee of the Combined Company or the Sierra/MDLY Company, as applicable may increase in recognition of performance in excess of performance objectives. As of December 31, 2019, the Company did not accrue for any bonuses to any pre-IPO members as the 2019 bonus amounts provided that the employment agreements are not effective until the closing of the MDLY Merger. As of December 31, 2019 there were no amounts due under these employment agreements as the MDLY Merger had not closed rendering these contracts not effective.

The long-term equity incentive will be made in the form of a restricted stock unit award, vesting in three annual installments on December 31, 2020, December 31, 2021 and December 31, 2022. The cash and equity award portions of the annual bonuses paid under the employment agreements will be subject to recoupment by the Combined Company or the Sierra/MDLY Company, as applicable, to the extent required by applicable law (including without limitation Section 304 of the Sarbanes-Oxley Act and Section 954 of the Dodd-Frank Act) and/or the rules and regulations of the NYSE.

## 13. RELATED PARTY TRANSACTIONS

Substantially all of Medley's revenue is earned through agreements with its non-consolidated funds for which it collects management and performance fees for providing asset management, advisory and other related services.

*Administration Agreements*

In January 2011 and April 2012, Medley entered into administration agreements with MCC (the "MCC Admin Agreement") and Sierra (the "SIC Admin Agreement"), respectively, whereby, as part of its performance obligation to provide asset management, advisory and other related services, Medley agreed to provide administrative services necessary for the operations of MCC and Sierra. MCC and Sierra agreed to pay Medley for the costs and expenses incurred in providing such administrative services, including an allocable portion of Medley's overhead expenses and an allocable portion of the cost of MCC and Sierra's officers and their respective staff.

Additionally, Medley has entered into administration agreements with other entities that it manages (the "Funds Admin Agreements"), whereby Medley agreed to provide administrative services necessary for the operations of these entities. These entities agreed to reimburse Medley for the costs and expenses incurred in providing such administrative services, including an

allocable portion of Medley's overhead expenses and an allocable portion of the cost of these other vehicles' officers and their respective staffs.

Medley records these administrative fees as revenue in the period when the performance obligation of providing such administrative services is satisfied and such revenue is included as a component of other revenues and fees on the consolidated statements of operations. Amounts due from these agreements are included as a component of other assets on the Company's consolidated balance sheets.

Total revenues recorded under these agreements for the years ended December 31, 2019, 2018 and 2017 are reflected in the table below.

| | For the Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2019** | | **2018** | | **2017** | |
| | | | (in thousands) | | | |
| MCC Admin Agreement | $ | 2,830 | $ | 3,382 | $ | 3,799 |
| SIC Admin Agreement | | 2,516 | | 2,538 | | 3,031 |
| Fund Admin Agreements | | 979 | | 976 | | 1,264 |
| Total administrative fees from related parties | $ | 6,325 | $ | 6,896 | $ | 8,094 |

Amounts due from related parties under these agreements are reflected in the table below.

| | As of December 31, | | | |
|---|---|---|---|---|
| | **2019** | | **2018** | |
| | | (in thousands) | | |
| Amounts due from MCC under the MCC Admin Agreement | $ | 444 | $ | 804 |
| Amounts due from SIC under the SIC Admin Agreement | | 382 | | 619 |
| Amounts due from entities under the Fund Admin Agreements | | 247 | | 222 |
| Total administrative fees receivable | $ | 1,073 | $ | 1,645 |

*Reimbursement Agreement*

In connection with the amended and restated limited liability agreement of Medley LLC, Medley LLC agreed to, at the sole discretion of the managing member, reimburse Medley Management Inc. for all expenses incurred, other than expenses incurred in connection with its income tax obligations. From time to time, the company may also advance funds to Medley Management Inc. to cover its operating needs. For the three years ended December 31, 2019, 2018 and 2017, the Company recorded reimbursable expenses of $6.6 million, $3.9 million and $1.9 million, respectively, which were recorded as a component of general, administrative and other expenses on the Company's consolidated statements of operations. As of December 31, 2019 and 2018, amounts due from Medley Management Inc. were $0.9 million and $0.8 million, respectively.

*Organization Agreement*

Pursuant to the organization agreement between Medley Management Inc. and Medley LLC, Medley Management Inc. may from time to time make grants of restricted stock units or other awards providing the holder with the contractual right to receive cash payments pursuant to an equity plan to employees, advisors or other persons, as defined, in respect of Medley LLC and its subsidiaries. These awards may entitle the holder thereof to receive dividends paid with respect to the shares of Class A common stock underlying such awards as if such holder were a holder of record of the underlying shares of Class A common stock. Medley LLC has agreed that it assumes any obligation to pay such dividend equivalent amounts to the holders of the respective awards. Additionally, pursuant to this agreement, the number of LLC Units held by Medley Management Inc., shall, at all times, equal the number of shares of Class A common stock outstanding

*Management fee Waiver*

During the first quarter of 2018, the Company voluntarily waived $0.4 million in management fees for MCC. There were no other management fee waivers during the years ended December 31, 2019, 2018 and 2017.

*Investments*

Refer to Note 4, *Investments,* for information related to the Company's investments in related parties.

*Exchange Agreement*

Prior to the completion of the Company's IPO, Medley LLC's limited liability agreement was restated among other things, to modify its capital structure by reclassifying the interests held by its then existing owners (i.e. the members of Medley prior to the IPO) into the LLC Units. Medley's existing owners also entered into an exchange agreement under which they (or certain permitted transferees thereof) have the right (subject to the terms of the exchange agreement as described therein), to exchange their LLC Units for shares of Medley Management Inc.'s Class A common stock on a one-for-one basis at fair value, subject to customary conversion rate adjustments for stock splits, stock dividends and reclassifications.

## 14. INCOME TAXES

The Company is treated as a partnership for income tax purposes and is therefore not subject to U.S. federal, state and local income taxes. The Company is subject to New York City unincorporated business tax attributable to the Company's taxable income apportioned to New York City. The provision for (benefit from) income taxes consist of the following

|  | For the Years Ending December 31, | | | | | |
|---|---|---|---|---|---|---|
|  | **2019** | | **2018** | | **2017** | |
| Current tax provision | $ | 35 | $ | 862 | $ | 681 |
| Deferred tax provision |  | 3,524 |  | (1,162) |  | (85) |
| **Provision for (benefit from) income taxes** | $ | 3,559 | $ | (300) | $ | 596 |

Deferred income taxes reflect the net effect of temporary differences between the tax basis of an asset or liability and its reported amount on the Company's consolidated balance sheets. These temporary differences result in taxable or deductible amounts in future years. The significant components of the Company's deferred tax assets and liabilities included on its consolidated balance sheet are as follows:

|  | As of December 31, | | | |
|---|---|---|---|---|
|  | **2019** | | **2018** | |
| **Deferred tax assets** | (in thousands) | | | |
| Tax goodwill | $ | 1,488 | $ | 565 |
| New York City unincorporated business tax |  | 1,177 |  | 1,234 |
| Unrealized losses |  | 145 |  | 581 |
| Stock-based compensation |  | 197 |  | 216 |
| Interest expense carryforward |  | 453 |  | 223 |
| Pending merger related costs |  | 188 |  | 101 |
| Other items |  | 148 |  | 224 |
| Gross deferred tax assets | $ | 3,796 | $ | 3,144 |
|  |  |  |  |  |
| **Deferred tax liability** |  |  |  |  |
| Accrued fee income | $ | 33   247 | $ | — |
| Other items |  | 78 |  | 60 |
| Gros deferred tax liabilities |  | 111 |  | 60 |
| Less deferred tax valuation allowance | $ | (3,685) |  | — |
| Net deferred tax asset | $ | — | $ | 3,084 |

During the year ended December 31, 2019, the Company recorded a deferred tax asset of $0.4 million in connection with its acquisition of a minority interest holder's ownership interests in a consolidated subsidiary which occurred on December 31, 2018. The establishment of this deferred tax asset was recorded through an adjustment of $0.4 million to members deficit. After

evaluating the quantitative and qualitative aspects of the adjustment, the Company concluded that its 2018 financial statements were not materially misstated and adjusted for the amount during the fourth quarter of 2019.

Due to the uncertain nature of the ultimate realization of its net deferred tax assets, the Company has established a full valuation allowance, as of December 31, 2019, against the benefits of its deferred tax assets and will recognize these benefits only as reassessment demonstrates they are realizable. Ultimate realization is dependent upon several factors, among which is future earnings and reversing temporary differences. While the need for this valuation allowance is subject to periodic review, if the allowance is reduced, the tax benefits of the net deferred tax assets will be recorded in future operations as a reduction of the Company's income tax expense.

A reconciliation of the federal statutory tax rate to the effective tax rates for the years ended December 31, 2019, 2018 and 2017 are as follows:

|  | For the For the Year Ending December 31, | | |
| --- | --- | --- | --- |
|  | **2019** | **2018** | **2017** |
| Federal statutory rate | 21.0 % | 21.0 % | 34.0 % |
| Rate benefit from U.S. partnership operations | (21.0)% | (21.0)% | (34.0)% |
| Partnership unincorporated business tax | 1.0 % | 1.4 % | 3.1 % |
| Valuation allowance | (30.5)% | — % | — % |
| Effective tax rate | (29.5)% | 1.4 % | 3.1 % |

Interest expense and penalties related to income tax matters are recognized as a component of the provision for income taxes and were not significant during the years ended December 31, 2019, 2018 and 2017. As of and during the years ended December 31, 2019, 2018 and 2017, there were no uncertain tax positions taken that were not more likely than not to be sustained. The primary jurisdictions in which the Company operates in are the United States, New York, New York City, and California.

## 15. COMPENSATION EXPENSE

Compensation generally includes salaries, bonuses, equity and profit sharing awards. Bonuses, equity and profit sharing awards are accrued over the service period to which they relate. Guaranteed payments made to the Company's senior professionals who are members of Medley LLC are recognized as compensation expense. The guaranteed payments to the Company's Co-Chief Executive Officers are performance based and are periodically set subject to maximums based on the Company's total assets under management. Such maximums aggregated to $5.0 million for each of the years ended December 31, 2019, 2018 and 2017. During the years ended December 31, 2019, 2018 and 2017, neither of the Company's Co-Chief Executive Officers received any guaranteed payments.

*Performance Fee Compensation*

In October 2010 and January 2014, the Company granted shares of vested profit interests in certain subsidiaries to select employees. These awards are viewed as a profit-sharing arrangement and are accounted for under ASC 710,Compensation - General, which requires compensation expense to be recognized over the vesting period, which is usually the period over which service is provided. The shares were vested at grant date, subject to a divestiture percentage based on percentage of service completed from the award grant date to the employee's termination date. The Company adjusts the related liability quarterly based on changes in estimated cash flows for the profit interests.

In February 2015 and March 2016, the Company granted incentive cash bonus awards to select employees. These awards entitle employees to receive cash compensation based on distributed carried interest received by the Company from certain institutional funds. Eligibility to receive payments pursuant to these incentive awards is based on continued employment and ceases automatically upon termination of employment. Performance compensation expense is recorded based on the fair value of the incentive awards at the date of grant and is recognized on a straight-line basis over the expected requisite service period. The performance compensation liability is subject to re-measurement at the end of each reporting period and any changes in the liability are recognized in such reporting period.

On November 12, 2018, the Company's board of directors approved the Medley Tactical Opportunities Carried Interest Allocation Plan (the "CI Plan"), pursuant to which certain key employees involved in and instrumental to the success of the Company's Tactical Opportunities transactions, were awarded interests in certain subsidiaries that were formed for the object and purpose of receiving carried interest earned on third party capital in connection with each of the Company's four respective Tactical Opportunities funds. Interests awarded under this plan are viewed as equity awards and are accounted for under ASC 718,Compensation-Stock Compensation, which requires compensation expense to be recognized over the vesting period, which is usually the period over which service is provided. Once vested the equity awards are than accounted for as non-controlling interests in consolidated subsidiaries on the Company's consolidated financial statements.The fair value of the awards on the date of grant was determined to be $0.6 million and was immediately recognized as performance compensation as the awards were fully vested when issued.

Total performance fee compensation expense relating to the profit sharing and equity awards for the years ended December 31, 2018 and 2017 was $0.5 million and $(0.9) million, respectively. There was no performance fee compensation for the year ended December 31, 2019 nor was there any performance fee compensation payable as of December 31, 2019 and 2018.

*Retirement Plan*

The Company sponsors a defined-contribution 401(k) retirement plan that covers all employees. Employees are eligible to participate in the plan immediately, and participants are 100% vested from the date of eligibility. The Company makes contributions to the plan of 3% of an employee's eligible wages, up to a maximum limit as determined by the Internal Revenue Service. The Company also pays all administrative fees related to the plan. During the years ended December 31, 2019, 2018 and 2017 the Company's accrued contributions to the plan were $0.4 million, $0.5 million and $0.5 million, respectively. As of December 31, 2019 and 2018 the Company's outstanding liability to the plan was $0.4 million and $0.5 million, respectively.

*Stock-Based Compensation*

In connection with the IPO of Medley Management Inc., Medley Management Inc. and Medley LLC adopted the Medley Management Inc. 2014 Omnibus Incentive Plan, as amended from time from time, (the "Plan"). The purpose of the Plan is to provide a means through which the Company may attract and retain key personnel and to provide a means whereby directors, officers, employees, consultants and advisors(and prospective directors, officers, employees, consultants and advisors) of the Company can acquire and maintain an equity interest in the Company, Medley Management Inc., or be paid incentive compensation, including incentive compensation measured by reference to the value of Medley Management Inc.'s Class A common stock or Medley LLC's unit interests, thereby strengthening their commitment to the welfare of the Company and aligning their interests with those of the Medley Management Inc.'s stockholders. The Plan provides for the issuance of incentive stock options, non-qualified stock options, stock appreciation rights,restricted stock, restricted stock units ("RSUs"), restricted LLC Units, stock bonuses, other stock-based awards and cash awards. As the grant of these awards are primarily for the benefit of the employees of Medley LLC, stock compensation is recognized in Medley LLC's separate consolidated financial statements through a corresponding credit to members' equity (deficit), representing a capital contribution by Medley Management Inc. Stock-based compensation was $7.2 million, $5.4 million, and $2.8 million for the years ended December 31, 2019, 2018 and 2017, respectively.

## 16. REDEEMABLE NON-CONTROLLING INTERESTS

Changes in redeemable non-controlling interests during the years ended December 31, 2019, 2018 and 2017 are reflected in the table below.

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2019 | 2018 | 2017 |
| | (in thousands) | | |
| Beginning balance | $ 23,186 | $ 53,741 | 30,805 |
| Net loss attributable to redeemable non-controlling interests in consolidated subsidiaries | (4,275) | (11,362) | 6,702 |
| Contributions | — | — | 23,000 |
| Distributions | (2,362) | (5,953) | (6,738) |
| Change in fair value of available-for-sale securities | — | — | (28) |
| Fair value adjustment to redeemable non-controlling interests | 812 | (965) | — |
| Reclassification of redeemable non-controlling interest in SIC Advisors LLC, including fair value adjustment of $965, to accounts payable, accrued expenses and other liabilities | — | (12,275) | — |
| Reclassification of redeemable non-controlling interest in the Joint Venture, including fair value adjustment of $812, to accounts payable, accrued expenses and other liabilities | (18,109) | — | — |
| Ending balance | $ (748) | $ 23,186 | $ 53,741 |

In January 2016, the Company executed an amendment to SIC Advisors' operating agreement which provided the Company with the right to redeem membership units owned by the minority interest holder. The Company's redemption right is triggered by the termination of the dealer manager agreement between Sierra and SC Distributors LLC ("DMA Termination"), an affiliate of the minority interest holder. As a result of this redemption feature, the Company reclassified the non-controlling interest in SIC Advisors from the equity section to redeemable non-controlling interests in the mezzanine section of the consolidated balance sheet based on its fair value as of the amendment date. The fair value of the non-controlling interest was determined to be $12.2 million on the amendment date and was adjusted through a charge to members' deficit.

On July 31, 2018, a DMA Termination event occurred and the membership units held by the minority interest holder were redeemed by Medley. In connection with the DMA Termination, the Company reclassified SIC Advisors' minority interest balance from redeemable non-controlling interests in the mezzanine section of its consolidated balance sheet to due to former minority interest holder (Note 10), a component of total liabilities, at its then fair value. The fair value of the non-controlling interest was determined to be $12.3 million on the DMA Termination date and was adjusted through a $1.0 million charge to members' deficit.

During the year ended December 31, 2018, profits allocated to this non-controlling interest were $2.1 million and distributions paid were $2.3 million. During the year ended December 31, 2017, profits allocated to this non-controlling interest were$4.4 million and distributions paid were $4.3 million. There were no profits or distributions allocated to this non-controlling interest subsequent the Company's redemption of the membership units held by the former minority interest holder. As of December 31, 2019 and 2018, there was no balance of redeemable non-controlling interests in SIC Advisors.

On June 3, 2016, the Company entered into a Master Investment Agreement with DB MED Investor I LLC and DB MED Investor II LLC ('DB Med Investors'') to invest up to $50.0 million in new and existing Medley managed funds (the ''Joint Venture''). The Company agreed to contribute up to $10.0 million and an interest in STRF Advisors LLC, the investment advisor to Sierra Total Return Fund, in exchange for common equity interests in the Joint Venture. On June 6, 2017, the Company entered into an amendment to its Master Investment Agreement with the Investors, which provided for, among other things, an increase in the Company's capital contribution to up to $13.8 million and extended the term of the Joint Venture from seven to ten years. DB Med Investors agreed to invest up to $40.0 million in exchange for preferred equity interests in the Joint Venture. Total contributions to the Joint Venture amounted to $53.8 million and were used to purchase $51.8 million of MCC shares on the open market and seed fund $2.0 million to STRF. On account of the preferred interests, DB Med Investors was entitled to receive an 8% preferred distribution, 15% of the Joint Venture's profits, and all of the profits from the contributed interest in STRF Advisors LLC. The Company could make a capital contribution to fund the 8% preferred distribution but was limited to one contribution in any rolling twelve month period without the prior written consent of DB Med Investors. Medley had the option, subject to certain conditions, to cause the Joint Venture to redeem the DB Med Investors' interests in exchange for repayment of the outstanding investment amount at the time of redemption, plus certain other considerations. DB Med Investors had the right, after ten years, to redeem their interests in the Joint Venture.

DB Med Investors also had the right upon the occurrence of certain events (the "Put Option Trigger Event") to redeem their interests in the Joint Venture. Upon a Put Option Trigger Event DB Med Investors have the right to exercise a put option in which they would be entitled to put their preferred interests back to the Joint Venture. The Joint Venture can satisfy the put in cash or in kind in an amount equal to the amount necessary to satisfy the Fund Share Interest Redemption Price, as defined.

In July 2019, the Company made a capital contribution of $0.7 million to cover the 8% preferred distribution which was paid to the Investors. In October 2019, the Joint Venture did not make the 8% preferred distribution resulting in a Put Option Trigger Event. On October 22, 2019, Medley LLC, Medley Seed Funding I LLC ("Seed Funding I"), Medley Seed Funding II LLC ("Seed Funding II"), and Medley Seed Funding III LLC ("Seed Funding III") received notice from DB Med Investors that they exercised their put option rights under the amended Master Investment Agreement (the "Agreement"). In connection with the exercise of DB Med Investors put option right, the Company reclassified the Joint Venture's minority interest balance from redeemable non-controlling interests in the mezzanine section of its consolidated balance sheet to due to DB Med Investors (Note 11), a component of accounts payable, accrued expenses and other liabilities, at its then fair value. The fair value of the non-controlling interest was determined to be $18.1 million on the date of the exercise of DB Med Investors put option right. The difference between fair value of the non-controlling interest and its carrying value of $0.8 million and was recorded as a reduction to members' deficit.

As of December 31, 2018, DB Med Investors' interest in the Joint Venture was $23.9 million and is included as a component of redeemable non-controlling interests on the Company's consolidated balance sheets. During the years ended December 31, 2019 and 2018, losses allocated to this non-controlling interest were $4.2 million and $13.1 million, respectively. During the year ended December 31, 2017, profits allocated to this non-controlling interest was $2.7 million. During the years ended December 31, 2019, 2018 and 2017, distributions paid were $2.4 million, $3.7 million and $2.4 million, respectively.

In October 2016, the Company executed an operating agreement for STRF Advisors LLC which provided the Company with the right to redeem membership units owned by the minority interest holder. The Company's redemption right is triggered by the

termination of the dealer manager agreement between STRF and SC Distributors LLC, an affiliate of the minority interest holder. As a result of this redemption feature, the non-controlling interest in STRF Advisors LLC is classified as a component of redeemable non-controlling interests in the mezzanine section of the balance sheet. During years ended December 31, 2019, 2018 and 2017, net losses allocated to this redeemable non-controlling interest were $0.1 million, $0.3 million and $0.4 million, respectively. As of December 31, 2019 and 2018, the balance of the redeemable non-controlling interest in STRF Advisors LLC was $(0.7) million for each of the years then ended.

## 17. MARKET AND OTHER RISK FACTORS

Due to the nature of the Medley funds' investment strategy, their portfolio of investments has significant market and credit risk. As a result, the Company is subject to market and other risk factors, including, but not limited to the following:

### Market Risk

The market price of investments may significantly fluctuate during the period of investment. Investments may decline in value due to factors affecting securities markets generally or particular industries represented in the securities markets. The value of an investment may decline due to general market conditions that are not specifically related to such investment, such as real or perceived adverse economic conditions, changes in the general outlook for corporate earnings, changes in interest or currency rates or adverse investor sentiment generally. They may also decline due to factors that affect a particular industry or industries, such as labor shortages or increased production costs and competitive conditions within an industry.

### Credit Risk

There are no restrictions on the credit quality of the investments the Company intends to make. Investments may be deemed by nationally recognized rating agencies to have substantial vulnerability to default in payment of interest and/or principal. Some investments may have low-quality ratings or be unrated. Lower rated and unrated investments have major risk exposure to adverse conditions and are considered to be predominantly speculative. Generally, such investments offer a higher return potential than higher rated investments, but involve greater volatility of price and greater risk of loss of income and principal.

In general, the ratings of nationally recognized rating organizations represent the opinions of agencies as to the quality of the securities they rate. Such ratings, however, are relative and subjective; they are not absolute standards of quality and do not

Medley LLC
Notes to Condensed Consolidated Financial Statements (unaudited)

evaluate the market value risk of the relevant securities. It is also possible that a rating agency might not change its rating of a particular issue on a timely basis to reflect subsequent events. The Company may use these ratings as initial criteria for the selection of portfolio assets for the Company but is not required to utilize them.

*Limited Liquidity of Investments*

The funds managed by the Company invest and intend to continue to invest in investments that may not be readily marketable. Illiquid investments may trade at a discount from comparable, more liquid investments and, at times there may be no market at all for such investments. Subordinate investments may be less marketable, or in some instances illiquid, because of the absence of registration under federal securities laws, contractual restrictions on transfer, the small size of the market or the small size of the issue (relative to issues of comparable interests). As a result, the funds managed by the Company may encounter difficulty in selling its investments or may, if required to liquidate investments to satisfy redemption requests of its investors or debt service obligations, be compelled to sell such investments at less than fair value.

*Counterparty Risk*

Some of the markets in which the Company, on behalf of its underlying funds, may affect its transactions are "over-the-counter" or "interdealer" markets. The participants in such markets are typically not subject to credit evaluation and regulatory oversight, unlike members of exchange-based markets. This exposes the Company to the risk that a counterparty will not settle a transaction in accordance with its terms and conditions because of a dispute over the terms of the applicable contract (whether or not such dispute is bona fide) or because of a credit or liquidity problem, causing the Company to suffer loss. Such "counterparty risk" is accentuated for contracts with longer maturities where events may intervene to prevent settlement, or where the Company has concentrated its transactions with a single or small group of counterparties.

## 18. QUARTERLY FINANCIAL DATA (UNAUDITED)

The Company's condensed consolidated unaudited quarterly results of operations for 2019 and 2018 are as follows:

| | For the Three Months Ended | | | |
| --- | --- | --- | --- | --- |
| | December 31, 2019 | September 30, 2019 | June 30, 2019 | March 31, 2019 |
| | (Amounts in thousands) | | | |
| Revenues | $ 10,654 | $ 11,536 | $ 12,882 | $ 13,769 |
| Expenses | 11,279 | 12,493 | 11,064 | 11,275 |
| Other (expenses) income, net | (6,445) | (924) | (8,666) | 1,245 |
| (Loss) income before income taxes | (7,070) | (1,881) | (6,848) | 3,739 |
| Net (loss) income | (10,699) | (1,853) | (6,815) | 3,748 |
| Net (loss) income attributable to redeemable non-controlling interests and non-controlling interests in consolidated subsidiaries | (3,836) | 1,619 | (5,674) | 4,195 |
| **Net (loss) income attributable to Medley LLC** | $ (6,863) | $ (3,472) | $ (1,141) | $ (447) |

| | For the Three Months Ended | | | |
| | December 31, 2018 | September 30, 2018 | June 30, 2018 | March 31, 2018 |
|---|---|---|---|---|
| | (Amounts in thousands) | | | |
| Revenues | $ 12,565 | $ 14,397 | $ 15,151 | $ 14,396 |
| Expenses | 14,058 | 12,485 | 11,649 | 12,840 |
| Other (expenses) income, net | (10,928) | 956 | (5,766) | (11,007) |
| (Loss) income before income taxes | (12,421) | 2,868 | (2,264) | (9,451) |
| Net (loss) income | (12,031) | 2,676 | (2,292) | (9,321) |
| Net (loss) income attributable to redeemable non-controlling interests and non-controlling interests in consolidated subsidiaries | (7,971) | 3,866 | (2,464) | (4,514) |
| **Net (loss) income attributable to Medley LLC** | $ (4,061) | $ (1,190) | $ 172 | $ (4,807) |

## 19. SUBSEQUENT EVENTS

Management has evaluated subsequent events through the date of issuance of the consolidated financial statements included herein. There have been no subsequent events that occurred during such period that would require disclosure in this Form 10-K or would be required to be recognized in the condensed consolidated financial statements as of and for the year ended December 31, 2019, except as disclosed below.

In connection with the exercise of DB Med Investors put option right in October 2019, as further discussed in Notes 11 and 16 to these consolidated financial statements, STRF had filed an application with the Securities and Exchange Commission ("SEC") on December 26, 2019, and an amendment on February 24, 2020, requesting an order under section 8(f) of the Investment Company Act of 1940 (the "Act") declaring that it has ceased to be an investment company. On March 25, 2020, the SEC ordered, under the Act, that STRF's application registration under the Act shall forthwith cease to be in effect. In connection with this deregistration, the Company will transfer the shares of STRF and remaining of cash of less than $0.1 million held by Seed Funding II LLC to DB Investors in full satisfaction of the liability due to DB Med Investors (Note 11), which is expected to place before March 31, 2020. As a result of the transfer the shares of STRF to DB Med Investors, the Company will no longer consolidate STRF in its consolidated financial statements.

As a result of the spread of the COVID-19 coronavirus, economic uncertainties have arisen which may have a negative impact on the Company's operations. Other financial impacts could occur though such potential impacts (and the possible nature and extent thereof) are unknown at this time.

**Item 9.    Changes and Disagreements with Accountants on Accounting and Financial Disclosure**

None.

**Item 9A.    Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

We maintain disclosure controls and procedures (as that term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) that are designed to ensure that information required to be disclosed in our reports under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our co-principal executive officers and principal financial officer, as appropriate, to allow timely decisions regarding required disclosures. The design of any disclosure controls and procedures is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions. Any controls and procedures, no matter how well designed and operated, can provide only reasonable, not absolute, assurance of achieving the desired control objectives. Our management, with the participation of our Co-Chief Executive Officers and our Chief Financial Officer, has evaluated the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report. Based upon that evaluation, and subject to the foregoing, our Co-Chief Executive Officers and our Chief Financial Officer have concluded that, as of the end of the period covered by this report, the design and operation of our disclosure controls and procedures were effective to accomplish their objectives at the reasonable assurance level.

**Changes in Internal Control over Financial Reporting**

There have been no changes in our internal control over financial reporting (as that term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the quarter ended December 31, 2019, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Management's Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over our financial reporting. Our internal control over financial reporting is designed to provide reasonable assurances regarding the reliability of financial reporting and the preparation of our consolidated financial statements in accordance with U.S. generally accepted accounting principles.

Our internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with U.S. generally accepted accounting principles, and that receipts and expenditures are being made only in accordance with authorizations of our management and directors; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because either conditions change or the degree of compliance with our policies and procedures may deteriorate.

Our management has assessed the effectiveness of our internal control over financial reporting as of December 31, 2019. In making this assessment, management used the framework set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control-Integrated Framework (2013). Based on this assessment, our management concluded that our internal control over financial reporting was effective as of December 31, 2019.

**PART III.**

**Item 10.    Directors, Executive Officers and Corporate Governance**

The information required by this Item is incorporated by reference to Medley Management Inc.'s definitive Proxy Statement for its 2020 Annual Meeting of Stockholders to be filed with the SEC within 120 days after the end of the fiscal year ended December 31, 2019.

**Item 11.    Executive Compensation**

The information required by this Item is incorporated by reference to Medley Management Inc.'s definitive Proxy Statement for its 2020 Annual Meeting of Stockholders to be filed with the SEC within 120 days after the end of the fiscal year ended December 31, 2019.

**Item 12.    Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

The information required by this Item is incorporated by reference to Medley Management Inc.'s definitive Proxy Statement for its 2020 Annual Meeting of Stockholders to be filed with the SEC within 120 days after the end of the fiscal year ended December 31, 2019.

**Item 13.    Certain Relationships and Related Transactions, and Director Independence**

The information required by this Item is incorporated by reference to Medley Management Inc.'s definitive Proxy Statement for its 2020 Annual Meeting of Stockholders to be filed with the SEC within 120 days after the end of the fiscal year ended December 31, 2019.

**Item 14.    Principal Accounting Fees and Services**

The information required by this Item is incorporated by reference to Medley Management Inc.'s definitive Proxy Statement for its 2020 Annual Meeting of Stockholders to be filed with the SEC within 120 days after the end of the fiscal year ended December 31, 2019.

**PART IV.**

**Item 15.    Exhibits**

| Exhibit No. | Exhibit Description |
|---|---|
| 2.1 | Agreement and Plan of Merger, dated as of August 9, 2018, by and among Medley Management Inc., Sierra Income Corporation and Sierra Management, Inc. (incorporated by reference to Exhibit 2.1 to the Registrant's Current Report on Form 8-K (File No. 001-36638) filed on August 15, 2018). |
| 2.2 | Amended and Restated Agreement and Plan of Merger, dated as of July 29, 2019, by and among Medley Management Inc., Sierra Income Corporation and Sierra Management, Inc. (incorporated by reference to Exhibit 2.1 to Medley Management Inc.'s Current Report on Form 8-K (File No. 001-36638) filed on August 2, 2019). |
| 3.1 | Amended and Restated Certificate of Incorporation of Medley Management Inc. (incorporated by reference to Exhibit 3.1 to the Registrant's Current Report on Form 8-K (File No. 001-36638) filed on September 29, 2014). |
| 3.2 | Amended and Restated By-Laws of Medley Management Inc. (incorporated by reference to Exhibit 3.2 to the Registrant's Current Report on Form 8-K (File No. 001-36638) filed on September 29, 2014). |
| 4.1 | Indenture, dated August 9, 2016, between Medley LLC and U.S. Bank National Association, as trustee (incorporated by reference to Exhibit 4.1 of Medley LLC's Current Report on Form 8-K (File No. 333-212514) filed on August 10, 2016). |
| 4.2 | First Supplemental Indenture, dated August 9, 2016, between Medley LLC and U.S. Bank National Association, as trustee, including the form of note attached as an exhibit thereto (incorporated by reference to Exhibit 4.2 of Medley LLC's Current Report on Form 8-K (File 333-212514) filed on August 10, 2016). |

| 4.3 | Second Supplemental Indenture dated as of October 18, 2016, between Medley LLC and U.S. Bank National Association, as Trustee, with the form of note included therein (incorporated by reference to Exhibit 4.1 of Medley LLC's Current Report on Form 8-K (File No. 001-37857) filed on October 19, 2016). |
|---|---|
| 4.4 | Third Supplemental Indenture, dated January 18, 2017, between Medley LLC and U.S. Bank National Association, as trustee, including the form of note attached as an exhibit thereto (incorporated by reference to Exhibit 4.1 of Medley LLC's Current Report on Form 8-K (File No. 001-37857) filed on January 20, 2017). |
| 4.5 | Fourth Supplemental Indenture, dated February 22, 2017, between Medley LLC and U.S. Bank National Association, as trustee, including the form of note attached as an exhibit thereto (incorporated by reference to Exhibit 4.1 of Medley LLC's Current Report on Form 8-K (File No. 001-37857) filed on February 22, 2017). |
| 10.1 | Fourth Amended and Restated Limited Liability Company Agreement of Medley LLC, dated as of September 23, 2014 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K (File No. 001-36638) filed on September 29, 2014). |
| 10.2 | Exchange Agreement, dated as of September 23, 2014, among Medley Management Inc., Medley LLC and the holders of LLC Units from time to time party thereto (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K (File No. 001-36638) filed on September 29, 2014). |
| 10.3 | Tax Receivable Agreement, dated as of September 23, 2014, by and among Medley Management Inc. and each of the other persons from time to time party thereto (incorporated by reference to Exhibit 10.3 to the Registrant's Current Report on Form 8-K (File No. 001-36638) filed on September 29, 2014). |
| 10.4 | Registration Rights Agreement, dated as of September 23, 2014, by and among Medley Management Inc. and the Covered Persons from time to time party thereto (incorporated by reference to Exhibit 10.4 to the Registrant's Current Report on Form 8-K (File No. 001-36638) filed on September 29, 2014). |
| 10.5 | Credit Agreement, dated as of August 14, 2014, among Medley LLC, the lenders party thereto and Credit Suisse AG, Cayman Islands Branch (incorporated by reference to Exhibit 10.10 to the Registrant's Registration Statement on Form S-1 (File No. 333-198212) filed on August 18, 2014). |
| 10.6 | Credit Agreement, dated as of August 19, 2014, among Medley LLC, the lenders party thereto and City National Bank (incorporated by reference to Exhibit 10.11 to the Registrant's Registration Statement on Form S-1/A (File No. 333-198212) filed on September 3, 2014). |
| 10.7 | Guarantee and Collateral Agreement, dated as of August 19, 2014, among Medley LLC, the subsidiary guarantors party thereto and City National Bank (incorporated by reference to Exhibit 10.12 to the Registrant's Registration Statement on Form S-1/A (File No. 333-198212) filed on September 3, 2014). |
| 10.8† | Medley Management Inc. 2014 Omnibus Incentive Plan (incorporated by reference to Exhibit 10.5 to the Registrant's Current Report on Form 8-K (File No. 001-36638) filed on September 29, 2014). |
| 10.9† | Form of Employee Restricted Stock Unit Award Agreement (incorporated by reference to Exhibit 10.5.2 to the Registrant's Registration Statement on Form S-1/A (File No. 333-198212) filed on September 3, 2014). |
| 10.10† | Form of Director Restricted Stock Unit Award Agreement (incorporated by reference to Exhibit 10.5.3 to the Registrant's Registration Statement on Form S-1/A (File No. 333-198212) filed on September 3, 2014). |
| 10.11† | Medley LLC Unit Award Agreement to Jeffrey Tonkel, dated as of January 7, 2013 (incorporated by reference to Exhibit 10.6 to the Registrant's Registration Statement on Form S-1 (File No. 333-198212) filed on August 18, 2014). |
| 10.12† | Amendment to Medley LLC Unit Award Agreement to Jeffrey Tonkel, dated as of May 29, 2014 (incorporated by reference to Exhibit 10.7 to the Registrant's Registration Statement on Form S-1 (File No. 333-198212) filed on August 18, 2014). |
| 10.13† | Medley LLC Unit Award Agreement to Richard Allorto, dated as of January 7, 2013 (incorporated by reference to Exhibit 10.8 to the Registrant's Registration Statement on Form S-1 (File No. 333-198212) filed on August 18, 2014). |
| 10.14† | Amendment to Medley LLC Unit Award Agreement to Richard Allorto, dated as of May 29, 2014 (incorporated by reference to Exhibit 10.9 to the Registrant's Registration Statement on Form S-1 (File No. 333-198212) filed on August 18, 2014). |
| 10.15† | Second Amendment to Award Agreement of Jeffrey Tonkel, dated September 23, 2014 (incorporated by reference to Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q (File No. 001-36638) filed on May 14, 2015). |

10.16†    Second Amendment to Award Agreement of Richard T. Allorto, Jr., dated September 23, 2014 (incorporated by reference to Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q (File No. 001-36638) filed on May 14, 2015).

10.17†    Award Agreement of John D. Fredericks, dated June 1, 2013 (incorporated by reference to Exhibit 10.3 to the Registrant's Quarterly Report on Form 10-Q (File No. 001-36638) filed on May 14, 2015).

10.18†    Amendment to Award Agreement of John D. Fredericks, dated May 29, 2014 (incorporated by reference to Exhibit 10.4 to the Registrant's Quarterly Report on Form 10-Q (File No. 001-36638) filed on May 14, 2015).

10.19†    Second Amendment to Award Agreement of John D. Fredericks, dated September 23, 2014 (incorporated by reference to Exhibit 10.5 to the Registrant's Quarterly Report on Form 10-Q (File No. 001-36638) filed on May 14, 2015).

10.20†    Form of Restrictive Covenant Agreement (incorporated by reference to Exhibit 10.6 to the Registrant's Quarterly Report on Form 10-Q (File No. 001-36638) filed on May 14, 2015).

10.21†    Letter Agreement, dated October 27, 2010, with Messrs. Brook and Seth Taube (incorporated by reference to Exhibit 10.7 to the Registrant's Quarterly Report on Form 10-Q (File No. 001-36638) filed on May 14, 2015).

10.22†    Form of Letter Agreement, dated March 17, 2016, entered into with John D. Fredericks and Richard T. Allorto, Jr. (incorporated by reference to Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q (File No. 001-36638) filed on May 12, 2016).

10.23    Master Investment Agreement, dated as of June 3, 2016, among Medley LLC, Medley Seed Funding I LLC, Medley Seed Funding II LLC, Medley Seed Funding III LLC, DB MED Investor I LLC and DB MED Investor II LLC (incorporated by reference to Exhibit 10.11 to Medley LLC's Amendment No. 1 to Form S-1 (File No. 333-212514) filed on July 28, 2016).

10.24    First Amendment dated as of May 3, 2016 to the Credit Agreement, dated as of August 14, 2014, among Medley LLC, the lenders party thereto and Credit Suisse AG, Cayman Islands Branch (incorporated by reference to Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q (File No. 001-36638) filed on August 11, 2016).

10.25     Amendment Number One and Consent dated as of August 12, 2015 to the Credit Agreement, dated as of August 19, 2014, among Medley LLC, the lenders party thereto and City National Bank (incorporated by reference to Exhibit 10.3 to the Registrant's Quarterly Report on Form 10-Q (File No. 001-36638) filed on August 11, 2016).

10.26    Amendment Number Two dated as of May 3, 2016 to the Credit Agreement, dated as of August 19, 2014, among Medley LLC, the lenders party thereto and City National Bank. (incorporated by reference to Exhibit 10.4 to the Registrant's Quarterly Report on Form 10-Q (File No. 001-36638) filed on August 11, 2016

10.27†    Form of Class A Medley LLC Unit Award Agreement, as amended (incorporated by reference to Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q (File No. 001-36638) filed on May 12, 2017).

10.28    Amendment dated as of June 6, 2017, to Master Investment Agreement, dated as of June 3, 2016, among Medley LLC, Medley Seed Funding I LLC, Medley Seed Funding II LLC, Medley Seed Funding III LLC, DB MED Investor I LLC and DB MED Investor II LLC (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K (File No. 001-36638) filed on June 12, 2017).

10.29    Amendment Number Three to Credit Agreement, dated as of September 22, 2017, by and among the lenders identified on the signatures pages thereto, City National Bank and Medley LLC (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K (File No. 001-36638) filed on September 27, 2017).

10.30†    Form of Award Letter for the Medley Tactical Opportunities Carried Interest Allocation Plan (incorporated by reference to Exhibit 10.30 to the Registrant's Annual Report on Form 10-K (File No. 001-36638) filed on April 1, 2019).

10.31†    Form of Amended and Restated Limited Liability Company Agreement for the plan LLCs associated with the Medley Tactical Opportunities Carried Interest Allocation Plan (incorporated by reference to Exhibit 10.31 to the Registrant's Annual Report on Form 10-K (File No. 001-36638) filed on April 1, 2019).

10.32    Letter Agreement, dated as of November 14, 2018, regarding the Credit Agreement, dated as of August 19, 2014, among Medley LLC, the lenders party thereto and City National Bank (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K (File No. 001-36638) filed on November 20, 2018).

10.33    Waiver, dated as of November 14, 2018, to the Credit Agreement, dated as of August 19, 2014, among Medley LLC, the lenders party thereto and City National Bank (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K (File No. 001-36638) filed on November 20, 2018).

| 10.34 | Supplement No. 4, dated as of November 14, 2018, to Guarantee and Collateral Agreement, dated as of August 19, 2014, among Medley LLC, the subsidiary guarantors party thereto and City National Bank (incorporated by reference to Exhibit 10.3 to the Registrant's Current Report on Form 8-K (File No. 001-36638) filed on November 20, 2018). |
|---|---|
| 10.35 | Waiver Letter, dated as of December 18, 2018, regarding the Credit Agreement, dated as of August 19, 2014, among Medley LLC, the lenders party thereto and City National Bank (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K (File No. 001-36638) filed on December 24, 2018). |
| 10.36† | Form of Class A Medley LLC Unit Award Agreement, as amended (incorporated by reference to Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q (File No. 001-36638) filed on May 15, 2018). |
| 10.37† | Form of Class A Medley LLC Unit Retention Award Agreement (incorporated by reference to Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q (File No. 001-36638) filed on May 15, 2018). |
| 10.38 | Amendment Number Four to Credit Agreement and Waiver, dated as of March 28, 2019, regarding the Credit Agreement, dated as of August 19, 2014, among Medley LLC, the lenders party thereto and City National Bank (incorporated by reference to Exhibit 10.38 to the Registrant's Annual Report on Form 10-K (File No. 001-36638) filed on April 1, 2019). |
| 10.39 | Settlement Term Sheet dated as of April 15, 2019 regarding the consolidated action styled In re Medley Capital Corporation Stockholder Litigation, C.A. No. 2019-0100-KSJM (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K (File No. 001-36638), filed on April 15, 2019). |
| 21.1* | Subsidiaries of Medley Management Inc. |
| 31.1* | Certification by Co-Chief Executive Officer under Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2* | Certification by Co-Chief Executive Officer under Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.3* | Certification by Chief Financial Officer under Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1** | Certification of Co-Chief Executive Officer Pursuant to 18 U.S.C. Section 1350 as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32.2** | Certification of Co-Chief Executive Officer Pursuant to 18 U.S.C. Section 1350 as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32.3** | Certification of Chief Financial Officer Pursuant to 18 U.S.C. Section 1350 as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 101.INS* | XBRL Instance Document |
| 101.SCH* | * |
| 101.CAL* | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF* | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB* | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE* | XBRL Taxonomy Extension Presentation Linkbase Document |

\* Filed herewith
\*\* Furnished herewith

The agreements and other documents filed as exhibits to this report are not intended to provide factual information or other disclosure other than with respect to the terms of the agreements or other documents themselves, and you should not rely on them for that purpose. In particular, any representations and warranties made by us in these agreements or other documents were made solely within the specific context of the relevant agreement or document and may not describe the actual state of affairs as of the date they were made or at any other time.

**Item 16.    Form 10-K Summary**

None.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

|  |  |
|---|---|
|  | **Medley LLC** |
|  | (Registrant) |

| Date: March 30, 2020 | By: | /s/ Richard T. Allorto, Jr. |
|---|---|---|
|  |  | Richard T. Allorto Jr. |
|  |  | Chief Financial Officer of Medley Management Inc. |

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed by the following persons on behalf of the registrant and in the capabilities indicated on the 30th day of March, 2020.

| Signature | Title |
|---|---|
| /s/ Brook Taube<br>Brook Taube | Co-Chief Executive Officer, Chief Investment Officer and Co-Chairman (Co-Principal Executive Officer) |
| /s/ Seth Taube<br>Seth Taube | Co-Chief Executive Officer, Co-Chariman (Co-Principal Executive Officer) |
| /s/ Richard T. Allorto, Jr.<br>Richard T. Allorto, Jr. | Chief Financial Officer (Principal Financial Officer and Principal Accounting Officer) |
| /s/ Jeffrey Tonkel<br>Jeffrey Tonkel | Director |
| /s/ James G. Eaton<br>James G. Eaton | Director |
| /s/ Jeffrey T. Leeds<br>Jeffrey T. Leeds | Director |
| /s/ Guy Rounsaville, Jr.<br>Guy Rounsaville, Jr. | Director |

**Exhibit 21.1**

**List of Subsidiaries**

The following is a list of subsidiaries of the Company as of December 31, 2019:

| Name of Subsidiary | Jurisdiction |
|---|---|
| MCC Advisors LLC | Delaware |
| MCOF GP LLC | Delaware |
| MCOF Management LLC | Delaware |
| Medley (Aspect) GP LLC | Delaware |
| Medley (Aspect B) GP LLC | Delaware |
| Medley (Aspect) Management LLC | Delaware |
| Medley Avantor Investors LLC | Delaware |
| Medley Capital LLC | Delaware |
| Medley Caddo Investors LLC | Delaware |
| Medley Cloverleaf Investors LLC | Delaware |
| Medley GP Holdings LLC | Delaware |
| Medley GP LLC | Delaware |
| Medley Real D Investors LLC | Delaware |
| Medley Seed Funding I LLC | Delaware |
| Medley Seed Funding II LLC | Delaware |
| Medley Seed Funding III LLC | Delaware |
| Medley SMA Advisors LLC | Delaware |
| MOF II GP LLC | Delaware |
| MOF II Management LLC | Delaware |
| MOF III GP LLC | Delaware |
| MOF III Management LLC | Delaware |
| MOF III Offshore GP LLC | Delaware |
| SIC Advisors LLC | Delaware |
| STRF Advisors LLC | Delaware |

**CERTIFICATION OF CO-CHIEF EXECUTIVE OFFICER**

I, Brook Taube, certify that:

1. I have reviewed this Annual Report on Form 10-K for the year ended December 31, 2019 of Medley LLC;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

By:   /s/ Brook Taube
_____
**Brook Taube**
**Co-Chief Executive Officer and Co-Chairman**
**(Co-Principal Executive Officer)**
March 30, 2020

### CERTIFICATION OF CO-CHIEF EXECUTIVE OFFICER

I, Seth Taube, certify that:

1. I have reviewed this Annual Report on Form 10-K for the year ended December 31, 2019 of Medley LLC;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

By:   /s/ Seth Taube
_____

**Seth Taube**
**Co-Chief Executive Officer and Co-Chairman**
**(Co-Principal Executive Officer)**
March 30, 2020

### CERTIFICATION OF CHIEF FINANCIAL OFFICER

I, Richard T. Allorto, Jr., certify that:

1.  I have reviewed this Annual Report on Form 10-K for the year ended December 31, 2019 of Medley LLC;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

By:  /s/ Richard T. Allorto, Jr.
    **Richard T. Allorto, Jr.**
    **Chief Financial Officer**
    **(Principal Financial Officer)**
    March 30, 2020

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY**
**ACT OF 2002**

In connection with the Annual Report on Form 10-K of Medley LLC (the "Company") for the year ended December 31, 2019 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Brook Taube, Co-Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.


By:   /s/ Brook Taube
      _____
      **Brook Taube**
      **Co-Chief Executive Officer and Co-Chairman**
      **(Co-Principal Executive Officer)**


March 30, 2020

*A signed original of this certification required by Section 906, or other document authenticating, acknowledging, or otherwise adopting the signature that appears in typed form within the electronic version of this written statement required by Section 906, has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request. The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not being filed as part of the Report or as a separate disclosure document.*

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY**
**ACT OF 2002**

In connection with the Annual Report on Form 10-K of Medley LLC (the "Company") for the year ended December 31, 2019 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Seth Taube, Co-Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1.  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.


By:  /s/ Seth Taube
―――――――――――――――――――――――
     **Seth Taube**
     **Co-Chief Executive Officer and Co-Chairman**
     **(Co-Principal Executive Officer)**


March 30, 2020

*A signed original of this certification required by Section 906, or other document authenticating, acknowledging, or otherwise adopting the signature that appears in typed form within the electronic version of this written statement required by Section 906, has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request. The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not being filed as part of the Report or as a separate disclosure document.*

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY**
**ACT OF 2002**

In connection with the Annual Report on Form 10-K of Medley LLC (the "Company") for the quarter ended December 31, 2019 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Richard T. Allorto, Jr., Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

By:    /s/ Richard T. Allorto, Jr.
      **Richard T. Allorto, Jr.**
      **Chief Financial Officer**
      **(Principal Financial Officer)**

March 30, 2020

*A signed original of this certification required by Section 906, or other document authenticating, acknowledging, or otherwise adopting the signature that appears in typed form within the electronic version of this written statement required by Section 906, has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request. The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not being filed as part of the Report or as a separate disclosure document.*